IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| | : | |
| NEAL A. CUPERSMITH, *ET AL.* | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | NO. 3:14-cv-01303-TJM-DEP |
| v. | : | |
| | : | |
| PIAKER & LYONS, P.C., *ET AL.* | : | *Jury Trial Demanded* |
| | : | |
| Defendants. | : | |
| | : | |

_____

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KANG HAGGERTY & FETBROYT LLC

Edward T. Kang
Jacklyn Fetbroyt (*pro hac vice*)
Gregory H. Mathews (*pro hac vice*)
David P. Dean (*pro hac vice*)
123 S. Broad Street, Suite 1670
Philadelphia, PA 19109
(215) 525-5850
(215) 525-5860 (fax)
*Counsel for Plaintiffs*

Dated: June 24, 2016

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINATRY STATEMENT ...................................................................................1

II.   ARGUMENT ..............................................................................................................1

  A.   Legal Standard ........................................................................................................1

  B.   The Statute of Limitations Does Not Bar Plaintiffs' Claims ................................2

        1.   New York Law Provides the Applicable Statute of Limitations ...........................2

        2.   Plaintiffs' Claims Are Timely under New York Law ...............................4

  C.   Genuine Issues of Fact Exist Concerning Plaintiff's Aiding and Abetting Fraud Claim ..12

        1.   The Evidence Establishes the Existence of an Underlying Fraud ........................12

        2.   Plaintiffs Have Established that Defendants Had Actual Knowledge of the
             McGinn Smith Fraud. ........................................................................................16

        3.   Plaintiffs Have Established that Defendants Provided Substantial Assistance to
             McGinn Smith's Fraud ........................................................................................20

III.  CONCLUSION....................................................................................................22

## **TABLE OF AUTHORITIES**

## **CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................1, 2, 12

*Arizona v. California*,
460 U.S. 605 (1983)...................................................................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................10

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)...................................................................................................10

*Cantor Fitzgerald Inc. v. Lutnick*,
313 F.3d 704 (2d Cir. 2002).........................................................................................2

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................................1

*City of Pontiac Gen. Employees' Retirement Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011).........................................................................................10

*Cuccolo v. Lipsky, Goodkin & Co.*,
826 F.Supp. 763 (S.D.N.Y. 1993). .............................................................................3

*Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001)..........................................................................20

*Dickerson v. Napolitano*,
604 F.3d 732 (2d Cir.2010)..........................................................................................2

*Doe v. New York City Department of Social Services*,
709 F.2d 782 (2d Cir. 1983).........................................................................................8

*Dutton v. Glass*,
2005 WL 146503 (S.D.N.Y. 2005)...............................................................................2

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
94 F.Supp.2d 491 (S.D.N.Y. 2000) .............................................................................12, 16

*Gleason v. Borough of Moosic*,
15 A.3d 479 (Pa. 2011)................................................................................................6

*Global Fin. Corp. v. Triarc Corp.*,
93 N.Y.2d 525 (N.Y. 1999). ............................................................................................2

*Great Am. Ins. Co. v. Poynter*,
2013 WL 1181445 (W.D. Ky. 2013) ..............................................................................21

*Hearndon v. Graham*,
767 So.2d 1179 (Fla. 2000)..............................................................................................6

*In re Openwave Sys. Sec. Litig.*,
528 F.Supp.2d 236 (S.D.N.Y. 2007).................................................................................6

*JP Morgan Chase Bank v. Winnick*,
406 F.Supp.2d 247 (S.D.N.Y. 2005)...............................................................................17

*King County, Wash. v. IKB Deutsche Industriebank AG*,
916 F. Supp. 2d 442 (S.D.N.Y. 2013)............................................................................17

*Kottler v. Deutsche Bank AG*,
607 F.Supp.2d 447 (S.D.N.Y. 2009)..........................................................................12, 16

*Marcus v. Sprayregen*,
1979 WL 1241 (S.D.N.Y. 1979) .....................................................................................16

*Maxzzaro De Abreu v. Bank of Am. Corp.*,
812 F.Supp.2d 316 (S.D.N.Y. 2011)...............................................................................16

*McDaniel v. Bear Stearns & Co., Inc.*,
196 F. Supp. 2d 343 (S.D.N.Y. 2002).............................................................................20

*Neufeld v. Neufeld*,
910 F.Supp. 977 (S.D.N.Y. 1996). ...................................................................................4

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
652 F.Supp.2d 495 (S.D.N.Y.2009)................................................................................21

*Saint-Jean v. Emigrant Mortg. Co.*,
50 F.Supp.3d 300 (E.D.N.Y. 2014) ................................................................................10

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
181 F.3d 410 (3d Cir. 1999)..............................................................................................6

*S.E.C. v. Kelly*,
663 F.Supp.2d 276 (2009) ................................................................................................5

*S.E.C. v. McGinn, Smith & Co., Inc.*,
2015 WL 667848 (N.D.N.Y. 2015) ...........................................................16

*S.E.C. v. Patterson*,
2006 WL 770626 (N.D. Okla. 2006) ..........................................................16

*Seeley v. FKI Logistex*,
2009 WL 2871170 (N.D.N.Y. 2009) ..........................................................12

*Stafford v. Int'l Harvester Co.*,
668 F.2d 142 (2d Cir. 1981) .......................................................................3

*United States v. Birney*,
686 F.2d 102 (2d Cir. 1982) .......................................................................7

*United States v. Quintieri*,
306 F.3d 1217 (2d Cir. 2002) ......................................................................7

*United States v. Uccio*,
940 F.2d 753 (2d Cir. 1991) .......................................................................7

*Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Loc. No. 395 Pension Trust Fund*,
38 P.3d 12 (Ariz. 2002) ............................................................................17

## STATUTES

NY CPLR § 202 ...........................................................................................2

NY CPLR § 213 ...........................................................................................4

NY CPLR § 213(8). ................................................................................4, 5, 6

## OTHER AUTHORITIES

FRCP 11 ....................................................................................................10

FRCP 56(a) ................................................................................................1

## I.     PRELIMINARY STATEMENT

Plaintiffs in this action are victims of a Ponzi scheme orchestrated by non-parties McGinn, Smith & Co., Inc., its principals, and a number of related McGinn Smith entities, including a number of investment vehicles in which Plaintiffs invested: First Independent Income Notes LLC ("FIIN"), First Equity Income Notes LLC ("FEIN"), First Albany Income Notes LLC ("FAIN"), and Third Albany Income Notes LLC ("TAIN") (collectively, the "Four Funds"); and a number of smaller-scale trusts (the "Trusts").  The Defendants here – Piaker & Lyons, P.C., and two of its partners, Ronald L. Simons and Timothy N. Paventi – were McGinn Smith's accountants, auditors, and tax preparers during the period McGinn Smith perpetrated its fraud.  While Defendants have attempted to shift the focus of this matter away from their own actions, by blaming the Plaintiffs for their losses, and suggesting they are simply hunting "deep pockets," the evidence in this matter provides ample reason for a jury to find that Defendants aided and abetted McGinn Smith's fraud, and, as set forth below, Defendants' motion for summary judgment must be denied.

## II.     ARGUMENT

### A.  Legal Standard

Summary judgment should only be granted "if the movant shows there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." FRCP 56(a).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the

moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 255.  The court also will "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir.2010).

### B.  The Statute of Limitations Does Not Bar Plaintiffs' Claims.

#### 1.    New York Law Provides the Applicable Statute of Limitations

Defendants contend initially that, because none of the named Plaintiffs in this matter are New York residents, the question of statute of limitations must be analyzed both under New York law and under the law of each Plaintiff's state of residence.  Under New York's "borrowing statute," any case "based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued."  NY CPLR § 202; *see also Global Fin. Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 528 (N.Y. 1999).  In other words, the borrowing statute would require the Court to consider the statute of limitations of both New York and the state in which Plaintiffs' claims accrued.  Defendants argue that a claim sounding in fraud, like Plaintiffs' aiding and abetting fraud claim here, generally is considered to accrue where the Plaintiffs' suffered their injuries, "which is generally the place where plaintiffs resided and sustained the economic impact of their loss." *Dutton v. Glass*, 2005 WL 146503, at *2 (S.D.N.Y. 2005) (citing *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002)).  Defendants further argue that because Plaintiffs reside in states other than New York—specifically, in Pennsylvania, New Jersey, and Florida—the statutes of limitations of those states should apply to the extent they impose shorter limitations periods than New York does.

The New York "borrowing statute," however, does not apply in this matter.  Where, as

here, nothing in the record suggests that Plaintiffs could have brought the action in any jurisdiction other than New York, courts have refused to apply NY CPLR § 202 and have instead looked only to New York's statute of limitations to determine the timeliness of a plaintiff's claims.  In *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F.Supp. 763 (S.D.N.Y. 1993), for example, the court held that only New York's limitations period applied to the plaintiffs' accounting malpractice claim, where the accounting firm had not presented any evidence that it would have been subject to suit in New Jersey, where the plaintiffs resided.  *Cuccolo*, 826 F.Supp. at 768. As the Second Circuit has explained, "[i]nsofar as the purpose of the borrowing statute is ... to prevent a plaintiff from forum shopping, it makes no sense at all to apply [a statute of] limitation of a state where the defendant *could not have been sued*." *Stafford v. Int'l Harvester Co.*, 668 F.2d 142, 152 (2d Cir. 1981) (emphasis added).

Defendants here have pointed to no evidence in the record suggesting that they would have been amenable to suit in Pennsylvania, New Jersey, or Florida.  Piaker & Lyons is incorporated in New York, and is based entirely within the state, with offices in Binghamton, Norwich, and Syracuse.  (Kang Declaration ("Kang Decl.") Ex. 12, at 8:3-7; Kang Decl. Ex. 29). Further, Defendants have gone to great lengths in their motion for summary judgment to stress that Defendants had no contact with any of the Plaintiffs regarding their investments in the McGinn Smith Funds and Trusts, had no separate relationship with any of the Plaintiffs, and that the Plaintiffs did not receive or rely on any work product of Piaker & Lyons in making their investment decisions. (Statement of Material Facts ("SMF") ¶¶ 51, 56, 61, 69-70, 77-78, 83, 88, 95-96, 103-104, 109-110, 114, 120, 127, 134, 139, 144, 152, 161, 162-163).

Furthermore, when the instant action was initially filed in the United States District Court for the District of New Jersey, the court, *sua sponte*, issued an order to show cause why the case

should not be dismissed or transferred for improper venue, casting doubts on whether venue or jurisdiction were proper in that district. *Cupersmith v. Piaker & Lyons, P.C. et al*, No. 14-cv-05681 (D.N.J.) (Doc. No. 5). The issue was never litigated, as the parties agreed to voluntarily transfer the action to this Court. As discussed above, however, Defendants have provided no evidence to suggest that they would have been subject to suit in New Jersey, Pennsylvania, or Florida. Accordingly, the Court should apply the statute of limitations for fraud found in NY CPLR § 213.

## 2.    Plaintiffs' Claims Are Timely under New York Law

New York law provides that an action based upon fraud must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." NY CPLR § 213(8). Defendants contend that Plaintiffs' claims related to any investments made before September 11, 2008 (six years before the filing of the initial complaint on September 11, 2014) must be dismissed as time barred. Defendants' arguments fail, however, for several reasons.

First, all of Plaintiffs' claims, even those related to Plaintiffs' investments in the Four Funds and Trusts made as far back as 2004 (SMF ¶ 29), are timely, as the underlying fraud perpetrated by McGinn Smith constituted a continuing violation for statute of limitations purposes. Under the "continuing violation" or "continuing fraud" doctrine, where violations occurring outside the limitation period are so closely related to other, non-time barred violations, as to be viewed as part of a continuing wrong, a plaintiff may recover for all violations, including those which on their face fall outside of the limitations period. *See, e.g., Neufeld v. Neufeld*, 910 F.Supp. 977, 982 (S.D.N.Y. 1996) ("Despite the general principle that a cause of action accrues

4

when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuous wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act.").

Courts in the Second Circuit have used this doctrine in the context of securities-related fraud cases.  For example, in *S.E.C. v. Kelly*, 663 F.Supp.2d 276 (2009), the District Court for the Southern District of New York applied the continuing violation doctrine to the S.E.C.'s claims for civil monetary penalties, as the S.E.C. properly alleged a "continuous, integrated scheme . . . operated by the same group . . . over a period of time to achieve the same purpose," just as Plaintiffs have done here.  As set forth in detail in the Expert Report of Stephen J. Scherf (the "Scherf Report"), Plaintiffs were victimized not by a single wrongful act, but by the conduct and continuation of an ongoing scheme perpetrated by McGinn and Smith (and, as discussed below, aided by Piaker and Lyons). (Kang Decl. Ex. 14, at 11, 22-26).  It is undisputed that McGinn Smith continued to market and sell investments in the Four Funds and Trusts to the Plaintiffs in this action throughout 2008, and as late as September 2009 (SMF ¶ 30).  The "continuous, integrated scheme," then, continued well past the cutoff date at which Defendants contend the Plaintiffs' claims should be barred, and, as such, they are timely.

Second, even if Defendants are correct that Plaintiffs' causes of action accrue as of the date of their investments, Plaintiffs made significant investments in the McGinn Smith Funds and Trusts after September 11, 2008, and well within six years of the commencement of this suit. As detailed in Exhibit D to the Swanekamp Declaration accompanying Defendants' motion, after September 11, 2008, Plaintiffs made significant investments in the various McGinn Smith vehicles, totaling more than $1.5 million. (Swanekamp Decl. Ex. D; SMF ¶ 30).  Even if Defendants are correct that Plaintiffs' claims related to investments made before September 11,

5

2008 should be disregarded (and, Plaintiffs maintain they should not), a substantial portion of Plaintiffs claims are still timely under § 213(8).

Finally, Plaintiffs' claims are timely under New York's "discovery rule," pursuant to which, even if a claim falls outside of the six year limitations period for fraud, it is timely where it is filed, as it was here, within two years "from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." NY CPLR § 213(8).  Plaintiffs were not on notice of their claims *against Defendants* until SEC staff accountant Kerri Palen testified in early 2014 in *In re Anthony*, Securities Exchange Commission File No. 3-15514, about Defendants' active participation in McGinn Smith's scheme.[1]  Palen drew these conclusions based upon her detailed review of McGinn Smith's bank records and internal files, as well as Defendants' working papers, which were obtained pursuant to an SEC subpoena. (Kang Decl. Ex. 30, at 434-468).  As Defendants repeatedly pointed out, none of Plaintiffs had any contact with Defendants, let alone seen any of their working papers, and, accordingly, Plaintiff had no reason to believe Defendants participated in the McGinn Smith Ponzi scheme, until Palen testified in the *In re Anthony* action.  (SMF ¶¶ 51, 56, 61, 69-70, 77-78, 83, 88, 95-96, 103-104, 109-110, 114, 120, 127, 134, 139, 144, 152, 161, 162-163).

Contradicting their assertion that they did nothing wrong and, obviously, no one should have suspected them of any wrongdoing, Defendants claim that all Plaintiffs were on inquiry

---

[1] Even if Defendants are correct that New York's "borrowing statute" requires that the limitations periods for fraud under Pennsylvania, New Jersey, and Florida law should apply (which, as shown above, they should not), the applicable statute of limitations in each of those jurisdictions contains a "discovery rule" materially similar to New York's. *See Gleason v. Borough of Moosic*, 15 A.3d 479, 485 (Pa. 2011) ("The discovery rule applies to toll the statute of limitations in any case in which a party is reasonably unaware of his or her injury at the time his or her cause of action accrued."); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) (New Jersey discovery rule provides that fraud claim accrues when plaintiff "discovered or should have discovered the elements of its cause of action."); *Hearndon v. Graham*, 767 So.2d 1179, 1184 (Fla. 2000) (a cause of action does not accrue "until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action.").

6

notice of their cause of action against Piaker & Lyons by April 2010. (Doc. No. 129, at 7).[2] Defendants further contend that this Court's ruling related to Defendants' motion to dismiss (Doc. No. 71), in which the Court dismissed Plaintiffs' claims for aiding and abetting breach of fiduciary duty and gross negligence based on the applicable statutes of limitation and found that the doctrine of equitable tolling did not apply to Plaintiffs' claims, is "law of the case" that should not be disturbed.  While a court's ruling on an issue should "generally be adhered to in subsequent stages in the same case," *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002), this is far from absolute.  As the Second Circuit has repeatedly cautioned, "[t]he doctrine of the law of the case is not an inviolate rule." *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (quoting *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982)).  Moreover, while the "law of the case" doctrine can inform a court's later decision, it "does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983).

The court's decision as to whether to apply the "law of the case" doctrine is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Uccio*, 940 F.2d at 758 (citing *Birney*, 686 F.2d at 107). Further, "prejudice" in this context "'refers to a lack of sufficiency of notice' or a lack of sufficient 'opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling].'" *Id.*  Defendants can show no such prejudice here.  Indeed, notwithstanding the Court's ruling on Plaintiff's equitable tolling argument in response to Defendants' motion to dismiss, Defendants devoted considerable time and resources attempting to establish that

---

[2] According to Defendants' logic, then, anyone having any dealings with McGinn Smith should have been a "suspect," whom Plaintiffs should have investigated.  This, of course, is not the standard that would trigger a plaintiff's duty to investigate a potential cause of action. *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007) (duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability" that she has a cause of action).

Plaintiffs were on notice of their potential claims against Defendants as early as 2009.  (*See, e.g.,* SMF and Response to SMF, at ¶¶ 11-17, 48-50, 55, 67-68, 76, 87, 93-94, 100-102, 108, 113, 118, 131-132, 137, 143, 151, 160).  For example, Defendants' counsel engaged in the following line of questioning with Plaintiff Pierre Conti:

> Q.      Given these three letters in the short period of time and what they mean, you know, what were you thinking?
>
> A.      That I was going to lose all my money.
>
> Q.      Did you think at that point in time that there was something going on with McGinn Smith other than they're just not doing very well?
>
> A.      Probably.
>
> Q.      Did you consider at that point in time that McGinn Smith may be doing something with your money that they weren't authorized to do?
>
> A.      I don't know that I can say that. They just, obviously, were not – whatever they were doing, they were losing money and they were losing our money.
>
> Q.      Okay. The resignation of National Financial Services as custodian, did that suggest to you more than McGinn Smith just not doing well financially?
>
> A.      No. It just suggested that they were going belly up.

(Kang Decl. Ex. 1, at 174:7-175:3).  Defendants asked similar questions of nearly all of the Plaintiffs they deposed.  Under these circumstances, where Defendants have been afforded considerable opportunity to develop the record on this issue, they cannot claim to be prejudiced by the Court revisiting its earlier ruling.

Further, a court is free to reconsider its earlier ruling on an issue where "cogent or compelling" reasons exist, such as new evidence, or the need to correct a clear error. *Doe v. New York City Department of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983).  In this case, the Court should not be bound by its earlier ruling concerning the date on which Plaintiffs should

have been on inquiry notice of their claims.  First, Defendants' contentions that Plaintiffs were

put on notice of potential "red flags" with their McGinn Smith investments before 2010—

specifically, as a result of letters sent to investors in October 2008 and November 2009—are not

credible.  While several Plaintiffs testified that these letters caused them to have concerns about

the viability of their investments (*see, e.g.*, SMF and Response to SMF at ¶¶ 48, 59, 67, 75, 100,

108, 118, 126, 131, 150), nothing in those letters indicates that McGinn Smith was perpetrating a

fraud.  After all, these letters were written by the fraudsters who were actively concealing their

fraud.  For example, the restructuring letter sent to Four Funds investors in October 2008 makes

no mention of any fraudulent or illegal activity on the part of McGinn Smith, but rather blames

the Four Funds' poor performance on the general performance of the economy at the time, the

period now commonly referred to as the Great Recession. (*See, e.g.*, Kang Decl. Ex. 21, at

internal Ex. 4).  The October 2008 letter states that:

> The stock market's decline is just a symptom of the credit crisis, and while I am
> in total sympathy for all of us suffering market losses, the real issue is the total
> lack of liquidity in the credit markets.  This is the major issue that impacts your
> investment in the FUND.

*Id.*  The November 2009 letter sent by McGinn Smith to investors was likewise silent as to

McGinn Smith's malfeasance, again blaming the continued non-performance of the investments

on the larger economy. (*See, e.g., id.* at internal Ex. 6) ("The market has proved equally difficult

for portfolio lenders such as ourselves. We are frequently met with fragmented bank groups, who

are often in the senior position and in no mood to be accommodative to subordinate lenders such

as ourselves.").

Defendants' invocation of "red flags" in unpersuasive.  Plaintiff Richard Harnish, for

example, indicated, in response to a leading question from Defendants' counsel, that the 2008

letter from McGinn Smith "should have" raised red flags. (Kang Decl. Ex. 20, at 28:4-13). Yet

nothing in Defendants' counsel's questioning or Mr. Harnish's testimony suggests what those "red flags" would have been, nor is there anything to suggest that the letter should have made Mr. Harnish suspect that McGinn Smith was defrauding him, let alone that Defendants had some involvement in McGinn Smith's scheme. *Id.*[3]

While Plaintiffs were aware of the SEC's claims **against McGinn Smith** for a Ponzi scheme in 2010, it does not follow that Plaintiffs should have known of an aiding and abetting fraud claim against Defendants at that time. Even if Plaintiffs' knowledge of the SEC proceeding may have also been enough to cast suspicion on other aspects of McGinn Smith's operations, such as the work of their accountants, mere suspicion is not enough to constitute notice for the purposes of the discovery rule. Rather, "discovering" a fact for purposes of the discovery rule is viewed in terms of "what was required to adequately plead that fact and survive a motion to dismiss." *Saint-Jean v. Emigrant Mortg. Co.*, 50 F.Supp.3d 300, 314-15 (E.D.N.Y. 2014) (quoting *City of Pontiac Gen. Employees' Retirement Sys. v. MBIA, Inc.*, 637 F.3d 169, 174–75 (2d Cir. 2011)).

Between 2010, when Plaintiffs learned of the SEC action, and 2014, when Plaintiffs actually discovered the facts supporting their claims of Piaker & Lyons' involvement in the McGinn Smith Ponzi scheme, Plaintiffs—unlike the SEC—lacked subpoena power and had no ability to obtain Piaker & Lyons' working papers, which were essential in showing the extent of Defendants' involvement with the scheme, such that Plaintiffs could plead their claims against Defendants sufficiently to comply with *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as well as Rule 11 of the Federal Rules of Civil Procedure. In other words, between 2010 and 2014, Plaintiffs had no practical or legal means to

---

[3] Even if Mr. Harnish had any subjective belief about any potential "red flag," which he never testified to during his deposition, his subjective belief could not be attributed to other investors.

investigate and obtain sufficient evidence of liability against the Defendants to bring an action against Defendants that could survive a motion to dismiss and, therefore, the discovery rule should not have been triggered until 2014.

Defendants' argument about how Plaintiffs should have known about a potential claim against them is incredible.  This is evident in Defendants' inconsistent position Defendants have maintained throughout this litigation – that is, Plaintiffs, who were not and could not have been privy to any of McGinn Smith's banking records or Piaker & Lyons' working papers, should have been on notice of ***Defendants' conduct*** in aiding and abetting the McGinn Smith fraud, while at the same time maintaining that they themselves cannot possibly be charged with knowledge of the ***McGinn Smith fraud***, because the McGinn Smith Ponzi scheme was, apparently, undetectable, even to Piaker and Lyons (the auditors and accountants).  Defendants' argument – that the trained accounting professionals could not tell their long-term client was engaged in a Ponzi scheme for years while the investors, mostly senior citizens who lost their retirement savings – should have known about a claim that ***derives*** from the Ponzi scheme is insincere and has no supporting authority.

Defendants' invocation of items on the public docket – namely, the subpoena directed to Piaker & Lyons in the SEC action, and Ronald Simons' guilty plea to a misdemeanor for filing a false tax return – does not change this analysis.  Again, knowledge of the fact that the SEC had issued a subpoena to Piaker & Lyons, and even knowledge of the specific services provided by Piaker & Lyons to McGinn Smith and its related entities, does not provide Plaintiffs or any other litigants with sufficient information to make good faith allegations of fraud, or aiding and abetting fraud, against Defendants without access to Defendants' work papers, which were not publicly available.  As the Scherf Report makes clear, Defendants' liability is based on a review

11

of the auditor's and accountant's working papers, and not on the publicly available information concerning the Defendants.

Nor does Mr. Simons' guilty plea to filing a false tax return on behalf of one of McGinn Smith's principals provide Plaintiffs with adequate notice, as the publicly available information concerning that plea, on its own, was not sufficient to establish any liability on the part of Piaker & Lyons (Kang Decl. Ex. 12, at 200:21-201:9, and internal Ex. 6). Even if Defendants could demonstrate that Plaintiffs were aware of Mr. Simons' guilty plea, which they have not, that plea dealt only with the preparation of a personal tax return for David Smith, not for the investment entities. *Id.* Such information, without more, would not have enabled Plaintiffs to successfully plead the elements of their claim against Defendants. Even if a reasonable investor had attempted to conduct an inquiry into Defendants' actions related to the Four Funds and Trusts upon learning of Mr. Simons' plea, such an investor – without any privity with Piaker & Lyons and without government subpoena power – would not have been able to access any of the documents that enable Plaintiffs here to make out their claims.[4]

For the foregoing reasons, Plaintiffs' claims are timely and should not be dismissed on statute of limitations grounds.

### C. Genuine Issues of Fact Exist Concerning Plaintiffs' Aiding and Abetting Fraud Claim

Plaintiffs have a single claim against Defendants remaining in this action. Specifically, Defendants aided and abetted the Ponzi scheme perpetrated by McGinn Smith and its related entities. To establish a claim for aiding and abetting fraud, a plaintiff must show "(1) the

---

[4] While Plaintiffs' expert points to Simons' guilty plea as an example of Simons' disregard of applicable professional standards, that is just one element – by itself insufficient – that supports Mr. Scherf's opinion that Piaker & Lyons had knowledge of McGinn Smith's fraud.

existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 464 (S.D.N.Y. 2009) (quoting *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F.Supp.2d 491, 511 (S.D.N.Y. 2000)).  Contrary to Defendants' contentions in their motion for summary judgment, significant issues of material fact exist, and the record before the Court is more than sufficient for a reasonable jury to return a verdict for Plaintiffs.  *Seeley v. FKI Logistex*, 2009 WL 2871170, at *2 (N.D.N.Y. 2009) (citing *Anderson* 477 U.S. at 248-249).

### 1.   The Evidence Establishes the Existence of an Underlying Fraud

The record developed through discovery and through the report of Plaintiff's expert witness, Stephen J. Scherf, is more than sufficient for a jury to find that Plaintiffs have established the existence of the underlying fraud.  Contrary to Defendants' repeated attempts to confuse the issue by focusing on Plaintiffs' lack of knowledge of or reliance on any work or statements made by Piaker & Lyons, the underlying fraud connected to Plaintiffs' aiding and abetting fraud claim is not any "fraud" perpetrated by Defendants.  Rather, the underlying fraud is the Ponzi scheme orchestrated by McGinn Smith.[5]

McGinn Smith and its principals have been the subject of multiple findings and judgments in this district, related to the perpetration of a Ponzi scheme related to the Four Funds and Trusts, the investment offerings purchased by the Plaintiffs in this action. (SMF ¶¶ 1, 2).  Specifically, Chief Judge Sharpe granted summary judgment in favor of the SEC and against McGinn Smith, *et al.* relating to the McGinn Smith Ponzi scheme in the matter styled *Securities*

---

[5] Plaintiffs acknowledge and agree that the evidence do not support finding of fraud on the part of the Defendants. Accordingly, on November 16, 2015, Plaintiffs voluntarily dismissed their fraud claim against Defendants.  (Doc. No. 82).  Defendants' continuing efforts to mix the two different frauds – the one alleged against Defendants and later dismissed and the McGinn Smith Ponzi scheme – are unpersuasive.

*and Exchange Commission v. McGinn Smith & Co., Inc., et al.*, U.S. District Court for the

Northern District of New York, No. 1:10-cv-457-GLS-CFH (Doc. Nos. 807 and 816).  Similarly,

on or about February 1, 2013, after trial in the Northern District of New York (Hurd, J.), a jury

convicted McGinn Smith's principals, Timothy M. McGinn and David L. Smith of various

securities, mail, and wire fraud and tax charges.  *See United States of America v. McGinn and*

*Smith*, U.S. District Court for the Northern District of New York, No. 1:12-cr-00028-DNH.

(Doc. No. 135).

      McGinn Smith set forth the terms of the investments in the Four Funds and Trusts in

Private Placement Memorandums ("PPMs") and subscription agreements for each of the

investments.  (*See, e.g.,* Response to MSF, ¶ 47 and Kang Decl. Ex. 13, at internal Exs. 1 and 2).

The PPM for FIIN, for example, contained a number of representations that turned out to be

false.  *Id.*  For instance, the PPMs claimed, among other things, that the Fund was "[f]ormed to

identify and acquire various public and/or private investments, which may include, without

limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust

preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment

leases, securitized cash flow instruments, and other investments that may add value to our

portfolio." (Kang Decl. Ex. 13, at internal Ex. 1).  Further, the PPM's represented that "[The

Fund] may acquire investments from our managing member or an affiliate of our managing

partner that has purchased the Investments.  If the Investment is purchased from our managing

partner or any affiliate, we will not pay above the price paid by our managing partner or such

affiliate for the Investment, other than to reimburse our managing partner or such affiliate for its

costs and any discounts that it may have received by virtue of a special arrangement or

relationship.  In other words, if we purchase an Investment from our managing member or any of

its affiliates, we will pay the same price for the Investment that we would have paid if we had purchased the Investment directly.  We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., is acting as underwriter or placement agent and for which McGinn, Smith & Co. will receive a commissions." (*Id.*).  Additionally, the PPMs and subscription agreements omitted any mention of the fact that the Funds would make loans to or transfers or investments in affiliated entities. (*Id.*; Kang Decl. Ex. 14, at 3).

As detailed in the Scherf Report, based upon Mr. Scherf's review of the McGinn Smith records and Defendants' work papers, these representations concerning the investments were false. (Kang Decl. Ex. 14, at 3, 16-20).  More fundamentally, the PPMs and subscription agreements represented that Plaintiffs' investments would be for a prescribed time period, that Plaintiffs would be able to redeem their investments at the maturity date, that Plaintiffs would be paid quarterly interest at a set rate, and that the various Funds and Trusts each offered several different interest rates, corresponding to various "senior" and "junior" tranches of notes within each Fund or Trust.  For example, the FIIN offering contained three tranches of notes, which offered varying interest rates corresponding to the priority in which investors would be repaid in the event of liquidation.  (*See, e.g.*, Kang Decl. Ex. 13, at internal Ex. 1).

Even these fundamental representations made by McGinn Smith in connection with the investment offerings were false.  As detailed in the Scherf Report, the promised payments of quarterly interest, to the extent they were actually paid, were frequently paid not from the investment returns of the individual Funds and Trusts, but through improper loans and transfers between the various Funds and Trusts, as well as from funds from new investors.  (Kang Decl. Ex. 14, at 25-26).  Further, after the fall of 2008, all interest payments from the Funds ceased, and Plaintiffs were no longer able to redeem their investments, contrary to the representations

15

made at the time of their investments. (Kang Decl. Ex. 13, at internal Ex. 5) (SMF and Response to SMF ¶¶ 41, 48, 59, 67, 75, 93, 100, 108, 118, 126, 131, 160).[6] Further, the promised priority allocated to "senior" notes offered through the various Funds and Trusts was also a fiction.[7]

Defendants attempt to obscure the McGinn Smith fraud by focusing on testimony by a number of Plaintiffs that they either did not read the PPMs related to their investments, read those items in a cursory manner, or relied on the advice of Bill Lex, the broker for McGinn Smith who sold the investments to the vast majority of the Plaintiffs here. (Defendants' Brief, at 23).  Whether they read every word of the PPMs and subscription agreements related to their investments is not the key point.  Rather, the Plaintiffs here relied on the representations of McGinn Smith—whether through the printed offering materials or their conversations with Mr. Lex—that their investments in the Four Funds and Trusts were legitimate investments that would pay them a determined rate of quarterly interest and would be redeemable at the investment's maturity. (*See, e.g.,* SMF and SMF Response, ¶¶ 62, 85, 135).[8]

---

[6] Notably, the correspondence that Plaintiffs received in 2008 and 2009 from McGinn Smith informing Plaintiffs of the "restructuring" of their investments, contained further misrepresentations, including the cause of the Funds' financial troubles and McGinn Smith's claims that it would forego fees as part of the restructuring plan.

[7] The McGinn Smith Receiver has refused to consider the separate tranches of notes in connection with the plan to liquidate the Funds and Trusts and make payments to eligible investors. *See SEC v. McGinn Smith* (Doc. No. 847), available at http://mcginnsmithreceiver.com/.

[8] Again, the underlying fraud in this case is the fraudulent conduct of McGinn Smith, not the Defendants.  As such, the Court should consider that the doctrine of collateral estoppel prevents the re-litigation of issues already determined in the SEC action against McGinn Smith, and the criminal trial of the McGinn Smith principals.  *See, e.g., Marcus v. Sprayregen,* 1979 WL 1241 (S.D.N.Y. 1979) (in securities fraud action with a prior criminal conviction, issues relevant to fraud alleged by plaintiffs that were fully litigated in prior actions maintain their preclusive effect); *S.E.C. v. McGinn, Smith & Co., Inc.,* 2015 WL 667848, at *10 (N.D.N.Y. Feb. 17, 2015) (concluding that "[b]ecause all of the elements of collateral estoppel have been met, the SEC is entitled to summary judgment on its first four causes of action, which, as discussed above, all require that the SEC establish essentially the same elements that were already proven in the MS Criminal Case by virtue of McGinn and Smith's convictions of wire fraud, mail fraud, and securities fraud."); *S.E.C. v. Patterson,* 2006 WL 770626, *3 (N.D. Okla. Mar. 23, 2006) (concluding that "[a] review of the SEC's civil complaint against Patterson reveals that all five claims therein flow from the same course of illegal conduct for which Patterson has already been adjudged guilty. The question of defendant's liability for those acts has already been fully resolved on the merits. Because the sole issues of importance in this pending civil matter have already been conclusively determined by a jury, collateral estoppel bars the relitigation of those issues by Patterson, and partial summary judgment is appropriate.").

Separate and apart from the issue of whether the Plaintiffs relied upon the misrepresentations contained in the PPMs, is the fact that McGinn Smith omitted to disclose numerous material facts in the PPMs, such as that the underlying loans were in default or that McGinn Smith was engaging in a pattern and practice of moving investments received by one Trust or Fund to another in order to make payments of principal and interest due to investors in those other entities.  In the case of such material omissions, reliance is presumed as a matter of law.  See, e.g., *Dodona I, LLC v. Goldman, Sachs & Co*., 847 F. Supp. 2d 624, 638-39 (S.D.N.Y. 2012) ("'[I]n the case of omissions, reliance on the omitted information may be presumed where such information is material.'") (quoting *Black v. Finatra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir. 2005). Thus, the reliance element to establishing the underlying fraud has easily been satisfied.

For these reasons, Plaintiffs have adequately demonstrated the existence of the underlying fraud.

## 2.    Plaintiffs Have Established that Defendants Had Actual Knowledge of the McGinn Smith Fraud

In addition to showing the existence of an underlying fraud, a plaintiff must show "knowledge of the fraud on the part of the aider and abettor."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009) (quoting *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 511 (S.D.N.Y. 2000)).  The evidence adduced in this case, including the working papers provided in discovery by Defendants, and the analysis in the Scherf Report, is more than sufficient for a reasonable jury to conclude that Defendants had knowledge of the McGinn Smith Ponzi scheme.

Defendants repeatedly contend in their motion that mere constructive knowledge – "the possession of information that would cause a person exercising reasonable care and diligence to

become aware of the fraud" – is insufficient to show knowledge. *See Maxzzaro De Abreu v. Bank of Am. Corp.*, 812 F.Supp.2d 316, 322 (S.D.N.Y. 2011).  In demonstrating actual knowledge, however, a plaintiff may establish knowledge through circumstantial evidence. *JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 253 (S.D.N.Y. 2005); *see also*; *King County, Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 453-54 (S.D.N.Y. 2013) (same); *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Loc. No. 395 Pension Trust Fund*, 38 P.3d 12, 27-28 (Ariz. 2002) ("if [a] ... method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.") (citation omitted).  This is understandable as most criminals, including both McGinn and Smith, who were convicted and found liable for fraud both criminally ***and*** civilly, maintained their "innocence" throughout their criminal and civil trials.  *See SEC v. McGinn Smith, et al.*, United States Court of Appeals for the Second Circuit, No. 15-1314; *United States v. McGinn & Smith*, *et al*, United States Court of Appeals for the Second Circuit, NO. 13-3164.

In *JP Morgan*, for instance, a syndicate of commercial banks alleged that individual officers of a telecommunications company to whom the banks had issued a series of loans, had aided and abetted the company's fraud on the banks.  The court found that, while there was no definitive admission or direct evidence establishing the officers' knowledge of the fraud, the officers' access to communications containing evidence of the fraud was sufficient to infer actual knowledge.  *J.P. Morgan*, 406 F.Supp.2d at 254-56.

As detailed in the Scherf Report, Defendants' working papers related to their preparation of audits for McGinn Smith, and their preparation of tax returns for the Four Funds and Trusts, contain ample evidence, including notations in Simons' and Paventi's handwriting, that support an inference of actual knowledge of the McGinn Smith fraud.

18

First, as CPAs, Defendants are well aware of the nature of a Ponzi scheme, such as the one orchestrated by McGinn Smith, and its characteristics.  Mr. Simons, for example, after initially claiming during the earlier part of his deposition that he was unable to define a Ponzi scheme, eventually admitted, after repeated questions, that his understanding of a Ponzi scheme is, in part, "the use of monies that may be raised and not used for their intended purpose but to be used to facilitate payments to other earlier investors." (Kang Decl. Ex. 12, at 45:1-6).  Mr. Paventi similarly expressed his understanding of a Ponzi scheme. (Kang Decl. Ex. 28, at 41-44).

Defendants maintained and reviewed, as part of the working papers from their auditing and tax engagements, a number of documents that demonstrated McGinn Smith's Ponzi scheme. The PPMs from the Four Funds and Trusts, for example, were a part of Defendants' working papers.  As Mr. Scherf details in his report, the trial balances of the Four Funds, which were provided to Piaker & Lyons by McGinn Smith, and used for the preparation of the tax returns for the Four Funds, demonstrate that the investments of Four Funds consisted largely of investments in affiliated companies, in clear contravention of the PPMs.  (Kang Decl. Ex. 14, at 19-20 and Table 4).  Defendants were aware of the various information contained in these documents, as they testified that they were professionally obligated to maintain professional skepticism and conduct necessary inquiries as part of auditing and tax preparation. (Kang Decl. Ex. 28, at 25-28).

As Mr. Scherf further details in his report, the professional standards governing the audit and tax work performed by Defendants, which Defendants insist they followed, "basic knowledge of the components of assets, specifically related party transactions, would have made the Defendants familiar with the composition of these investments," and, thus, of the improper nature of those investments. (Kang Decl. Ex. 14, at 20).

In addition, the trial balances that Defendants maintained and reviewed as part of their tax preparation demonstrate that the Four Funds were profitable in just four of the fifteen quarterly periods reflected in the work papers between 2004 and 2007. (*Id.* at 23 and Table 5). Yet Defendants were aware that the Four Funds continued to make interest payments to investors, despite those interest payments supposedly being derived from the profitability of the Funds. (*Id.* at 23-25). Defendants knew or should have known that interest payments were being made from funds received from new investors, not from the profits of the Funds.

Further, the working papers contain a number of notations in Simons' and Paventi's own handwriting, detailing payments from one Fund or Trust to another to cover interest payments, or to cover redemptions to investors. For example, FEIN's 2006 tax working papers included a handwritten note which stated, "Per Dave Rees [McGinn Smith's controller] – represents funding of RTC Trust monthly cash flow shortages. To be repaid with Trust receipts – after Trust debt is paid off - OR – will be purchased by another entity. Not accruing any interest income on above loans as of 12/31." (Kang Decl. Ex. 12, at internal Ex. 10; Kang Decl. Ex. 14, at 25). In Mr. Scherf's professional opinion, this handwritten notation demonstrates actual knowledge of the fraud, and is a classic example of a Ponzi scheme. (Kang Decl. Ex. 14, at 25). Another FEIN working paper identifies, in Defendants' handwriting, a $30,000 payment between FEIN and FIIN as being a "PMT to Cover Interest." (Kang Decl. Ex. 12, at internal Ex. 12; Kang Decl. Ex. 14, at 26). Additional working papers show transfers or other loans between various of the Four Funds and Trusts to cover redemptions of investors. (Kang Decl. Ex. 12, at internal Ex. 13; Kang Decl. Ex. 14, at 26). This evidence, together with the analysis and conclusions of the Scherf Report, provides ample evidence from which a jury could conclude that Defendants had actual knowledge of McGinn Smith's fraud.

20

Defendants' contentions that Mr. Scherf's report is unclear, or equivocating just because the report does not contain direct admission of the defendants, are unpersuasive. Again, the report analyzes the facts supporting Defendants' knowledge of the fraud, for example, that (1) the Defendants knew or should have known that the investments by McGinn Smith to support the Four Funds and Trusts were in violation of the PPMs; (2) the various investment vehicles made a number of related-party loans and other transactions that violated the terms of the PPMs; the Four Funds and Trusts paid excessive fees to McGinn Smith; and the Four Funds and Trusts generated insufficient income to make required principal and interest payments. (Kang Decl. Ex. 14, at 16 – 20). The report further details the consistent losses of the Four Funds and Trusts as a glaring red flag of an underlying fraud of which Defendants were aware, based on their work preparing annual tax returns for those entities. (*Id.* at 23 – 24).

All of the above details support a conclusion by Mr. Scherf that Defendants knew of the McGinn Smith Ponzi scheme. And, indeed, Mr. Scherf included an entire section in the initial report under the sub-heading "Defendants knew of the Ponzi Scheme," (*Id.* at 25), in which he details the Defendants' documentation in their work papers of various facets of the Ponzi scheme, including notations of payments to cover interest, payments to cover redemptions in other funds, and improper transactions between the various Four Funds and Trusts. (*Id.* at 26).

For these reasons, the record in this case is sufficient to demonstrate Defendants' knowledge of McGinn Smith's fraud, and Defendants' motion should be denied.

### 3.    Plaintiffs Have Established that Defendants Provided Substantial Assistance to McGinn Smith's Fraud

In addition to containing sufficient evidence to show the existence of the underlying fraud, and Defendant's actual knowledge of the fraud, the record contains sufficient evidence for a reasonable jury to conclude that Defendants provided "substantial assistance … in the

achievement of the fraud." *Kottler*, 607 F.Supp.2d at 447.  Under New York law, "substantial assistance" exists "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); *see also McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002); *see also Great Am. Ins. Co. v. Poynter*, 2013 WL 1181445, at *4 (W.D. Ky. 2013) (unusual nature of bank transactions would allow jury to find substantial assistance) *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, LLC, 652 F.Supp.2d 495, 511 (S.D.N.Y.2009) (denying bank's motion for summary judgment on aiding and abetting hedge fund manager's alleged breach of fiduciary duty because bank recorded information showing " 'too good to be true' " gains by the funds; prepared accounting statements reflecting these gains that were, in turn, used by auditors and administrators; and made other statements concealing the fraud).

Defendants contend that Plaintiffs' claims rely solely on Defendants' failure to notify Plaintiffs of the ongoing fraud, and stress that none of the Plaintiffs had an existing professional relationship with Piaker & Lyons, and did not receive or rely on any of Piaker & Lyons' work product in making their investments in the Four Funds and Trusts.  (Defendants' Brief at 32-34) (SMF and Response to SMF, ¶¶ 51, 56, 61, 69-70, 77-78, 83, 88, 95-96, 103-104, 109-110, 114, 120, 127, 134, 139, 144, 152, 161, 162-163).  Yet Plaintiffs concede, and have never contended that they received or relied on any of Defendants' work product in making their investments in the Four Funds and Trusts. (SMF ¶¶ 162, 163).

Defendants are incorrect, however, in their assertions that Plaintiffs' allegations of substantial assistance consist only of failures to act, rather than affirmative actions of Defendants.  As Mr. Scherf's report makes clear, Defendants, in connection with their

knowledge of the fraud, issued clean audit reports for McGinn Smith, despite the fact that the financial state of the Funds and Trusts themselves made infeasible the fees and payments claimed and received by McGinn Smith related to those entities (Kang Decl. Ex. 14, at 14-15, 24-25); prepared and filed tax returns for the Four Funds and Trusts based on information they knew to be reflective of the operation of a Ponzi scheme (*Id.* at 23-26); and proposed and made adjusting journal entries that were designed to conceal a Ponzi scheme, despite the presence of transactions indicating the existence of a Ponzi scheme (*Id.* at 20-21).  Defendants' actions, in concealing the fraud and failing to intervene, allowed McGinn Smith's scheme to continue unabated.  These affirmative actions by Defendants, when viewed together with the improper transfers, payments of interest, and payment of redemptions discussed above, are sufficient for a reasonable jury to conclude that Defendants substantially assisted in the perpetration of McGinn Smith's Ponzi scheme, which caused Plaintiffs' loss of their investments. (*Id.* at 26-28).

For these reasons, Defendants' motion for summary judgment on Plaintiffs' claim of aiding and abetting fraud should be denied.

## III.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment.

Respectfully submitted,

KANG HAGGERTY & FETBROYT LLC


By:  */s/ Edward T. Kang*  
Edward T. Kang  
Jacklyn Fetbroyt (*pro hac vice*)  
Gregory H. Mathews (*pro hac vice*)  
David P. Dean (*pro hac vice*)

123 South Broad Street, Suite 1670
Philadelphia, PA 19109
Tel: (215) 525-5850
Fax: (215) 525-5860
ekang@lawkhf.com
jfetbroyt@lawkhf.com
gmathews@lawkhf.com
ddean@lawkhf.com
*Counsel for Plaintiffs*

Dated: June 24, 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

NEAL A. CUPERSMITH, *ET AL.*      :      CIVIL ACTION

    :

       Plaintiffs,      :

    :      NO. 3:14-cv-01303

      v.      :

    :

PIAKER & LYONS, P.C., *ET AL.*      :      ***Jury Trial Demanded***

    :

       Defendants.      :

_____

## CERTIFICATE OF SERVICE

I, Edward T. Kang, hereby certify that on June 24, 2016, I electronically filed the

foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgement,

Response to Defendants' Statement of Additional Material Facts, and Declaration of Edward T.

Kang with the Clerk of the United States District Court for the Northern District of New York

using the CM/ECF system, which sent notification of such filing to the following:

Charles C. Swanekamp

Jaeckle, Flesichmann & Mugel

Avant Building, Suite 900

200 Delaware Avenue

Buffalo, NY 14202

*Counsel for Defendants*

*/s/Edward T. Kang*

Edward T. Kang