IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

|   |   |   |
|---|---|---|
| | : | |
| NEAL A. CUPERSMITH, *ET AL.* | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | NO. 3:14-cv-01303-TJM-DEP |
| v. | : | |
| | : | |
| PIAKER & LYONS, P.C., *ET AL.* | : | |
| | : | |
| Defendants. | : | |
| | : | |

_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS
AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiffs Neal A. Cupersmith, *et al.*, through their counsel, pursuant to Local Rule 7.1(a)(3), hereby respond to the Statement of Material Facts of Defendants, Piaker & Lyons, P.C., Ronald L. Simons, and Timothy N. Paventi, as follows:

1.     Admitted.

2.     Denied.  In addition to the trusts listed in this paragraph, various Plaintiffs also invested in the TDMM Cable Sr. Trust 09 (Plaintiffs Criniti, Dale, Forsyth, and Gillis), and TDM Verifier Trust 07R (Plaintiffs Forsyth and Pavlishin). (Swanekamp Decl. Ex. C.)

3.     Admitted.

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.     Admitted.

8.     Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Denied.  The allegations in this paragraph are unsupported by any citation to the record or any evidence produced in this matter.  To the extent that the SEC action received media attention, such attention was largely limited to local media in upstate New York.  [See Kang Decl. Ex 1, 184:14 – 185:12]; [Kang Decl. Ex 2, 40:6 – 13].

13.     Admitted in part, denied in part.  It is admitted only that the SEC issued a press release on April 20, 2010.  The press release makes no mention of Piaker & Lyons, Ronald Simons, or Timothy Paventi.  It further states that "the full extent of the fraud is not yet known."  [Kang Decl. Ex 3].

14.     Admitted.

15.     Denied as stated.  Defendants' description is incomplete.  The Memorandum of Law, and the exhibits attached to the Mr. Simons' Motion to Quash also indicate that the SEC sought Mr. Simons' testimony with respect to tax work done for the personal tax returns of David and Lynn Smith and the David Smith Private Annuity Trust, as opposed to the tax work Piaker & Lyons performed for the Four Funds and the Trusts, or the auditing work Piaker & Lyons performed for McGinn Smith.  [Kang Decl. Ex. 4].

16.     Admitted.

17.     Admitted.

18.     Denied as stated.  Plaintiffs' Amended Complaint contains a number of factual allegations supporting their claims against Defendants.  (*See* Swanekamp Decl., Ex. A). Defendants' contention that Plaintiffs' claims "rely" upon the admissions in Simons' plea

agreement is a legal conclusion.  Further, the publicly available information concerning that plea, on its own, was not sufficient to establish any liability on the part of Piaker & Lyons [Kang Decl. Ex. 12, 200:21-201:9, Internal Ex. 6].

19.    Admitted.

20.    Admitted.

21.    Admitted.

22.    Denied.  The allegations in this paragraph are unsupported by any citation to the record or any evidence produced in this matter. As with the initiation of the SEC action against McGinn Smith, the press coverage of the McGinn and Smith indictments was limited to upstate New York.

23.

    a.    Admitted.

    b.    Admitted.

    c.    Admitted.

24.

    a.    Admitted.

    b.    Admitted.

    c.    Admitted.

25.    Admitted.

26.

    a.    Admitted.

    b.    Admitted.

    c.    Admitted.

      d.      Admitted.

      e.      Admitted.

27.

      a.      Admitted in part, denied in part.  In addition to the two investments listed in this paragraph, Kenneth Dale, late husband of Plaintiff Mary Dale, made an investment of $40,000.00 in TDMM Cable Sr. Trust 09 on January 30, 2009. (Swanekamp Decl., Ex. D); [Kang Dec. Ex. 5].

      b.      Admitted.

28.      Denied. Kenneth Dale is the deceased husband of Plaintiff Mary Dale. (*See* Swanekamp Decl., Ex. D); [Kang Dec. Ex  6].

29.

      a.      Admitted.

      b.      Admitted.

      c.      Admitted.

      d.      Admitted.

      e.      Admitted.

      f.      Admitted.

      g.      Admitted.

      h.      Admitted.

      i.      Admitted.

      j.      Admitted.

      k.      Admitted.

      l.      Admitted.

m.      Admitted.

n.      Admitted.

o.      Admitted.

p.      Admitted.

q.      Admitted.

r.      Admitted.

s.      Admitted.

t.      Admitted.

u.      Admitted.

v.      Admitted.

w.      Admitted.

x.      Admitted.

y.      Admitted.

30.

a.      Admitted.

b.      Admitted.

c.      Admitted.

d.      Admitted.

e.      Admitted.

f.      Admitted.

g.      Admitted.

h.      Admitted.

i.      Admitted.

j.       Admitted.

k.       Admitted.

l.       Admitted.

m.      Admitted.

n.       Admitted.

o.       Admitted.

p.       Admitted.

q.       Admitted.

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted in part, denied in part.  It is admitted that Mr. Lex was licensed to sell securities.  Mr. Lex has been, and still is, licensed to sell insurance products [Kang Dec. Ex. 7, 44 – 46]. Though Mr. Lex testified that he has never been licensed as an investment advisor, many of the Plaintiffs in this action considered him to be an investment advisor, and trusted Mr. Lex's investment recommendations. [See Kang Dec. Ex. 1, 21:1-8; 40:14-16; 70:2-24; Kang Dec. Ex. 8, 7:7-14; Kang Dec. Ex. 9, 20:7-17; 32:18 – 33:8; Kang Dec. Ex. 10, 23:17 – 24:6].

35.     Admitted in part, denied in part. At least one Plaintiff recalled having conversations with Mr. Lex concerning his due diligence concerning the McGinn Smith investments. [Kang Dec Ex. 11, 9:21 – 10:8].

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.     Admitted.

40.     Admitted.

41.     Admitted in part, denied in part. It is admitted only that investors were notified of the Four Funds restructuring and National Financial Services' resignation as custodian.  The restructuring letter sent to Four Funds investors makes no mention of any fraudulent or illegal activity on the part of McGinn Smith, but rather blames the Four Funds' poor performance on the general performance of the economy at the time. [Kang Decl. Ex. 13, internal Ex. 5].

42.     Admitted.

***Deanna M. Ayers***

43.     Admitted.

44.     Denied. Defendants misstate the record. Ms. Ayers understood Mr. Lex to be an advisor and a broker, and that Mr. Lex had some sort of relationship with McGinn Smith.  She stated that "[h]e [Lex] trusted these people and I trusted him and that's why I am where I am." [Kang Decl. Ex. 13, 22:14-15].

45.     Admitted.

46.     Denied. Aside from the speculative statements set forth by Defendants, Ms. Ayers stated that she had no independent recollection of whether or not she reviewed the subscription agreement or private placement memorandum for her FIIN investment. [Kang Decl. Ex. 13, 39:4, 39:16-18; 34:9-10].

47.     Denied.  Ms. Ayers stated that she did not recall learning of FIIN's potential lack of liquidity. [Kang Decl. Ex. 13, 35:12-17 ("Q. Okay, and one of the things that's noted here is the lack of liquidity making it virtually impossible for someone to get their money out prior to maturity.  A. I don't remember that, either. I mean, that, I don't recall that at all.")]. In fact, Ms. Ayers also testified that, with respect to liquidity, she believed that "it was an assumption on my

7

part that at some point I would be able to liquidate these notes," [Kang Decl. Ex. 13, 32:4-6], which was true, as the notes gave Ms. Ayers and other investors the right to redeem the notes "at some point," namely, when they matured. She also does not recall whether she knew that the notes would not be registered. [Kang Decl. Ex. 13, 35:21 – 36:4]. Further, while Ms. Ayers testified she was not sure if her investment decision would have been affected by knowledge that FIIN may invest in affiliated companies, the questioning concerning this issue was misleading and misstated the PPM. The PPM does not indicate that FIIN might invest in affiliated companies. Rather, it states that FIIN may purchase assets for its investment portfolio from affiliated companies. [Kang Decl. Ex. 13, Internal Ex. 1 at p. 9; Kang Decl. Ex. 13, Internal Ex. 2]. Further, it also contains assurances that the price paid by FIIN will be no more than the price paid by the affiliate. [*Id.*]. McGinn Smith's fraud involved repeated violations of these terms of the PPMs, as well as transfers of funds between various affiliated entities to pay interest and redeem investors – in other words, actions that went far beyond the "risk factors" set forth in the PPM. [Kang Decl. Ex. 14]. Ms. Ayers repeatedly testified that she was aware that all investments carry the risk of loss. [Kang Decl. Ex. 13, 31:9-14].

48.     Denied as stated. Regardless of how the October, 2008 or 2009 letters make Ms. Ayers feel in retrospect regarding the state of her investments, the restructuring letter sent to Four Funds investors makes no mention of any fraudulent or illegal activity on the part of McGinn Smith, but rather blames the Four Funds' poor performance on the general performance of the economy at the time. [Kang Decl. Ex. 13, Internal Ex. 5].

49.     Admitted.

50.     Admitted.

51.     Admitted.

***Garth Borel***

52.     Denied as stated. Mr. Borel relied on Mr. Lex's recommendations in making his investment decisions, based in part upon Mr. Lex's representations that he (Mr. Lex), his family, and many of his clients invested in the Four Funds and Trusts. [Kang Dec. Ex. 9, 14:12-17].

53.     Admitted in part, denied in part.  It is admitted only that Mr. Borel conducted no independent research concerning the McGinn Smith investments. The remainder of the paragraph is denied.  Mr. Borel testified that he and Mr. Lex discussed the risks involved with his investment in TDM Verfier Trust, and that he had similar conversations regarding the other investments, though he did not recall the exact specifics of those conversations. [Kang Dec. Ex. 8, 21:8-13; 22:8-24].  Further, Mr. Borel understood that the investments carried inherent risks, and that he may lose a portion or all of his investment.  [Kang Dec. Ex. 8, 19:6-12].

54.     Admitted.

55.     Admitted in part, denied in part.  It is admitted that Mr. Borel became aware of the SEC investigation of McGinn Smith via the court-appointed Receiver; however, he did not recall when he learned this information. [Kang Dec. Ex. 8, 42:18-23].  Nor did Mr. Borel recall when he became aware of the criminal proceedings against McGinn and Smith. [Kang Dec. Ex. 8, 48:1-9].

56.     Admitted.

***Richard Bove***

57.     Admitted.

58.     Admitted in part, denied in part.  It is admitted that Dr. Bove testified that he did not specifically recall reading the subscription agreements for his investments; however, Dr. Bove also testified that he is sure he read parts of the documents, and was also aware that his investments in the Four Funds and Trusts, like any investment, carried inherent risks. [Kang

Decl. Ex. 15, 16:15-21; 17:19-22].

59.     Admitted.

60.     Denied as stated.  Dr. Bove testified that he did not recall which court documents Piaker & Lyons was mentioned in, nor did he recall when he first saw reference to Piaker & Lyons. [Decl. Ex. 15, 35:17-36:3]. Further, Dr. Bove testified that his efforts to determine the identity of McGinn Smith's accountants and tax preparers occurred in the "last couple years," and that he has conducted most of his internet research recently, now that he is no longer a practicing surgeon.  [Decl. Ex. 15, 33:5-34:2].

61.     Admitted in part, denied in part. It is admitted that Dr. Bove did not review or receive any documents from Piaker & Lyons, nor has he spoken with any employee of Piaker & Lyons.  However, Dr. Bove also testified that had he learned that McGinn Smith's accountant had resigned from its representation of McGinn Smith, it would have affected his decision to invest in, and/or renew his investments in, the Four Funds and Trusts. [Decl. Ex. 15, 45:11-22; 47:14-48:9].

***James J. Burke***

62.     Denied as stated.  Mr. Burke did not "recall specifics" of the conversations he had with Mr. Lex concerning his investments more than a decade ago.  Further, Mr. Burke did not testify that he understood the risks of the senior or senior subordinate notes to be non-existent; rather, he understood those notes to be relatively less risky than the junior notes, because they would maintain priority in the event of fund liquidation. [Kang Decl. Ex. 16, 20:15 – 21:23; 43:16-23].  Mr. Burke also testified that, to the best of his recollection, he was aware at the time he made his investments that the investments were not insured or guaranteed in any way. [Kang Decl. Ex. 16, 48:18-49:13].

63.     Admitted.

64.     Admitted in part, denied in part. While Mr. Burke testified that he did not have a specific recollection of reviewing many of the offering materials for his investments, he did have conversations with Mr. Lex concerning the nature of those investments. [Kang Decl. Ex. 16, 48:18-49:13; 59:10-17].

65.     Admitted.

66.     Denied as stated. Mr. Burke testified that he had no recollection of reading the risk factors contained in the TAIN subscription agreement, but also testified that he signed the document, and agreed to the terms contained therein. [Kang Decl. Ex. 16, . 62:12-20].

67.     Admitted in part, denied in part. It is admitted that Mr. Burke testified to being concerned about his investments when he received the October 2008 and December 2009 letters. However, those letters make no mention of any fraudulent or illegal activity on the part of McGinn Smith, but rather blames the Four Funds' poor performance on the general performance of the economy at the time. [Kang Decl. Ex. 13 Internal Ex. 5].

68.     Admitted.

69.     Admitted.

70.     Admitted.

71.     Denied. This paragraph misrepresents Mr. Burke's testimony. When Mr. Burke was asked why he was suing Defendants, his full response was "Because deeper pocket – no, I'm just joking.  Because accountants, just like attorneys, just like professional brokers, have a – have a duty to represent their clients. So I would think that accountants, if they're representing McGinn and Smith -- I never thought in my wildest dreams that I was going to be defrauded out of almost -- whatever you want to say the number is, 360-some-thousand dollars -- accountants representing a firm like McGinn Smith, as accountants there's no way in the world they wouldn't have seen

what was going on here." [Kang Decl. Ex. 16, 159:12-24].

*Pierre Conti*

72.    Admitted.

73.    Admitted.

74.    Denied as stated. Dr. Conti testified that he recalled receiving "the prospectus or whatever McGinn Smith provides with the note," in connection with his investments. [Kang Dec. Ex 1, 68:21-69:2]. Further, Dr. Conti testified that, with respect to all of his investments, he understood that he risked losing the investment. [Kang Dec. Ex 1, 83:20-84:5].

75.    Denied as stated.  Dr. Conti testified that he was worried, in 2008 and 2009, that he was going to lose his investments. However, when questioned about the letters, Dr. Conti testified as follows:

Q.    Given these three letters in the short period of time and what they mean, you know, what were you thinking?

A.    That I was going to lose all my money.

Q.    Did you think at that point in time that there was something going on with McGinn Smith other than they're just not doing very well?

A.    Probably.

Q.    Did you consider at that point in time that McGinn Smith may be doing something with your money that they weren't authorized to do?

A.    I don't know that I can say that. They just, obviously, were not -- whatever they were doing, they were losing money and they were losing our money.

Q.    Okay. The resignation of National Financial Services as custodian, did that suggest to you more than McGinn Smith just not doing well financially?

A.    No. It just suggested that they were going belly up.

[Kang Dec. Ex 1, 174:7-175:3]. While it may have "crossed [his] mind" that McGinn Smith was engaged in a Ponzi scheme, this was based on the presence of the Madoff story in the news, and not on any specific information that Dr. Conti possessed. [Kang Dec. Ex 1, 175:7-176:2].

76.    Admitted.

77.    Admitted.

78.    Admitted.

**Charles Criniti**

79.    Admitted.

80.    Admitted in part, denied in part. It is admitted that Mr. Criniti testified that he did not review the PPM's related to his investments, or ask Mr. Lex any questions concerning the contents of those PPM's. It is denied that Mr. Criniti was unaware of the risk that he could lose his investment. Mr. Criniti specifically testified that he was aware that every investment has some degree of risk. [Kang Decl. Ex. 17, 17:20-24].

81.    Admitted.

82.    Admitted.

83.    Admitted.

**Henry S. Crist, MD**

84.    Admitted.

85.    Admitted in part, denied in part. It is admitted that Dr. Crist testified that it was not his practice to review the PPM's from his investments, and that he did not recall Mr. Lex advising him of the specific risk factors set forth in the PPM's. [Kang Decl. Ex. 18, 37:5-10]. However, Dr. Crist also understood that the McGinn Smith investments carried the risk of loss of part or all of the investment, and that they were not secured. [Kang Decl. Ex. 18, 38:9-40:6].

86.    Admitted. By way of further response, Dr. Crist testified that he was not surprised

by the boilerplate language of the risk factors in the PPM's. [Kang Decl. Ex. 18, 49:7-50:8].

87.    Admitted.

88.    Admitted.

**Alice J. Forsyth**

89.    Admitted.

90.    Admitted. By way of further response, Ms. Forsyth conducted less independent research into her investments after 1997 because she was recovering from surgery to remove two brain tumors. [Kang Dec. Ex. 9, 19:6-13].

91.    Denied. Contrary to Defendants' assertions, Ms. Forsyth specifically testified that Mr. Lex provided her with written materials concerning her investments ("Q. Okay. Did anyone, and I guess, the anyone here would be Bill Lex, provide you with any kind of written materials regarding these investments? A. Oh, yes."), though she did not recall, a decade later, exactly what those materials were. [Kang Dec. Ex. 9, 39:17-20].

92.    Admitted in part, denied in part.  Ms. Forsyth's testimony concerning potential conflicts of interests by the trustee of the TAIN fund was based on misleading questioning, which conflated risk disclosures in the PPM concerning potential conflicts of interest the trustee may face between various levels of note holders, and the ability of the funds to invest in affiliated companies. [Kang Dec. Ex. 9, 45:3-16, Internal Ex. 2].

93.    Admitted.

94.    Admitted.

95.    Admitted.

96.    Admitted.

**George M. Gavin, MD**

97.    Admitted.

14

98.     Admitted.

99.     Denied as stated. Dr. Gavin recalled reading portions of the subscription agreements and PPM's related to his investments with respect to the risk factors detailed in those materials. [Kang Decl. Ex. 19, 31:6-22; 32:9 – 33:2; 34:20 – 35:19]; Further, Dr. Gavin understood fully the risks that his investments carried. [Kang Decl. Ex 19, 32:4-5].

100.    Admitted.

101.    Admitted.

102.    Admitted.

103.    Admitted.

104.    Admitted.

**Richard Harnish**

105.    Admitted.

106.    Admitted.

107.    Denied.  While Mr. Harnish initially stated that he had not reviewed or received any documents related to his investments, when presented a copy of a subscription agreement and PPM from his investments, he recalled receiving those documents. [Kang Decl. Ex. 20, 20:1-12]

108.    Denied as stated. While Mr. Harnish indicated, in response to a leading question from Defendants' counsel, that the 2008 letter from McGinn Smith "should have" raised red flags, nothing in his testimony suggests what those "red flags" would have been, nor is there anything to suggest that he should have had any reason to suspect that Defendants had some involvement in McGinn Smith's scheme. [Kang Decl. Ex. 20, 28:4-13].  Further, while Mr. Harnish did not conduct any independent investigation into Defendants once McGinn Smith was in receivership, there is no indication that such investigation would have yielded any information concerning potential causes of action against Defendants.

109.    Admitted.

110.    Admitted.

**Joseph J. Mayberry, MD**

111.    Admitted.

112.    Denied.  Dr. Mayberry did not specifically recall reading the documents related to his investments many years after the fact.  However, while he did not recall the specific language in the subscription agreement and PPM, Dr. Mayberry understood the risks of his investments, and it was certainly never disclosed to him that McGinn Smith would be operating a Ponzi scheme. As Dr. Mayberry testified, "No, I don't have any specific recall. If I could comment on that.  If you read enough about the information in the prospectus on an investment or anything, you go between stuff you don't understand and stuff that makes you scared. At some point in time, unless you want to put your money under a pillow, you have to rely on an advisor.  I understood that I could lose all my money. I understood that as a result of market forces and interest, but I didn't think I was going to lose it this way and I don't think it says that in here." [Kang Decl. Ex. 21 28:16-29:1]. Additionally, Dr. Mayberry received the October, 2008 and November, 2009 letters from McGinn Smith, but those letters, as discussed elsewhere, contain no indication of fraudulent activity by McGinn Smith, but instead blame the poor performance of the Four Funds on the larger economy. [Kang Decl. Ex. 21, Internal Ex. 4, 6]

113.    Admitted in part, denied in part.  It is admitted that Dr. Mayberry received notification that McGinn Smith was in receivership in 2010, and that he learned of the criminal proceeding against McGinn and Smith from the receiver's website. It is denied that Dr. Mayberry was not "interested" in the work of the tax preparers or accountants of McGinn Smith, and he never testified as such.  Rather, Dr. Mayberry testified that he did not think it was necessary to investigate beyond what was on the receiver's website with respect to the auditing work done on

McGinn Smith, as he would not have understood it, because the SEC and other regulatory agencies were already investigating, and "[b]ecause I presume there was auditing being done and it was appropriate and it satisfied regulatory personnel and so it was only a name to me." [Kang Decl. Ex. 21, 46:17-47:10].

114.    Admitted.

**Russell F. Mazda, MD**

115.    Admitted.

116.    Admitted.

117.    Denied as stated. While Dr. Mazda did not have a specific recollection of reviewing the PPM related to his FEIN investment, he understood that he could lose the money he invested in FEIN, and that there were no guarantees attached to his investment. [Kang Decl. Ex 10, 40:4-41:2].

118.    Admitted.

119.    Admitted.

120.    Admitted.

**Ellen L. Myers**

121.    Admitted.

122.    Admitted.

123.    Admitted.

124.    Admitted.

125.    Denied as stated. Ms. Myers testified repeatedly that she had little to no memory of what she read, or what she discussed with Mr. Lex at the time she made her investments, nor did she recall what her understanding of those investments was at the time. [Kang Decl. Ex. 22 50:13-52:24; 54:17-57:6].

17

126.    Admitted.

127.    Admitted.

**Ilene K. Nemeth**

128.    Admitted.

129.    Denied. Ms. Nemeth testified that she "always reviewed everything" related to her investments when she received it. [Kang Decl. Ex. 23, 51:15-19].

130.    Denied as stated. Ms. Nemeth testified simply that she did not recall reviewing the portion of the PPM regarding risk factors, and did not recall having such a discussion with Mr. Lex. [Kang Decl. Ex. 23, 55:8-56:1].

131.    Denied as stated. Ms. Nemeth did not specific a time period in which she learned that "everything at McGinn Smith has been locked up." [Nemeth Dep. 38:1-2].  In addition, while Ms. Nemeth suspected that "something" was going on with McGinn Smith in late 2009, she "didn't know there was a fraud." [Kang Decl. Ex. 23, 36:24-37:2].

132.    Admitted.

133.    Admitted.

134.    Admitted.

**Paul Pavlishin**

135.    Denied as stated. Mr. Pavlishin understood that there were risks inherent in his investment, and that his investments in the Four Funds and Trusts were not insured.  [Kang Decl. Ex. 24, 38:8-39:1].

136.    Admitted.

137.    Admitted.

138.    Admitted.

139.    Admitted.

### Mary Wanda Peters

140.    Denied.  Ms. Peters specifically testified that her husband, who died in 2014, spoke with Mr. Lex concerning the investments in this matter, and does not have personal knowledge of the substance of those conversations.  For instance, Ms. Peters did not know if Mr. Lex performed any due diligence on the investments, if Mr. Lex provided any specific advice regarding the investments, or if her husband knew of the risks involved with making the McGinn Smith investments [Kang Decl. Ex. 25, 9:14-15; 14:22-17:14].

141.    Admitted.

142.    Admitted.

143.    Admitted.

144.    Admitted.

### David T. Shannon

145.    Admitted.

146.    Admitted.

147.    Admitted in part, denied in part. It is admitted only that Mr. Shannon did not recall his specific discussions with Mr. Lex, or whether he discussed the investment related documents with Mr. Lex.  However, Mr. Shannon understood that he would not be able to retrieve his investments prior the maturity date(s), and that the McGinn Smith investments, like any investments, carried risks. [Kang Decl. Ex. 26, 27:5-13; 19:10-13].

148.    Admitted.

149.    Admitted.

150.    Admitted.

151.    Admitted.

152.    Admitted.

***Monsignor Robert J. Wargo***

153.    Admitted.

154.    Admitted.

155.    Admitted.

156.    Admitted.

157.    Denied as stated.  Msgr. Wargo testified that he signed the subscription agreements understanding that there were risks involved in his investments, and that he was agreeing to the risks as spelled out in the subscription agreements and PPM's. [Kang Decl. Ex.27 43:22-45:16].

158.    Admitted.

159.    Admitted.

160.    Admitted.

161.    Admitted.

162.    Admitted.

163.    Admitted.

***Parties' Stipulation***

164.    Admitted.

***Defendants' Role in Relation to the McGinn Smith Entities***

165.    Admitted.

166.    Admitted. By way of further response, regardless of the form of the formal return, Piaker & Lyons provided tax services to each of the Four Funds, as well as "numerous, numerous" trusts.  [Kang Decl. Ex. 12, 101:17-103:6]; (Swanekamp Decl. Ex. F).

167.    Admitted.

168.    Admitted.

169.    Admitted.

170.    Admitted.

171.    Admitted in part, denied in part.  It is admitted only that Piaker & Lyons was provided with copies of the PPM's by McGinn Smith, and were included in Piaker & Lyons' work papers.  Mr. Simons' self-serving testimony concerning which parts of the PPM's he reviewed is denied.  Mr. Simons and Mr. Paventi both had access to the PPM's, and those PPM's were part of the documentation reviewed as part of the tax work conducted for the Funds. [Kang Decl. Ex. 12, 129:12-132:1].  The Defendants also had access to the financial and accounting records of the Four Funds, Trusts and McGinn Smith & Co., Inc. [Kang Decl. Ex. 12, 119:3-12]

172.    Denied. While McGinn Smith & Co., Inc. was a separate entity from the Four Funds and Trusts, it is denied that the information learned in the preparation of the tax returns of the Four Funds and Trusts was irrelevant to Piaker & Lyons' audit work.  Mr. Simons testified that he considered information used in preparing the tax returns of the Four Funds and Trusts during Piaker & Lyons' audit of McGinn Smith & Co., Inc.  [Kang Decl. Ex. 12, 174:10-175:23]; [Kang Decl. Ex. 28, 25-28].  Further, as set forth in the Expert Report of Stephen J. Scherf (the "Scherf Report"), the applicable professional standards required Piaker & Lyons to consider all information known to it, not only in the preparation of tax returns, but also in conducting an audit. [Kang Decl, Ex. 14, 13-14, 15-16, 19-21].

173.    Admitted.

174.    Admitted.

175.    Admitted.

176.    Denied.  Simons testified that he believed that McGinn Smith's fraud was related to the Four Funds and Trusts [Kang Decl. Ex. 12, 222:19-224:6].  While Piaker & Lyons did not

perform audit services for the Four Funds and Trusts, it did perform tax services for the Four Funds and Trusts. Through this tax work, Defendants obtained PPM's from the Four Funds and Trusts, bank statements, and other documents contained in Defendants' work papers that detailed the operations of the Four Funds, the Trusts, and McGinn Smith & Co., Inc., among others. [Kang Decl, Ex. 14, 15]. As detailed in the Scherf Report, Defendants disregarded their professional obligations and did not accord sufficient professional skepticism to the information before them. [Kang Decl, Ex. 14, 14-16]. The movement of funds from one Fund or Trust to others were in violation of the terms of the PPM's, which Piaker & Lyons had and reviewed as part of its work papers. [Kang Decl, Ex. 14, 16-19]. Moreover, the notations in the work papers made by Paventi and Simons demonstrate their knowledge that transfers and loans between affiliated entities were being made for the purposes of paying interest to and redeeming investors, Simons' and Paventi's self-serving protestations notwithstanding. [Kang Decl, Ex. 14, 26] [Kang Decl. Ex. 12, 248:23-251:7; 258:9-259:5]; [Kang Decl. Ex. 28, 127:14-134:8] [Kang Decl. Ex. 12, Internal Ex. 10, 12, 13]. Further, both Simons and Paventi testified that they understood the nature and characteristics of a Ponzi scheme. [Kang Decl. Ex. 12, 45:1-6]; [Kang Decl. Ex. 28, 41-44].

177. Denied. Simons testified that he believed that McGinn Smith's fraud was related to the Four Funds and Trusts [Kang Decl. Ex. 12, 222:19-224:6]. While Piaker & Lyons did not perform audit services for the Four Funds and Trusts, it did perform tax services for the Four Funds and Trusts. Through this tax work, Defendants obtained PPM's from the Four Funds and Trusts, bank statements, and other documents contained in Defendants' work papers that detailed the operations of the Four Funds, the Trusts, and McGinn Smith & Co., Inc., among others. [Kang Decl. Ex. 14, 15]. As detailed in the Scherf Report, Defendants disregarded their professional obligations and did not accord sufficient professional skepticism to the information before them.

[Kang Decl. Ex. 14, 14-16].  The movement of funds from one Fund or Trust to others were in violation of the terms of the PPM's, which Piaker & Lyons had and reviewed as part of its work papers. [Kang Decl. Ex. 14, 16-19].  Moreover, the notations in the work papers made by Paventi and Simons demonstrate their knowledge that transfers and loans between affiliated entities were being made for the purposes of paying interest to and redeeming investors, Simons' and Paventi's self-serving protestations notwithstanding. [Kang Decl. Ex. 14, 26] [Kang Decl. Ex. 12, 248:23-251:7; 258:9-259:5];[Kang Decl. Ex. 12, Internal Ex. 10, 12, 13]; [Kang Decl. Ex. 28, 127:14-134:8].

178.    Admitted.

179.    Denied. Mr. Simons' self-serving testimony concerning which parts of the PPM's he reviewed is denied.  Mr. Simons and Mr. Paventi both had access to the PPM's, and those PPM's were part of the documentation reviewed as part of the tax work conducted for the Funds. [Kang Decl. Ex. 12, 129:12-132:1].

180.    Admitted.

181.    Denied. The cited portion of the record contains no such factual averment.  To the contrary, Paventi's testimony on pages 33-34 of his transcript concerns the necessity of the requirement to make reasonable inquiries concerning the information provided by a tax client. Further, Paventi agreed that a tax preparer should consider information from a different taxpayer if such information is relevant to prepare a return for the tax client in question. [Kang Decl. Ex. 28, 33:3-35:24].

182.    Admitted.

183.    Denied. Through their tax work, Defendants obtained PPM's from the Four Funds and Trusts, bank statements, and other documents contained in Defendants' work papers that

detailed the operations of the Four Funds, the Trusts, and McGinn Smith & Co., Inc., among others. [Kang Decl. Ex. 14, 15]. As detailed in the Scherf Report, Defendants disregarded their professional obligations and did not accord sufficient professional skepticism to the information before them. [Kang Decl. Ex. 14, 14-16]. The movement of funds from one Fund or Trust to others were in violation of the terms of the PPM's, which Piaker & Lyons had and reviewed as part of its work papers. [Kang Decl. Ex. 14, 16-19]. Moreover, the notations in the work papers made by Paventi and Simons demonstrate their knowledge that transfers and loans between affiliated entities were being made for the purposes of paying interest to and redeeming investors, Simons' and Paventi's self-serving protestations notwithstanding. [Kang Decl. Ex. 14, 26] [Kang Decl. Ex. 12, 248:23-251:7; 258:9-259:5]; [Kang Decl. Ex. 28, 127:14-134:8].

### Defendants' Expert Report

184.   Denied.  This paragraph contains legal conclusions concerning the relevance of the expert report provided by Plaintiffs.  Contrary to Defendants' assertions, the Scherf Report details the myriad ways in which the Defendants disregarded professional accounting standards in both their audits of McGinn Smith & Co., Inc., and their tax work for, among others, the Four Funds and Trusts.   For example, Defendants failed to maintain proper professional skepticism in analyzing the feasibility of the expected returns for the various investment vehicles; failed to properly analyze related party transactions; failed to investigate excessive fees paid to McGinn Smith & Co., Inc.; failed to apply appropriate professional skepticism with respect to violations of the terms of the PPM's; and at the very least failed to properly investigate entries in the work papers that were red flags of ongoing fraud. [Kang Decl. Ex. 14].

### Plaintiffs' Expert Report

185.   Denied. The Scherf Report clearly opines that Defendants had knowledge of the

McGinn Smith Ponzi scheme. The Scherf Report analyzes the documents obtained by the Defendants through the professional services they provided to McGinn Smith, including private placement memoranda ("PPM's") for the Four Funds and Trusts, bank records, and the like. [Scherf Report, 15-16]. The report further analyzes the facts supporting Defendants' knowledge of the fraud, for example that (1) the Defendants knew or should have known that the investments by McGinn Smith to support the Four Funds and Trusts were in violation of the PPM's; (2) the various investment vehicles made a number of related-party loans and other transactions that violated the terms of the PPM's; the Four Funds and Trusts paid excessive fees to McGinn Smith; and the Four Funds and Trusts generated insufficient income to make required principal and interest payments. [Kang Decl. Ex. 14,16 – 20]. The report further details the consistent losses of the Four Funds and Trusts as a glaring red flag of an underlying fraud of which Defendants were aware, based on their work preparing annual tax returns for those entities. [Kang Decl. Ex. 14, 23 – 24]. All of these details support a conclusion by Mr. Scherf that Defendants knew of the McGinn Smith Ponzi scheme. And, indeed, Mr. Scherf included an entire section in the initial report under the sub-heading "Defendants knew of the Ponzi Scheme," [Kang Decl. Ex. 14, 25], in which he details the Defendants' documentation in their work papers of various facets of the Ponzi scheme, including notations of payments to cover interest, payments to cover redemptions in other funds, and improper transactions between the various Four Funds and Trusts. [Kang Decl. Ex. 14, 26].

### *Inquiry Notice – Law of the Case*

186. Denied. The referenced email contains no such concession, but instead merely references the Court's prior ruling. Whether or not this prior ruling is binding as "law of the case" is a question of law, not of fact.

**Statement of Additional Material Facts**

1.      Piaker & Lyons, P.C., is a New York corporation with offices in Binghamton, Norwich, and Syracuse. [Kang Decl. Ex. 12, 8:3-7] [NY Corp. Record].

2.      In addition to the enforcement action against McGinn Smith and its principals, the Securities and Exchange Commission brought an action against a number of brokers affiliated with McGinn Smith.  *In re Anthony*, Securities Exchange Commission File No. 3-15514.  In the trial in that matter, an SEC staff accountant named Kerri Palen testified, on or about January 27-28, 2014, that based on her review of McGinn Smith's bank records and internal documents, as well as the working papers of Piaker & Lyons, that it was her opinion that Piaker & Lyons had knowledge of McGinn Smith's Ponzi scheme. [Kang Decl. Ex. 30].

Respectfully submitted,

KANG HAGGERTY & FETBROYT LLC

By:      *s/ Edward T. Kang*
Edward T. Kang
Gregory H. Mathews (*Pro Hac*)
David P. Dean (*Pro Hac*)
Jacklyn Fetbroyt (*Pro Hac*)
123 S. Broad Street, Suite 1670
Philadelphia, PA 19109
(215) 525-5850
(215) 525-5860 (fax)
ekang@LawKHF.com
gmathews@LawKHF.com
ddean@LawKHF.com
jfetbroyt@LawKHF.com
*Attorneys for Plaintiffs*

Dated:  June 24, 2016