# **Exhibit 1**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF NEW YORK
 2              CIVIL ACTION NO. 3:14-CV-01303

 3

 4  NEAL A. CUPERSMITH, ET AL.,

 5       Plaintiffs,

 6       v.

 7  PIAKER & LYONS, P.C., RONALD L.
    SIMONS AND TIMOTHY N. PAVENTI,
 8
         Defendants.
 9

10

11

12              Oral deposition of PIERRE A. CONTI,

13  VDM, taken at the offices of Kang, Haggerty &

14  Fetbroyt, 123 South Broad Street, Suite 1670,

15  Philadelphia, Pennsylvania, on Wednesday,

16  December 9, 2015, commencing at 9:09 a.m., before

17  Suzanne Walinsky, a Court Reporter and Notary

18  Public, pursuant to notice.

19

20

21

22

23

24
```

**Page 18**

1 go back to maybe two thousand -- the end of 2013.
2    Q.    Okay.  Was everything prior to 2013,
3 had that already been deleted?
4    A.    Well, it wasn't on the computer.
5    Q.    Okay.  Do you know if your e-mails are
6 archived?
7    A.    I don't know that answer.
8    Q.    Okay.  Who's in charge of your
9 e-mails?  Do you have anyone that you've retained
10 to do that?
11    A.    No.  No, not officially.  I mean, I'm
12 just really the one person, so...
13    Q.    So it's just you?  You don't have,
14 like, an IT person?
15    A.    No.
16    Q.    And what e-mail account do you use?
17    A.    It's something generic that somebody
18 had recommended.  I mean, when you're -- maybe to
19 just summarize my IT -- a visual aid.  I'm going to
20 give you a visual aid.  Where is my visual aid?
21        I was going to show you my flip phone.
22 Okay?
23            MR. ABRAMSON:  In your overcoat
24 probably.

**Page 19**

1            THE WITNESS:  Yeah.  It may be in my
2 overcoat.  Okay.  But that's...
3 BY MR. HOPPE:
4    Q.    I understand what you're saying.
5    A.    Yeah.  That's fine.
6    Q.    Do you use Microsoft Outlook?
7    A.    Yes.  I think I have that on there.
8    Q.    Is that the account that you used to
9 communicate with the plaintiffs in this action?
10    A.    I think it may be Microsoft Outlook.
11    Q.    And is that your business account?
12    A.    Recently -- e-mail -- there's very
13 little e-mail in my business.  I -- I -- it's
14 verbal communication.
15        I mean, 99 percent of my communication
16 with my clients is -- in fact, most of the time,
17 e-mail is just responding to somebody's e-mail to
18 me.  But I instruct people e-mail is not the way to
19 get to me.
20    Q.    Okay.  And when you speak with your
21 clients, then, is it typically over the phone?
22    A.    Yes.
23    Q.    What about when you were a broker with
24 McGinn Smith; how did you communicate with McGinn

**Page 20**

1 Smith generally?  Would that have been over e-mail?
2    A.    Well, yes.  There was -- yeah, there
3 were some e-mail.  And, of course, I think we
4 brought them here today that -- you know,
5 administrative e-mails back and forth.
6    Q.    And the account that you used when you
7 communicated with McGinn Smith via e-mail, would
8 that have been the Microsoft Outlook account as
9 well?
10    A.    It was whatever system they -- in
11 other words, we responded to their system.  I mean,
12 to whatever it was, McGinn Smith.com.
13    Q.    So you were --
14    A.    Can I excuse myself for one minute?  I
15 just want to make sure my cell phone is not lost.
16    Q.    Oh, sure.
17    A.    May I pause just one minute?
18    Q.    Yeah.  There's not a pending question.
19 That's fine.
20        (Recess.)
21 BY MR. HOPPE:
22    Q.    Mr. Lex, I was asking you some
23 questions about the e-mail accounts that you've
24 used in the past.

**Page 21**

1        You had mentioned that you had a
2 Microsoft Outlook account.  What is that e-mail
3 address?
4    A.    That would be Mailbox@Lex&Smith.com.
5    Q.    And how long have you been using that
6 e-mail account?
7    A.    Half a dozen years or so.
8    Q.    And you did review that account for
9 e-mails that were responsive?
10    A.    Yeah.  Well, that's what I looked at.
11    Q.    You also mentioned that at one time
12 you had an account through McGinn Smith, correct?
13    A.    Well, it wasn't my account.  I just
14 responded to whatever their e-mail address was.
15    Q.    So they didn't provide you a McGinn
16 Smith account?
17    A.    No.  I mean, you wouldn't call it
18 providing if you're just responding.
19    Q.    Oh, no.  Correct.
20        What I'm trying to understand is if
21 you had a McGinn Smith e-mail account or if you
22 used this Microsoft Outlook account for responding
23 to those e-mails from McGinn Smith.
24    A.    I would have responded on the McGinn

**Page 38**

1      A.     I don't define my actions as
2  recruiting people.
3      Q.     Okay.  Let me ask it this way:  Were
4  you involved in any way in contacting any of your
5  clients to see if they're interested in being part
6  of this case?
7      A.     My activity was to tell them if they
8  were interested, that they should contact Mr. Kang.
9      Q.     Okay.  Is that something that you're
10 going to get reimbursed for as well?
11             MR. ABRAMSON:  You mean that time he
12 spent --
13             MR. HOPPE:  Yes.
14             MR. ABRAMSON:  -- doing that?
15             THE WITNESS:  If I remembered to
16 write the time down, I would.  I've just been
17 writing down on scratch paper as I recall the time
18 spent.
19 BY MR. HOPPE:
20     Q.     Okay.  Just going back, then, to the
21 understanding, because I believe you said that the
22 understanding was that you were going to be
23 reimbursed for the time you spent in connection --
24     A.     And --

**Page 39**

1      Q.     -- with the documents.
2      A.     And costs.  I mean, there's
3  photocopying and Federal Express in some cases.
4      Q.     And the reason I'm going back to that
5  is, you just stated there that to the extent you
6  record your time, you'd also be reimbursed for --
7  you know, in connection with contacting your
8  clients in connection with this lawsuit; is that
9  correct?
10     A.     I'm not sure if I ever recorded that
11 and considered that.
12     Q.     Was that part of the understanding
13 that you had with Mr. Kang's office?
14     A.     We really never discussed that.
15     Q.     Have you provided periodic updates to
16 any of your clients who are plaintiffs in this
17 lawsuit regarding the status of the case?
18     A.     I'm not involved in that.
19     Q.     You're not provided periodic updates
20 of the status --
21     A.     No.
22     Q.     -- of the case?
23             And any communications you had with
24 any of the plaintiffs in this action regarding, you

**Page 40**

1  know, their potential interest in being involved in
2  this case, did you turn those communications over
3  to your attorney in connection with the subpoena?
4      A.     I mean, if something existed in
5  writing, I gave it to him.
6      Q.     Do you recall coming across any such
7  communications in your review?
8      A.     And -- and, again, what -- what was
9  the question again, as far as what specific --
10             MR. HOPPE:  Could you read it back,
11 please.
12             (The court reporter read back the
13 following:
14             "Q.     Do you recall coming across
15 any such communications in your review?")
16 BY MR. HOPPE:
17     Q.     And I'm referring to --
18     A.     But what would be the subject?
19     Q.     It would be any communications between
20 you and your clients who are plaintiffs in this
21 action, regarding their potential interest in being
22 involved.
23     A.     Well, if anything pertained to the
24 case, it was reproduced and given to Mr. Abramson.

**Page 41**

1      Q.     Understood.
2             And I guess my question is just a
3  little different.  Do you recall actually coming
4  across those communications?
5      A.     I've looked at so much, I -- I...
6      Q.     Fair enough.  Understood.
7      A.     If it applied, I gave it to
8  Mr. Abramson.
9      Q.     Were you involved in any meetings
10 between your clients and Mr. Kang relating to this
11 lawsuit?
12     A.     No.
13     Q.     Any telephone conversations between
14 Mr. Kang and your clients where you were a party?
15     A.     Do you mean a three-way conversation?
16     Q.     Yes.
17     A.     No.
18     Q.     Are you still doing work for Mr. Kang
19 or Mr. Kang's law office relating to this case?
20     A.     If he asked me for a document, I would
21 do it for him if -- if I had it.
22     Q.     Are you getting reimbursed for your
23 time today doing this deposition?
24     A.     I didn't think of it.  But I should,

**Page 66**

1  additional investment?
2      A.    Well, I think after, what, 2006 most
3  of those were renewals.
4      Q.    Okay.  So from --
5      A.    In other words, do I want to renew the
6  fund, reinvest the fund.
7      Q.    Okay.  So from late 2003 through 2006,
8  that's when new money was invested, correct?
9      A.    I think so.
10     Q.    Okay.  And then based on your
11  understanding, your recollection, from 2006 onward,
12  it's renewing those earlier investments, correct?
13     A.    Yes.  There may -- no, there would
14  have been additional moneys added --
15     Q.    Okay.
16     A.    -- from savings or something.
17     Q.    Okay.
18     A.    But essentially, I was renewing the
19  notes, or occasionally buying another one of the
20  four notes with moneys that I had.
21     Q.    Understood.
22     A.    We had.
23     Q.    And those renewals, was it the same
24  process, you would meet with Bill Lex, or would he

**Page 67**

1  give you a phone call?  How did that work?
2      A.    He would probably give me a heads-up
3  that it was coming up for renewal.  Then he would
4  send me a letter saying that this one is due on --
5  you know, for renewal, do you want to renew?
6           And I would usually say, sure, go
7  ahead.
8      Q.    Okay.
9      A.    I mean, if I'm making money, I'm
10  earning interest, why not?
11     Q.    And I asked you earlier about, you
12  know, what investigation you did into those alarm
13  notes before making the investment.
14           Do you remember that?
15     A.    Yes.
16     Q.    Same question with respect to these
17  four funds.  Did you do any independent --
18     A.    No.
19     Q.    -- investigation or analysis?
20     A.    No.
21     Q.    Okay.  Did you review the materials
22  that Bill Lex sent you regarding each of those new
23  investments?
24     A.    Yes.

**Page 68**

1      Q.    Okay.  I believe you testified earlier
2  that more often than not you did not review them.
3           Do you remember that?
4      A.    Yes.
5      Q.    Is that true with respect to the four
6  funds?
7      A.    Probably the same level of research on
8  them.  I mean, you know, reading the file and --
9  and particularly when they were renewals, yes,
10  that's the same one I had before, I'm making money,
11  keep going, Bill.
12     Q.    And just so the record is clear, from
13  2003 to 2006, when you were investing this new
14  money, was it more often than not that you were not
15  reviewing the materials that were being provided to
16  you?
17     A.    Probably more often than not.
18     Q.    More often than not that you were
19  reviewing or you're weren't reviewing?
20     A.    That I was not.
21     Q.    Okay.  And do you recall what the
22  materials were that were provided to you by Bill
23  Lex with respect to the four funds?
24     A.    The prospectus or whatever McGinn

**Page 69**

1  Smith provides with the note, that here's the note,
2  here's when it's due, here's what it's...
3      Q.    Do you have a recollection of a
4  Private Placement Memorandum?
5      A.    Not much.
6      Q.    Okay.  And I'll show an example to you
7  in just a moment.
8      A.    Yeah.
9      Q.    But you're not familiar with that
10  term, "Private Placement Memorandum"?
11     A.    I have heard the term, yeah.  I think
12  I know what it means, yes.
13     Q.    Okay.  What about a subscription
14  agreement; do you remember getting a subscription
15  agreement?
16     A.    No.
17     Q.    Okay.  Do you have any recollection of
18  an investor questionnaire that you filled out with
19  respect to the four funds?
20     A.    In terms of what my risk tolerance is,
21  that -- that...
22     Q.    Just a questionnaire.  And I'll go
23  over a document with you in a minute, I just want
24  to --

**Page 70**

1  yourself that this was a good investment?
2      A.    I depended on the performance.
3      Q.    And the first investment you made with
4  McGinn Smith, one of the trusts, that was a -- you
5  said an alarm service contract, correct?
6      A.    That's my belief, yes.
7      Q.    In connection with that investment,
8  did you ask to see any financial statements of the
9  company, the -- I guess, the alarm service company,
10 to see how they were doing?
11     A.    No.
12     Q.    Did you want to take a look or did you
13 actually ask about the management of that company,
14 the management structure?
15     A.    Of what company?
16     Q.    The alarm service contract.
17     A.    There was no one company.
18     Q.    Okay.  There were multiple
19 companies -- correct? -- that they were investing
20 in?
21     A.    That they bought the alarm contracts
22 from, that's correct.
23     Q.    Now, the companies that McGinn Smith
24 purchased the alarm contracts from, did you ask

**Page 71**

1  about the management of those companies?
2      A.    No.
3      Q.    Is it fair to say that the success of
4  the investment would depend on those particular
5  companies and how they were performing?
6      A.    What's the question?
7            MR. HOPPE:  Could you read that back.
8            (The court reporter read back the
9  following:
10           "Q.    Is it fair to say that the
11 success of the investment would depend on those
12 particular companies and how they were
13 performing?")
14           THE WITNESS:  I believe that's yes.
15 BY MR. HOPPE:
16     Q.    Did you ask to take a look at any
17 revenue projections for the alarm service companies
18 that McGinn Smith was investing in?
19     A.    No.
20     Q.    Now, you said that you started selling
21 these McGinn Smith trusts about a year or two after
22 you made your first investment; is that correct?
23     A.    That's my recollection.
24     Q.    Now, your first investment in a McGinn

**Page 72**

1  Smith trust, do you remember what the rate of
2  return was on that investment?
3      A.    No.
4      Q.    Do you know if it was more or less
5  than 5 percent?
6      A.    I believe it was more than 5.
7      Q.    Do you know if it was more or less
8  than 10 percent?
9      A.    I don't recall.
10     Q.    What is the typical rate of return on
11 a note or a trust?
12           Let's go back to the year 2000.  What
13 would be a typical rate of return on an investment
14 in a note product?
15     A.    Note or trust with alarms, which --
16 where --
17     Q.    Let's talk about alarm trusts.  What
18 would be a typical rate of return?
19     A.    Nine.
20     Q.    And that was in the 2000 time period?
21     A.    Yes.
22     Q.    And would you consider that a high
23 rate of return?
24     A.    That's subjective.

**Page 73**

1      Q.    Okay.  Now, there's different
2  tranches -- right? -- for these investments?
3            I'm going back --
4      A.    Yes.  Some -- some of the trusts had
5  different tranches.
6      Q.    I'm going back to the 2000 time
7  period.  Was it accurate then that there were
8  different tranches with respect to the trusts?
9      A.    Some had them.
10     Q.    And how would that work?  Could you
11 explain that a little bit.
12     A.    If you were senior, you got a lower
13 interest rate than a junior.
14     Q.    Do you recall what a senior interest
15 rate would be on an alarm service contract trust in
16 the 2000 time period?
17     A.    Senior you're asking?
18     Q.    Yes.
19     A.    It would be the 9 percent that I
20 recall being an average.
21     Q.    And what would the typical interest
22 rate be then on a junior?
23     A.    It would be higher.  I don't know what
24 would be typical.

**Page 82**

1  Again, he said that McGinn Smith -- he's worked
2  with him for 25 years, they have made numerous
3  investments, they have been successful in the
4  investments.
5       Q.   Okay.
6       A.   And -- and he was able to show me that
7  that was the case.
8       Q.   Okay.  And when you say show you that
9  was the case, is that through your investments,
10 correct?
11      A.   Through my investments, yes.
12      Q.   Okay.  He didn't give you any examples
13 of, you know, client X made this much, or anything
14 like that?
15      A.   I don't -- he may have or may not.  I
16 don't know.
17      Q.   Okay.  Did he provide you any kind of
18 marketing materials from his company regarding
19 these investments?
20      A.   From Lex & Smith --
21      Q.   Yeah.
22      A.   -- or from McGinn Smith?
23      Q.   From Lex & Smith.
24      A.   Not that I recall.

**Page 83**

1       Q.   Okay.
2       A.   He's basically an insurance broker.
3       Q.   Okay.
4       A.   Insurance agent or broker, I guess
5  it's a same thing, but...
6       Q.   Okay.  So was his main business
7  insurance?
8       A.   Mm-hmm.  As far as I know, it was.
9       Q.   When did he become involved in the --
10      A.   I don't know.
11      Q.   -- securities industry?
12      A.   I don't know.
13      Q.   Okay.  Do you believe that the
14 securities was secondary to the insurance part of
15 his business?
16      A.   I don't know.
17      Q.   Did you ever meet the Smith from Lex &
18 Smith?
19      A.   No.
20      Q.   Now, I understand you didn't -- you
21 may not have had a discussion regarding the level
22 of risk, but was there a discussion you had with
23 Mr. Lex regarding the possibility of losing the
24 investment?

**Page 84**

1       A.   I'm sure he said that.
2       A.   That's something you understood when
3  you made the investment, that there's --
4       A.   Any investment you make, no matter
5  what it is, there's the risk of loss.
6       Q.   Okay.
7       A.   And I went through that in 2001 with
8  the other company.
9       Q.   Given that issue you had with the
10 other company, did that make you look a little
11 closer at investments before following through with
12 them?
13      A.   Probably.
14      Q.   Okay.
15      A.   Probably.
16      Q.   But at least with respect to the
17 McGinn Smith investments, that didn't translate
18 into doing any kind of independent investigation?
19      A.   No, because I guess I didn't
20 understand completely the role of McGinn Smith.
21 And, I mean, you know, that McGinn Smith was the
22 broker.
23           I assumed it was like the -- with Jim
24 Gentz, he worked for Merrill Lynch.  And Merrill

**Page 85**

1  Lynch was the money people that had the money, and
2  he -- and he -- Mr. Gentz was the Bill -- or Bill
3  Lex.  He was the one that said, here's where you
4  should buy your money and put your money and it
5  went to Merrill Lynch.  I assumed it was the same
6  type of thing.
7       Q.   Did you come to understand that it was
8  different than that --
9       A.   No.
10      Q.   -- Bill Lex's relationship with McGinn
11 Smith?
12      A.   No.
13      Q.   Okay.  And I guess what I'm trying to
14 understand is, you testified that you assumed that
15 Bill Lex's relationship with McGinn Smith was
16 similar to Mr. Gentz's relationship with Merrill
17 Lynch, correct?
18      A.   That's the best analogy I can think
19 of.
20      Q.   Okay.  And that was the reason why you
21 didn't do any investigation on your own, correct?
22      A.   I don't think you can say that.
23      Q.   Okay.  Because that's -- that was the
24 explanation you provided me as to why you didn't

**Page 174**

1    Q.    And then two months later, November of
2  2009, you receive another letter from McGinn Smith
3  basically notifying you that nothing is going to
4  change and that the restructuring is going to
5  continue as is, correct?
6    A.    Yes.
7    Q.    Okay.  Given these three letters in
8  the short period of time and what they mean, you
9  know, what were you thinking?
10    A.    That I was going to lose all my money.
11    Q.    Did you think at that point in time
12  that there was something going on with McGinn Smith
13  other than they're just not doing very well?
14    A.    Probably.
15    Q.    Did you consider at that point in time
16  that McGinn Smith may be doing something with your
17  money that they weren't authorized to do?
18    A.    I don't know that I can say that.
19  They just, obviously, were not -- whatever they
20  were doing, they were losing money and they were
21  losing our money.
22    Q.    Okay.  The resignation of National
23  Financial Services as custodian, did that suggest
24  to you more than McGinn Smith just not doing well

**Page 175**

1  financially?
2    A.    No.  It just suggested that they were
3  going belly up.
4    Q.    Okay.  And you believed that they were
5  going belly up as of September of 2009?
6    A.    Probably.
7    Q.    Did it ever cross your mind, in
8  September of 2009, that there could be a fraud
9  going on?
10    A.    There could be a what?
11    Q.    A fraud going on.
12    A.    The thought probably crossed my mind,
13  yes, because we were -- we had just heard of the
14  Madoff thing a couple years before that, and then
15  suddenly, you know, you begin to make connections.
16    Q.    And the Madoff was -- that news broke
17  when?  Was it 2008?  2007?
18    A.    Somewhere around there, '7 or '8.  I'm
19  not sure exactly when.  But I know it was before
20  this.
21    Q.    So at some point that was in the back
22  of your mind as something that could be going on
23  here?
24    A.    Yeah.  Because I was thinking about a

**Page 176**

1  Ponzi, you know, somebody told me what a Ponzi
2  scheme was.
3        MR. HOPPE:  One more letter.  Let's
4  just mark this as Exhibit 11.
5        (Deposition Exhibit Conti-11 was
6  marked for identification.)
7  BY MR. HOPPE:
8    Q.    Did there come a point in time,
9  Dr. Conti, that Bill Lex resigned from McGinn
10  Smith?
11    A.    I don't know when that was.
12  There were -- there was something in the SEC write-
13  up early on, or in some newsletter I got, that said
14  that he was no longer allowed to serve as a broker.
15    Q.    Other than --
16    A.    He didn't tell me that.
17    Q.    Other than the issue with the SEC, did
18  you ever receive any correspondence from Bill Lex
19  wherein he advised you that he's no longer
20  affiliated with McGinn Smith?
21    A.    I don't recall that.
22    Q.    Okay.  I'm going to show you this
23  letter.  It's been marked as Exhibit 11.  Maybe it
24  will refresh your recollection.

**Page 177**

1    A.    Okay.
2    Q.    Do you have any recollection of having
3  received Exhibit 11?
4    A.    I do now, yes.
5    Q.    Okay.  And is it fair to characterize
6  that letter as advising clients that he's no longer
7  affiliated with McGinn Smith?
8    A.    Well, it states it right in the first
9  paragraph, yes.
10    Q.    That's on McGinn Smith letterhead,
11  correct?
12    A.    Yes.
13    Q.    Okay.  And he's advising his clients
14  that he's being -- he's now affiliated with
15  Dinosaur Securities?
16    A.    Yes.
17    Q.    Did you have any discussions with Bill
18  Lex in December of 2009, or any time close to then,
19  regarding the reasons for him resigning from McGinn
20  Smith?
21    A.    No.
22    Q.    Did this cause you any concern that
23  Bill Lex is no longer affiliated with McGinn Smith?
24    A.    No.  I think I understood that he was

**Page 182**

1      A.    Yes.

2      Q.    Okay.  How long has he been your

3 accountant?

4      A.    Probably since 2002.

5      Q.    Do you understand Mr. Cupersmith to be

6 a plaintiff in this action as well?

7      A.    Yes.

8      Q.    Okay.  Would Mr. Cupersmith have been

9 the one to introduce you to Bill Lex?

10     A.    The other way around.

11     Q.    Oh, you introduced -- okay.

12           How much did Mr. Cupersmith have

13 invested in McGinn Smith?  Do you know?

14     A.    A hundred thousand roughly, something

15 like that.  I don't know.  I'd have to -- I'd have

16 to look on that list that the SEC put out.

17     Q.    So Mr. Cupersmith advised you that he

18 tried to sell his notes, but no luck?

19     A.    Yes.

20     Q.    Did you ever individually, yourself,

21 look into whether there was a market for these

22 notes?

23     A.    No, because I was told there wasn't

24 any.

**Page 183**

1      Q.    And that was by Mr. Cupersmith?

2      A.    And Bill Lex.

3      Q.    Okay.  Are you familiar with the

4 investment the SAI Trust?  Do you know what that

5 is?

6      A.    No.

7      Q.    Okay.  So you didn't have any money

8 invested in that trust; is that correct?

9      A.    No.

10     Q.    Okay.  Were you ever contacted by Bill

11 Lex or McGinn Smith regarding bridge financing?

12     A.    No.

13     Q.    So you never asked to make a loan

14 directly to McGinn Smith?

15     A.    No.

16     Q.    Okay.  Were you aware that they were

17 seeking bridge financing from certain investors?

18     A.    No.

19     Q.    Had you been made aware of that, would

20 that make you concerned?

21     A.    Only if I understood what you were

22 talking about.

23     Q.    Did anyone ever come to you and advise

24 you that McGinn Smith was looking for investors to

**Page 184**

1 help bail them out?

2      A.    No.

3      Q.    Okay.  In 2009 or 2010, did you make

4 any attempts to withdraw your money or to redeem

5 it?

6      A.    No.

7      Q.    Okay.  Do you believe that McGinn

8 Smith would have honored any such request?

9      A.    No.

10     Q.    Did there come a time when you learned

11 that this was a fraud?

12     A.    Mm-hmm.  Well, when -- when and the

13 time or...

14     Q.    Did there come a time when you

15 learned --

16     A.    Yes --

17     Q.    -- that this was a fraud?

18     A.    -- there was.  I think I read it in

19 the newspaper article.

20     Q.    Okay.  Is that the first time you

21 learned about that?

22     A.    That it was a fraud?  Yes.  I believe

23 so.  There was some Binghamton newspaper or

24 Syracuse newspaper that had a whole article on --

**Page 185**

1      Q.    Prior to --

2      A.    -- on McGinn Smith.

3      Q.    -- reading it in the newspaper, did

4 you receive anything from Bill Lex or anyone else

5 suggesting that a fraud was going on here?

6      A.    I -- I received several

7 communications, but I don't recall who -- I mean,

8 that is newspaper articles, copies of articles,

9 some of which Bill would have sent, some that I got

10 elsewhere, either off the Internet or someplace.  I

11 don't know.  But I -- I have a few of those

12 articles at home.

13     Q.    When you read the newspaper for the

14 first time and the first time, you know, you saw

15 that this was, in fact, a fraud, did that come as a

16 surprise to you?

17     A.    I don't recall the -- when I -- when I

18 first read that and when we got all of these

19 letters that sort of led me to believe that there

20 was a fraud.

21     Q.    Okay.

22     A.    So I don't know the timeline.

23     Q.    Certainly, then, given these letters,

24 when you saw in the newspaper that there was a

# **Exhibit 2**

1

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF NEW YORK
 2                    CIVIL ACTION NO. 3:14-CV-01303

 3                         - - -

 4  Neal A. Cupersmith., et al

 5       Plaintiffs

 6       v

 7  Piaker & Lyons, P.C., Ronald L.
    Simons and Timothy N. Paventi,
 8
         Defendants
 9                             - - -

10

11          Oral deposition of PETER ZAKROFF, taken at

12  the law offices of Kang, Haggerty & Fetbroyt, 123 South

13  Broad Street, Suite 1670, Philadelphia, Pennsylvania,

14  on Tuesday, October 13, 2015, commencing at 1:00 p.m.,

15  before Alan L. Lesky, Certified Court Reporter of the

16  State of New Jersey, pursuant to notice.

17

18

19

20

21

22               ALAN L. LESKY & ASSOCIATES
                     Six Highspire Court
23               Medford, New Jersey 08055
                      609-257-3146
24
```

**Page 38**

1  forms because they're not in agreement with them --
2      Q.    What forms?
3      A.    I mean the tax returns.  If they believed, the
4  accountants believed that the information is right and
5  will sign the return then I believe in what it is.  I know
6  I have to sign my tax returns.  My preparer signs my tax
7  returns.
8      Q.    Had you seen the tax returns for McGinn Smith?
9      A.    No, I haven't.
10     Q.    So do you know whether or not they were signed?
11     A.    No, I don't.
12     Q.    Did you ever make a complaint to any governmental
13 entity regarding your investments at issue in this action?
14     A.    I was contacted by the SEC.
15     Q.    When did they contact you?
16     A.    Probably about a year ago.
17     Q.    What was the purpose of the contact?
18     A.    They wanted me to -- whatever documents I had
19 available.
20     Q.    Other than that contact did you make a complaint
21 to anyone in government?
22     A.    No, I did not, because I saw the receiver
23 information and I'm not a skilled attorney to know all the
24 ins and outs.

**Page 39**

1      Q.    You mentioned the SEC action.  Do you recall when
2  you first became aware of that, that action?
3      A.    I'm thinking November or December of last year.
4      Q.    Was the contact you just described, was that how
5  you became aware of the SEC action or something else?
6      A.    I'm not sure because I know there is information
7  on the website and I'm not sure whether the call came
8  before the information on the website.
9      Q.    What is your understanding as far as the nature
10 of the action against McGinn Smith?
11     A.    What do you mean the nature of the action?  They
12 were convicted of, I believe, fraud.
13     Q.    In the criminal proceeding?
14     A.    Yes.
15     Q.    Are you aware there is a separate SEC proceeding?
16     A.    Yes.  Against -- yes, against them and I believe
17 -- yes.
18     Q.    Did you conduct any investigation after you
19 became aware of either the criminal proceeding or the SEC
20 action?
21     A.    No, I did not.
22     Q.    Have you spoken with Mr. Lex about the criminal
23 proceeding or the SEC action?
24     A.    No, I have not.

**Page 40**

1      Q.    After you became aware of the legal proceedings
2  involving McGinn Smith did you do anything to determine
3  who the accountants or tax preparers were providing
4  services to them?
5      A.    No, I did not.
6      Q.    Do you recall when you became familiar with the
7  criminal proceeding involving McGinn Smith?
8      A.    When I received I believe an email from Bill Lex
9  telling me about there was a copy of a newspaper article,
10 I guess, from a newspaper in Albany.
11     Q.    Was that the article stating they had been
12 convicted?
13     A.    No.  They were on trial.
14     Q.    Are you familiar with the name Ronald Simons?
15     A.    No.
16     Q.    Are you aware of an SEC action against certain
17 brokers employed by McGinn Smith?
18     A.    Yes.
19     Q.    Do you recall when you became aware of that?
20     A.    I believe on the website.
21     Q.    What is your understanding as far as the nature
22 of that proceeding?
23     A.    I believe the SEC's charge is that these people
24 knew about what was going on at McGinn Smith.

**Page 41**

1      Q.    Do you know if Mr. Lex is one of the brokers who
2  is included in that matter?
3      A.    Yes, he is.
4      Q.    Did you use the services of any of the other
5  individuals -- any other individuals in connection with
6  your investments at McGinn Smith?
7      A.    No.
8      Q.    Do you know the status or outcome of the SEC
9  action again the brokers?
10     A.    There's supposed to be a decision soon.  I mean I
11 know they were suggested penalties and I believe several
12 of the brokers had appealed based on what I read on the
13 website.
14     Q.    Do you recall what the suggested penalties were?
15     A.    Not exactly.
16     Q.    What if anything do you recall?
17     A.    That there was monetary and many of them from
18 being forbidden to engage in selling securities again.
19     Q.    Do you know if that was the case with respect to
20 Mr. Lex?
21     A.    I believe it was.
22     Q.    Do you know what the basis for that decision for
23 those suggested penalties were?
24     A.    No.

# **Exhibit 3**



**U.S. Securities and Exchange Commission**

## SEC Files Emergency Action to Halt Fraudulent Scheme at Albany-Based Firm

**FOR IMMEDIATE RELEASE**
**2010-62**

*Washington, D.C., April 20, 2010* — The Securities and Exchange Commission today filed an emergency enforcement action to halt a fraudulent scheme being orchestrated by two co-owners of an Albany, N.Y.-based firm who misused investor money to fund their struggling business operations and meet ever-increasing liquidity needs. The SEC has obtained a court order to freeze their assets.

**Additional Materials**

➤ SEC Complaint

According to the SEC's complaint, filed in U.S. District Court for the Northern District of New York, Timothy M. McGinn and David L. Smith — through their firm McGinn, Smith & Co., Inc. (MS & Co.) and affiliated entities — raised approximately $120 million from investors in more than 25 debt offerings that were not registered with the SEC under the securities laws. They misrepresented that the investments would generate sufficient income to support the promoted interest rates and the return of principal at the end of the notes' terms.

The SEC alleges that McGinn and Smith knew that it would never be possible to repay investors their principal, let alone the quarterly interest payments promised. McGinn and Smith instead misused offering proceeds to support their financially troubled or bankrupt entities, to make payroll for MS & Co., and even for their own personal activities such as procuring strippers for a "sexually themed" cruise. Although the full extent of the fraud is not yet known, it appears that investors are currently owed at least $80 million.

"McGinn and Smith deceived investors about the true purpose behind these offerings," said Andrew M. Calamari, Associate Director of the SEC's New York Regional Office. "They falsely promised investors a profitable payday but secretly siphoned off money for their own payroll."

According to the SEC's complaint, the debt offerings have been sold to hundreds of investors through four funds and at least 18 trusts created by MS & Co. affiliates. They made a host of representations about the extent of due diligence they had performed, among other things. Contrary to their representations to investors, McGinn and Smith used much of the money raised in these offerings to make prohibited investments in their other businesses or make unsecured loans to financially support them. They also misused investor funds to pay exorbitant commission and transaction fees to their affiliated entities and make interest payments to investors in the other entities.

The Commission would like to thank the Financial Industry Regulatory Authority (FINRA) for its assistance in this matter. The SEC's investigation is continuing.

# # #

For more information about this enforcement action, contact:

Andrew M. Calamari
Associate Director, SEC's New York Regional Office
(212) 336-0042

*http://www.sec.gov/news/press/2010/2010-62.htm*

# **Exhibit 4**

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
  COMMISSION,

Plaintiff,

-vs-                                    **Civil Action No. 10-cv-457(GLS/RFT)**

MCGINN, SMITH & CO., INC., *et al.*,

Defendants.

### NOTICE OF MOTION

      **PLEASE TAKE NOTICE**, that upon the annexed Affidavit of Charles C. Swanekamp, Esq. and the Memorandum of Law and upon all prior pleadings and proceedings heretofore had herein, a Motion will be made as follows:

      **DATE, PLACE AND TIME OF MOTION:** The date and time of the motion will be determined by the Court, with the location to be at the James T. Foley U.S. Courthouse, 445 Broadway, Albany, New York 12207 before the Hon. David R. Homer, Magistrate Judge.

      **TYPE OF MOTION:** Ronald L. Simons, a non-party to this action, seeks to quash a subpoena to appear and testify pursuant to Fed. R. Civ. Pro. 45(c)(3)(A).

DATED: November 5, 2010

                              Respectfully submitted,

                              **JAECKLE FLEISCHMANN & MUGEL, LLP**

                              By:_____
                              Charles C. Swanekamp (601346)
                              *Attorneys for Ronald L. Simons*
                              12 Fountain Plaza, Suite 800
                              Buffalo, New York 14202
                              Telephone: 716.856.0600
                              Fax: 716-856-0432

# EXHIBIT E



**Jaeckle** | FLEISCHMANN & MUGEL, LLP
Attorneys at Law

Charles C. Swanekamp
Partner
Direct: 716.843.3925
cswanekamp@jaeckle.com

12 Fountain Plaza | Suite 800
Buffalo, NY 14202-2292
Tel: 716.856.0600
Fax: 716.856.0432

October 29, 2010

**Via E-Mail mehrabanl@sec.gov
and First Class Mail**

Ms. Lara Shalov Mehraban
U.S. Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Room 400
New York, NY 10281-1022

Re:    **SEC v. McGinn Smith & Co., et al.
No. 10 Civ. 457 (NDNY)**

Dear Ms. Mehraban:

May this correspondence confirm my acceptance of the Subpoena directed to my client, Ronald Simons, with respect to a hearing to be conducted on November 16, 2010 at 9:15 a.m. in the matter of *Securities and Exchange Commission v. McGinn Smith & Co.* (No. 10-cv-457). My acceptance of service in this matter on behalf of Mr. Simons does not necessarily constitute an acceptance of service of any future subpoenas or other documents on my client.

You have indicated that the testimony sought from my client will relate to the David Smith Private Annuity Trust and tax returns prepared for David and Lynn Smith, among other things.

May this correspondence constitute a formal request that you withdraw your Subpoena directed to Mr. Simons. As you are no doubt aware, Mr. Simons has been designated a "target" by the United States Attorney for the Northern District of New York in regard to a Grand Jury proceeding that is presently in process in regard to the *McGinn Smith & Co.* matter. As such, it is my client's intention to assert the Fifth Amendment right against self-incrimination and to accordingly, respectfully decline to answer any questions posed to him with respect to the *McGinn Smith & Co.* engagement. Inasmuch as my client will not be providing any testimony, and in the interests of judicial economy, we respectfully submit that the Subpoena should be withdrawn.

Ms. Lara Shalov Mehraban
US Securities and Exchange Commission
New York Regional Office
October 29, 2010

Page 2


      We would appreciate advisement by November 3, 2010 of your intentions with respect to the withdrawal of the Subpoena.  Unless we hear from you affirmatively that the Subpoena will be withdrawn, we will have little recourse other than moving to quash it in all respects.


                Very truly yours,


                CHARLES C. SWANEKAMP

CCS:sm/1021618

cc:  Brian DeVane, Esq.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

-vs-                                              Civil Action No. 10-cv-457(GLS/RFT)

MCGINN, SMITH & CO., INC., *et al.*,

                                        Defendants.

MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO QUASH PURSUANT TO FED. R. CIV. P. 45(c)(3)(A)(iii)

This memorandum of law is submitted on behalf of Ronald L. Simons, a non-party to this

action, in support of his motion to quash a subpoena ad testificandum issued by plaintiff

Securities and Exchange Commission ("SEC"). The relevant facts are contained in the

accompanying affidavit of Charles C. Swanekamp, Esq., and will not be repeated herein.

ARGUMENT

Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 45(c)(3)(A)(iii), "the

issuing court <u>must</u> quash or modify a subpoena that…requires disclosure of privileged or other

protected matter, if no exception or waiver applies…." (Emphasis added). In this case, Mr.

Simons asserts that testifying before this Court in this action implicates his Fifth Amendment

right against self-incrimination.

Specifically, Mr. Simons is the President and a principle of the accounting firm of Piaker

& Lyons, LLP ("Piaker"). For several years, Piaker completed and filed federal tax returns for

defendant McGinn, Smith & Co., Inc., as well as some of its related entities and Messrs. McGinn

and Smith personally. As a result of his preparation of these tax returns, Mr. Simons is now a target of an investigation by the United States Attorneys' Office ("USAO"). It is these same tax returns upon which the SEC seeks to question Mr. Simons.

As detailed in the accompanying affidavit, the documents which the SEC obtained from Piaker as a result of an earlier subpoena, are a subset of documents produced to the United States Attorneys' Office pursuant to a Grand Jury Subpoena. Piaker has not produced any documents to the SEC which were not previously produced to the USAO. Consequently, at the upcoming hearing, any document upon which Mr. Simons is questioned about has an impact on the USAO's investigation. As a result, Mr. Simons must assert his Fifth Amendment right against self-incrimination to any question posed by the SEC at the upcoming hearing.

It is well established that the Fifth Amendment "can be asserted in any proceeding, civil or criminal,…against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-445, 32 L.Ed.2d 212, 92 S.Ct. 1653 (1972)(footnotes omitted). Here, Mr. Simons is a target of criminal investigation by the USAO. His assertion of his Fifth Amendment rights is not based upon the specter of a possibility that his statements might be used against him.

While the SEC may argue that Mr. Simons should be compelled to appear at the upcoming hearing because the SEC may ask questions which Mr. Simons could answer, such a compulsion also jeopardizes Mr. Simons right to preserve his Fifth Amendment privileges. As stated in *United States v. O'Henry Film Works, Inc*, 598 F.2d 313, 317 (2d Cir. 1979)(citations omitted), "[a] witness who fails to invoke the Fifth Amendment against questions as to which he could have claimed it is deemed to have waived his privilege respecting all questions on the

2

same subject matter." In this case, the SEC is seeking to call Mr. Simons not to ask him general

questions relating to tax preparation; rather they seek to question him on specific tax returns—

the same tax returns in the possession of the USAO. Indeed, even a seemingly innocuous

question about why an entry was placed on a certain schedule, if answered, will waive Mr.

Simons' right to invoke his Fifth Amendment privilege under the *O'Henry Film Works, Inc.*

analysis. Consequently, Mr. Simons will not be able to answer any questions at the upcoming

hearing, rendering his appearance futile.

   As a result, the subpoena ad testificandum should be quashed and no additional

subpoenas issued for Mr. Simons' testimony until the USAO investigation is complete.

DATED: November 5, 2010

                                   Respectfully submitted,

                                   **JAECKLE FLEISCHMANN & MUGEL, LLP**

                                   By:_____
                                   Charles C. Swanekamp (601346)
                                   *Attorneys for Ronald L. Simons*
                                   12 Fountain Plaza, Suite 800
                                   Buffalo, New York 14202
                                   Telephone: 716.856.0600
                                   Fax:     716-856-0432
                                   E-Mail:  cswanekamp@jaeckle.com

                                   and

                                   Brian Devane, Esq. (501138)
                                   **LAW OFFICE OF BRIAN DEVANE**
                                   *Of Counsel*
                                   600 Broadway
                                   Albany, New York 12207-2235
                                   Telephone: 518.475.9845
                                   Fax:     518-475.9846
                                   E-Mail:  bdevane@devanelaw.com

TO:    Lara S. Mehraban, Esq.
        Securities and Exchange Commission
        3 World Financial Center, Room 400
        New York, New York 10281
        Telephone: 212.336.0591
        E-mail:  MehrabanL@sec.gov

1024407

# **Exhibit 5**

20090714599516+   cusip# 872995AD7

**No. 10**

**$40000**

# TDMM CABLE SR. TRUST 09
### Albany, New York
## Contract Certificate
## 9.00% Due February 1, 2012

**Registered Holder: NFS/FMTC IRA FBO KENNETH DALE**

TDMM CABLE SR. TRUST 09, A NEW YORK TRUST (THE "TRUST"), FOR VALUE RECEIVED, HEREBY PROMISES TO PAY TO THE CERTIFICATEHOLDER, or assign(s), the Principal Amount of Forty Thousand Dollars ($40000) in such coin or currency of the United States of America as at the time of payment shall be legal tender for public and private debts, together with interest accrued thereon at the rate of 9.00% per annum in the following manner: Principal and interest on the Certificates at the aforesaid rate will be paid in monthly installments on March 1, 2009 and on the first day of each subsequent month thereafter, to and including February 1, 2012, on which all accrued interest and unpaid principal shall become immediately due and payable.

THIS CERTIFICATE IS ISSUED pursuant and subject to the Declaration of Trust dated as of January 16, 2009 (as amended from time to time, the "Declaration") and the Memorandum dated as of January 19, 2009, and the holder of this Certificate is entitled to all of the benefits thereof. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Declaration.

PRINCIPAL AND INTEREST shall be payable by check mailed from the office of the Trustee to the Certificateholder stated above, or assign(s), at the address as it appears on the Certificate Register maintained by the Trustee as of the close of the first day of the month.

THIS CERTIFICATE HAS NOT BEEN REGISTERED or qualified under the Federal Securities Act of 1933, as amended, or applicable state securities laws and may not be sold or transferred without such registration or qualification or an exemption therefrom.

THE TRUST MAY, as a condition of payment in full of the principal of and interest of this Certificate, require the Certificateholder to surrender this Certificate. All amounts payable under this Certificate shall be payable without presentment or demand for payment, notice of nonpayment, protest or further notice or demand of any kind, all of which are expressly waived. This Certificate shall be construed in accordance with and be governed by the laws of the State of New York.

IN WITNESS WHEREOF, TDMM CABLE SR. TRUST 09 has caused this Certificate to be signed in its name by its Trustee thereunto duly authorized, and to be dated as of the date written below.

DATE: 1/30/2009

TDMM CABLE SR. TRUST 09
By: MCGINN, SMITH CAPITAL HOLDINGS CORP.,
not in its individual capacity, but solely as
Trustee under the Declaration of Trust dated
as of January 16, 2009.

By: _____
     David L. Smith, President

**CONFIDENTIAL**

PLTF011544

# **Exhibit 6**

DECEASED KENNETH H DALE 08/01/2010

COPY

Form **1040** Department of the Treasury — Internal Revenue Service

**U.S. Individual Income Tax Return** **2010** (99) IRS Use Only — Do not write or staple in this space.

| | | | | | | |
|---|---|---|---|---|---|---|
| Name, Address, and SSN | For the year Jan 1 - Dec 31, 2010, or other tax year beginning | | , 2010, ending | , 20 | | OMB No. 1545-0074 |

Your first name MI Last name
KENNETH H DALE

If a joint return, spouse's first name MI Last name
MARY L DALE

See separate instructions.

Home address (number and street). If you have a P.O. box, see instructions. Apartment no.
10148 SANDY MARSH LANE

City, town or post office. If you have a foreign address, see instructions. State ZIP code
ORLANDO FL 32832

Make sure the SSN(s) above and on line 6c are correct. ▲

**Presidential Election Campaign** ► Check here if you, or your spouse if filing jointly, want $3 to go to this fund?.............► [X] You [X] Spouse

Checking a box below will not change your tax or refund.

**Filing Status**

Check only one box.

1 ☐ Single
2 [X] Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above & full name here. ►
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ►
5 ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a [X] **Yourself.** If someone can claim you as a dependent, **do not** check box 6a...........
b [X] **Spouse** .........................................................

Boxes checked on 6a and 6b ... **2**

| c Dependents: | | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax cr (see instrs) |
|---|---|---|---|---|
| **(1)** First name | Last name | | | |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |

No. of children on 6c who:
● lived with you .....
● did not live with you due to divorce or separation (see instrs)
Dependents on 6c not entered above .

If more than four dependents, see instructions and check here . . . ►☐

Add numbers on lines above . . . ► **2**

d Total number of exemptions claimed .................................

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ..................... | 7 | |
| 8a | Taxable interest. Attach Schedule B if required...................... | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a..... | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required ................... | 9a | |
| b | Qualified dividends............................. | 9b | 509. | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes.......... | 10 | |
| 11 | Alimony received .................................................. | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ................... | 12 | |
| 13 | Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here.................► ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 .......................... | 14 | |
| 15a | IRA distributions ............ | 15a | b Taxable amount .... | 15b | |
| 16a | Pensions and annuities ...... | 16a | 21,954. | b Taxable amount ..... | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E . | 17 | |
| 18 | Farm income or (loss). Attach Schedule F............................ | 18 | |
| 19 | Unemployment compensation ....................................... | 19 | |
| 20a | Social security benefits ......... | 20a | 30,136. | b Taxable amount ..... | 20b | |
| 21 | Other income VAN KAMPEN UIT REIM. | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ........... ► | 22 | |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses ...................................... | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ ...... | 24 | |
| 25 | Health savings account deduction. Attach Form 8889........ | 25 | |
| 26 | Moving expenses. Attach Form 3903 ..................... | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE ...... | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans .......... | 28 | |
| 29 | Self-employed health insurance deduction ............... | 29 | |
| 30 | Penalty on early withdrawal of savings ................... | 30 | |
| 31a | Alimony paid b Recipient's SSN ... ► | 31a | |
| 32 | IRA deduction ......................................... | 32 | |
| 33 | Student loan interest deduction ........................ | 33 | |
| 34 | Tuition and fees. Attach Form 8917 .................... | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 ... | 35 | |
| 36 | Add lines 23 - 31a and 32 - 35 ............................................... | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** .................► | 37 | 32,300. |

**BAA** **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** FDIA0112 12/22/10 Form **1040** (2010)

CONFIDENTIAL

PLTF010485

# **Exhibit 7**

1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF NEW YORK
2                 CIVIL ACTION NO. 3:14-CV-01303

3

4   NEAL A. CUPERSMITH, ET AL.,

5        Plaintiffs,

6        v.

7   PIAKER & LYONS, P.C., RONALD L.
    SIMONS AND TIMOTHY N. PAVENTI,
8
         Defendants.
9

10

11

12                 Oral deposition of WILLIAM F. LEX,

13  taken at the law offices of Kang, Haggerty &

14  Fetbroyt, 123 South Broad Street, Suite 1670,

15  Philadelphia, Pennsylvania, on Wednesday, February

16  17, 2016, commencing at 10:24 a.m., before Suzanne

17  Walinsky, a Court Reporter and Notary Public,

18  pursuant to notice.

19

20

21

22

23

24

**Page 42**

1 yes.  I would put that down, yes.

2      Q.     Any communications with Mr. Kang

3 regarding your testimony today?

4      A.     Other than we met for five minutes

5 before coming in here, just him explaining the --

6 the rules of engagement, no.

7      Q.     Other than going over the rules of a

8 deposition, were there any discussions regarding

9 your actual testimony today?

10     A.     No.

11     Q.     Other than your help with documents

12 and communications that you may have had with

13 certain of your clients regarding this lawsuit,

14 anything else that you've done in connection with

15 this consultancy relationship in this case?

16     A.     I can't think of anything.

17     Q.     Are you aware that my clients have

18 been deposed in this case?

19            I'm talking about Piaker & Lyons,

20 Ronald Simons, and Tim Paventi.

21     A.     Am I aware they were?  No.  I'm not

22 aware that they were.

23     Q.     Then I think I probably know the

24 answer to this question.

**Page 43**

1      A.     Excuse me?

2      Q.     Then I think I know the answer to this

3 next question, but did you assist Mr. Kang's office

4 in preparing for those depositions?

5      A.     Of -- of the defendants?

6      Q.     Correct.

7      A.     No.

8      Q.     And just so I'm clear, you have yet to

9 submit any invoices for time spent in this case.

10     A.     That's correct.

11     Q.     And you said the rate was $100 an

12 hour?

13     A.     Yes.

14     Q.     How did you come up with that rate?

15     A.     I -- I just determined that it was --

16 which I thought would be fair and not excessive.

17     Q.     I understand you haven't submitted any

18 invoices, but have you prepared any documents

19 keeping track of the time you spent thus far?

20     A.     Just notes of scratch paper.

21     Q.     Have you produced those to your

22 attorney in response to our subpoena?

23     A.     No.  I don't believe I did.

24     Q.     Okay.

**Page 44**

1      A.     I didn't think they were on the list.

2            MR. HOPPE:  Go off the record real

3 quick.

4            (Discussion off the record.)

5 BY MR. HOPPE:

6      Q.     Okay.  Mr. Lex, just shifting gears.

7            When did you get into the financial

8 services industry?

9      A.     November of '71.

10     Q.     And how did that come about?

11     A.     I signed up with John Hancock Life

12 Insurance.

13     Q.     So you started out in the life

14 insurance field?

15     A.     That's correct.

16     Q.     Before signing up with John Hancock,

17 what did you do before then?

18     A.     I was in marketing with an electrical

19 equipment manufacturer.

20     Q.     And how long were you with that

21 manufacturer?

22     A.     About four years.

23     Q.     When you signed up with John Hancock

24 in '71, did you have to get any licenses in

**Page 45**

1 connection with the life insurance?

2      A.     Yes.

3      Q.     And what license did you have to get?

4      A.     Insurance licenses.

5      Q.     Any tests that you had to take for

6 that?

7      A.     Yes.

8      Q.     What tests were those?

9      A.     Life insurance tests.

10     Q.     And how good is that license for, how

11 long?

12     A.     It has to be renewed every couple

13 years.

14     Q.     And in connection with the renewal,

15 what do you have to do?

16     A.     Pay a fee.

17     Q.     Is there any kind of continuing

18 education that you have to do in connection with

19 such a license?

20     A.     Yes.

21     Q.     And how many hours of continuing

22 education do you have to do?

23     A.     I believe it's 24 every two years.

24     Q.     So then, once you complete your

**Page 46**

1  continuing education, at that point, you just seek
2  a renewal of your license?
3       A.    Well, it comes in the mail and...
4       Q.    Do you still have that license today
5  for insurance?
6       A.    Yes.
7       Q.    How long were you with John Hancock?
8       A.    Well, I'm still a broker with them,
9  so... I was never employed.  I was always a
10 independent contractor.
11      Q.    The company Lex & Smith, when did that
12 start?
13      A.    It was about 1975.
14      Q.    So when you were a broker for John
15 Hancock, starting in 1971, were you affiliated with
16 any other companies?
17      A.    Yes.  I mean, at any one time I could
18 have had 20, 30 affiliations in any year.
19      Q.    What is Lex & Smith?
20      A.    It's a Sub S corporation.
21      Q.    And did you become a shareholder in
22 Lex & Smith in 1975?
23      A.    I believe 1975 it was just a marketing
24 entity, and some time after that we incorporated

**Page 47**

1  it.
2       Q.    As a marketing entity, what was it?
3  Was it a DBA?  Was it something else?
4       A.    It was a Sub S corporation.
5       Q.    As of 1975?
6       A.    No.  Somewhere after that.
7       Q.    Who is Mr. Smith?
8       A.    He was my partner that died in 1994.
9       Q.    Okay.  Until Lex & Smith was
10 incorporated, was it just a partnership?
11      A.    No.  It was just a marketing entity,
12 both our names.
13      Q.    I'm just trying to understand what you
14 mean by "marketing entity."  Was it a DBA for you
15 and Mr. Smith?
16      A.    No.  It was the names of -- it was our
17 names.  And we just called it Lex & Smith.
18      Q.    Did you have any employees back in
19 1975?
20      A.    No.
21      Q.    No administrative assistants or
22 anything like that?
23      A.    Lex & Smith never had employees.
24      Q.    Okay.  You've had administrative

**Page 48**

1  assistants during your career, correct?
2       A.    Yeah.  I've had people working for me.
3       Q.    Who employed them?
4       A.    Many times we just reimbursed
5  insurance companies.  They were employees of the
6  insurance company and we reimbursed the insurance
7  company.
8       Q.    And you said you reimbursed.  It would
9  be you and Mr. Smith individually?
10      A.    Right.
11      Q.    So, for example, you were affiliated
12 with John Hancock in 1971, correct?
13      A.    Correct.
14      Q.    Did you have an administrative
15 assistant in 1971?
16      A.    No.  I used their employees.
17      Q.    When is it that you began to diversify
18 your work and shift from the insurance stuff to
19 stocks, bonds, investments?
20      A.    It was a gradual progression.
21      Q.    And what did you start out with as far
22 as investments?
23      A.    Primarily, variable annuities.
24      Q.    And who were you affiliated with when

**Page 49**

1  you started out in annuities?
2       A.    Well, it was John Hancock, Lincoln
3  National, Aetna, Equitable -- not Equitable.
4  Aetna.
5       Q.    And were you a broker --
6       A.    Yes.
7       Q.    -- for each of those companies?
8             And how did you get paid whenever you
9  sold an annuity?
10      A.    Commission.
11      Q.    You didn't get paid by your individual
12 clients, did you?
13      A.    No.
14      Q.    And when did you start out in the
15 annuities industry?
16      A.    Well, in 1975 I did annuities.
17      Q.    So from 1971 to '75 --
18      A.    Or it may have been '71.  I could sell
19 annuities in '71 if I wanted to.
20      Q.    What license did you need for
21 annuities?
22      A.    It depends on the type of annuity.
23      Q.    In 1971 what licenses did you have?
24      A.    Life, health, annuities.

# **Exhibit 8**

1

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF NEW YORK
 2                    CIVIL ACTION NO. 3:14-CV-01303

 3                       - - -

 4  Neal A. Cupersmith., et al

 5      Plaintiffs

 6      v

 7  Piaker & Lyons, P.C., Ronald L.
    Simons and Timothy N. Paventi,
 8
        Defendants
 9                          - - -

10

11          Oral deposition of GARTH BOREL, taken at

12  the law offices of Kang, Haggerty & Fetbroyt, 123 South

13  Broad Street, Suite 1670, Philadelphia, Pennsylvania,

14  on Tuesday, October 13, 2015, commencing at 9:00 a.m.,

15  before Alan L. Lesky, Certified Court Reporter of the

16  State of New Jersey, pursuant to notice.

17

18

19

20

21

22                  ALAN L. LESKY & ASSOCIATES
                         Six Highspire Court
23                  Medford, New Jersey 08055
                         609-257-3146
24
```

**Page 6**

1 world. I was a regional manager selling advertising
2 display space in magazines. In 1991 I started my own
3 business, so I've been self-employed ever since.
4     Q. What type of business is that?
5     A. It's a carpet cleaning business, oriental rug
6 cleaning business and mini blind cleaning business.
7     Q. And you currently have that business today?
8     A. Yes.
9     Q. Do you know what your current net worth is?
10     A. Liquid assets or --
11     Q. Liquid assets and then your complete picture.
12     MR. MATHEWS: Objection. You can answer.
13     A. Does that include like the value of your home and
14 stuff?
15     Q. Yes.
16     A. I'd say maybe two million.
17     Q. How many homes do you have?
18     A. One.
19     Q. Do you have any condos or apartments or time
20 shares?
21     A. Not right now, no.
22     Q. How many cars do you own?
23     A. I own one. I own a company truck and I lease a
24 car.

**Page 7**

1     Q. Have you taken any courses regarding the stock
2 market or securities?
3     A. No.
4     Q. Have you taken any other financial courses?
5     A. No.
6     Q. Do you read any investment publications or
7 on-line articles regarding investments?
8     A. Occasionally.
9     Q. Do you recall specifically which publications
10 you've read?
11     A. No.
12     Q. Approximately how long ago did you start reading
13 these articles?
14     A. Just simply over time I keep track of the economy
15 so I'll look up U.S.A. Today and maybe see what's
16 happening with the market, why it was up, why it was down.
17 That's really about the extent of it.
18     Q. Have you done that for 10 years?
19     A. Maybe 15-ish.
20     Q. Have you ever invested in stocks or bonds?
21     A. Yes.
22     Q. Do you recall when?
23     A. Probably the mid-seventies I started investing
24 with I guess basically mutual funds with Delaware Cash

**Page 8**

1 Reserve at the time and then Vanguard when they became
2 established which may have been sometime I'd say maybe
3 late seventies when I was in the corporate world.
4     Q. Was there a broker involved in making those
5 investments?
6     A. No.
7     Q. Was there an investment advisor involved?
8     A. No.
9     Q. At the time that you were making those
10 investments that you were just describing did you do any
11 research or read up on the investments prior to making
12 those investment decisions?
13     A. No. I don't really have a knowledge about -- I
14 never really learned much about investing in college. I
15 simply look at the previous results.
16     Q. Do you recall how you became aware of the
17 investments that you made in the late seventies you were
18 describing?
19     A. Through my dad, my father.
20     Q. He recommended that you make those investments?
21     A. Yeah. He was in most of the same mutual funds.
22     Q. Are you familiar with a brokerage firm McGinn
23 Smith and Company?
24     A. Yes.

**Page 9**

1     Q. Are you familiar with the term brokerage firm?
2     A. The term, yes.
3     Q. What do you understand that term to mean?
4     A. That they represent -- there are different
5 clients that have different investments you can invest
6 into.
7     Q. When did you first become familiar with McGinn
8 Smith and Company?
9     A. I'd say the late -- probably around late
10 nineties, 2000.
11     Q. How did you become familiar with McGinn Smith and
12 Company?
13     A. I first basically through my business -- wait, is
14 that McGinn Smith or --
15     Q. McGinn Smith, yes.
16     A. Okay. Backtrack. I was thinking Lex and Smith.
17 Okay.
18     Q. So when you said earlier the late nineties, 2000
19 were you thinking of Lex and Smith?
20     A. I was thinking Lex and Smith. There are two
21 Smiths that were throwing me off.
22     Q. What is Lex and Smith?
23     A. That was my financial advisor that invested in
24 the McGinn Smith investments.

**Page 14**

1  but he felt these were the best investments for us based
2  upon the security of them, basically.
3       Q.   Did Mr. Lex have the authority to make any
4  investments without your specific authorization?
5       A.   No.
6       Q.   So he would need to consult with you prior to
7  making investments?
8       A.   Yes.
9       Q.   Did Mr. Lexapro provide any advice to you
10  regarding your investments?
11      A.   Yes.
12      Q.   Do you recall specifically what the substance of
13  that advice was?
14      A.   Only the fact these were very secure, safe notes
15  that he's been invested in.  He's had many clients
16  invested in.  His family's been invested in it.  We bought
17  the fact it was a very safe notes to purchase from him.
18      Q.   Did he explain why he felt they were so safe?
19      A.   We always had an understanding that for every
20  dollar we were investing there was like three times I
21  guess in holdings somewhere with these notes.  For
22  example, if you invested, I think he would say roughly
23  like they're going to offer a million dollars and they're
24  backed up by like three million dollars as an example.

**Page 15**

1  So, more or less for we bought hundred thousand dollars
2  notes, they're backed up by three times that and nothing
3  is going to ever -- they're secure.
4       Q.   Do you know whether Mr. Lex performed any due
5  diligence on the investments?
6            MR. MATHEWS:  Objection.
7       A.   Repeat that.
8       Q.   Do you know whether Mr. Lex performed any due
9  diligence on the investments?
10      A.   I don't really understand what --
11      Q.   Did you discuss what research Mr. Lex had done
12  into the specific products and entities involved?
13      A.   Only to the degree that he brought these up and I
14  had faith in him and I trusted him.  We was dealing with
15  these notes for years as far as I understood.
16      Q.   But do you recall having any discussion about any
17  research he may have performed?
18      A.   No.
19      Q.   So you deferred to his judgment?
20      A.   Yes.
21      Q.   Did you meet with Mr. Lex in person or have
22  telephone conversations regarding your investments?
23      A.   Well, initially in person, both.  Mostly in
24  person.  He would visit us as needed or when it came time

**Page 16**

1  to renew some of these he would put a letter out to us and
2  follow up with a phone call.
3       Q.   Did you discuss with Mr. Lex -- what was your
4  risk tolerance at this time you were making the
5  investments in the four funds?
6            MR. MATHEWS:  Objection.
7       A.   I would say I'm conservative, I'm very
8  conservative.
9       Q.   Did you convey that to Mr. Lex prior to making
10  your investments?
11      A.   Oh, yes.
12      Q.   Mark this as 2, please.  Do you recognize that
13  document?
14      A.   Yes.
15      Q.   Is this one of the documents that you received in
16  connection with making your investment in the TDM Verfier
17  Trust?
18      A.   Yes.
19      Q.   Do you recall how you came to make this
20  investment?
21      A.   Yes.
22      Q.   How did you come to make that investment?
23      A.   I invested, I gave my children, Brynne Borel and
24  Paige Borel I think $12,000 each and I put a thousand

**Page 17**

1  dollars toward it which added up to 25,000 which was the
2  minimum purchase for this fund or the trust fund.  I had
3  to co-sign it because they didn't qualify because they
4  were, because, I guess their net worth or age at the time,
5  so I co-signed it for my daughters.  So I more or less
6  helped put this to vest with them a little bit of money I
7  more or less gifted them if you will.
8       Q.   You mentioned, was this something you invested in
9  through Mr. Lex?
10      A.   Yes.
11      Q.   Do you recall whether you met with Mr. Lex in
12  person to make this investment?
13      A.   I'm not sure whether I met with him in person but
14  we discussed it.
15      Q.   Is this one of the investments that Mr. Lex
16  recommended to you?
17      A.   Yes.
18      Q.   You mentioned that your children didn't qualify
19  and you mentioned a net worth requirement.  Do you know
20  what the net worth requirement was for this investment?
21      A.   I don't recall.  You know, they were in their
22  twenties.  They obviously didn't have --
23      Q.   Do you know if Mr. Lex received any commissions
24  or fees in connection with this investment?

**Page 18**

1    A.  I don't know.

2    Q.  Did you ever ask if he received any fees or

3 commissions in connection with the investment?

4    A.  Never actually asked him.  I assume a broker has

5 to get a commission.

6    Q.  Do you recall did Mr. Lex describe this

7 investment to you?

8    A.  The TDM, if I recall, this is, again he described

9 everything as being whatever monies you bought there was

10 like three times that backing them up on hold I guess if

11 you will which basically meant they were secure.

12    Q.  Did Mr. Lex say anything about any potential

13 risks in the investment?

14    A.  Only that this was extremely low risk and again

15 his family's been in it, he's been in it so it was very,

16 very highly recommended based upon the conservative nature

17 that I was looking for.

18    Q.  Do you recall whether you discussed the risk of

19 losing a portion or all of your investment?

20    A.  No.

21    Q.  Did you discuss you might not get the interest

22 rate that was promised?

23    MR. MATHEWS:  Objection.

24    A.  No.  It was basically almost guaranteed because

**Page 19**

1 we were senior -- again, I get confused whether we were

2 still a senior note holder in this fund trust or the

3 others.  I know we were a senior note holder, he described

4 you will get your interest first and then goes down to the

5 other junior note holders.

6    Q.  Did you understand that there was an inherent

7 risk in your investment?

8    MR. MATHEWS:  Objection.

9    A.  Yes.

10    Q.  What did you understand that risk to be?

11    A.  Well, like with any investment you do have a

12 slight chance to possibly lose based upon the economy.

13    Q.  Mr. Borel, if you could please turn, still on

14 Exhibit 2, to the second page which I believe has your

15 signature towards the bottom.

16    A.  Yes.

17    Q.  Can you also look at paragraph 8b as in boy.  Do

18 you see there that it states that I recognize that

19 investment certificates involve substantial risk factors

20 including those set forth under risks in the memorandum.

21 Do you see that?

22    A.  Yeah.  I see that.

23    Q.  Do you recall reading that paragraph at the time

24 you signed this?

**Page 20**

1    A.  No.

2    Q.  Do you recall reading anything that listed

3 substantial risk factors at the time you made your

4 investment?

5    A.  No.

6    Q.  But that is your signature at the bottom of the

7 page, correct?

8    A.  Yes.

9    Q.  Do you recall whether you had multiple

10 conversations with Mr. Lex regarding this particular

11 investment or just one conversation?

12    A.  I don't recall.

13    Q.  Did you do any research regarding this particular

14 investment prior to making the decision to invest?

15    A.  No.

16    Q.  Could you mark this as 3, please.  Do you

17 recognize that document?

18    A.  Yes.

19    Q.  I believe that lists the First Advisory Income

20 Notes on page 1, top paragraph?

21    A.  Okay, yes.

22    Q.  Is this one of the investments that you made in

23 McGinn Smith through Mr. Lex?

24    A.  Yes.

**Page 21**

1    Q.  Do you recall the circumstances that led to you

2 making this investment?

3    A.  Well, that was recommended by Bill Lex.

4    Q.  Do you recall any specific discussions you had

5 with Mr. Lex regarding this investment?

6    A.  None other than he suggested it was a safe

7 investment.

8    Q.  Did you discuss the risks involved in this

9 particular investment with Mr. Lex?

10    A.  Yes.

11    Q.  Do you recall what Mr. Lex told you regarding the

12 risks involved in the investment?

13    A.  Not totally.

14    Q.  Do you remember anything that he told you?

15    A.  No.  Only like the other funds they were backed

16 up and very secure notes.  He had a good track record with

17 them.

18    Q.  Do you recall whether you met with Mr. Lex in

19 person or had a telephone conversation with him regarding

20 this investment?

21    A.  Well, we met with them before we went with these.

22 And then he set them up.  So I'm not sure which note was

23 first without -- I'm not sure exactly the dates when we

24 set up because I know we did have three of those notes.

**Page 22**

1   Q.   Let's mark this one as 4.

2   Q.   Do you recognize the documents that are marked

3   exhibits 4 and 5?

4   A.   Yes.

5   Q.   Are those the other two notes you invested in,

6   Mr. Lex?

7   A.   Yes.

8   Q.   Do you recall did you have separate conversations

9   or meetings with Mr. Lex regarding each individual

10  investment?

11  A.   Yes.

12  Q.   Do you recall whether there was anything

13  different about your discussions regarding one investment

14  as opposed to another?

15  A.   Not with these notes, no.

16  Q.   So you generally asked the same types of

17  questions and obtained the same types of information with

18  respect to each?

19  A.   Yes.

20  Q.   Do you recall whether the discussion regarding

21  the risks of the investment were the same or different

22  with respect to the various investments that you made with

23  Mr. Lex?

24  A.   No.  And they were all pretty much similar.

**Page 23**

1   Q.   Do you recall whether Mr. Lex described any

2   independent research he had done with respect to each of

3   these investments?

4        MR. MATHEWS:  Objection.

5   A.   Repeat that.

6   Q.   Do you recall whether Mr. Lex described any

7   independent research he performed regarding any of these

8   investments that are in front of you?

9   A.   No, I don't.

10  Q.   I believe you answered this earlier but I just

11  want to confirm.  Did you do any independent research

12  regarding any of the investments that you made in these

13  funds?

14  A.   No.

15  Q.   Are you familiar with the term liquidity?

16  A.   Yes.

17  Q.   What is your understanding of that term?

18  A.   To me being liquid means that you can access

19  those funds very, very quickly.

20  Q.   Did you discuss with Mr. Lex the liquidity of any

21  of your investments you made in McGinn Smith?

22  A.   I don't recall.

23  Q.   Was that a concern of yours at the time of making

24  your investments?

**Page 24**

1   A.   Yes.

2   Q.   Did you expect to be able to get your money out

3   at any time prior to the maturity dates with respect to

4   these investments?

5   A.   If I recall, you had to be in for I think these

6   were year notes.  Once the term was up you had the option

7   to renew and that's why like the one fund for my daughter,

8   they did terminate that fund because they needed -- I

9   think it was in for a year.  I'm not sure exactly.

10  Q.   So they redeemed the money?

11  A.   Yes.

12  Q.   Did you redeem any money from any of the other

13  investments?

14  A.   No.

15  Q.   Did you discuss with Mr. Lex when you would be

16  getting your money out for any of these investments prior

17  to making your investment?

18  A.   No.

19  Q.   Did you discuss with Mr. Lex the prospect you

20  might need to take your money out earlier than the

21  maturity dates?

22  A.   I don't recall.

23  Q.   Was it important for you to be able to get your

24  money out early?

**Page 25**

1        MR. MATHEWS:  Objection.

2   A.   I forget what the penalty was.  To be honest with

3   you, I don't recall.

4   Q.   Did Mr. Lex or anyone provide you with written

5   materials regarding your investments prior to the time

6   that you made the investments?

7   A.   No.

8   Q.   Did you review anything in writing prior to

9   making your investments?

10  A.   Regarding these funds?

11  Q.   Yes.

12  A.   No.

13  Q.   Do you recall receiving what's called a private

14  placement memorandum or a PPM?

15  A.   No.

16  Q.   I'd like you to look again at exhibits 2, 3, 4

17  and 5 and if you look at page 2 on Exhibit 2, can you

18  please read to me paragraph 8a i, little i, little 1?

19  A.   I have received and carefully read and understood

20  the private placement memorandum dated December 17th, 2007

21  given to me by the trust fund in connection with the

22  offering of certificates.

23  Q.   Do you recall reading that paragraph at the time

24  you signed this document?

1     A.   I don't recall.
2     Q.   Do you recall whether you thought there was a
3 problem as far as Mr. Lex no longer being affiliated with
4 McGinn Smith?
5          MR. MATHEWS:  Objection.
6     A.   Yes.
7     Q.   But you don't recall whether you inquired about
8 that?
9     A.   No.
10    Q.   Did there come a time you were advised that the
11 funds had collapsed and redemptions were being suspended?
12    A.   I'm sorry --
13    Q.   Did there come a time when you were advised that
14 the four funds had collapsed and redemptions were being
15 suspended?
16         MR. MATHEWS:  Objection.
17    A.   Yes.
18    Q.   Did there come a time you were advised that
19 McGinn Smith was in receivership?
20    A.   Yes.
21    Q.   Do you recall when that was?
22    A.   I don't know an exact date.  Whenever
23 receivership -- I'd have to look at my notes.
24    Q.   Do you recall how you became aware that a

1 receiver had been appointed?
2     A.   By mail.
3     Q.   Do you recall who informed you?
4     A.   The attorney who was handling the receivership up
5 in, wherever it was being handled out of, upstate New
6 York.  I think Albany but I'm not sure.  I forget.  I know
7 we have spoken a few times.
8     Q.   You've spoken to the attorney?
9     A.   To the receivership in the beginning stages I was
10 in touch with him.
11    Q.   What was the purpose of the correspondence with
12 the receiver?
13    A.   To let us know about the litigation and the SEC
14 going after McGinn Smith for fraud and so we followed that
15 on the computer on-line and we did, my wife and I, spoke
16 to him a few times.  We knew that McGinn Smith had been
17 shut down and they were -- the SEC was going after them.
18    Q.   Do you recall how often you were in touch with
19 the receiver?
20    A.   Well, initially a few times.  Then we followed it
21 on-line because they just couldn't deal with the
22 correspondence and the phone calls and so forth from all
23 the investors.
24    Q.   How often have you visited the receiver's

1 website?
2     A.   You mean during the process?
3     Q.   Since you became aware of it?
4     A.   I have no idea.  A hundred times.
5     Q.   On a daily basis, weekly basis?
6     A.   I'd say weekly.
7     Q.   What type of information are you looking for when
8 you check the website?
9     A.   Basically to see whether there's any net worth
10 left so we might hopefully get some of our funds back, our
11 investments back.
12    Q.   What is your understanding regarding the type of
13 information that is made available on the web site?
14    A.   Well, very little.  I mean I kind of believe
15 what's on there from what I see from the receivership.
16    Q.   Do you know if there's court documents on there,
17 letters?
18    A.   Oh, yeah, there's court documents.
19    Q.   Does the website identify the accountants or tax
20 preparers who provided services to McGinn Smith?
21    A.   I don't recall.
22    Q.   Have you at any point made any effort to
23 ascertain the identity of the accountants or tax preparers
24 who provided services for McGinn Smith?

1     A.   No.
2     Q.   Were you at any point interested in the work that
3 was performed by the accountants or tax preparers for
4 McGinn Smith?
5     A.   Yes.
6     Q.   So when did you become interested in that work?
7     A.   I don't know the exact time but I knew there had
8 to have been other people involved to cover up this fraud
9 between his family members and whoever worked with the
10 McGinn Smith firm.
11    Q.   So if you were interested in that why did you not
12 attempt to identify who was providing those accounting
13 services?
14         MR. MATHEWS:  Objection.
15    A.   I can't answer that.
16    Q.   Why can't you answer it?  You don't recall or you
17 --
18    A.   I don't recall.  I mean there was so much going
19 on with the receivership and emotionally you didn't know
20 where to go, to be honest with you, to try to get an
21 answer.
22    Q.   You thought somebody must have been involved in
23 covering this up.  You weren't interested in finding out
24 who may have been involved?

**Page 46**

1          MR. MATHEWS:  Objection.
2     A.    Oh, yes, I was.
3     Q.    But you didn't do anything to actually find out?
4          MR. MATHEWS:  Objection.
5     A.    We received different letters from Bill Lex's
6     firm discussing the process and we were simply following
7     what the process was going through.
8     Q.    So you weren't doing any independent
9     investigation regarding these funds?
10    A.    No.
11    Q.    Did you ever file a complaint with any
12    governmental entity regarding your investments at issue in
13    this action?
14    A.    I would say not a formal complaint.  We did
15    contact some congress or senators or congressmen regarding
16    the SIPC specific program, whatever.
17    Q.    Do you know whether you had the ability to file a
18    complaint with a governmental entity?
19    A.    I don't know.
20    Q.    You mentioned earlier the SEC was going after
21    McGinn Smith.  Are you aware there was a legal proceeding
22    against McGinn Smith and the principals of McGinn Smith?
23    A.    Oh, yes.
24    Q.    Did you say how you became aware of that legal

**Page 47**

1     proceeding?
2     A.    We received a memo from the receivership to all
3     the investors received that.
4     Q.    Did you conduct any investigation after you
5     became aware of that legal proceeding against McGinn
6     Smith?
7     A.    Only following it on the news, on the internet
8     news articles we found out and through the receivership we
9     followed it that way.
10    Q.    Do you remember whether you spoke with Mr. Lex
11    regarding the legal proceeding against McGinn Smith?
12    A.    Yes.
13    Q.    What did you discuss with Mr. Lex regarding that
14    legal proceeding?
15    A.    We're basically all on the sidelines trying to
16    wait and see what's going to happen.
17    Q.    Did Mr. Lex have any information that you did not
18    have available to you regarding the legal proceeding?
19    A.    I don't recall.
20    Q.    After becoming aware of the legal proceeding
21    against McGinn Smith did you do anything to find out who
22    may have provided professional services to McGinn Smith?
23          MR. MATHEWS:  Objection.
24    A.    No.

**Page 48**

1     Q.    Are you aware that there is a criminal proceeding
2     involving McGinn Smith?
3     A.    Was I aware?
4     Q.    Yes.
5     A.    Oh, yes.
6     Q.    Do you recall when you became aware of that
7     proceeding?
8     A.    Same time we received these notes.  I don't have
9     the exact dates.  I would say 2008, whenever it happened.
10    Q.    Do you recall who made you aware of the criminal
11    proceeding?
12    A.    Well, the receivership as I mentioned earlier.
13    Q.    Have you had any discussions with Mr. Lex
14    regarding the criminal proceedings regarding McGinn Smith?
15    A.    Only that they were committed and they're doing
16    jail time.
17    Q.    Do you recognize the name Ronald Simons?
18    A.    No.
19    Q.    Are you aware of an SEC action against certain
20    brokers who were employed by McGinn Smith?
21    A.    I don't recall.
22    Q.    Are you aware that the SEC commenced an action
23    against various individuals including Mr. Lex?
24    A.    I did understand that they were being

**Page 49**

1     investigated, some of the brokers.
2     Q.    Had you used the services of any other brokers
3     other than Mr. Lex for your McGinn Smith investments?
4     A.    No.
5     Q.    Are you aware that Mr. Lex was found liable in
6     the SEC action?
7          MR. MATHEWS:  Objection.
8     A.    I was aware afterwards, yes.
9     Q.    Are you aware he was ordered to pay a civil
10    penalty of $130,000 with respect to the four funds and the
11    trust?
12    A.    No.
13    Q.    Are you aware he was ordered to disgorge
14    approximately $335,000 in fees that he received for
15    brokering those investments?
16          MR. MATHEWS:  Objection.
17    A.    No.
18    Q.    Are you aware he was permanently barred as acting
19    as a broker or investment advisor as a result of the
20    circumstances surrounding the four funds and the trust?
21          MR. MATHEWS:  Objection.
22    A.    No.  But I suspected there was something going
23    on.
24    Q.    Are you aware that part of the basis for the

# **Exhibit 9**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK


NEAL A. CUPERSMITH, et al.,    )
                               )
          Plaintiffs,          )
                               )
-vs-                           )   Civil Action No.
                               )   3:14-cv-01303-TJM-DEP
                               )
PIAKER & LYONS, P.C.,          )
RONALD L. SIMONS, and          )
TIMOTHY N. PAVENTI,            )
                               )
          Defendants.          )
_____)


DEPOSITION OF ALICE FORSYTH


          DATE TAKEN:          October 30, 2015

          TIME:                9:00 a.m. to 11:53 a.m.

          BEHALF OF:           The Defendants

          PLACE TAKEN:         Fort Myers Court Reporting
                               2231 First Street
                               Fort Myers, Florida

          BEFORE:              Janice Humble, RPR, CLVS,
                               Notary Public
                               State of Florida at Large


_____

FORT MYERS COURT REPORTING
2231 First Street
Fort Myers, Florida  33901
(239) 334-1411
FAX (239) 334-1476

1      Q.   Okay.

2      A.   And they set it up in such a way that the

3   fees were way higher than they should have been, and

4   if I had been paying attention better, maybe I

5   wouldn't have gone to him.

6           But by then I started to have some medical

7   troubles, and in 1997 is when the two brain tumors

8   were diagnosed, and I should have known I wouldn't

9   have enough time to keep a better eye on it.  I should

10   have realized that the medical stuff was going to

11   occupy me enough, but the diagnosis just blindsided

12   me.  I started to have vision trouble and then bingo,

13   all of a sudden I had to have brain surgery, so --

14      Q.   Gotcha.  All right.  Let's move on then to

15   what we're talking about here, McGinn Smith and

16   Company.  Are you familiar with a brokerage firm

17   called McGinn Smith?

18      A.   Oh, yes.

19      Q.   Now, we talked about brokers and that term.

20   What is your understanding of a broker or a brokerage

21   firm?  What does that mean?

22      A.   Someone who does investments on behalf of the

23   client.

24      Q.   Uh-huh.

25      A.   With various levels of relationship.

1      Q.   Uh-huh.  Now, a broker, or a brokerage firm,

2  or do you have any understanding of the type of fees

3  that they get for their work?

4      A.   I guess it varies.  I don't know that much

5  about it, but I felt that Mr. Lex had charge of who he

6  dealt with in addition to himself, basically.

7      Q.   Okay.  Did you understand Bill Lex to be a

8  broker of McGinn Smith?

9      A.   Well, I considered him to be my financial

10 advisor, and I'm not sure how he chose who else he

11 dealt with.  You know, that's the financial industry,

12 it's not my expertise, but I trusted that he would

13 choose people to invest with that he thought were

14 reasonable.

15     Q.   Understood.  So your understanding in your

16 relationship you had with Bill Lex, your understanding

17 was he was to be your investment advisor first?

18     A.   Yes.

19     Q.   Okay.  Do you know whether or not or --

20 strike that.  Did you understand how Bill Lex was

21 affiliated with McGinn Smith, if at all?

22     A.   I don't know what their financial

23 relationship or anything like that was, no.  I just

24 knew that he considered -- that they approached him

25 about these investments and he looked them over and

1  possibility of losing the entire investment with any

2  of these funds?

3       A.   No, there really wasn't, no.

4       Q.   Would you have remembered that if he told

5  you?

6       A.   I think I would have remembered if he told me

7  I could lose it all.

8       Q.   Okay.  So then it's your understanding --

9       A.   My understanding was it was -- it was

10  something that was suitable for a retirement account,

11  and even the mutual funds that I was managing myself I

12  considered to be relatively safe compared to stock

13  market wild things.

14       Q.   Understood.  And that wasn't an assumption

15  that you made, that was based on representation from

16  Bill Lex?

17       A.   Yes.

18       Q.   Okay.  Now, did you have any discussion with

19  Bill Lex about any due diligence or any investigation

20  he undertook to look into these funds?

21       A.   No, no.

22       Q.   And I'm assuming you didn't do that on your

23  own once he told you this is McGinn Smith or --

24       A.   No.  I trusted him on that because I had more

25  than a full plate and he had performed well for 20

1    years for me and I had no reason to think that we were

2    going into uncharted waters.

3        Q.   Would you have expected him as your financial

4    advisor to undertake due diligence?

5        A.   Yes.

6        Q.   Then investing with him you kind of relied on

7    that?

8        A.   Oh, yes.

9        Q.   On that assumption.

10       But as far as you recollect, you never had a

11   specific conversation with him to that effect?

12       A.   No.

13       Q.   Did he tell you that he believed that this

14   was a suitable investment for you?

15       A.   Oh, did I tell him?  No.  I relied upon his

16   choosing.

17       Q.   No.  Did he tell you that he believed this

18   was a suitable investment for you?

19       A.   Yes.

20       Q.   But he never told you exactly what he

21   believed that --

22       A.   No.

23       Q.   Okay.  Was there any kind of discussion you

24   had with Bill Lex regarding where the proceeds of that

25   investment would be going?

1       A.   Yes.

2       Q.   Was it similarly your expectation that

3  whenever renewal came up or a rollover came up that he

4  performed that same kind of due diligence?

5       A.   Yes.

6       Q.   Did he ever tell you that that's what he did

7  or was that just an expectation you had to your part?

8       A.   I don't know that he ever specifically

9  verbalized that he had.  He may have.  I don't know.

10       Q.   Either way, it was your expectation?

11       A.   Yes.

12       Q.   So when he recommended that you go ahead and

13  do a rollover, it was -- you assumed that something

14  was done to make sure that it was still a good

15  investment?

16       A.   Yes.

17       Q.   Okay.  Did anyone, and I guess, the anyone

18  here would be Bill Lex, provide you with any kind of

19  written materials regarding these investments?

20       A.   Oh, yes.

21       Q.   Do you have any recollection as you sit here

22  today what those written materials were?

23       A.   No.  They were just -- I don't really

24  remember exactly what they were.  I do know he didn't

25  give us written materials about each thing.

1   known this was not FDIC protected I would have been

2   very concerned.

3       Q.   Okay.  And then the last risk factor, I just

4   want to go over it real quick, is the final one on

5   page 10 where it says the trustee may experience

6   conflict of interest.  Did you have any understanding

7   or discussion with Bill Lex regarding any conflicts of

8   interest that the trustee may have?

9       A.   No.

10      Q.   Did he have any understanding that some of

11  the funds or some of the proceeds of your investment

12  might be invested with affiliated companies?

13      A.   No.

14      Q.   Okay.  Would that have any impact on whether

15  or not you saw this as a suitable investment?

16      A.   In retrospect, yes.

17      Q.   Okay.  I guess just to sum up, these risk

18  factors that we just went over, that's something you

19  knew about at the time of the investment?

20      A.   Not something I was aware of, and maybe I

21  should have done, but on the other hand, you know, I

22  was a medical person.  Bill Lex sold insurance for 30

23  years, he was a little older than I was, and so he had

24  been in the business, the insurance business, at

25  least, and the financial advising business for 30

# EXHIBIT 2

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### THIRD ALBANY INCOME NOTES, LLC

**$4,000,000 Minimum Offering**
**$30,000,000 Maximum Offering**

**5.75% Secured Senior Notes due 2005**
**7.75% Secured Senior Subordinated Notes due 2007**
**10.25% Secured Junior Notes due 2009**

We are offering up to $30 million aggregate principal amount of our 5.75% secured senior notes due 2005, (the "original senior notes"), 7.75% secured senior subordinated notes due 2007 (the "original senior subordinated notes") and 10.25% secured junior notes due 2009 (the "junior notes" and together with the senior notes (as defined below) and the senior subordinated notes (as defined below), the "notes"). Upon the maturity of the original senior notes, we may continue to issue additional senior notes (the "additional senior notes" and together with the original senior notes, the "senior notes") with a one-year maturity date and an interest rate of the then current prime rate +1% up to one year prior to the maturity date of the original senior subordinated notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $30 million. The original senior notes will mature on December 15, 2005 and any additional senior notes will mature on December 15, 2006, 2007, 2008 or 2009, respectively. Similarly, upon the maturity of the original senior subordinated notes, we may continue to issue additional senior subordinated notes (the "additional senior subordinated notes" and together with the original senior subordinated notes, the "senior subordinated notes") with a two-year maturity date and an interest rate of the greater of (i) 7.75% or (ii) the then current prime rate +2%, up to one year prior to the maturity date of the senior subordinated notes and the junior notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $30 million. The original senior subordinated notes will mature on December 15, 2005 and the additional senior subordinated notes will mature on December 15, 2006, 2007, 2008 or 2009, respectively. The senior subordinated notes will mature on December 15, 2007 and the additional senior subordinated notes, if any, will mature on December 15, 2009. The junior notes will mature on December 15, 2009. We will pay interest on the notes quarterly on the 15th day of January, April, July and October, commencing on January 15, 2005. The notes are secured by all of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. The senior subordinated notes and the junior notes are subordinated in right of payment to the senior notes. Additionally, the junior note holders' right to payment is subordinated in right of payment to the senior subordinated note holders. At our option, we may redeem a pro rata portion of the notes upon the removal, whether voluntary or involuntary, of an Investment from our portfolio.

The notes will be sold through McGinn, Smith & Co., Inc., which is acting as our placement agent for the notes. No public market exists with respect to the notes.

**The notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation or any other governmental or private fund or entity. Investing in the notes involves a high degree of risk. See "Risk Factors", beginning on page 5, for a discussion of risks that you should consider before making a decision to invest in the notes.**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AS AMENDED, OR ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE OR FOREIGN SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE NOTES ARE OFFERED BY VIRTUE OF EXEMPTIONS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT, REGULATION D PROMULGATED UNDER THE SECURITIES ACT, CERTAIN STATE AND FOREIGN SECURITIES LAWS AND CERTAIN RULES AND REGULATIONS PROMULGATED PURSUANT THERETO. THE NOTES MAY NOT BE RESOLD OR OTHERWISE TRANSFERRED UNLESS WE RECEIVE AN OPINION OF COUNSEL OR OTHER DOCUMENTATION ACCEPTABLE TO US AND OUR COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED, OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS.

| | Per note | Total |
|---|---|---|
| Offering price | 100% | 100% |
| Placement agent commissions | 2% | 2% |
| Proceeds to Third Albany Income Notes, LLC, before expenses | 98% | 98% |

McGinn, Smith & Co., Inc. has agreed, as our placement agent, to offer the notes on a "best efforts, all or none" basis with respect to the minimum offering of $4,000,000, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering.

We will issue the notes in certificated form. We expect that delivery of the notes will be made in Albany, New York. McGinn, Smith Capital Holdings Corp. will act as trustee for the notes. See "Affiliated Transactions."

**McGINN, SMITH & CO., INC.**
The date of this Private Placement Memorandum is November 1, 2004.



**TABLE OF CONTENTS**

NOTICE TO INVESTORS ........................................................................................................iv

DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS .....................................iv

ADDITIONAL INFORMATION ............................................................................................iv

    SUMMARY ....................................................................................................................5
        TAIN .......................................................................................................................5
        Business.................................................................................................................5
        The Offering ..........................................................................................................5
        Risk Factors ..........................................................................................................8

    RISK FACTORS ............................................................................................................9
        Risk Factors Relating to the Notes .........................................................................9
        Risk Factors Relating to TAIN...............................................................................11

    USE OF PROCEEDS.......................................................................................................13

    CAPITALIZATION .........................................................................................................13

    BUSINESS .....................................................................................................................13

    MANAGEMENT .............................................................................................................13

    DESCRIPTION OF THE NOTES .....................................................................................14

    PLAN OF DISTRIBUTION .............................................................................................20

    OWNERSHIP STRUCTURE AND PRINCIPAL EQUITY HOLDERS .................................20

    AFFILIATED TRANSACTIONS.......................................................................................21

    INVESTOR SUITABILITY REQUIREMENTS...................................................................21

    WHERE YOU CAN FIND MORE INFORMATION ...........................................................23

    EXHIBITS

    EXHIBIT A – FORM OF INVESTOR QUESTIONNAIRE ...............................................A-1

    EXHIBIT B – FORM OF SUBSCRIPTION AGREEMENT ..............................................B-1

**CONFIDENTIAL**

## NOTICE TO INVESTORS

The information contained in this private placement memorandum (the "memorandum") is not complete and its contents may differ from that of memoranda designed to conform to the requirements applicable to registration statements under United States securities laws. The notes are being offered only to "accredited investors", as that term is defined by Regulation D under the Securities Act, and the rules and regulations thereunder, who directly or through their advisors have the expert knowledge to evaluate information and data and whose potential investment is sufficiently large to justify the utilization by them of the access being granted them to other information. Prospective investors will be granted access to all reasonably available, relevant data concerning Third Albany Income Notes, LLC and are urged to request whatever documents or material they believe will be useful in making their investment decision. Potential investors should base their investment decision on their own analysis of all information they deem to be relevant.

The information presented herein was prepared by us and is being furnished by McGinn, Smith & Co., Inc., the placement agent, solely for use by prospective investors in connection with this offering. The placement agent has not independently verified the information contained herein or otherwise made any further investigation of Third Albany Income Notes, LLC and makes no representation or warranty, express or implied, as to the accuracy or completeness of such information. Neither we nor the placement agent make any representation or warranty, express or implied, as to our future performance.

**BECAUSE THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY STATE OR FOREIGN SECURITIES LAWS, THEY MAY NOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THE RESALE, TRANSFER OR OTHER DISPOSITION IS REGISTERED UNDER THE SECURITIES ACT OR ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS OR AN EXEMPTION THEREFROM IS AVAILABLE. NO PUBLIC MARKET EXISTS WITH RESPECT TO ANY OF OUR SECURITIES, INCLUDING THE NOTES. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD.**

This memorandum does not constitute an offer to sell or a solicitation of an offer to buy any of our securities to any person in any jurisdiction in which such offer or solicitation is unlawful. This offering is not being made to, nor will subscriptions be accepted from or on behalf of, any person in any jurisdiction in which the making or acceptance thereof would not be in compliance with the laws of such jurisdiction. We may, however, in our sole and absolute discretion, take such action as we deem necessary to make the offering in any such jurisdiction and extend the offering to offerees in such jurisdiction.

This memorandum is submitted to prospective investors on a confidential basis and is for their informational use solely in connection with the offering described herein. The disclosure of any of the information contained herein or its use for any other purpose except with our prior written consent is prohibited. This memorandum may not be reproduced, in whole or in part, and it is accepted with the understanding that it will be returned on request if the recipient does not purchase the securities offered hereby or if the recipient's subscription is not accepted or if the offering is terminated.

This memorandum supercedes any documents previously supplied to prospective investors concerning us and the terms and conditions of the offering being made hereby. This memorandum contains summaries of the contents of certain agreements and other documents. Reference should be made to these agreements and documents for complete information concerning the rights and obligations of the parties thereto and the matters described therein. Subject to any applicable restrictions as to confidentiality, all of these agreements and documents shall be made available upon request.

No person has been authorized to make any representations concerning this offering, and no person other than the placement agent has been authorized to furnish any information, other than as set forth in this memorandum, and, if made or given, these other representations or information must not be relied upon by prospective investors.

**Prospective investors are not to construe the contents of this memorandum as legal, tax or investment advice. Each prospective investor should consult its advisors as to legal, tax, financial and related matters concerning an investment in the notes. Without limiting the generality of the foregoing, prospective investors outside the United States should consult their legal, tax or financial advisers in order to ascertain the tax consequences of buying, holding and receiving proceeds from the notes.**

iv

**CONFIDENTIAL**

Neither the delivery of this memorandum nor any sale made hereunder shall, under any circumstances, create any implication that the information herein is correct as of any time subsequent to the date hereof or that there has not been any change in the information contained herein or in our affairs since the date hereof.

The notes are offered subject to our acceptance of subscriptions and other conditions as set forth in this memorandum. We reserve the right in our discretion to reject any subscription in whole or in part or to allot to any investor less than the aggregate principal amount of the notes subscribed for, and to withdraw, cancel or modify the offering at any time without notice.

This memorandum does not constitute an offer of or an invitation by or on behalf of the issuer to subscribe or purchase any notes and may not be used for the purpose of an offer to, or a solicitation by, anyone in any circumstances in which such offer or solicitation is not authorized or lawful. The distribution of this document and the offering of the notes in certain jurisdictions may be restricted by law. Persons who obtain this document are required by the issuer to inform themselves about and to observe any such restrictions. No action is being taken to permit a public offering of the notes or the distribution of this document in any jurisdiction where action would be required for such purposes.

### NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

### NOTICE TO FLORIDA RESIDENTS

THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061(11) OF THE FLORIDA SECURITIES ACT. THE SECURITIES BEING OFFERED HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

### NOTICE TO PENNSYLVANIA RESIDENTS

UNDER PROVISIONS OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OR PURCHASE OR IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO WRITTEN BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED.

### NOTICE TO NEW YORK INVESTORS

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PROR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

iv

**CONFIDENTIAL**

THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

### NOTICE TO NEW JERSEY RESIDENTS

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED OR REVIEWED BY THE NEW JERSEY BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. NEITHER THE ATTORNEY GENERAL OR THE STATE OF NEW JERSEY BUREAU OF SECURITIES HAS PASSED ON OR ENDORSED THE MERITS OF THIS MEMORANDUM (OR THE PRIVATE OFFERING CONTAINED HEREIN). ANY REPRESENTATIONS TO THE CONTRARY ARE UNLAWFUL. ALL PROCEEDS OF THE OFFERING WILL BE HELD IN TRUST BY THE COMPANY FOR THE BENEFIT OF THE PURCHASERS OF NOTES TO BE USED ONLY FOR THE PURPOSES SET FORTH UNDER THE CAPTION "USE OF PROCEEDS".

### NOTICE TO CONNECTICUT RESIDENTS

THE SECURITIES REFERRED TO IN THIS MEMORANDUM WILL BE SOLD PURSUANT TO THE EXEMPTION SET OUT IN SECTION 36-490(B)(9) OF THE CONNECTICUT UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE BANKING COMMISSIONER OF THE STATE OF CONNECTICUT, NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

### NOTICE TO MASSACHUSETTS RESIDENTS

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE MASSACHUSETTS UNIFORM SECURITIES ACT OR THE SECURITIES ACT OF 1933, AS AMENDED, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

### NOTICE TO CALIFORNIA RESIDENTS

THE SALE OF THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR THE RECEIPT OF CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE THEREOF IS EXEMPT UNDER APPLICABLE LAW. THE COMPANY IS RELYING ON THE EXEMPTION FROM SUCH QUALIFICATION PROVIDED BY SECTION 25102(f) OF THE CALIFORNIA CORPORATIONS CODE.

### NOTICE TO OHIO RESIDENTS

THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE OHIO SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH SUCH ACT. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF THIS STATE NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

iv

**CONFIDENTIAL**

PLTF00017191

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This memorandum includes "forward-looking statements". All statements other than statements of historical facts included in this memorandum may constitute forward-looking statements. In addition, forward-looking statements generally can be identified by the use of forward-looking terminology such as "may", "will", "expect", "intend", "estimate", "anticipate", "believe" or "continue" or the negatives thereof or variations thereon or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to have been correct. Important factors such as those discussed in the "Risk Factors" section could cause actual results to differ materially from our expectations. All subsequent written and oral forward-looking statements attributable to us, the placement agent or any other persons acting on our behalf are expressly qualified in their entirety by this paragraph. These forward-looking statements speak only as of the date of this memorandum. We expressly disclaim any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.

## ADDITIONAL INFORMATION

We have retained McGinn, Smith & Co., Inc. to act as our placement agent in connection with arranging the private placement of the notes. With respect to the minimum offering of $4,000,000, McGinn, Smith & Co., Inc., as our placement agent, has agreed to offer the notes on a "best efforts, all or none" basis, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering. The placement agent will act as primary contact for, and will be available to consult with, any prospective investor who receives this document.

We undertake to make available to every investor, during the course of the offering and prior to sale, the opportunity to ask questions of and receive answers from us concerning the terms and conditions of the offering and to obtain any appropriate additional information necessary to verify the accuracy of the information contained in this document or for any other purpose relevant to a prospective investment in the notes offered hereby.

All communications or inquiries relating to the notes should be directed to the following individual at McGinn, Smith & Co., Inc.:

David L. Smith
President
McGinn, Smith & Co., Inc.
Capital Center, 5th Floor
99 Pine Street
Albany, New York 12207
Phone: 518-449-5131
Fax: 518-449-4894
E-Mail: smithd@mcginnsmith.com

**CONFIDENTIAL**

PLTF00017192

## SUMMARY

*This summary highlights selected information from this memorandum and may not contain all the information that may be important to you. The following summary is qualified in its entirety by the more detailed information appearing elsewhere in this memorandum. You should read the entire memorandum before making an investment decision. Unless the context otherwise requires, all references to "TAIN", "we", "us" or "our" refer to Third Albany Income Notes, LLC.*

### TAIN

Third Albany Income Notes, LLC ("TAIN") is a newly formed, single purpose limited liability company. We were organized in New York in 2004.

Our sole and managing member is McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc.

Our principal offices are located at Capital Center, 5th Floor, 99 Pine Street, Albany, New York, 12207 and our telephone number is (518) 449-5131.

### Business

TAIN has been formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"). We may acquire such Investments directly, or from our managing member or an affiliate of us or our managing member that has purchased the Investment. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the Investment. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission. We may retain the Investments beyond the term of the notes, sell such Investments during the term of the notes or offer the notes to preferred investors. If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we may, at our option, redeem a pro rata portion of the notes. See "Description of the Notes – Redemption at the Option of TAIN".

Our profitability is largely determined by the difference, or "spread," between the effective rate we pay on the Investments we acquire and the full rate of return received on such Investments.

### The Offering

*The following summary is not intended to be complete. For a more detailed description of the notes, see "Description of the Notes."*

Issuer .........................................................Third Albany Income Notes, LLC

Amount of Offering......................................Up to $30 million in three tranches: a minimum of $2.5 million and up to $7.5 million to senior note holders; a minimum of $2.5 million and up to $7.5 million to senior subordinated note holders; and a minimum of $10 million and up to $20 million to junior note holders.

Placement Agent .........................................McGinn, Smith & Co., Inc.

Trustee.........................................................McGinn, Smith Capital Holdings Corp.

Securities Offered........................................5.75% Secured Senior Notes due 2005 (the "original senior notes"), 7.75% Secured Senior Subordinated Notes due 2007 (the "original senior

**CONFIDENTIAL**

PLTF00017193

subordinated notes") and 10.25% Secured Junior Notes due 2009 (the "junior notes" and together with the senior notes (as defined below) and senior subordinated notes (as defined below), the "notes"). Upon the maturity of the original senior notes, we may continue to issue additional senior notes (the "additional senior notes" and together with the original senior notes, the "senior notes") with a one-year maturity date and an interest rate of the then current prime rate +1% up to one year prior to the maturity date of the original senior subordinated notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $30 million. Similarly, upon the maturity of the original senior subordinated notes, we may continue to issue additional senior subordinated notes (the "additional senior subordinated notes" and together with the original senior subordinated notes, the "senior subordinated notes") with a two-year maturity date and an interest rate of the greater of (i) 7.75% or (ii) the then current prime rate +2%, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $30 million. The notes are secured promises to pay issued by us. By purchasing a note, you are lending money to us. The notes represent our obligation to repay your loan with interest.

Security ........................................... All of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses.

First Closing ................................... Occurs upon the receipt of $4 million aggregate principal amount from the sale of the notes.

Escrow Account ............................ All subscription proceeds will be held in an escrow account and no subscription agreement will be accepted until the minimum proceeds requirement is met for the first closing.

Method of Purchase...................... Prior to your purchase of notes, you will be required to complete a subscription agreement that will set forth the principal amount of your purchase and certain other information regarding your ownership of the notes.

Minimum Subscription.................. Minimum aggregate principal amount of $25,000 for each of the senior notes, senior subordinated notes and junior notes.

Offering Price................................ 100% of the principal amount per note.

Maturity.......................................... December 15, 2005 for the original senior notes and December 15, 2006, 2007, 2008 or 2009, respectively, for any additional senior notes. December 15, 2007 for the original senior subordinated notes and December 15, 2009 for the additional senior subordinated notes, if any. December 15, 2009 for the junior notes.

Interest Rate .................................. The notes will accrue interest from the date of the first closing at the following rates per year: 5.75% for the original senior notes and the then current prime rate + 1% for any additional senior notes; 7.75% for the original senior subordinated notes and any additional senior subordinated notes; and 10.25% for the junior notes.

Interest Payment Dates.................. Quarterly on the 15th day of January, April, July and October, commencing on January 15, 2005.

- 6 -

**CONFIDENTIAL**

PLTF00017194

Principal Payment ........................................Unless we choose to redeem a pro rata portion of the notes upon the removal, whether voluntary or involuntary, of an Investment from our asset portfolio, we will not pay principal over the term of the notes. See "Description of the Notes – Redemption at the Option of TAIN". We are obligated to pay the entire principal balance of the outstanding notes upon maturity.

Payment Method ...........................................Principal and interest payments will be made by whatever means you indicate in your subscription agreement, including by an electronic funds transfer to a depository account you designate in your subscription documents.

Redemption at Maturity................................Unless we choose to redeem a pro rata portion of the notes, the notes may only be redeemed at, and not prior to, Maturity.

Optional Redemption ....................................At the option of TAIN, a pro rata percentage of the notes may be redeemed if an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes. See "Description of the Notes – Redemption at the Option of TAIN".

Ranking .......................................................The senior subordinated notes and junior notes are subordinate in right of payment to the senior notes, and the junior notes are additionally subordinate in right of payment to the senior subordinated notes.

Use of Proceeds.............................................If all the notes are sold, we would expect to receive approximately $29.35 million of net proceeds from this offering after deducting the placement agent's commissions and estimated offering expenses payable by us. We intend to use the net proceeds to acquire Investments. Assuming we received the maximum amount of the offering, we will not invest more than 25% of the net proceeds of the offering in any single Investment. See "Use of Proceeds."

Absence of Public Market .............................There is no existing or public market for the notes. We cannot provide you with any assurance as to:

- the liquidity of any market that may develop for the notes;

- your ability to sell or pledge your notes; or

- the prices at which you will be able to sell your notes.

Transfer Restrictions ....................................The notes are subject to significant restrictions on resale. We have not registered, and do not plan to register, the notes under the Securities Act or any state securities laws and you may not offer or sell the notes except under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

Plan of Distribution .....................................We are offering the notes without registration under the Securities Act in reliance upon an exemption afforded by Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.

McGinn, Smith & Co., Inc., as our placement agent, will solicit offers to purchase the notes, for which it will receive commissions equal to 2% of the purchase price of the notes. With respect to the minimum offering of $4,000,000, McGinn, Smith & Co., Inc., as our placement agent, has agreed to offer the notes on a "best efforts, all or none" basis, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering. The offering period will extend until the earlier of (i) the sale of all of the notes, or (ii) December 31, 2004, provided that we have retained the right, in our discretion, and our placement agent has

- 7 -

**CONFIDENTIAL**

PLTF00017195

agreed in that event, to extend the offering period for up to six additional months.

Suitability Requirements ..............................The risks associated with an investment in the notes and the lack of liquidity makes this investment suitable only for an investor who has substantial net worth, no need for liquidity with respect to this investment and who can bear the economic risk of a complete loss of the investment. In addition, the investment is suitable only for an investor who has sufficient knowledge and experience in financial and business matters and investments in organizations such as TAIN to enable the investor to evaluate the merits and risk associated with a purchase of the notes. Subscriptions will be accepted only from "accredited investors," as that term is defined in Regulation D promulgated under the Securities Act.

### Risk Factors

See "Risk Factors", immediately following this summary, for a discussion of risks relating to an investment in the notes.

**CONFIDENTIAL**

PLTF00017196

# RISK FACTORS

*Before you invest in the notes, you should carefully consider these risk factors, as well as the other information contained in this memorandum.*

## Risk Factors Relating to the Notes

**The Notes May Not Be A Suitable Investment for All Investors.** *The notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing notes.*

The risks described below set forth many of the risks associated with the purchase of notes. In addition to those risks, the characteristics of the notes, including maturity, interest rate and lack of liquidity, may not satisfy your investment objectives or otherwise be a suitable investment for you. This may be based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. For instance, prior to purchasing any notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the notes in relation to your other investment holdings and the diversity of those holdings.

**The Notes Will Not Be Registered Under The Securities Act And You May Not Be Able To Sell The Notes Quickly, Or At All.** *Your ability to liquidate your investment is limited because of transfer restrictions and the lack of a trading market.*

The notes are being offered without registration under the Securities Act in reliance upon an exemption afforded by Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act. We have no plans or intention to register the notes. As a result, there are significant restrictions on your ability to sell or otherwise transfer the notes and we cannot assure you that you will be able to sell the notes quickly, or at all. Therefore, the notes are suitable for purchase only by investors who are capable of bearing the economic risks of holding the notes for an indefinite period of time. Due to the non-transferable nature of the notes and the lack of a market for the sale of the notes, you might be unable to sell, pledge or otherwise liquidate your investment. See "Description of the Notes."

**You Will Have Only Limited Protection Under The Indenture.** *The indenture governing the notes contains only limited restrictions on our activities and only limited events of default, and thus, provides only limited protection to you.*

The indenture governing the notes contains limited restrictions on our activities. Because there are only very limited restrictions and limited events of default under the indenture, we will not be required to maintain any ratios of assets to debt in order to increase the likelihood of timely payments to you under the notes. See "Description of the Notes - Events of Default."

**The Senior Subordinate Note Holders And Junior Note Holders Lack Priority In Payment On The Notes.** *The senior subordinated note holders' and junior note holders' right to receive payments on the notes is subordinated in right of payment to the senior note holders.*

The senior subordinated notes and junior notes will be subordinated to the prior payment in full of the senior notes. The junior notes will also be subordinated in right of payment to the senior subordinated notes. The senior note holders will have priority over up to 25% of our secured assets over the senior subordinated and junior note holders, and the senior note holders and senior subordinated note holders will have priority over up to 50% of our secured assets over the junior note holders. Because of the subordination provisions of the notes, in the event of our bankruptcy, liquidation or dissolution, our assets would be available to make payments to the senior subordinated note holders and the junior note holders only after all payments had been made on the senior notes, and to the junior note holders only after all payments had been made on the senior subordinated notes. Sufficient assets may not remain after all such senior note payments have been made to make any payments to the senior subordinated notes and the junior notes, including payments of interest when due or principal upon maturity. Likewise, sufficient assets may not remain after all senior subordinated note payments have been made to make any payments to the junior notes, including payments of interest when due or principal upon maturity.

CONFIDENTIAL

PLTF00017197

**The Secured Assets May Be Inadequate To Repay The Notes.** *If an Investment is redeemed, prepaid, liquidated or sold, there may be insufficient security for you to collect upon in an event of default.*

Your security interest is in the pool of Investments as a whole, not a particular Investment, and in any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. Even though the proceeds from your purchase of a note may be used to acquire a particular Investment, specific notes are not limited to or payable from a particular Investment. All notes in the same tranche will be equally and ratably secured by all of our Investments. We are not restricted in the indenture from selling any of the Investments that we acquire. Although we have the option to redeem a portion of the notes upon the removal, whether voluntary or involuntary, of an Investment from our asset portfolio, we are not required to do so. Therefore, in an event of default, your security interest in the Investments may be insufficient for you to be repaid on the notes.

**The Notes Will Have No Insurance Or Guarantee.** *There is no insurance or guarantee for our obligation to make payments on the notes, so you will have to rely on our cash flow from operations and the Investments for the repayment of principal and payment of interest.*

The notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the notes, you will have to rely on our cash flow from operations and the Investments for repayment of principal at maturity and payment of interest when due. The senior notes will have priority over the Investments. If, after the payment of the senior notes, the Investments and cash flow from operations and other sources of funds are not sufficient to pay the senior subordinated notes and junior notes, then the senior subordinated note holders and junior note holders may lose all or part of their investment. Likewise, if, after the payment of the senior subordinated notes, the Investments and cash flow from operations and other sources of funds are not sufficient to pay the junior notes, then the junior note holders may lose all or part of their investment.

**Risk Of Redemption At The Option Of TAIN.** *Redemption by us prior to maturity may result in reinvestment risk to you.*

If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we have the option to redeem a pro rata portion of the notes prior to its stated maturity upon 10 days written notice to you. For those notes that are redeemed, 100% of the principal amount plus accrued but unpaid interest up to the redemption date will be paid. Any such redemption may have the effect of reducing the income or return on investment that you may receive in an investment in the notes by reducing the term of the investment. In addition, you may not be able to reinvest the proceeds of any such redemption for the remainder of the original term of the notes at an interest rate comparable to the rate paid on the notes. See "Description of the Notes - Redemption at the Option of TAIN."

**The Trustee May Experience A Conflict Of Interest.** *The trustee under the indenture governing the notes is an affiliate of our managing member, acts as our servicing agent, acts as the collateral agent under the security agreement, and represents all three tranches of notes.*

The trustee is McGinn, Smith Capital Holdings Corp., which is an affiliate of our managing member, McGinn, Smith Advisors, LLC and of our placement agent, McGinn, Smith & Co., Inc. In addition, we have retained McGinn, Smith Capital Holdings Corp. to act as our servicing agent. Furthermore, pursuant to a security agreement between TAIN and McGinn, Smith Capital Holdings Corp., as collateral agent, McGinn, Smith Capital Holdings Corp. will hold the security interest on the Investments on behalf of the note holders. In the event that you feel that you are not adequately represented by the trustee and/or the collateral agent in an event of default, holders of 25% of the aggregate principal amount of all notes outstanding may vote to remove the trustee and/or the collateral agent and elect a successor trustee and/or the collateral agent.

The trustee under the indenture and the collateral agent under the security agreement will represent all three tranches of notes. The note holders of a particular tranche of notes may feel that the trustee and/or the collateral agent have a conflict of interest when it acts in a way that favors one tranche of notes over another tranche of notes. In that event, holders of 25% of the aggregate principal amount of notes in a particular tranche may vote to remove the trustee and/or the collateral agent with respect to that tranche of notes and appoint a successor trustee and/or the collateral agent to represent that tranche of notes.

- 10 -

**CONFIDENTIAL**

**Risk Factors Relating to TAIN**

**TAIN Is A Newly-Formed Limited Liability Company.** *We have no historical financial information or results of operations on which you can base your investment decision.*

TAIN was organized in New York in 2004. We have no historical financial statements or results of operations. As a result, you have no historical data on which to base your estimation of our likelihood success in achieving our business and financial goals.

**We May Be Unable To Finance Our Operations.** *If we are unable to generate a sufficient cash flow, our results of operations and financial condition would be materially and adversely affected and we may be unable to make payments on the notes.*

We require a substantial amount of cash liquidity to operate our business. Among other things, we use such cash liquidity to:

- pay incentive commissions to our managing member's salesmen at the rate of 2% of the aggregate principal amount of the notes per year over the term of the notes;

- pay our managing member a portfolio management fee of 1% of the aggregate principal amount of the notes per year over the term of the notes;

- pay our servicing agent a fee for administering the notes of 0.25% of the aggregate principal amount of the notes per year over the term of the notes;

- satisfy working capital requirements and pay operating expenses, including accounting and legal expenses that we estimate to equal 0.25% of the aggregate principal amount of the notes per year; and

- pay interest expense.

Our cash flow is wholly dependent on our ability to find and acquire suitable Investments. We cannot assure you that our business strategy will succeed or that we will achieve our anticipated financial results. We may not be able to find such opportunities and our ability to generate cash flow depends on market and other factors beyond our control. These factors include:

- the current economic and competitive conditions; and

- any delays in implementing any strategic projects we may have.

Depending upon the outcome of one or more of these factors, we may not be able to generate sufficient cash flow from operations to satisfy all of our obligations, including the notes. If we are unable to pay our debts, we will be required to pursue one or more alternative strategies, such as selling assets, or refinancing or restructuring our indebtedness. These alternative strategies may not be feasible at the time or prove adequate.

**We Are Subject To Rate Fluctuations.** *Rate fluctuations between instruments may materially and adversely affect our results of operations, financial condition and cash flows and our ability to make payments on the notes.*

Our profitability is largely determined by the difference, or "spread," between the effective rate we pay on the Investments we acquire and the full rate received on such Investments. We may not be able to receive the same rate of return on all of our Investments. If one of our Investments is redeemed, prepaid, liquidated or sold prior to maturity, we may not be able to find a comparable Investment to replace it that would generate the same yields.

**We Will Be Adversely Affected When Investments Are Prepaid Or Defaulted.** *If an Investment is prepaid or experiences a default, our results of operations, financial condition and cash flows and our ability to make payments on the notes could be materially and adversely affected.*

- 11 -

**CONFIDENTIAL**

PLTF00017199

Our results of operations, financial condition, cash flows and liquidity, and consequently our ability to make payments on the notes, depend, to a material extent, on the performance of the Investments that we purchase. A portion of the Investments that we acquire may default or prepay. We bear the risk of losses resulting from payment defaults and may not realize the full value of our investment. Our income can also be adversely affected by prepayment of an Investment in our portfolio. Our revenue is based on a percentage of the outstanding principal balance of an Investment in our portfolio. If an Investment is prepaid or charged-off, then our revenue will decline while our servicing costs may not decline proportionately.

**We Depend On Our Managing Member And On Key Personnel.** *The success of our operations depends on our managing member and on certain key personnel.*

Our future operating results depend in significant part upon the continued service of our managing member, to which we pay 1% of the aggregate principal amount of the notes per year over the term of the notes to act as our portfolio manager and give us investment advice. We rely solely on the expertise of our managing member to make the proper investment decisions to generate cash flow.

Our future operating results also depend in part upon our ability to attract and retain qualified management, technical, and sales and support personnel for our operations. Competition for such personnel is intense. We cannot assure you that we will be successful in attracting or retaining such personnel. The loss of any key employee, the failure of any key employee to perform in his or her current position or our inability to attract and retain skilled employees, as needed, could materially and adversely affect our results of operations, financial condition and cash flows.

**Our Industry Is Competitive.** *Increased competition could materially and adversely affect our operations and profitability.*

We may have to compete with other investors. These competitors may have greater financial resources than we do or have better relationships or offer other forms of financing or services not provided by us. Our ability to compete successfully depends largely upon establishing and maintaining relationships in the investment community and acquiring suitable Investments.

**We May Be Harmed By Adverse Economic Conditions.** *Adverse economic conditions could materially and adversely effect our revenues and cash flows.*

A prolonged downturn in the economy could have a material adverse impact upon us, our results of operations and our ability to implement our business strategy. Similarly, adverse economic conditions or other factors might adversely affect the performance of our Investments, including the level of delinquencies, which could materially and adversely affect our results of operation, financial condition and cash flows and our ability to perform our obligations under the notes. These economic conditions could result in severe reductions in our revenues or the cash flows available to us and adversely affect our ability to make payments on the notes.

**We Are Subject To Regulations.** *Failure to materially comply with all laws and regulations applicable to us could materially and adversely affect our ability to operate our business and our ability to make payments on the notes.*

We believe that we are in compliance in all material respects with all such laws and regulations, and that such laws and regulations have had no material adverse effect on our ability to operate our business. However, we will be materially and adversely affected if we fail to comply with:

- applicable laws and regulations;

- changes in existing laws or regulations;

- changes in the interpretation of existing laws or regulations; or

- any additional laws or regulations that may be enacted in the future.

**CONFIDENTIAL**

PLTF00017200

## USE OF PROCEEDS

If all of the notes are sold, we would expect to receive approximately $29.35 million of net proceeds from this offering after deducting the 2% placement agent commission and other offering expenses payable by us.

We intend to use the net proceeds to acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"). Assuming we received the maximum amount of the offering, we will not invest more than 25% of the proceeds of this offering in any single Investment. All subscription proceeds will be held in an escrow account and no subscription agreement will be accepted until the minimum proceeds requirement is met for the first closing. Once we achieve the minimum amount required for the first closing, we will begin to acquire Investments.

We may acquire such Investments directly, or from our managing member or an affiliate of us or our managing member that has purchased the Investment. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the Investment. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission. We may retain the Investments beyond the term of the notes, sell such Investments during the term of the notes or offer the notes to preferred investors. If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we may, at our option, redeem a pro rata portion of the notes. See "Description of the Notes – Redemption at the Option of TAIN".

## CAPITALIZATION

Our sole member is our managing member, McGinn, Smith Advisors, LLC, which holds 100% of the membership interest in TAIN.

## BUSINESS

TAIN has been formed to acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"). We may acquire such Investments directly, or from our managing member or an affiliate of us or our managing member that has purchased the Investment. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the Investment. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission.

Our profitability is largely determined by the difference, or "spread," between the effective rate we pay on the Investments we acquire and the full rate of return received on such Investments.

## MANAGEMENT

We are solely managed by our managing member, McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC was formed in 2003. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc.

- 13 -

**CONFIDENTIAL**

PLTF00017201

## DESCRIPTION OF THE NOTES

*The following statements with respect to the notes are not complete and are qualified in all respects by the provisions of the indenture, copies of which are available from TAIN upon request. See "Additional Information."*

**General.** We will issue the notes under a indenture between Third Albany Income Notes, LLC and McGinn, Smith Capital Holdings Corp., as trustee (the "trustee") in a private transaction that is not subject to the registration requirements of the Securities Act. The terms and conditions of the notes include those stated in the indenture. The following is a summary of some, but not all, provisions of the notes and the indenture. For a complete understanding of the notes, you should review the definitive terms and conditions contained in the actual notes and the indenture, which include definitions of certain terms used below. The indenture, and not this description, defines your rights as holders of the notes. Copies of the form of the notes and the indenture are available from us at no charge upon request.

We are offering up to $30 million aggregate principal amount of our 5.75% secured senior notes due 2005 (the "original senior notes"), 7.75% secured senior subordinated notes due 2007 (the "original senior subordinated notes") and 10.25% secured junior notes due 2009 (the "junior notes" and together with the senior notes (as defined below) and the senior subordinated notes (as defined below), the "notes"). Upon the maturity of the original senior notes, we may continue to issue additional senior notes (the "additional senior notes" and together with the original senior notes, the "senior notes") with a one-year maturity date and an interest rate of the then current prime rate +1% up to one year prior to the maturity date of the original senior subordinated notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $30 million. Similarly, upon the maturity of the original senior subordinated notes, we may continue to issue additional senior subordinated notes (the "additional senior subordinated notes" and together with the original senior subordinated notes, the "senior subordinated notes") with a two-year maturity date and an interest rate of the greater of (i) 7.75% or (ii) the then current prime rate +2%, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $30 million.

The notes are secured by all of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. Even though the proceeds from your purchase of a note may be used acquire a particular Investment, specific notes are not limited to or payable from a particular Investment. All notes in the same tranche will be equably and ratably secured by all of our Investments. The senior subordinated notes and junior notes will be subordinated in right of payment to the prior payment in full of the senior notes. Additionally, the junior notes will be subordinated in right of payment to the prior payment in full of the senior subordinated notes. The notes are not insured by the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation or any other agency or company.

If not earlier redeemed, the original senior notes will mature on December 15, 2005 and any additional senior notes will mature on December 15, 2006, 2007, 2008 or 2009, respectively. If not earlier redeemed, the original senior subordinated notes will mature on December 15, 2007 and any additional senior subordinated notes will mature on December 15, 2009. If not redeemed earlier, the junior notes will mature on December 15, 2009. We will pay interest on the notes quarterly on the 15th day of January, April, July and October, commencing on January 15, 2005.

You may determine the amount (minimum $25,000 plus integral multiples of $5,000) of the notes you would like to purchase when you subscribe. See "- Denomination" below. If your subscription is rejected by us, all funds deposited will be promptly returned to you without any interest. Investors whose subscriptions for notes have been accepted and anyone who subsequently acquires notes in a qualified transfer are referred to as "holders" or "registered holders" in this memorandum and in the indenture.

We may modify or supplement the terms of the notes described in this memorandum from time to time in a supplement to the indenture and this memorandum. Except as set forth under "- Amendment, Supplement And Waiver" below, any modification or amendment will not affect notes outstanding at the time of such modification or amendment.

**Denomination.** You may purchase notes in the minimum principal amount of $25,000 plus integral multiples of $5,000. You will determine the original principal amount of each note you purchase when you subscribe.

**CONFIDENTIAL**

PLTF00017202

**First Closing.** The first closing will occur once a minimum of $4 million aggregate principal amount of the notes is purchased.

**Term.** The original senior notes will mature on December 15, 2005 and any additional senior notes will mature on December 15, 2006, 2007, 2008 or 2009, respectively. The senior subordinated notes will mature on December 15, 2007 and any additional senior subordinated notes will mature on December 15, 2009. The junior notes will mature on December 15, 2009.

**Interest Rate.** The original senior notes will accrue interest at an annual rate of 5.75% and any additional senior notes will accrue interest at an annual rate of the then current prime rate +1%. The senior subordinated notes will accrue interest at the annual rate of 7.75% and any additional senior subordinated notes will accrue interest at an annual rate of the greater of (i) 7.75% or (ii) the then current prime rate +2%. The junior notes will accrue interest at an annual rate of 10.25%.

**Computation of Interest.** We will compute interest on notes on the basis of an actual calendar year. Interest will compound daily and accrue from the date of the first closing.

**Interest Payment Dates.** Interest will be paid quarterly on the 15th day of January, April, July and October, commencing on January 15, 2005, to the person in whose name the note is registered at the close of business on the 15th day of the month preceding the month in which the interest payment date occurs. Your last interest payment will be made on the maturity date. Any interest not paid on an interest payment date will be paid at maturity.

**Place and Method of Payment.** We will pay principal and interest on the notes through our paying agent, by whatever means is chosen by you in your subscription agreement, including the use of an electronic funds transfer to a depository account you specify in your subscription documents.

**Servicing Agent.** We have engaged McGinn, Smith Capital Holdings Corp., an affiliate of our managing member, McGinn, Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc., to act as our servicing agent for the notes. The responsibilities as servicing agent will involve the performance of certain administrative and customer service functions for the notes that we are responsible for performing as the issuer of the notes. For example, the servicing agent will serve as our registrar and transfer agent and paying agent and will manage all aspects of the customer service function for the notes, including handling all phone inquiries, meeting with investors, processing subscription agreements, distributing our annual statement of operations upon request by a note holder, and dealing with any administrative tax matters with regards to the notes. In addition the servicing agent will provide us with monthly reports and analysis regarding the status of the notes and the amount of notes that remain available for purchase, if any.

As compensation for the services as servicing agent, we will pay the servicing agent an annual fee equal to 0.25% of the aggregate principal amount of the notes so long as the servicing agent is engaged. Such ongoing fee will be paid quarterly.

You may contact our servicing agent as follows with any questions about the notes:

> McGinn, Smith Capital Holdings Corp.
> Capital Center, 5th Floor
> 99 Pine Street
> Albany, New York 12207
> Attn: David L. Smith
> Tel: 518-449-5131
> Fax: 518-449-4894
> E-Mail: smithd@mcginnsmith.com

On each interest payment date, the servicing agent will credit interest due on each account and make such payments to the holders.

Our servicing agent, McGinn, Smith Capital Holdings Corp., an affiliate of our managing member McGinn, Smith Advisors, LLC and of our placement agent, McGinn, Smith & Co., Inc., is also the trustee under the indenture governing the notes and the collateral agent under the security agreement. As a result, McGinn, Smith Capital Holdings Corp. may experience a conflict of interest between its role as our servicing agent on the one hand and as the trustee and

- 15 -

**CONFIDENTIAL**

collateral agent for the note holders, on the other hand.  See "Risk Factors – Risk Factors Relating to the Notes – The Trustee May Experience a Conflict of Interest."

**Subscriptions.** Each subscriber will be required to complete an investor questionnaire in the form attached to this memorandum and submit an executed subscription agreement in the form attached to this memorandum. Each prospective investor must deliver with his or her subscription agreement a check in the full amount of the purchase price for the notes for which he or she has subscribed. The checks shall be made payable to Manufacturers and Traders trust Company ("M&T Bank"), Escrow Agent for Third Albany Income Notes, LLC", and upon receipt shall be deposited into an escrow account maintained by the placement agent with M&T Bank for the benefit of the investors (the "escrow account"). The proceeds of sale of the notes will remain in the escrow account until a subscription has been accepted by us and the placement agent, or until a subscription is rejected, at which time the amount of such subscription will be returned to the investor without interest. Subscriptions will be accepted only after satisfaction of the minimum offering amount and completion of the first closing. All such funds shall continue to be the property of the subscribers and shall be held in trust for their benefit until the subscribers receive their notes. We may reject any subscription for notes in our sole discretion.

**Redemption at the Option of TAIN.** If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we have the right, at our option, to redeem a pro rata portion of the notes prior to their stated maturity upon 10 days written notice to you. For example, if an Investment that comprises 20% of our secured assets is no longer owned by us, we may redeem 20% of the notes pro rata across all tranches and all note holders within each tranche. The notes that are redeemed will be redeemed at 100% of the principal amount plus accrued but unpaid interest up to but not including the redemption date without any penalty or premium. The holder has no right to require us to prepay or repurchase any note prior to its maturity date.

**Payment upon Maturity.** On the maturity date, we will pay the holder the principal amount and any accrued and unpaid interest.

**Transfers.** The notes are subject to significant restrictions on resale. We have not registered, and do not plan to register, the notes under the Securities Act or any state securities laws. You may not offer or sell the notes except (i) with an opinion of counsel or other documentation acceptable to us that the transfer is exempt from, or not subject to, the registration requirements of the Securities Act, or (ii) under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

**Security.** The notes are secured by all of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. Even though the proceeds from your purchase of a note may be used to acquire a particular Investment, specific notes are not limited to or payable from a particular Investment. All notes in the same tranche will be equally and ratably secured by all of our Investments.

**Subordination.** The indebtedness evidenced by the senior subordinated notes and the junior notes, and any interest thereon, are subordinated in right of payment to the senior notes. The indenture does not prevent holders of the senior notes from disposing of, or exercising any other rights with respect to, any or all of the collateral securing the senior notes. See "Risk Factors - Risk Factors Relating to the Notes – The Senior Subordinate Note Holders and Junior Note Holders Lack Priority in Payment on the Notes." Likewise, the indebtedness evidenced by the junior notes, and any interest thereon, are subordinated in right of payment to the senior subordinated notes. The indenture does not prevent holders of the senior subordinated notes from disposing of, or exercising any other rights with respect to, any or all of the collateral securing the senior subordinated notes. The notes are not guaranteed by any of our subsidiaries, affiliates or control persons.

In the event of any liquidation, dissolution or any other winding up of us, or of any receivership, insolvency, bankruptcy, readjustment, reorganization or similar proceeding under the U.S. Bankruptcy Code or any other applicable federal or state law relating to bankruptcy or insolvency, no payment may be made on the senior subordinated notes and junior notes until all the senior notes have been paid in full, and no payment may be made on the junior notes until all the senior notes and senior subordinated notes have been paid in full. If any of the above events occurs, holders of the senior notes may also submit claims on behalf of holders of the senior subordinated and junior notes and retain the proceeds for their own benefit until they have been fully paid, and any excess will be turned over to the holders of the senior

- 16 -

**CONFIDENTIAL**

subordinated notes and junior notes. If any distribution is nonetheless made to holders of the senior subordinated notes or junior notes, the money or property distributed to them must be paid over to the holders of the senior notes to the extent necessary to pay the senior notes in full.

In the event and during the continuation of any default in the payment of principal of or interest on the senior notes, we will not make any payment, direct or indirect, on the senior subordinated and junior notes unless and until (i) the default has been cured or waived or has ceased to exist or (ii) the end of the payment blockage period. Any payment blockage period will commence on the date the trustee receives written notice of default from a holder of the senior notes and will end on the earlier of (a) 179 days after the trustee's receipt of the notice of default; (b) the trustee's receipt of a valid waiver of default from the holders of the senior notes; or (c) the trustee's receipt of a written notice from the holders of the senior notes terminating the payment blockage period.

**Consolidation, Merger or Sale.** The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- we survive such merger or consolidation;

- such consolidation, merger or transfer is with one of our affiliates;

- the resulting or acquiring entity, if other than us, is organized and existing under the laws of a domestic jurisdiction and expressly assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the applicable indenture; and

- immediately after the transaction, and giving effect to the transaction, no event of default under the indenture exists.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, such successor entity may exercise our rights and powers under the indenture, in our name and we will be released from all our liabilities and obligations under the indenture and under the notes.

**Events Of Default.** The indenture provides that each of the following constitutes an event of default:

- a failure to pay interest on a note within 30 days after the due date for such payment (whether or not prohibited by the subordination provisions of the indenture);

- failure to pay principal on a note within 30 days after the due date for such payment (whether or not prohibited by the subordination provisions of the indenture);

- our failure to observe or perform any material covenant or our breach of any material representation or warranty, but only after we have been given notice of such failure or breach and such failure or breach is not cured within 60 days after our receipt of notice;

- certain events of bankruptcy, insolvency, liquidation or reorganization with respect to us, whether voluntary or involuntary; and

- any security interest granted to the Trustee on behalf of the Note Holders on any material portion of the Investments shall cease to be valid and effective.

If any event of default occurs and is continuing (other than an event of default involving certain events of bankruptcy or insolvency with respect to us) for a particular tranche of notes, the trustee or the holders of at least a majority in aggregate principal amount of the then outstanding notes for such tranche may declare the unpaid principal and any accrued interest on the notes to be due and payable immediately. In the case of an event of default arising from certain events of bankruptcy or insolvency, with respect to us, all outstanding notes will become due and payable without further action or notice.

- 17 -

**CONFIDENTIAL**

Holders of the notes may not enforce the indenture or the notes except as provided in the indenture. Subject to certain limitations, holders of a majority in principal amount of the then outstanding notes for a particular tranche of notes may direct the trustee in its exercise of any trust or power. The trustee may withhold from holders of the notes notice of any continuing default or event of default (except a default or event of default relating to the payment of principal or interest) if the trustee in good faith determines that withholding notice would have no material adverse effect on the holders.

The holders of a majority in aggregate principal amount of the notes then outstanding for a particular tranche of notes by notice to the trustee may, on behalf of all holders of such tranche, waive any existing default or event of default and its consequences under the indenture, except a continuing default or event of default in the payment of interest on, or the principal of, a note.

**Amendment, Supplement And Waiver.** Except as provided in this memorandum or the indenture, the terms of the notes then outstanding may be amended or supplemented with the consent of the holders of at least a majority in aggregate principal amount of the notes affected by such amendment or supplement, and any existing default or compliance with any provision of the indenture or the notes may be waived with the consent of the holders of a majority in aggregate principal amount of the notes affected.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the notes held by a holder who has not consented if it has any of the following consequences:

- reduces the principal of or changes the fixed maturity of any note or alters the redemption provisions or the price at which we shall offer to redeem the note;

- reduces the rate of or changes the time for payment of interest on any note;

- makes any note payable in money other than that stated in the notes;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of notes to receive payments of principal of or interest on the notes;

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of notes; or

- makes any change in the foregoing amendment and waiver provisions.

Notwithstanding the foregoing, without the consent of any holder of the notes, we and the trustee may amend or supplement the indenture or the notes:

- to cure ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the notes in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional certificates; or

- to make any change that would provide any additional rights or benefits to the holders of the notes or that does not materially adversely affect the legal rights under the indenture of any such holder.

**The Trustee.** McGinn, Smith Capital Holdings Corp. has agreed to be the trustee for all of the notes under the indenture and to hold the security interest in the Investments on behalf of all of the note holders as collateral agent under the security agreement. McGinn, Smith Capital Holdings Corp. is an affiliate of our managing member, McGinn, Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc., and has been engaged to act as our servicing agent. Because of the trustee's and the collateral agent's affiliation with our managing member and its role as our servicing agent, you may not feel that you are adequately represented by the trustee and/or the collateral agent in an event of default. In that instance, holders of 25% of the aggregate principal amount of all notes outstanding may vote to remove the trustee and/or the collateral agent and replace it with a successor trustee.

- 18 -

**CONFIDENTIAL**

As earlier stated, the trustee and the collateral agent represent all three tranches of note holders. As a result, a conflict of interest may arise in situations where one tranche of note holders wishes the trustee or the collateral agent to act in a way that is not beneficial to another tranche of note holders. If such conflict arises, holders of 25% of the aggregate principal amount of notes for a particular tranche may remove the trustee and/or the collateral agent with respect to that tranche and appoint a successor trustee and/or collateral agent with respect to that tranche pursuant to the procedures set forth in the indenture and the security agreement, as applicable.

Subject to certain exceptions, the holders of a majority in aggregate principal amount of notes for a particular tranche of notes will have the right to direct the time, method and place of conducting any proceeding or exercising any remedy available to the trustee. The indenture provides that in case an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs.

Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of notes, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

**Resignation or Removal of The Trustee.** The trustee may resign at any time, may be removed by the holders of 25% of the aggregate principal amount of all outstanding notes, or may be removed by the holders of 25% of the aggregate principal amount of notes of a particular tranche with respect to that tranche. In addition, upon the occurrence of contingencies relating generally to the insolvency of the trustee or the trustee's ineligibility to serve as trustee, we may remove the trustee or a court of competent jurisdiction may remove the trustee. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

**Reports To Trustee.** We will provide to the trustee reports containing any information reasonably requested by the trustee. These reports may include information on each note outstanding during the preceding quarter, including outstanding principal balance, interest credited and paid, transfers made, any redemption and interest rate paid.

**No Personal Liability of Our or Our Servicing Agent's Directors, Officers, Employees, Members and Stockholders.** None of our or our servicing agent's directors, officers, employees, incorporators, members or stockholders will have any liability for any of our obligations under the notes, the indenture or for any claim based on, in respect to, or by reason of, these obligations or their creation. Each holder of the notes waives and releases these persons from any liability. The waiver and release are part of the consideration for issuance of the notes. We have been advised that the waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the Securities and Exchange Commission that such a waiver is against public policy.

**Service Charges.** Our servicing agent may assess service charges for changing the registration of any note to reflect a change in name of the holder or transfers (whether by operation of law or otherwise) of a note by the holder to another person.

**Reports.** At the request of the holder, our servicing agent will provide to the holders of the notes our annual statement of the operations consisting of a balance sheet and income statement.

**Variations By State.** We may offer different securities and vary the terms and conditions of the offer (including, but not limited to, different interest rates and service charges for all notes) depending upon the state where the purchaser resides.

**Liquidity.** There is not currently a public market for the notes, and we do not expect that a public market for the notes will develop.

**Satisfaction and Discharge of Indenture.** The indenture shall cease to be of further effect upon the payment in full of all of the outstanding notes and upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding notes.

- 19 -

**CONFIDENTIAL**

## PLAN OF DISTRIBUTION

McGinn, Smith & Co., Inc., as our placement agent, will solicit offers to purchase the notes, for which it will receive commissions equal to 2% of the purchase price of the notes. With respect to the minimum offering of $4,000,000, McGinn, Smith & Co., Inc., as our placement agent, has agreed to offer the notes on a "best efforts, all or none" basis, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering. The offering period will extend until the earlier of (i) the sale of all of the notes, or (ii) December 31, 2004, provided that we have retained the right, in our discretion, and our placement agent has agreed in that event, to extend the offering period for up to six additional months. The placement agent is not obligated to purchase any of the notes. We have agreed to indemnify the placement agent and certain affiliated persons with respect to certain liabilities, including certain liabilities under the Securities Act. We also have agreed to reimburse the placement agent for reasonable expenses, including legal fees of its counsel. Affiliates of the placement agent may purchase a portion of the notes offered hereby.

The following table summarizes the compensation we will pay the placement agent for its services in selling the notes:

Form of Compensation

| | |
|---|---|
| Total commissions | $ 400,000 (1) |
| Reimbursement of expenses | $ 50,000 |

(1) Assumes the sale of 100% of aggregate principal amount of notes offered.

The placement agent agreement provides for reciprocal indemnification between us and the placement agent, including the placement agent's and our officers, directors and controlling persons, against civil liabilities in connection with this offering, including certain liabilities under the Securities Act. Insofar as indemnification for liabilities arising under the Securities Act may be permitted pursuant to such indemnification provisions, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

We are offering the notes without registration under the Securities Act in reliance upon an exemption afforded by Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.

The foregoing is a summary of the material provisions relating to selling and distribution of the notes in the placement agent agreement.

## OWNERSHIP STRUCTURE AND PRINCIPAL EQUITY HOLDERS

### History

Third Albany Income Notes, LLC, a New York limited liability company, was formed in 2004 for the purpose of identifying and acquiring various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments").

### Principal Equity Holders of TAIN

Third Albany Income Notes, LLC is solely owned by our managing member, McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc.

### Key Governance Provisions

Management of TAIN is vested in our managing member. Our managing member has authority to take all actions necessary or appropriate in connection with the operation and financing of TAIN. The managing member is solely

- 20 -

CONFIDENTIAL

responsible for finding suitable Investments and is paid an annual fee of 1% of the aggregate principal amount of the notes to make such decisions and manage our portfolio.

**Indemnification of Managing Member**

Our articles of operation provide that TAIN will indemnify and hold harmless our managing member from any loss or damage, including attorney's fees incurred by such managing member, relating to any action taken, or failed to be taken, on behalf of TAIN so long as the managing member acted in good faith. The managing member is not entitled to be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence.

## AFFILIATED TRANSACTIONS

Our managing member is McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc. David L. Smith, who is 50% owner of our servicing agent, McGinn, Smith Capital Holdings Corp., and the President and Chief Executive Officer of our placement agent, McGinn, Smith & Co., Inc., is the principal officer of McGinn, Smith Advisors, LLC. We will pay our managing member 1% of the aggregate principal amount of the notes per year over the term of the notes to act as our portfolio manager and give us investment advice. In addition, we will pay incentive commissions to our managing member's salesmen at the rate of 2% of the aggregate principal amount of the notes per year over the term of the notes. We may acquire Investments from our managing member or an affiliate of our managing member that has purchased the Investments. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any of its affiliates, we will pay the same price for the Investment that we would have paid if we had purchased the Investment directly. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission.

Our servicing agent, McGinn, Smith Capital Holdings Corp., is an affiliate of our managing member, McGinn Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc. McGinn, Smith Capital Holdings Corp. is 50% owned by David L. Smith, principal officer of our managing member, McGinn, Smith Advisors, LLC, and President and Chief Executive Officer of our placement agent, McGinn, Smith & Co., Inc. We will pay our servicing agent a fee for administering the notes in the amount of 0.25% of the aggregate principal amount of the notes per year over the term of the notes.

The trustee under the indenture governing the notes and the collateral agent holding the security interest on the Investments on behalf of the note holders under the security agreement is also McGinn, Smith Capital Holdings Corp., an affiliate of our managing member, McGinn Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc. McGinn, Smith Capital Holdings Corp. is 50% owned by David L. Smith, principal officer of our managing member, McGinn, Smith Advisors, LLC, and President and Chief Executive Officer of our placement agent, McGinn, Smith & Co., Inc.

## INVESTOR SUITABILITY REQUIREMENTS

**General**

An investment in the notes involves significant risks and is suitable only for persons of adequate financial means who have no need for liquidity with respect to their investment and who can bear the economic risk of a complete loss of their investment. This offering is made in reliance on exemptions from the registration requirements of the Securities Act and applicable state and foreign securities laws and regulations.

The suitability standards discussed below represent minimum suitability standards for prospective investors. The satisfaction of such standards by a prospective investor does not necessarily mean that the notes are a suitable investment for such prospective investor. Prospective investors are encouraged to consult their personal financial advisors to determine whether an investment in the notes is appropriate. We may reject subscriptions, in whole or in part, in our sole discretion.

- 21 -

PLTF00017209

We will require each investor to represent in writing that, among other things, (i) by reason of the investor's business or financial experience, or that of the investor's professional advisor, the investor is capable of evaluating the merits and risks of an investment in the notes and of protecting its own interests in connection with the transaction; (ii) the investor is acquiring the notes for its own account, for investment only and not with a view toward the resale or distribution thereof; (iii) the investor is aware that the notes have not been registered under the Securities Act or any state or foreign securities laws and that transfer thereof is restricted by the Securities Act, applicable state or foreign securities laws and the absence of a market for the notes; and (iv) such investor meets the suitability requirements set forth below.

**Suitability Requirements**

Each investor must represent in writing that it qualifies as an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act, and must demonstrate the basis for such qualification. To be an accredited investor, an investor must fall within any of the following categories at the time of the sale of the notes to that investor:

- a bank as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity, a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; an insurance company as defined in Section 2(13) of the Securities Act; an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(48) of that Act; a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of the Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

- a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940,

- an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended; a corporation; a Massachusetts or similar business trust; or a partnership; in each case, not formed for the specific purpose of acquiring the notes and with total assets in excess of $5,000,000;

- a manager, member or executive officer of TAIN;

- a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of such person's purchase of the notes, exceeds $1,000,000;

- a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

- a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the notes, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D; or

- any entity in which all of the equity owners are accredited investors.

In order to meet the conditions for exemptions from the registration requirements under the securities laws of certain jurisdictions, investors who are residents of such jurisdictions may be required to meet additional suitability requirements.

- 22 -

**CONFIDENTIAL**

PLTF00017210

## WHERE YOU CAN FIND MORE INFORMATION

Upon request of a prospective investor, we will make available to such investor the opportunity to ask questions of and receive answers from us concerning the terms and conditions of the offering. Further, we will, subject to confidentiality agreements and other considerations, obtain and make available additional information reasonably requested by such investor to the extent we possess such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of any of the information concerning the terms and conditions of the offering or any of the transactions referred to herein.

Copies of our certificate of formation, operating agreement and certain other documents referred to in this memorandum are available from the placement agent upon request.

- 23 -

**CONFIDENTIAL**

PLTF00017211

**EXHIBIT A**

**FORM OF INVESTOR QUESTIONNAIRE**

**CONFIDENTIAL**

PLTF00017212

**EXHIBIT B**

**FORM OF SUBSCRIPTION AGREEMENT**

**CONFIDENTIAL**

PLTF00017213

# **Exhibit 10**

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF NEW YORK
2             CIVIL ACTION NO. 3:14-CV-01303

3

4 NEAL A. CUPERSMITH, ET AL.,

5      Plaintiffs,

6      v.

7 PIAKER & LYONS, P.C., RONALD L.
  SIMONS AND TIMOTHY N. PAVENTI,
8
       Defendants.
9

10

11

12              Oral deposition of RUSSELL FRED MAZDA,

13 MD, taken at the law offices of Kang, Haggerty &

14 Fetbroyt, 123 South Broad Street, Suite 1670,

15 Philadelphia, Pennsylvania, on Tuesday, November 3,

16 2015, commencing at 9:22 a.m., before Suzanne

17 Walinsky, a Court Reporter and Notary Public,

18 pursuant to notice.

19

20

21

22

23

24

**Page 22**

1  didn't take the higher level of return because it
2  seemed more risky.  They was supposedly backed by
3  some pool of money that protected the investment to
4  some degree.
5      Q.      Now, you had mentioned that there was
6  some discussion regarding risk.  Do you
7  specifically remember that?
8      A.      I remember talking with him about, you
9  know, the notes and whether -- you know, whether
10 they were very risky or not.
11             But, you know, we discussed the fact
12 that people were going to make payments on their
13 alarm system bills, I guess, however it's arranged.
14 My understanding was the alarm companies go
15 in, they put in alarm systems and then people make
16 monthly payments for monitoring, which included the
17 cost of the equipment.
18             And -- and it seemed reasonable to
19 expect that -- that a person wants to be secure, so
20 they make sure they have their monitoring and they
21 pay it.  So it seemed like there was not a great
22 degree of risk in the note.
23     Q.      And do you have a specific
24 recollection of Bill Lex advising you that these

**Page 23**

1  weren't high risk?
2      A.      I don't think he ever told me there
3  was no risk.  I mean, but I don't think -- as I
4  said, there was riskier level of note to invest in,
5  which I didn't go for.
6      Q.      Let me ask you this.  I mean, if we do
7  a scale of 1 to 5, you know, 1 being the lowest
8  risk, 5 being the highest risk, what was your
9  understanding at the time you invested?
10     A.      Be about 3.
11     Q.      Did you have a discussion with Bill
12 Lex at the time of that initial investment what
13 your goals were as far as investing?
14     A.      I don't recall that.  But I don't
15 think that was a big part of money that I was
16 investing, so I don't think.
17     Q.      Did you believe Bill Lex to be an
18 investment advisor?
19     A.      I believe so, yeah.
20     Q.      Do you understand the difference
21 between an investment advisor and a broker?
22     A.      An investment advisor helps you decide
23 where to place your money.  The brokers's actually
24 selling you the -- the vehicle or the investment.

**Page 24**

1      Q.      And it was your understanding that
2  Bill Lex was helping you with the investments,
3  correct?
4      A.      Right.
5      Q.      Giving you advice, correct?
6      A.      Right.
7      Q.      In connection with the original
8  investment, given your risk tolerance, did he
9  recommend that this was a good investment for you?
10     A.      Well, I think he thought so since -- I
11 don't really recall.  I was trying to make a lot
12 of -- you know, I mean, I just wanted some place
13 the money would, you know, do something more than
14 inflation, so...
15     Q.      Do you have a specific recollection as
16 to what the expected return on investment was for
17 that initial investment?
18     A.      Not offhand.
19     Q.      Okay.
20     A.      Might have been 5 or 6 percent.  I
21 don't think it was -- yeah, not offhand.
22     Q.      Now, I believe you stated that it is
23 your understanding that your initial investment
24 with Mr. Lex was late '90s or early 2000s.

**Page 25**

1              Does that sound about right?
2      A.      Yes.
3      Q.      Now, I'm going to represent to you,
4  and I'm sure counsel will correct me if what I'm
5  saying is wrong, but it's my understanding that at
6  some point in time, these alarm service contracts
7  or investments were rolled over into what became
8  the four funds.
9              Are you familiar with the term "four
10 funds"?
11     A.      No.
12     Q.      Okay.  Well, I'm going to name a
13 couple of those funds for you and just let me know
14 if you have any recollection or understanding of
15 these names.
16             First Excelsior Income Notes, LLC.
17 Does that sound familiar to you?
18     A.      Yes.
19     Q.      First Albany Income Notes, LLC.  Does
20 that sound familiar to you?
21     A.      No.
22     Q.      With respect to the First Excelsior
23 Income Notes, do you have any recollection as to
24 whether the alarm security investments were rolled

**Page 38**

1    Q.    Would you have expected Bill Lex, as
2 part of the investment, to provide you with the
3 offering documents?
4    A.    Would I have expected that?  I don't
5 know that I would have expected it, no.
6    Q.    Okay.  Any reason to believe that he
7 wouldn't have provided you a copy of the Private
8 Placement Memorandum to review prior to your
9 investment?
10    A.    I don't -- I don't have any reason to
11 think that.
12    Q.    Is the document that's been marked as
13 Exhibit 2, is that something that you would
14 consider relevant to your investment?
15    A.    Yes.
16    Q.    But as you sit here today, you have no
17 recollection as to whether or not you actually did
18 review that document?
19    A.    No, I don't.
20    Q.    Do you have any recollection of having
21 any discussions with Bill Lex regarding that
22 document or any other documents relating to the
23 First Excelsior Income Notes investment?
24    A.    No.  I don't recall discussing the

**Page 39**

1 document itself, no.
2    Q.    And I think I asked this earlier, but
3 after looking at that document, the Private
4 Placement Memorandum marked as Exhibit No. 2, does
5 that help inform you as to what exactly the
6 offering was?
7    A.    Not much more than I remember.  You
8 know, the money was going to McGinn Smith and it
9 was going to be used to invest in other vehicles
10 that...
11    Q.    But as to the specific places the
12 money was going, do you have any knowledge, even
13 after reviewing that document, where the money was
14 going to go?
15    A.    No.
16    Q.    I'm going to go through a few things
17 in this document with you.
18         I'm going to start on page 5 under the
19 heading "Risk Factors."  And just let me know when
20 you've had a chance to review it.
21    A.    Okay.
22    Q.    Do you have any recollection of
23 reviewing this part of the document entitled "Risk
24 Factors"?

**Page 40**

1    A.    I don't recall.
2    Q.    I just want to go through a few of the
3 risk factors that are noted there.
4         Do you see on page 6 where it notes
5 that "The security interest may not be sufficient
6 for repayment of the notes?"
7    A.    Yeah.
8    Q.    Is that something that you understood
9 at the time you made the investment?
10    A.    Yeah.  I -- I remember not thinking
11 that there was a guarantee that there was money to
12 cover the investment.
13    Q.    Is it fair to characterize this risk
14 as saying that there's a chance that you might lose
15 everything?
16    A.    Yes.
17    Q.    And that's something you did
18 understand?
19    A.    Yeah.
20    Q.    Also on page 6, do you see where it
21 notes that "The notes are not insured or
22 guaranteed?"
23    A.    Yeah.
24    Q.    Is that something you understood at

**Page 41**

1 the time you made the investment?
2    A.    Yes.
3    Q.    Is that consistent with what Bill Lex
4 had said about a pool of money being there to cover
5 everything?
6         MR. DEAN:  Objection.  Misstates the
7 prior testimony.
8         THE WITNESS:  I didn't understand if
9 there was pool of money that would guarantee the
10 return of my money.
11 BY MR. HOPPE:
12    Q.    And your understanding was what of
13 that pool of money?
14    A.    That it would help cover some loss.
15    Q.    Okay.  But you understood at the time
16 of the investment that the notes aren't insured or
17 guaranteed?
18    A.    Yeah.
19    Q.    And you were okay with that when you
20 made the investment?
21    A.    Yeah.
22    Q.    Now, also on page 6, if you scroll
23 down a little more, do you see where there's --
24 where it notes that there are conflicts of interest