# Exhibit 11

1           UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF NEW YORK
2            CIVIL ACTION NO. 3:14-CV-01303

3

4  NEAL A. CUPERSMITH, ET AL.,

5     Plaintiffs,

6     v.

7  PIAKER & LYONS, P.C., RONALD L.
   SIMONS AND TIMOTHY N. PAVENTI,
8
     Defendants.
9

10

11

12          Oral deposition of LINDA M. SULLIVAN,

13  taken at the law offices of Kang, Haggerty & Fetbroyt,

14  123 South Broad Street, Suite 1670, Philadelphia,

15  Pennsylvania, on Monday, December 7, 2015, commencing

16  at 11:06 a.m., before Suzanne Walinsky, a Court

17  Reporter and Notary Public, pursuant to notice.

18

19

20

21

22

23

24

**Page 6**

1  sorry to interrupt.  I don't know if you guys hear it
2  on your end, but it seems -- I don't know if it's a
3  bad connection.  I'm getting -- it's kind of muffled.
4          MR. DEAN:  Kind of muffled?
5          MS. PIETRASZEWSKI:  Yeah.  When she's
6  speaking, I'm having a hard time really hearing her.
7          MR. DEAN:  Here, let me try moving the
8  phone closer and see if that helps.
9          MS. PIETRASZEWSKI:  Okay.
10         THE WITNESS:  I said that I graduated
11 from Bishop Neumann Business School and then took the
12 test for my GED.
13 BY MS. PIETRASZEWSKI:
14     Q.     Okay.  And can you describe for me your
15 employment background.
16     A.     Mostly office work.  I was out of the
17 work force for several years raising my children.
18         MS. PIETRASZEWSKI:  David, I'm sorry.  I
19 think I'm going to have to call back.  It's almost
20 sounding like robotic.
21         MR. DEAN:  Oh, that's weird.
22         (Discussion off the record.)
23         MR. DEAN:  Do we want to read back the
24 last -- or what was the -- where were we?

**Page 7**

1          MS. PIETRASZEWSKI:  She was describing
2  her employment.  But I couldn't really -- I heard
3  office work and that was pretty much it.
4          THE WITNESS:  Right.  I said I've mostly
5  done office work.  I took several years off to raise
6  my children and then went back and did office work
7  again.  But I stopped working in 2003.
8  BY MS. PIETRASZEWSKI:
9      Q.     Okay.  And did you retire in 2003?
10     A.     I became disabled.
11     Q.     Okay.  And can you describe for me,
12 generally what was your involvement in the investment
13 decisions that your mother, Ms. Glasgow, made?
14     A.     Basically, I made the decision.  I --
15 excuse me -- I took care of all of my mother's
16 financial decisions.  I wrote her checks.  I invested
17 her money.  So I was the one who, you know, actually
18 made the decision to purchase the note.
19     Q.     Okay.  And have you had any background
20 in dealing with the stock market or securities?
21     A.     Yes.
22     Q.     And what was that background?
23     A.     I was licensed with my Series 6 and 63.
24     Q.     And do you read investment publications

**Page 8**

1  or articles or journals or anything like that?
2      A.     I used to.  I now just listen to, you
3  know, Fox or CNBC.
4      Q.     Okay.  And what about -- at what point
5  in time did you make the investment on behalf of your
6  mother that's at issue in this lawsuit?
7      A.     I do not remember.
8      Q.     Okay.  At the time that you made the
9  investment, do you recall whether you were regularly
10 reading any investment publications?
11     A.     Not at that time.
12     Q.     And aside from the investments that are
13 at issue in this lawsuit, have you invested in stocks
14 and bonds in the past?
15     A.     Have I or have I for my mother?
16     Q.     Have you?
17     A.     Yes.
18     Q.     And did you use a broker or an
19 investment advisor in making those investments?
20     A.     Yes.
21     Q.     Okay.  Who did you use?
22     A.     William F. Lex.
23     Q.     And was he a broker or an advisor?
24     A.     Both.

**Page 9**

1      Q.     Okay.  And how did you meet Mr. Lex?
2      A.     He married my sister.
3      Q.     And what year did he do that?
4      A.     60 years ago -- 50 years ago.  I'm
5  sorry.  So it would be 1965.
6      Q.     Okay.  When did you first start using
7  Mr. Lex as a broker and advisor?
8      A.     Maybe 20 years ago.
9      Q.     Okay.  And what types of accounts did
10 you have, other than the one at issue here for your
11 mother, what types of accounts did you have that
12 Mr. Lex was involved in?
13     A.     I had an annuity and I had purchased
14 stock.
15     Q.     And when you made the investment
16 decisions, do you perform any due diligence on the
17 investments?
18     A.     Other than I would check the stock
19 market.  I basically stayed with blue chip, so I just
20 checked on those occasionally.
21     Q.     Okay.  And do you know if Mr. Lex
22 performed any due diligence on the investments that he
23 was involved in?
24     A.     Yes.

1    Q.      Okay.  And how do you know that he did
2  that?
3    A.      Because I would talk to him.
4    Q.      And he told you that he did due
5  diligence?
6    A.      Yes.  And that, you know, he would say
7  this report came in or that -- you know, the -- the
8  Wall Street Journal said this or, you know...
9    Q.      And at what point in time did you take
10 over the financial decisions for your mother?
11   A.      Let me think for a minute.
12   Q.      Sure.
13   A.      Probably 10 to 12 years ago.
14   Q.      And are you familiar with the brokerage
15 firm McGinn Smith & Company?
16   A.      Yes.
17   Q.      How did you become familiar with that
18 company?
19   A.      They were my broker.
20   Q.      Okay.  When did they become your broker?
21   A.      When I got my licensing, my Series 6 and
22 63.
23   Q.      So you've been using them since 1963?
24   A.      No.  I said when I took the exam and got

1  my Series 6 and 63, that's when they became my broker.
2    Q.      Okay.  And how was it that they came to
3  be your broker?
4    A.      Because you have to have a broker when
5  you have your licensing.
6    Q.      Okay.  How come it was them as opposed
7  to someone else?
8    A.      Because I worked at Lex & Smith and they
9  were their broker.
10   Q.      You worked at Lex & Smith?
11   A.      Yes.
12   Q.      When did you work there?
13   A.      I don't exactly remember when I started,
14 so give me a minute.
15           I know that I stopped working in 2003.
16 About 25 years ago, so either the late 1980s or at the
17 very beginning of the 1990s.
18   Q.      Okay.  So you had made other investments
19 with McGinn Smith prior to the investments at issue in
20 this lawsuit?
21   A.      Yes.
22   Q.      And what types of investments were
23 those?
24   A.      Basically, the stock trades.

1    Q.      Okay.  And how did you come to make the
2  investments at issue in this lawsuit?
3    A.      It -- the investments had a very good
4  history, as far as paying out.  And it was a way for
5  my mother to have monthly income to help subsidize her
6  Social Security and her very small pension.
7    Q.      And how did you become familiar with
8  those investments?
9    A.      Well, many years prior, when I worked at
10 Lex & Smith, those notes were sold and they had always
11 paid and always performed and had done well.
12   Q.      Now, the investment that you made for
13 your mother was after you had stopped working, though,
14 correct?
15   A.      Correct.
16   Q.      Did you contact someone to inquire about
17 investments or did someone bring them to your
18 attention?  How did that come about?
19   A.      Well, Bill and I discussed, you know, my
20 mother's finances and what we thought would be, you
21 know, a way for her to generate income.
22   Q.      And then he suggested making this
23 investment?
24   A.      Yes.

1    Q.      And do you know what the investment was
2  that you made for your mother?
3    A.      I -- I don't remember off the top of my
4  head.  I do know that it was a senior note, which was
5  very important, because senior notes are paid first.
6  I don't remember the specific investment.
7    Q.      And do you know how much you invested?
8    A.      A hundred thousand.
9    Q.      And at the time that you were making the
10 investment, did you speak with anyone at McGinn Smith
11 regarding the investment?
12   A.      No.
13   Q.      You just spoke with Mr. Lex?
14   A.      Yes.
15   Q.      And I assume, based on what you
16 previously mentioned, that Mr. Lex was aware of your
17 mother's financial situation and your goals in making
18 investments on her behalf?
19   A.      Yes.
20   Q.      And what was ultimately determined
21 through those discussions with Mr. Lex?
22   A.      As I previously stated, it was a way for
23 my mother to have a monthly income to help in addition
24 to the Social Security and small pension.

# **Exhibit 12**

RONALD L. SIMONS

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
- - -

NEAL A. CUPERSMITH,   :  Civil Action No.
ET AL.,          : 3:14-cv-01303-TJM-DEP
      Plaintiffs :
   vs.        :
            :
PIAKER & LYONS, P.C., :
ET AL.,         :
      Defendants :

- - -
Wednesday, December 16, 2015
- - -

Oral 30(b)(6) Corporate Designee
and Individual deposition of RONALD L.
SIMONS, taken pursuant to notice, held at
the DoubleTree by Hilton Hotel, 225 Water
Street, Binghamton, New York 13901,
commencing at approximately 8:56 a.m., on
the above date, before MARIA NOELLE DAMIANI,
Registered Merit Reporter, Certified
Realtime Reporter, Certified LiveNote
Reporter, Certified Shorthand Reporter (PA;
DC; NY; NJ, License No. 30XI00224100; DE,
License No. RPR-117) and a Notary Public in
the Commonwealth of Pennsylvania.

- - -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19102
www.Elitelsllc.com ~ (215) 563-3703

## Page 2

1
2
    A P P E A R A N C E S :
3
4      KANG HAGGERTY FETBROYT, LLC
       BY: EDWARD T. KANG, ESQUIRE
5      BY: DAVID DEAN, ESQUIRE
       123 S. Broad, Suite 1670
6      Philadelphia, Pennsylvania 19109
       Telephone: (215) 525-5850
7      E-mail:  Ekang@LawKHF.com;
       Ddean@LawKHF.com
8      --Representing the Plaintiffs
9
10     JAECKLE FLEISCHMANN & MUGEL, LLP
       BY: CHARLES C. SWANEKAMP, ESQUIRE
11     Avant Building, Suite 900
       200 Delaware Avenue
12     Buffalo, New York 14202-2107
       Telephone: (716) 856-0600
13     E-mail: Cswanekamp@jaeckle.com
       --Representing the Defendants
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1
2          C O N T E N T S
          - - -
3
4   Testimony of:       RONALD SIMONS
5                 Page Number
6   By Mr. Kang . . . . . . . . . . 6
7        E X H I B I T S
         - - - -
8   "P" DEPOSITION EXHIBIT NO.   PAGE MARKED
9   1  Amended Notice of          11
       Deposition of Corporate
10     Designee(s) of Piaker & Lyons, P.C.
11  2  AICPA Code of Professional   64
       Conduct and Bylaws As of
12     June 1, 2008
13  3  Statements and Standards for  119
       Tax Services, August 2000, 1-8
14
15  4  Confidential Private Placement  134
       Memorandum FAIN
16  5  Letter, October 13, 2008      188
17  6  Plea Agreement            201
18  7  AU Section 314,            213
       Accounting Memo
19
20  8  AU Section 316,            217
       Accounting Memo
21  9  Court Transcript           242
22  10 FEIN Transactions by Account    250
       As of December 31, 2006
23
24  11 Journal Entries              259

## Page 4

1
2          E X H I B I T S
          - - - -
3   "P" DEPOSITION EXHIBIT NO.    PAGE MARKED
4
5   12 FEIN Transactions by Account    267
       As of December 31, 2007
6      *Re-marked              282
7   13 FEIN General Ledger As of      283
       December 31, 2007
8
9   14 Audit Planning Checklist       300
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

RONALD L. SIMONS

Page 5

1
2          DEPOSITION SUPPORT INDEX
3              - - -
4
Direction to Witness Not to Answer
5   Page
6   None
7
8
Request for Production of Documents
9   Page
10  26, 33
11
12
Stipulations
13  Page
14  190
15
16
Question Marked
17
Page
18  None
19
20
Confidential Portions
21
Page
22  None
23
24

Page 6

1              - - -
2          RONALD L. SIMONS, after having
3      been duly sworn, was examined and
4      testified as follows:
5              - - -
6          E X A M I N A T I O N
7              - - -
8   BY MR. KANG:
9          Q.   Mr. Simons, my name is Edward
10  Kang, we met before, and I represent the
11  Plaintiffs in this case.
12         A.   Uh-huh.
13         Q.   You have been deposed before,
14  right?
15         A.   No.
16         Q.   This is your first time?
17         A.   Yes.
18         Q.   But you've testified in court
19  before?
20         A.   Yes.
21         Q.   A deposition is the same
22  process as if you were testifying in court,
23  the only difference is that there's a judge,
24  but other than that, the same rules apply.

Page 7

1          A.   Yes.
2          Q.   And I will give you
3      instructions as we move forward as
4      necessary.
5              Let's start with your
6      background.  Who do you work for?
7          A.   Uhm, I am presently
8      unemployed.
9          Q.   Unemployed you said?
10         A.   Yes.
11         Q.   And how long have you been
12     unemployed?
13         A.   Uhm, I left in the first week
14     of December of this year.
15         Q.   And before that you were at
16     Piaker & Lyons, right?
17         A.   Yes.
18         Q.   What happened to that
19     employment at Piaker & Lyons?
20         A.   I retired.
21         Q.   You retired.  Well,
22     congratulations.
23         A.   Thank you.
24         Q.   When you were at Piaker &

Page 8

1   Lyons, what was your title?
2          A.   President.
3          Q.   Okay.  And how big is Piaker &
4      Lyons?
5          A.   We have three offices:
6      Binghamton, Norwich and Syracuse.  Combined,
7      all employees, it ranges between 45 and 50.
8          Q.   How many CPAs?
9          A.   Approximately 30.
10         Q.   And what were your duties as
11     president of Piaker & Lyons?
12         A.   Uhm, my duties as president,
13     uhm, uhm, I was responsible for the
14     administrative functions of the firm and
15     also had a client log where I was the
16     engagement partner on, uhm -- on various
17     clients.
18         Q.   Were you also in charge of
19     overseeing other CPAs?
20         A.   Yes.
21         Q.   All of them?
22         A.   No.  Well, there's nine
23     partners so I'm on the -- jobs that I
24     was the engagement partner on, I would be

RONALD L. SIMONS

Page 45

1    THE WITNESS:  Uhm, uhm, the
2    use of -- of -- the use of monies
3    that may be raised and not used for
4    their intended purpose but to be
5    used to facilitate payments to other
6    earlier investors.
7    BY MR. KANG:
8        Q.   I think what you just said is
9    a general description of a Ponzi scheme so I
10   think your understanding is correct.
11       With that, I'm sure that you
12   heard the term or you heard about McGinn,
13   Smith and their Ponzi scheme, right?
14       MR. SWANEKAMP:  Form.
15       THE WITNESS:  I -- I heard --
16   I know that they went to -- they
17   were indicted and there was a court
18   proceeding and -- and they were
19   found guilty of various felonies,
20   uhm, that I believe related to
21   Ponzi-type activity.
22   BY MR. KANG:
23       Q.   And you know that there was an
24   SEC action filed here in the United States

Page 46

1    District Court, Northern District against
2    McGinn, Smith & Co., Inc., and other people
3    for a Ponzi scheme, right?
4        MR. SWANEKAMP:  Form.
5        THE WITNESS:  I believe you're
6    referring to the Complaint in 2010?
7        MR. KANG:  That's right.
8        THE WITNESS:  I am aware of
9    that, yes.
10       MR. KANG:  Right.
11   BY MR. KANG:
12       Q.   And how did you hear about
13   that?
14       A.   It hit the -- hit the news.
15   And, uhm, I recall getting a phone call from
16   the controller at the time.
17       Q.   Was that Shea or Rees?
18       A.   It was Brian Shea.
19       Q.   So in 2010 Brian Shea called
20   you and told you about the action brought by
21   the SEC against McGinn, Smith for a Ponzi
22   scheme; is that your testimony?
23       MR. SWANEKAMP:  Form.
24       THE WITNESS:  I recall

Page 47

1    receiving a phone call that on that
2    date in April of 2010 various
3    federal authorities came -- came
4    into the office of McGinn, Smith in
5    Albany and did some sort of action.
6    I don't recall at that time whether
7    I knew there was an SEC proceeding
8    or not, but there was some sort of
9    event, uhm, with the federal
10   authorities of raiding their
11   offices.
12   BY MR. KANG:
13       Q.   And you know that through
14   Mr. Rees?
15       A.   Shea.
16       Q.   Shea, I'm sorry.
17       So you know that through
18   Mr. Shea?
19       A.   Yes.
20       Q.   Because he told you that on
21   the phone?
22       A.   Yes.
23       Q.   When Mr. Shea told you that on
24   the phone, the federal authority that you

Page 48

1    described, were they at the scene as
2    Mr. Shea was calling you?
3        A.   Uhm, I think it was during
4    that day.
5        Q.   Can you tell me as much as you
6    can what Mr. Shea told you during that phone
7    call?
8        A.   That there was a federal raid
9    going on and a lot of people with guns and
10   they were securing and seizing our records
11   and computers and things like that.
12       Q.   And what was your reaction
13   when you first heard that from Mr. Shea?
14       A.   Shock.
15       Q.   Can you tell me why you were
16   shocked?
17       A.   Uhm, I wasn't aware that any
18   federal proceeding was -- was happening.
19       Q.   Did Mr. Shea tell you that the
20   federal proceeding that you just mentioned
21   had to do with a Ponzi scheme?
22       MR. SWANEKAMP:  Form.
23       THE WITNESS:  No.
24   BY MR. KANG:

12 (Pages 45 to 48)

RONALD L. SIMONS

Page 101

1  statement that I just read, which you read
2  too just now, it also said that Ms. Palen
3  spoke with your former colleague,
4  Mr. Paventi. Do you know that that took
5  place?
6      A.   I have no knowledge of it
7  taking place, no.
8      Q.   You're sure that you didn't
9  talk to Ms. Palen?
10     A.   I am sure I did not talk to
11  Ms. Palen, to my recollection.
12     Q.   Mr. Simons, Piaker & Lyons, in
13  addition to providing auditing services for
14  McGinn, Smith, it also provided tax services
15  to McGinn, Smith, right?
16     A.   Yes.
17     Q.   And it also provided tax
18  services for the Four Funds, right?
19     A.   Yes.
20     Q.   Do you know the names of those
21  Four Funds?
22     A.   Yes.
23     Q.   One is FEIN, F-E-I-N.
24     A.   Yes.

Page 102

1      Q.   F-I-I-N is FIIN?
2      A.   Yes.
3      Q.   There's a TAIN, T-A-I-N?
4      A.   Yes.
5      Q.   And what's the fourth one?
6      A.   FIIN, FEIN, FAIN and TAIN.
7      Q.   Well, I have F-E-I-N, F-I-I-N,
8  T-A-I-N.
9      A.   F-A-I-N.
10     Q.   F-A-I-N.
11     A.   First Advisory, yes.
12     Q.   And did Piaker & Lyons provide
13  any other services for the Four Funds other
14  than tax services?
15     A.   No.
16     Q.   Just tax?
17     A.   Yes.
18     Q.   Were you the partner in
19  charge?
20     A.   I was the engagement partner
21  of those, yes.
22     Q.   And Piaker & Lyons also
23  provided tax services to a number of McGinn,
24  Smith's related trusts, right?

Page 103

1      A.   Right.
2      Q.   How many trusts?
3      A.   Numerous, numerous.
4      Q.   Like 20 some, right?
5      A.   Over the course of, uhm -- of
6  that many years, yes.
7          MR. SWANEKAMP: Are you asking
8  how many trusts there were or how
9  many trusts were provided tax
10  services by Piaker & Lyons?
11         MR. KANG: I think we already
12  got that covered.
13  BY MR. KANG:
14     Q.   Do you know the difference
15  between the Four Funds and various trusts
16  related to McGinn, Smith?
17     A.   Yes.
18     Q.   Can you tell me the
19  difference?
20     A.   The Four Funds were all part
21  of a rollup into an LLC, McGinn, Smith
22  Holdings, LLC. The trusts were separate
23  financing vehicles that were -- that were
24  outside of the Four Funds.

Page 104

1      Q.   What do you mean by "separate
2  financing vehicles"?
3      A.   The trusts raised money from
4  individual investors to invest in some sort
5  of investment owned by the Trust.
6      Q.   And you said that the Four
7  Funds were rollups. What do you mean by
8  that?
9      A.   They -- the sole member of
10  these Four Funds was McGinn, Smith Advisors,
11  LLC. Accordingly, they are a disregarded
12  tax entity because they are owned by a
13  single member. McGinn, Smith Advisors, LLC
14  was a single member LLC owned by McGinn,
15  Smith Holdings, LLC so it was also a
16  disregarded tax entity. So all of this
17  activity went up into one partnership tax
18  filing for McGinn, Smith Holdings, LLC, the
19  tax return that I signed.
20     Q.   So the distinction that you
21  just made between the Four Funds and various
22  trusts was relating to a tax purpose?
23     A.   Yes.
24     Q.   Besides the tax distinction

26 (Pages 101 to 104)

RONALD L. SIMONS

Page 117

```
 1        Q.   So the tax returns that you
 2  filed under the consolidated return of
 3  McGinn, Smith Holdings, LLC had -- or it
 4  featured all the Four Funds underneath?
 5             MR. SWANEKAMP:  Form.
 6             THE WITNESS:  They included
 7        all the financial information for
 8        the Four Funds, yes.
 9  BY MR. KANG:
10        Q.   All right.  So in that
11  consolidated return for McGinn, Smith
12  Holdings, LLC, did it include any other
13  entities besides the Four Funds and McGinn,
14  Smith Advisors, LLC?
15        A.   I believe in the later years,
16  '6 and '7 it did.
17        Q.   Do you know what those
18  entities were?
19        A.   Uhm, they were smaller
20  entities that, uhm, as I sit here I don't
21  recall, no.
22        Q.   So when you were filing tax
23  returns for McGinn, Smith Holdings, LLC,
24  that means that you had to review and
```

Page 118

```
 1  prepare financial information relating to
 2  the Four Funds?
 3             MR. SWANEKAMP:  Form.
 4             THE WITNESS:  Uhm, I might
 5        take exception with the term
 6        "review," that may have an
 7        attestation definition to it.  We
 8        are responsible for the preparation
 9        of the tax returns, yes, tax
10        services.
11  BY MR. KANG:
12        Q.   Okay.  I understand that
13  "review" is an auditing term and auditing is
14  a very broad terms that includes certain
15  terms such as attestation and auditing,
16  right?
17             MR. SWANEKAMP:  Form.
18             THE WITNESS:  Yes.
19  BY MR. KANG:
20        Q.   Right?
21        A.   Yes.
22        Q.   Right, and that's not the term
23  that I was using.  I was talking about
24  reviewing as in you were reviewing their
```

Page 119

```
 1  paperwork.
 2        A.   Right.
 3        Q.   So when you were preparing tax
 4  returns for McGinn, Smith Holdings, LLC, you
 5  were examining, and I choose the term
 6  "examining" instead of "review" --
 7        A.   Oh, okay.
 8        Q.   -- you were examining the
 9  books and records of the Four Funds?
10        A.   We were -- we were looking at
11  the books and records of the Four Funds.
12  Examination sounds like a lot.
13        Q.   Are you familiar with the
14  AICPA standards called the Statement on
15  Standards for Tax Services?
16        A.   I am.
17        Q.   Known as SSTS?
18        A.   Yes.
19             - - -
20             (Whereupon, Exhibit P-3 was
21  marked for identification.)
22             - - -
23             MR. KANG:  While David is
24  looking for the actual copy, let me
```

Page 120

```
 1  just -- I actually have it in my
 2  papers and I can read it for you.
 3  It's the Statement on Standards for
 4  Tax Services.
 5        It says, "In preparing or
 6  signing a return," and I am skipping
 7  the middle part, "a member should
 8  not ignore the implications of
 9  information furnished and should
10  make reasonable inquiries if the
11  information furnished appears to be
12  incorrect, incomplete, or
13  inconsistent, either on its face or
14  on the basis of other facts known to
15  a member.  Further, a member should
16  refer to the taxpayer's returns from
17  one or more years whenever
18  feasible."
19        Are you familiar with that
20  provision?
21             THE WITNESS:  Yes.
22  BY MR. KANG:
23        Q.   What does that mean?
24        A.   Well, I think what you didn't
```

30 (Pages 117 to 120)

RONALD L. SIMONS

Page 129

1    ignore that information, right?
2            MR. SWANEKAMP:  Form.
3            THE WITNESS:  Correct, yes.
4    BY MR. KANG:
5        Q.    In fact, you should consider
6    that information if that information is
7    relevant to the audit services that you're
8    providing; correct?
9        A.    Is relevant, yes.
10       Q.    Right?
11       A.    I thought you said irrelevant.
12       Q.    Going back to PPMs, the
13   Product Placement Memorandum, when was the
14   first time that you received a copy?
15       A.    For who?
16       Q.    I'm sorry, the Four Funds.
17       A.    The Four Funds?  Uhm, I don't
18   recall which of the funds was first, but I
19   believe it was in 2003 or 2004.
20       Q.    And each of the Four Funds had
21   a separate PPM, right?
22       A.    Yes.
23       Q.    And it lasted sometime from
24   2003 to 2007 you said?

Page 130

1        A.    Yes.  They would raise money
2    for one fund first.  When they received the
3    max, they could choose to then open or
4    create a new one for subsequent investors.
5        Q.    Mr. Simons, who gave you
6    copies of the PPMs for the Four Funds?
7        A.    We would have requested it
8    from the controller.
9        Q.    And "controller" meaning at
10   this time Shea?
11       A.    Or David Rees, depending on
12   the year.
13       Q.    Okay.  When did David Rees
14   begin?
15       A.    I'm not sure what year.  Brian
16   Shea was there originally.  Then when a new
17   entity IPO was created, IASG, Tim McGinn
18   went there and Brian Shea went with him and
19   Dave Rees was the controller.  And then at
20   some point in time such some year David Rees
21   left and Brian Shea came back.
22       Q.    Now, after you requested the
23   PPMs and after you received them you read
24   them?

Page 131

1            MR. SWANEKAMP:  Form.
2            THE WITNESS:  I had access to
3        them, yes, and looked at information
4        that I was interested in.
5    BY MR. KANG:
6        Q.    Who else at Piaker & Lyons
7    read these PPMs?
8        A.    It was part of our workpaper
9    documents, so I believe Tim Paventi at least
10   had access to them.  I'm not quite sure
11   exactly how detailed he read them.
12       Q.    Given that you're the one who
13   requested it, "you" meaning Piaker & Lyons,
14   given that you're the one who requested it,
15   you did it to review or read these
16   materials, right?
17           MR. SWANEKAMP:  Form.
18           THE WITNESS:  To read -- to
19       read certain items in them, yes.
20       Yes.
21   BY MR. KANG:
22       Q.    Right.
23       A.    Either I requested them or Tim
24   Paventi requested them, I'm not quite sure

Page 132

1    who, but our firm requested them.
2        Q.    In other words, you didn't
3    just request them because it was somehow
4    required by law or something?
5            MR. SWANEKAMP:  Form.
6            THE WITNESS:  Required by law?
7    BY MR. KANG:
8        Q.    No, I was just trying to give
9    you an example.  The reason that you
10   requested these PPMs was because you wanted
11   to review it?
12       A.    For general information,
13   correct.
14       Q.    Right.  Correct.  Because you
15   know how sometimes you need to -- I'm not
16   talking about the Four Funds, but sometimes
17   you request certain information because it
18   may be required by law to request certain
19   information?
20       A.    Okay.
21       Q.    Do you know what I am talking
22   about?
23       A.    Yes.
24       Q.    Right.  And that wasn't the

RONALD L. SIMONS

Page 173

1  that are responsive to those requests in the
2  CDs that you're holding?
3      A.   Yes.
4      Q.   And as a result of your
5  searching those CDs for documents that are
6  responsive to the document requests, did you
7  produce documents?
8      A.   Yes.
9      Q.   And the documents you produced
10  included workpapers?
11      A.   Yes.
12      Q.   And the workpapers that you
13  produced in response to our document
14  requests, did the workpapers include all
15  audit programs related to McGinn, Smith?
16      A.   I believe so, yes.
17      Q.   Who designed that audit
18  program?
19      A.   PPC.
20      Q.   So you mean the checklist we
21  talked about?
22      A.   Yes.
23      Q.   Do you know whether anything
24  that's material was excluded from the

Page 174

1  workpapers?
2          MR. SWANEKAMP:  Form.
3          THE WITNESS:  Not to my
4      knowledge, no.
5  BY MR. KANG:
6      Q.   Do the audit workpapers
7  contain all the audit procedures taken by
8  Piaker & Lyons regarding McGinn, Smith?
9      A.   Yes.
10      Q.   Mr. Simons, we talked earlier
11  about based on the Statements of Standards
12  for Tax that information that you obtained
13  while preparing tax returns should be
14  considered in providing audit services if
15  relevant.  Do you remember that?
16          MR. SWANEKAMP:  Form.
17          THE WITNESS:  Yes.
18  BY MR. KANG:
19      Q.   You received and looked at, I
20  don't want to say review or examined,
21  certain documents and information relating
22  to McGinn, Smith and other related entities
23  in providing tax services for these
24  entities, right?

Page 175

1      A.   Which entities?
2      Q.   These entities, McGinn, Smith
3  and their related or affiliated entities.
4      A.   Yes.
5      Q.   You understand what I am
6  talking about?
7      A.   I believe so.
8      Q.   Yes.  Now, in light of the
9  discussions year we had relating to
10  statements for on standards for tax returns,
11  when you were providing audit services for
12  McGinn, Smith, did you consider any relevant
13  information that you received or used in
14  preparing tax returns for McGinn, Smith?
15      A.   For the other entities, the
16  Four Funds and the trusts that you were
17  referring to?
18      Q.   Yes.
19      A.   Yes.
20      Q.   Including the trust, right?
21      A.   Yes.
22      Q.   Including the PPM?
23      A.   Yes.
24      Q.   Who actually prepared the

Page 176

1  audit opinions for McGinn, Smith?
2      A.   Well, they're standard
3  boilerplate, unless they are modified from
4  year to year based on revisions, so...
5      Q.   So it's --
6      A.   Tim Paventi, yeah, is
7  preparing the financial statements.
8      Q.   The only difference is the
9  name of the client, right, pretty much?
10      A.   Well, there was a -- there was
11  a clarity standard that changed somewhere in
12  between there where the wording kind of
13  changed, but it would have only changed to
14  the extent that as required by the AICPA,
15  they changed the form and presentation.
16  Uhm, uhm, I believe that answers the
17  question.
18      Q.   So if there's no change
19  between year to year from the AICPA, it's
20  pretty much the same form, you just change
21  the date?
22      A.   As long as the opinion is the
23  same.
24      Q.   Right, assuming the opinion is

RONALD L. SIMONS

1    agreement and pled guilty prior to -- prior
2    to the criminal trial of David Smith and Tim
3    McGinn.  Are you asking for timing?  I'm
4    sorry.
5        Q.    When you say "he" who are you
6    talking about?
7        A.    Matt Rodgers.
8        Q.    So Matt Rodgers took a plea
9    bargain?
10       A.    I believe he took a plea
11   agreement.
12       Q.    And when was that?
13       A.    Prior to the trial of David
14   Smith and Tim McGinn.
15       Q.    But after, after the civil
16   action brought by the SEC against McGinn,
17   Smith, right?
18       A.    Yes, yes, yes.
19       Q.    Now, when was the charge
20   brought against you?
21       A.    I accepted a plea agreement in
22   November of 2011.
23       Q.    So the charge was brought
24   against you in 2010?

1        A.    I was never indicted.
2        Q.    But --
3        A.    I accepted a plea agreement in
4    November of 2011.  That was the first formal
5    action proceeding pertaining to me.
6        Q.    To accept the plea there has
7    to be a charge, right, a claim against you?
8            MR. SWANEKAMP:  Form.
9            THE WITNESS:  I was never
10           indicted.  As part of the plea
11           agreement there was some other
12           document, but I don't think it was a
13           charge.  I think it's called an
14           information or something.
15   BY MR. KANG:
16       Q.    What I am talking about is --
17   and if you don't understand or maybe I'm
18   wrong, but before you have a plea agreement
19   you would have a charge or claim brought
20   against you.
21       A.    I don't believe -- I don't
22   believe that's the case.  I don't believe
23   there was any charge, indictment, charge or
24   whatever you want to call it prior to my

1    accepting a plea.  I think the plea
2    agreement kind of circumvented that -- that
3    event that may have happened if I didn't
4    accept the plea agreement.
5        Q.    So you think what you received
6    is something called an information?
7        A.    I think there's something that
8    -- that's included with the plea agreement,
9    but I -- or the -- the -- hmm, or the charge
10   that happens at the same time.  I don't
11   recall.
12       Q.    Okay.  But ultimately, whether
13   it was a charge, an indictment, an
14   information, whatever it is, ultimately you
15   reached an agreement with the United States
16   government?
17       A.    Yes.
18       Q.    For a misdemeanor?
19       A.    That's correct.
20       Q.    What was that plea?
21       A.    It was one misdemeanor count
22   of disclosing and filing a false income tax
23   return pertaining to the individual tax
24   return of David Smith for the year 2006.

1        Q.    So similar to the charge that
2    was brought against Matt Rodgers?
3            MR. SWANEKAMP:  Form.
4            THE WITNESS:  I recollect his
5            was of income tax.
6    BY MR. KANG:
7        Q.    I'm sorry?
8        A.    I remember his was an income
9    tax return charge, but I'm not familiar with
10   his proceedings.
11       Q.    Yours was also income tax,
12   right?
13       A.    Yes.
14       Q.    Of David Smith?
15       A.    Yes, individual income tax
16   return.
17       Q.    Tell me in detail as specific
18   as possible the facts underlying that plea,
19   I mean, the facts underlying what happened
20   with the income tax.
21       A.    I think the plea agreement
22   pretty much spells out the -- the
23   transactions that happened as far as the
24   furnishing of information from a client to

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RONALD L. SIMONS

Page 201

1   ]me; inquiries, reasonable inquiries that
2   were made of myself to the client, David
3   Smith, and/or the controller.
4         The -- the stipulation in my
5   plea agreement pertains to a $57,000 item
6   that was an adjusting journal entry that our
7   firm made based on information provided by a
8   client from fees to a loan on the books of
9   TDM Funding, LLC.
10        THE COURT REPORTER:  This will
11   be P-6.
12        - - -
13        (Whereupon, Exhibit P-6 was
14   marked for identification.)
15        - - -
16   BY MR. KANG:
17        Q.    The document that I just
18   handed to you that's been marked as P-6, is
19   that the plea agreement that you just talked
20   about?
21        A.    (Reviewing.)  Yes.
22        Q.    On Page 3, paragraph 5, it
23   says, "Factual Basis for the Plea."
24        Do you see that?

Page 202

1        A.    I do.
2        Q.    And it says --
3        A.    Yes.
4        Q.    -- "Ronald Simons admits the
5   following facts," and it has facts,
6   paragraphs from A through E extending to
7   page number 4.  Do you see that?
8        A.    I do.
9        Q.    Are all of the facts which you
10   admitted, are all the facts accurate?
11        A.    Yes.
12        Q.    Based on paragraph 5B --
13        A.    B.
14        Q.    -- on Page 3 it says that the
15   2006 tax returns that you talked about
16   earlier had -- it did not report $407,000 of
17   income, right?
18        A.    Yes.
19        Q.    And, rather, that $407,000 was
20   characterized as a loan, right?
21        A.    Yes.
22        Q.    And is it your testimony that
23   Piaker & Lyons or you filed tax returns with
24   $407,000 as loans rather than income based

Page 203

1   on your client's representation?
2        A.    Yes.
3        Q.    When you prepared that tax
4   return for Mr. Smith, did you exercise the
5   professional skepticism that we talked about
6   earlier?
7        A.    Yes.
8        Q.    And based on your exercise of
9   professional skepticism, you believed that
10   $407,000 was properly characterized as a fee
11   -- I'm sorry, as loans?
12        A.    Yes.
13        Q.    So you didn't think that the
14   client misled you into believing that it's a
15   loan when, in fact, it really was income?
16        A.    That's correct.  There was
17   already fees paid to McGinn, Smith who was
18   the broker/dealer who employs the brokers
19   that get paid the commission.  These -- they
20   had never in the past taken fees
21   individually, to my knowledge.  All fees
22   would have been funneled through the
23   broker/dealer because they're the ones that
24   employed the brokers and dealers what they

Page 204

1   had to pay the commissions on.
2        So it was an unusual
3   transaction, and I believe I followed
4   standards in doing reasonable inquiry
5   regarding inconsistent or incomplete
6   information.
7        And then the distinction here
8   of that -- the total 407, the 350 based on
9   reasonable inquiries, they sent us back a
10   revised set of -- of a trial balance which
11   they reclassed the 350 as loans.
12        Q.    So let me just -- I don't want
13   to stop you, but I just want to know who are
14   you referring to when you refer to "they"?
15        A.    Well, the client.
16        Q.    McGinn, Smith?
17        A.    Yeah, the client.
18        Q.    Who is the client here,
19   McGinn, Smith or David Smith?
20        A.    Well, the client for TDM --
21   the client is TDM, the TDM tax return for
22   these transactions.  These transactions are
23   on TDM.
24        Q.    Since we were talking about

51 (Pages 201 to 204)

RONALD L. SIMONS

Page 221

1      A.    Defendant?
2      Q.    The defendants.  Well, let's
3   break it down one at a time.
4          You acknowledged earlier that
5   in the civil action the defendants in that
6   case, McGinn, Smith and other related
7   entities, they were found -- they lost,
8   right?
9      A.    Yes.
10      Q.    And the charge brought against
11   them were securities fraud and other
12   fraud-related claims.  Do you remember that?
13          MR. SWANEKAMP:  Form.
14          THE WITNESS:  Yes.
15   BY MR. KANG:
16      Q.    Right.  And in the criminal
17   action both Tim McGinn and David Smith, they
18   lost or they were found guilty, right?
19      A.    Yeah.
20      Q.    And they were found guilty of
21   different kinds of frauds, right, different
22   kind of fraud?
23      A.    Yes.
24      Q.    Now, after these defendants in

Page 222

1   the civil action and the criminal action,
2   now that they lost or they have been found
3   guilty, would you say in looking at it from
4   I guess sort of in hindsight there should
5   have been a better risk assessment for
6   McGinn, Smith when you're providing the
7   auditing services?
8          MR. SWANEKAMP:  Form.
9          THE WITNESS:  I don't believe
10          there was any -- any -- any
11          formalization or any -- any -- I
12          don't believe in any of those
13          proceedings has it ever been stated
14          that the financial statements
15          contained any fraud or were not --
16          or our audit opinion was taken into
17          question.
18   BY MR. KANG:
19      Q.    Are you saying that the
20   financial statements that were presented,
21   the financial statements related to McGinn,
22   Smith were accurate?
23      A.    To my knowledge, yes.
24      Q.    So based on --

Page 223

1      A.    I believe the fraud is related
2   to the other entities which we did not
3   audit.
4      Q.    Oh, so you're talking about
5   how the financial statements of McGinn,
6   Smith were not in question but the financial
7   statements of other entities are in
8   question; that's what you're saying?
9          MR. SWANEKAMP:  Form.  Form.
10          THE WITNESS:  I don't -- we
11          didn't do any financial statements
12          for the other entities.  Financial
13          transactions or activity on those
14          other entities were the -- were the
15          -- the, uhm, transactions that were
16          taken into consideration for both
17          the civil and the criminal
18          proceedings.
19   BY MR. KANG:
20      Q.    And which entities
21   specifically?
22      A.    The Four Funds and trusts.
23      Q.    And the Four Funds and McGinn,
24   Smith, they are related by having common

Page 224

1   ownership, right?
2      A.    Yes.
3      Q.    The same thing with the trust,
4   right?
5      A.    There's some sort of related
6   affiliate activity, yes.
7      Q.    You testified during the
8   criminal case which we talked about earlier
9   in how you testified against McGinn, Smith.
10   Do you remember that?
11      A.    Against the individuals, yes.
12      Q.    Right, against McGinn and
13   Smith.
14      A.    David Smith and Tim McGinn,
15   yes.
16      Q.    All right.  And one of the
17   areas of testimony that you provided was
18   related to excessive fees paid to TDM Cable
19   Funding, LLC.  Do you remember that?
20      A.    I don't know if that's my
21   testimony.  It related to fees on TDM, yes,
22   or questions that were posed to me.
23      Q.    Okay.  Mr. Simons, I'm not
24   going to mark this.  I'm just giving it to

56 (Pages 221 to 224)

RONALD L. SIMONS

Page 245

```
1              What I am saying is whether
2    you provided attestation services or just
3    tax services, the fact is the documents show
4    the movement of money from one fund to
5    another to pay down the interest or pay
6    redemption of earlier investors.
7              So forget about what kind of
8    services you provided.  Given the common
9    definition of Ponzi scheme that you know,
10   that we know, your knowledge when you
11   discovered monies moving from one fund to
12   another, didn't that concern you at all?
13             MR. SWANEKAMP:  Form.
14             THE WITNESS:  No.
15             MR. KANG:  I'm sorry?
16             THE WITNESS:  No.
17   BY MR. KANG:
18        Q.   And why didn't that concern
19   you?
20        A.   All of their transactions are
21   loans, investments.  Money coming in is a
22   loan, money going out is a loan.  All of
23   their -- all of the transactions that I saw
24   as part of performing tax services is --
```

Page 246

```
1    didn't -- it did not -- did not percolate my
2    attention that there was anything illegal or
3    any fraud going on.
4         Q.   You asked for copies of the
5    PPM for the Four Funds and you received
6    that, that was your testimony?
7         A.   Yes.
8         Q.   Now, the PPMs prohibit such
9    transactions, PPMs -- the provisions
10   contained in the PPMs do not allow such
11   related transactions making loans and paying
12   down the redemptions and paying off the
13   interest payment of other funds; you know
14   that, right?
15             MR. SWANEKAMP:  Form.
16             THE WITNESS:  I don't know --
17        I don't know what is in the PPM as
18        far as eligible investments.  I do
19        not know that, no.
20   BY MR. KANG:
21        Q.   Now, I'm not just talking
22   about illegible investment, and I know the
23   PPM contains what investments it could make,
24   but the PPM says nothing about how the money
```

Page 247

```
1    can be used to redeem investors from
2    different funds?
3         A.   I don't know --
4              MR. SWANEKAMP:  Form.
5              THE WITNESS:  -- what's in the
6         -- in the PPM as far as operational
7         use of monies.
8    BY MR. KANG:
9         Q.   And what do you mean by all
10   transactions are loans?
11        A.   Well, just as we've discussed,
12   all of the investors, they weren't equity
13   investors.  They infused capital in the --
14   in the form of a promissory note for a
15   certain period of years at a certain
16   interest rate and the -- the business model
17   is borrowing from people to lend to people
18   so that you got loans on the -- on the asset
19   side and you have loans on the -- on the
20   liability side.  Everything is a loan except
21   for the payment of fees.
22        Q.   So you're talking about the
23   investments that were made in the funds were
24   in the form of loans rather than equity,
```

Page 248

```
1    right?
2         A.   Monies coming in were in the
3    form of loans versus equity and the monies
4    going out were either for purchasing
5    investments in companies or for loaning
6    high-risk loans to -- to other entities to
7    generate the -- the -- the interest at a
8    spread to pay the investors -- to pay the
9    fees and to hopefully have a profit.
10        Q.   And the investment, the funds
11   made were not loans?
12        A.   Yes.
13        Q.   They were loans?
14        A.   The investment?  Yes.  Money
15   that went out, not all loans.  They had some
16   stocks or certain other investments, but I
17   would suggest the majority of the money that
18   went out was in the form of loans.
19        Q.   If --
20        A.   Promissory notes to other
21   third parties and at a higher interest rate
22   than they were paying the investors.
23        Q.   If money that -- when an
24   investor invests money into one of the Four
```

62 (Pages 245 to 248)

RONALD L. SIMONS

Page 249

1    Funds, and that money is being used to
2    redeem investors from different funds?
3         A.    I don't know that.
4         Q.    Your tax work shows that.
5              MR. SWANEKAMP:  Form.
6              THE WITNESS:  I guess I'd
7         comment I'm looking at something.
8         Let's clarify.  Things that are in
9         our workpapers might not be our --
10        they are -- they are client
11        information in our workpapers.  For
12        instance, it's a general ledger,
13        that's in our workpapers but it's
14        really not our workpaper.
15   BY MR. KANG:
16        Q.    You mean because the
17   workpapers are given to you?
18        A.    Normally it would say "PBC" on
19   the first page, either prepared by client or
20   provided by client.  It's in our workpapers,
21   but it's not our workpaper.  To clarify,
22   those -- those entries in the general ledger
23   are not our creation of accounting entries,
24   books of original records, they are the

Page 250

1    client's.
2              THE COURT REPORTER:  This will
3         be P-10.
4              - - -
5              (Whereupon, Exhibit P-10 was
6         marked for identification.)
7              - - -
8    BY MR. KANG:
9         Q.    The document that I handed to
10   you marked as Plaintiff's Exhibit 10, you
11   recognize this document, right?
12        A.    I do.
13        Q.    And this document is part of
14   your workpapers for one of the Four Funds,
15   right?
16        A.    It's in our workpapers for
17   FEIN 2006, yes.
18        Q.    Right.  Whose handwriting is
19   that in the body?
20        A.    In the box?
21        Q.    In the box?
22        A.    Mine.
23        Q.    Can you read that for the
24   record, please?

Page 251

1         A.    "Per David Rees, represents
2    funding of RTC Trust.  Monthly cash flow
3    shortages to be repaid with trust receipts
4    after trust debt is paid off or will be
5    purchased by another entity.  Not accruing
6    any interest income on above loan as of
7    12/31/05."
8         Q.    According to your handwriting,
9    the money from FEIN, F-E-I-N, was being
10   used to pay for RTC Trust?
11             MR. SWANEKAMP:  Form.
12             THE WITNESS:  Your word, not
13        mine.  The money from FEIN, F-E-I-N,
14        FEIN, was a loan to RTC -- was a
15        loan to RTC Trust.
16   BY MR. KANG:
17        Q.    And RTC Trust is one of the
18   earlier trusts relating to McGinn, Smith,
19   right?
20        A.    I believe it's a McGinn, Smith
21   trust.  What year I am not sure.
22        Q.    Right.  I mean this is a --
23   when I say "earlier trust," I'm talking
24   about trust before the Four Funds were

Page 252

1    formed.
2         A.    I'm not sure of the timing of
3    RTC.  There's numerous trusts.
4         Q.    This workpaper that -- well,
5    this document that was produced or that's
6    part of your workpapers for FEIN, F-E-I-N,
7    when you saw this document saying that money
8    from FEIN is being used to pay for RTC, that
9    didn't concern you about the potential Ponzi
10   scheme?
11             MR. SWANEKAMP:  Form.
12             THE WITNESS:  No, it was a
13        loan to RTC.
14   BY MR. KANG:
15        Q.    Mr. Simons, you know that --
16   well, maybe you don't.  When a Ponzi scheme
17   is -- when the Ponzi scheme takes place,
18   whether it's small or little, you understand
19   that no one says that I am -- when one
20   source of funding is used to pay off
21   existing investors or an earlier investor,
22   investment, no one says that the money is a
23   Ponzi scheme fund, they usually characterize
24   it as a loan?  I mean, you know that, right?

63 (Pages 249 to 252)

RONALD L. SIMONS

Page 257

1    Q.    When David Rees told you or
2  when he -- to use your term, when he
3  represented about the cash flow and the loan
4  or however he characterized it, did you
5  exercise professional skepticism then?
6    A.    I'm not sure professional
7  skepticism is required in providing tax
8  services.  We -- we don't do any analytical
9  review for any examination or any audit-type
10 procedures.
11   Q.    Well, Mr. Simons, your earlier
12 testimony was that based on the Code of
13 Professional Conduct professional skepticism
14 is required in every professional service
15 you provide.
16           MR. SWANEKAMP:  Form.
17           MR. KANG:  You don't remember
18 saying that?
19           THE WITNESS:  Uhm, I don't --
20 I don't remember saying that as part
21 of what the AICPA Code of Conduct or
22 the --
23 BY MR. KANG:
24   Q.    AICPA, the Code of Conduct,

Page 258

1  that is applicable to any professional
2  service that a CPA provides, isn't it?
3    A.    Uhm, I don't think so.
4    Q.    Are you saying that AICPA code
5  of --
6    A.    I mean.
7    Q.    Let me finish my question
8  first.
9           Are you saying that the AICPA
10 Code of Professional Conduct applies only
11 for audit services?
12   A.    I'm not sure.  For instance,
13 the AICPA Code of Conduct talks about
14 independence.  Independence is an
15 attestation requirement, not a tax return
16 requirement, so I believe there's certain
17 items in the AICPA Code of Conduct that
18 might pertain to both.
19           My understanding of
20 professional skepticism is more of an audit,
21 an audit assessment, not -- not tax return
22 services.
23   Q.    Are you saying that when
24 Mr. Rees, David Rees, represented to you

Page 259

1  about the shortage of cash flow and how
2  FEIN -- how the RTC Trust needs money from
3  FEIN or another source, you took his words
4  without using your professional skepticism?
5    A.    Yes.
6           THE COURT REPORTER:  This will
7  be P-11.
8           - - -
9           (Whereupon, Exhibit P-11 was
10 marked for identification.)
11          - - -
12 BY MR. KANG:
13   Q.    The document that I have just
14 handed to you is marked as P-11 and it has a
15 Bates number on the bottom that says PL
16 013500.  Do you recognize this document?
17   A.    I do.
18   Q.    This document was in your
19 workpapers, right?
20   A.    Yes.
21   Q.    Whose handwriting is that on
22 the top where it says "FEIN"?
23   A.    "TP," Tim Paventi.
24   Q.    All right.  Can you read his

Page 260

1  handwriting?
2    A.    Yes.
3    Q.    What does it say?
4    A.    Where?  Where, at the top?
5    Q.    On the top, yes.
6    A.    Well, his initials TP with a
7  date is up in the upper right-hand corner.
8  The heading of the paper is FEIN.  Uhm, the
9  account name is Due FIIN, which is on the
10 second line, and on the number on the bottom
11 of the account number of 2060.  And it's a
12 workpaper from the '07 calendar year,
13 workpaper file.
14   Q.    Where did you just read?
15   A.    Where did I just read?  You
16 want me to repeat that?
17   Q.    Just the last one.
18   A.    The 12/31/07 would indicate to
19 me that this was part of our 2007 workpaper
20 file, tax return file for FEIN.
21   Q.    And according to this
22 document, FEIN was paying FIIN; is that the
23 flow of money?
24   A.    Well, which transaction?

65 (Pages 257 to 260)

# <u>EXHIBIT 6</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**********************************

UNITED STATES OF AMERICA

    v.

RONALD SIMONS,

          Defendant.

Criminal Action No.
11-CR- 525 DRH

PLEA AGREEMENT
(Corrected)

**********************************

RICHARD S. HARTUNIAN, United States Attorney for the Northern District of New York

(by Elizabeth C. Coombe, appearing) and RONALD SIMONS (with Kevin E. McCormack, Esq.,

appearing) hereby enter into the following Plea Agreement regarding the disposition of certain

criminal charges against the Defendant:

    1.    **Defendant's Promises.** In return for the consideration described below, RONALD

SIMONS agrees as follows:

        a.    The Defendant will enter a plea of guilty to a one-count Information charging

him with Delivering and Disclosing a False Return, in violation of 26 U.S.C. § 7207, 18 U.S.C. § 2.

    2.    **Potential Penalties.** RONALD SIMONS understands that his guilty plea to the

Information will subject him to the following potential penalties:

        a.    <u>Maximum Term of Imprisonment</u>: 1 year. (26 U.S.C. § 7207)

        b.    <u>Supervised Release</u>: In addition to imposing any other penalty, the sentencing

Court may require the Defendant to serve a term of supervised release of up to 1 year, to begin at the



Exhibit No. P-6
Date: 12-16-15
MARIA N. DAMIANI

expiration of any term of imprisonment imposed upon him. (18 U.S.C. § 3583) Should the

Defendant be placed on a term of supervised release and subsequently violate any of the terms and

conditions of that release before the expiration of such term, he may be sentenced to up to 1 year of

imprisonment in addition to any prison term previously imposed upon him and in addition to the

statutory maximum term of imprisonment set forth above. Under some circumstances, the Court

may also extend the term of supervised release, and it may modify, reduce, or enlarge the conditions

of such release.

      c.     <u>Maximum Fine</u>: $100,000. (18 U.S.C. § 3571(b)(5))

      d.     <u>Special Assessment</u>: The Defendant will be required to pay an assessment

of $25, which is due and payable at the time of sentencing. (18 U.S.C. § 3013) The Defendant

agrees to deliver a check or money order to the Clerk of the Court in the amount of $25, payable to

the U.S. District Court at the time of his sentencing.

      e.     <u>Interest and Penalties</u>: Interest and penalties may accrue, as a matter of law,

on any unpaid financial obligation imposed as part of the Defendant's sentence, from as early as the

date of sentencing.

      3.     **Sentencing Factors.**  RONALD SIMONS understands that the sentence to be

imposed upon him is within the discretion of the sentencing Court, subject to the statutory maximum

penalties and the provisions of the Sentencing Reform Act and the United States Sentencing

Guidelines promulgated thereunder, as modified by *United States v. Booker*, 543 U.S. 220 (2005).

While the Court is not ultimately bound to impose a sentence within the applicable Sentencing

Guidelines range, it must take into account the Sentencing Guidelines, along with the other factors

set forth in 18 U.S.C. § 3553(a).

4.      **Elements of the Offense.**  RONALD SIMONS understands the following legal elements of the offense stated in the Information, and admits that those elements accurately describe his criminal conduct:

      a.      First, that a false return was submitted to the Internal Revenue Service;

      b.      Second, that the return was false or fraudulent as to a material matter; and

      c.      Third, that the defendant acted willfully in aiding and abetting the false submission of the return.

5.      **Factual Basis for the Plea.**  RONALD SIMONS admits the following facts, which establish his guilt with respect to the offense stated in the Information:

      a.      From in or about 1987 through the present, Simons, a certified public accountant, was a partner at the accounting firm of Piaker & Lyons.  From in or about 1992 through 2008, he prepared audited financial statements for McGinn, Smith & Co., Inc. ("McGinn Smith").  He also prepared tax returns for David L. Smith and other McGinn Smith entities.

      b.      In the fall of 2007, Simons prepared the 2006 U.S. Individual Income Tax Return for David and Lynn Smith ("the 2006 Return") and, at Smith's request, caused the return to be filed.  The 2006 Return was received by the Internal Revenue Service on or about October 17, 2007 in Andover, Massachusetts.  The 2006 Return did not report $407,000 in fees distributed to Smith from TDM Cable Funding LLC during 2006: $350,000 on October 3, 2006 (the "October Transaction") and $57,000 on December 21, 2006 (the "December Transaction").  As a result, the 2006 Return, including line 22, "total income," was not accurate.

      c.      At the time that Simons prepared the 2006 Return, he knew that:

        i.     before in or about April 15, 2007, David L. Smith characterized the

October Transaction as income,

        ii.    both the October and December Transactions were initially booked

by the McGinn Smith controller as origination fees,

        iii.   in October 2007, Smith told Simons that the October Transaction was

a "loan," causing Simons not to include it on the 2006 Return,

        iv.   in October 2007, the McGinn Smith controller reclassified the October

Transaction from origination fees to "Loan-DLS,"

        v.    in October 2007, the McGinn Smith controller told Simons that the

fees paid to Smith and others should be "loans," and

        vi.   before on or about October 11, 2007, Simons reclassified the

December Transaction from origination fees to "Loans-other" by making an adjusting journal entry.

        d.    As a result of Simons's reclassification of the December Transaction, as

Simons knew, the 2006 Return did not report $407,000 in fees distributed to Smith from TDM Cable

Funding LLC during 2006.

        e.    The parties incorporate by reference, as further factual admissions by the

Defendant, the stipulations as to sentencing factors and issues set forth in paragraph 8 below.

        6.    **Use of Defendant's Admissions.** The Defendant agrees that the statements made

by him in signing this Agreement, including the factual admissions set forth above in paragraph 5,

shall be admissible and useable against the Defendant by the United States in any subsequent

criminal or civil proceeding, even if he fails to enter a guilty plea pursuant to this Agreement, or if

such a guilty plea is later vacated or withdrawn. The Defendant waives any rights under Fed. R.

4

Crim. P. 11(f) and Fed. R. Evid. 410, to the extent these rules are inconsistent with this paragraph or with this Agreement generally.

7. **Government's Promises and Reservation of Rights.** In exchange for the plea of guilty to the Information by RONALD SIMONS and his continuing compliance with all of the terms of this Plea Agreement, the United States Attorney's Office for the Northern District of New York agrees as follows:

a. It will bring no further federal criminal charges against the Defendant relating to the conduct in the Northern District of New York, committed before the date of this Agreement, which is described in the Information and the Defendant's admissions in paragraph 5, above for so long as the guilty plea and sentence on the Information remain in effect.

b. If the guilty plea to the Information is later withdrawn or vacated, the charges not prosecuted pursuant to subparagraph 7a of this Agreement may be filed and prosecuted, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the filing of any such charges. The Defendant waives any defense or objection to the filing and prosecution of any such charges that are not time-barred by the applicable statute of limitations as of the date of this Agreement.

c. The U.S. Attorney's Office will not oppose the imposition of the least severe sentence permitted within the applicable Sentencing Guidelines range determined by the Court.

d. The U.S. Attorney's Office reserves the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the Information.

5

8. **Stipulations.** The U.S. Attorney's Office and RONALD SIMONS agree to stipulate at sentencing to the statement(s) set forth in subparagraph a below, subject to the caveats set forth in the subparagraphs following.

    a.    <u>Stipulations</u>

        i.    The relevant guideline is U.S.S.G. § 2T1.1, and the base offense level will be the level from U.S.S.G. § 2T4.1 (Tax Table) corresponding to the tax loss resulting from the reclassification of the $57,000 Smith received in December 2006.

        ii.    The U.S. Attorney's Office will recommend a 2-level downward adjustment to the applicable Sentencing Guidelines range if, (A) through the time of sentencing, the Defendant clearly demonstrates "acceptance of responsibility" to the satisfaction of the Government for the offense, as defined in U.S.S.G. § 3E1.1(a); and (B) the Government does not learn of new evidence of conduct committed by the Defendant, either before or after his guilty plea, that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1.

        iii.    Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the Defendant's Criminal History Category and, in some cases, his total offense level.

    b.    It is understood that these stipulations cannot and do not bind the sentencing Court, which may make independent factual findings by a preponderance of the evidence and may reject any or all stipulations between the parties. The rejection of any or all stipulations by the Court will not be the basis for the withdrawal of a plea of guilty by the Defendant, and will not release either the U.S. Attorney's Office or the Defendant from any other portion of this Agreement, including any other stipulations agreed to herein.

6

c.    No stipulation in this Agreement shall affect the parties' respective obligations
to ensure that, to the extent possible, the Court has all information pertinent to its determination of
an appropriate sentence. The parties may provide any such factual information to the Probation
Office and/or to the Court, without limitation, before or after the completion of the Presentence
Investigation Report, and agree that the submission of such information shall not be deemed
"advocacy" in violation of any stipulation in this Agreement.

d.    To the extent the stipulations above do not reflect agreement on any factor or
issue potentially affecting the applicable advisory Sentencing Guidelines range, the Defendant and
the U.S. Attorney's Office each expressly reserves the right to advocate if, and how, any such factor
or issue would apply under the Sentencing Guidelines.

e.    The Defendant understands that any estimate of the Defendant's Sentencing
Guidelines range provided before sentencing is preliminary and is not binding on the parties to this
Agreement, the Probation Office, or the Court.

9.    **Remedies for Breach.**  Should the U.S. Attorney's Office determine that the
Defendant, after the date of this Plea Agreement, (i) has committed any further crime or violated any
condition of release or supervision imposed by the Court (whether or not charged); (ii) has given
false, incomplete, or misleading testimony or information; or (iii) has otherwise breached any
condition of this Agreement, the U.S. Attorney's Office will have the right, in its sole discretion, to
void this Agreement, in whole or in part. In the event of any such breach, the Defendant will not be
permitted to withdraw his guilty plea under this Agreement, but will thereafter be subject to
prosecution for any federal criminal violation of which the U.S. Attorney's Office has knowledge,

7

including but not limited to charges that this Office has agreed not to prosecute in subparagraph 7a of this Agreement.

a.      The Defendant waives any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date of this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of any such prosecution.

b.      Moreover, in connection with any such prosecution, any information, statement, or testimony provided by the Defendant, and all leads derived therefrom, may be used against him, without limitation.

c.      In the event of any such breach by the Defendant, the U.S. Attorney's Office will have the right, in its sole discretion, to do the following, notwithstanding any contrary provision or stipulation in this Plea Agreement:

i.      to advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range;

ii.      to recommend a specific sentence of imprisonment within or above the applicable Sentencing Guidelines range determined by the Court.

10.      **Limitations on Agreement.** This Agreement is limited to the U.S. Attorney's Office for the Northern District of New York and cannot bind other federal, state or local prosecuting authorities. Furthermore, this Agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the Defendant.

8

11.    **Agreement Not Binding on the Court.**  The Court is neither a party to, nor bound by this Agreement.  The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the U.S. Probation Office.

a.    If the Court rejects the provisions of this Agreement permitting the Defendant to plead guilty to the Information in satisfaction of other charges, which provisions were negotiated pursuant to Fed. R. Crim. P. 11(c)(1)(A), the Court will afford the Defendant an opportunity to withdraw his plea of guilty prior to sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

b.    The Court is not bound by any recommendation, stipulation, or request made by the parties, pursuant to Fed. R. Crim. P. 11(c)(1)(B), as to the appropriate sentence, and the Defendant may not withdraw his plea of guilty if the Court declines to follow any such recommendation, stipulation, or request.  The U.S. Attorney's Office reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the Defendant's sentence, whether or not such decision is consistent with this Office's recommendations, stipulations, or requests.

12.    **Waiver of Defendant's Rights.**  The Defendant acknowledges that he has read each of the provisions of the entire Plea Agreement with the assistance of counsel and understands its provisions.  The Defendant further acknowledges that his plea is voluntary and did not result from any force, threat, or promises (other than the promises in this Plea Agreement).

a.    The Defendant understands his right to assistance of counsel at every stage of the proceeding and has discussed his constitutional and other rights with defense counsel.  The Defendant understands that by entering a plea of guilty, he will be giving up his rights (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial

9

by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present evidence in his defense; and (vi) to remain silent and refuse to be a witness against himself by asserting the privilege against self-incrimination.

b.     The Defendant has been advised by defense counsel of the nature of the charges to which he is entering a guilty plea and the nature and range of the possible sentence. The Defendant understands the sentencing Court's obligation to consider the United States Sentencing Guidelines (as explained further in paragraph 3 above) and the Court's discretion to depart from those Guidelines under some circumstances or otherwise to impose a reasonable sentence outside of the applicable Sentencing Guidelines range.

13.     **Waiver of Appeal and Collateral Attack.** The Defendant acknowledges that, after consultation with defense counsel, he fully understands the extent of his rights to appeal, and/or to collaterally attack the conviction and sentence in this case. The Defendant waives any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. § 2255, to appeal or collaterally attack his conviction and any sentence of imprisonment of 12 months or less, including any related issues with respect to the establishment of the advisory Sentencing Guidelines range or the reasonableness of the sentence imposed. The Defendant acknowledges that the number of months specified above is not a promise of any particular sentence and is not binding on the Court. The Defendant agrees that, should the sentence imposed exceed 12 months, this would not permit him to withdraw his guilty plea or to appeal or collaterally attack his conviction, but would merely allow the Defendant to appeal or collaterally attack the sentence imposed by the Court, to the extent permitted by 18 U.S.C. § 3742 and/or 28 U.S.C. § 2255.

14.     **Memorialization of Agreement.** No promises, agreements or conditions other than those set forth in this Agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court. This Agreement, to become effective, must be signed by all of the parties listed below.

11

RICHARD S. HARTUNIAN
United States Attorney
Northern District of New York

Dated: November 8, 2011          By:

Elizabeth C. Coombe
Richard Belliss
Assistant U.S. Attorney
Bar Roll Nos. 511925 & 515295

Dated: November 8, 2011

RONALD SIMONS
Defendant

Dated: November 8, 2011

Kevin E. McCormack, Esq.
Attorney for Defendant
Bar Roll No. 506130

12

# **EXHIBIT 10**

3:39 PM

03/21/07

Accrual Basis

**FEIN**

**Transactions by Account**

As of December 31, 2006

*ABC*

| Type | Date | Name | Memo | Amount | Balance |
|------|------|------|------|--------|---------|
| **RTC Loan** | | | | | 228,874.57 |
| Check | 1/3/2006 | Rtc | Funds to cover 1/1 Monthly pmts | 26,500.00 | 255,374.57 |
| Check | 1/31/2006 | Rtc | February Interest | 15,400.00 | 270,774.57 |
| Check | 2/28/2006 | Rtc | Funds to cover 3/1 Monthly pmts | 23,000.00 | 293,774.57 |
| **Total RTC Loan** | | | | 64,900.00 | 293,774.57 |
| **TOTAL** | | | | 64,900.00 | 293,774.57 |

Per Dave Rees - Represents Funding
of RTC Trust monthly cash flow
Shortages. To Be Repaid with
Trust Receipts - after Trust Debt is
paid off (SD) will be purchased
by another entity. Not accruing
will interest in lene on above loan
as of 12/31/65.

Exhibit No. **P-10**
Date: 12-16-15
**MARIA N. DAMIANI**

*1260* Page 1
RTC LOAN

PL013477

# EXHIBIT 12

11 05 AM
11/14/08
Accrual Basis

**FEIN**
**Transactions by Account**
As of December 31, 2007

| Type | Date | Num | Adj | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| **Due to TAIN** | | | | | | | | 0.00 |
| Deposit | 2/5/2007 | | | TAIN LOAN | New Funding 10% to cover 7.5% Redemptions | | 450,000.00 | 450,000.00 |
| General Journal | 2/5/2007 | EFT | | | | 0.00 | | 450,000.00 |
| Check | 6/28/2007 | EFT | | TAIN LOAN | New Funding 10% to cover 7.5% Redemptions | 50,000.00 | | 400,000.00 |
| Check | 8/10/2007 | EFT | | TAIN LOAN | Paydown TAIN Loan | 44,266.67 | | 355,733.33 |
| Total Due to TAIN | | | | | | 94,266.67 | 450,000.00 | 355,733.33 |
| TOTAL | | | | | | 94,266.67 | 450,000.00 | 355,733.33 |





PL013501

# EXHIBIT 13

10:57 AM
11/14/08
Accrual Basis

**FEIN**
**General Ledger**
As of December 31, 2007

| Type | Date | Num | Adj | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 11/20/2007 | 3349 | | New York State Sales Tax | Sales Tax | | 128.00 | -2,807.46 |
| Check | 11/20/2007 | 3350 | | City Of Avondale | Sales Tax | | 10.96 | -2,818.42 |
| Check | 11/20/2007 | 3351 | | City Of Mesa Licensing Office | TPT and Use Tax | | 57.16 | -2,875.58 |
| Check | 11/20/2007 | 3352 | | City Of Glendale | Sales Tax | | 40.09 | -2,915.67 |
| Deposit | 12/5/2007 | | | FEIN | Hornland | 20,000.00 | | 17,084.33 |
| Check | 12/7/2007 | EFT | | Gadsby Redemption | Redemption | | 19,200.00 | -2,115.67 |
| Transfer | 12/11/2007 | EFT | | FEIN Accum | December Sweep | 45,000.00 | | 42,884.33 |
| Check | 12/11/2007 | 3354 | | Phoenix City Treasury | License | | 137.54 | 42,746.79 |
| Check | 12/11/2007 | 3355 | | City Of Chandler Tax & License Dv | License | | 40.00 | 42,706.79 |
| Check | 12/11/2007 | 3356 | | City Of Tempe | License Renewal | | 25.00 | 42,681.79 |
| Check | 12/11/2007 | 3357 | | McGann Smith Alarm Traders | Advertising Signs | | 1,461.76 | 41,220.03 |
| Check | 12/11/2007 | 3358 | | City Of Scottsdale | Tax and License | | 50.00 | 41,170.03 |
| Check | 12/11/2007 | 3359 | | City Of Avondale | Sales Tax | | 2.28 | 41,167.75 |
| Check | 12/11/2007 | 3360 | | City Of Avondale | License Renewal | | 40.00 | 41,127.75 |
| Check | 12/11/2007 | 3361 | | State Comptroller | Sales Tax | | 97.24 | 41,030.51 |
| Check | 12/11/2007 | 3362 | | Madara Security Systems | Sale Service | | 262.53 | 40,768.01 |
| Check | 12/11/2007 | 3363 | | New York State Sales Tax | 1419999022 11/30/07 Sales Tax | | 562.70 | 40,205.31 |
| Check | 12/11/2007 | 3364 | | United Security Company | Service | | 581.73 | 39,623.53 |
| Check | 12/11/2007 | 3365 | | Safeguard Security | Simpsons Self Storage | | 25.00 | 39,598.53 |
| Check | 12/11/2007 | 3366 | | Az Security | Acct 575 Inv AFS1733 | | 4,014.45 | 35,584.08 |
| Check | 12/11/2007 | 3367 | | Security Associates International | Monitoring | | 949.48 | 34,634.60 |
| Check | 12/11/2007 | 3368 | | Hacker & Murphy | FED ID 14-1732285 | | 462.17 | 34,172.43 |
| Check | 12/11/2007 | 3369 | | City Of Glendale | License Renewal | | 50.00 | 34,122.43 |
| Check | 12/11/2007 | 3370 | | Monitronics | Inv 87340 | | 1,167.50 | 32,954.93 |
| Check | 12/12/2007 | ACH | | State Of Ohio | Sales Tax | | 96.74 | 32,858.19 |
| Check | 12/12/2007 | ACH | | Arizona Department Of Revenue | Sales Tax | | 88.10 | 32,770.09 |
| Check | 12/12/2007 | ACH | | Arizona Department Of Revenue | Sales Tax | | 68.88 | 32,701.21 |
| Transfer | 12/14/2007 | EFT | | FEIN Accum | Sweep | 35,000.00 | | 67,701.21 |
| Deposit | 12/14/2007 | | | FEIN | Repayment | 5,549.87 | | 73,251.08 |
| Deposit | 12/14/2007 | | | Capital C4 | Repayment | 3,421.11 | | 76,672.19 |
| Deposit | 12/14/2007 | | | Rtc | Repayment | 1,820.01 | | 78,492.22 |
| Deposit | 12/14/2007 | | | Pacific | Repayment | 1,128.87 | | 79,621.09 |
| Deposit | 12/14/2007 | | | SA1 00 | Repayment | 503.55 | | 80,129.64 |
| Deposit | 12/14/2007 | | | SA1 03 Sr | Repayment | 400.00 | | 80,529.64 |
| Deposit | 12/14/2007 | | | Tian | Repayment | 390.79 | | 80,910.43 |
| Check | 12/14/2007 | | | City Of Chandler | Privilege Tax | | 53.94 | 80,856.49 |
| Deposit | 12/29/2007 | | | Pscp | sale of PSCP | 699,204.00 | | 780,060.49 |
| Check | 12/31/2007 | | | NFS - Wire | Margin Call | | 146,866.81 | 633,193.68 |
| Deposit | 12/31/2007 | | | NFS - Wire | Quicken Missing Transaction | 146,866.81 | | 780,060.49 |
| Check | 12/31/2007 | | | | Out Margin Call | | 146,866.81 | 633,193.68 |
| **Total Fein Operating** | | | | | | **4,094,417.49** | **4,372,520.33** | **633,193.68** |
| | | | | | | | | |
| **FEIN SPTIII Accum** | | | | | | | | -433.53 |
| Deposit | 1/31/2007 | | | Collections Rev | Jan 07 alarm contract Collections | 1,757.90 | | -2,189.43 |
| Deposit | 2/28/2007 | | | Collections Rev | Feb 07 alarm contract Collections | 600.70 | | -2,789.13 |
| Deposit | 3/31/2007 | | | Collections Rev | SP Trust | 999.64 | | -3,789.81 |
| Deposit | 4/30/2007 | | | Collections Rev | SP Trust | 1,044.68 | | -4,833.49 |
| Deposit | 5/31/2007 | | | Collections Rev | SP Trust | 1,248.29 | | -6,081.78 |
| Deposit | 6/30/2007 | | | Collections Rev | SP Trust | 934.18 | | -7,016.56 |
| Deposit | 7/31/2007 | | | Collections Rev | SP Trust | 53.28 | | -7,069.84 |
| Transfer | 10/29/2007 | EFT | | To FEIN Operating | To sweep contract collections | | 7,069.84 | 0.00 |
| **Total FEIN SPTIII Accum** | | | | | | **6,639.31** | **7,069.84** | **0.00** |
| | | | | | | | | |
| **_Invest Adjust** | | | | | | | | 0.00 |
| General Journal | 1/4/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 1/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 1/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 1/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 2/28/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 3/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 4/2/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 4/25/2007 | EFT | | | Change in Cash | 52,500.00 | | 52,500.00 |
| General Journal | 4/25/2007 | EFT | | | Change in Cost Basis | | 52,500.00 | 0.00 |
| General Journal | 4/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 5/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 5/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 6/29/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 7/2/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 7/27/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 7/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 7/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 8/2/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 8/28/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 8/28/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 9/28/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 9/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 9/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 10/1/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 10/4/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 10/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 10/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 11/27/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 11/30/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 12/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 12/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| General Journal | 12/31/2007 | EFT | | | -MULTIPLE- | 0.00 | | 0.00 |
| **Total _Invest Adjust** | | | | | | **52,500.00** | **52,500.00** | **0.00** |
| | | | | | | | | |
| **107th Assoc** | | | | | | | | 0.00 |
| General Journal | 10/1/2007 | YEADJ | | Coventry | | 0.00 | | 0.00 |
| General Journal | 10/4/2007 | YEADJ | | | | 500,000.00 | | 500,000.00 |
| General Journal | 10/4/2007 | EFT | | | Quicken Missing Transaction | | 500,000.00 | 0.00 |
| General Journal | 10/4/2007 | EFT | | | Pin | 562,000.00 | | 500,000.00 |
| **Total 107th Assoc** | | | | | | **1,000,000.00** | **562,000.00** | **500,000.00** |
| | | | | | | | | |
| **Bear Stearns** | | | | | | | | 0.00 |
| **Total Bear Stearns** | | | | | | | | 0.00 |
| | | | | | | | | |
| **CCCC Loan (Chang)** | | | | | | | | 475,000.00 |
| **Total CCCC Loan (Chang)** | | | | | | | | 475,000.00 |
| | | | | | | | | |
| **CCIG Senior Note** | | | | | | | | 549,807.17 |
| **Total CCIG Senior Note** | | | | | | | | 549,807.17 |
| | | | | | | | | |
| **Cherokee ATM** | | | | | | | | 1,384,623.00 |
| **Total Cherokee ATM** | | | | | | | | 1,384,623.00 |
| | | | | | | | | |
| **Christopher's** | | | | | | | | 300,000.00 |
| **Total Christopher's** | | | | | | | | 300,000.00 |
| | | | | | | | | |
| **Coventry Note** | | | | | | | | 1,420,000.00 |
| General Journal | 11/30/2007 | YEADJ | | Coventry | roll accrued into principle bal | 104,922.00 | | 1,524,922.00 |
| **Total Coventry Note** | | | | | | **104,922.00** | **0.00** | **1,524,922.00** |
| | | | | | | | | |
| **DF OTHERS PSPC** | | | | | | | | 0.00 |
| General Journal | 1/1/2007 | YEADJ | | | | 0.00 | | 0.00 |
| General Journal | 9/27/2007 | EFT | | FIIN | Due From FIIN | 300,000.00 | | 300,000.00 |
| General Journal | 9/27/2007 | EFT | | FIIN | 3331 | 75,000.00 | | 375,000.00 |
| General Journal | 10/31/2007 | EFT | | FIIN | Due From FIIN H/s 10.25 paydown | 300,000.00 | | 675,000.00 |
| **Total DF OTHERS PSPC** | | | | | | **675,000.00** | **0.00** | **675,000.00** |

Page 7



Exhibit No. 13
Date: [handwritten] 10/14/15
MARIA N. DAMIANI

PL013529

# **Exhibit 13**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK


NEAL A. CUPERSMITH, et al.,    )
                               )
          Plaintiffs,          )
                               )
-vs-                           )   Civil Action No.
                               )   3:14-cv-01303-TJM-DEP
                               )
PIAKER & LYONS, P.C.,          )
RONALD L. SIMONS, and          )
TIMOTHY N. PAVENTI,            )
                               )
          Defendants.          )
_____)


DEPOSITION OF DEANNA AYERS


          DATE TAKEN:          October 30, 2015

          TIME:               1:07 p.m. to 2:47 p.m.

          BEHALF OF:          The Defendants

          PLACE TAKEN:        Fort Myers Court Reporting
                              2231 First Street
                              Fort Myers, Florida

          BEFORE:             Janice Humble, RPR, CLVS,
                              Notary Public
                              State of Florida at Large


_____

FORT MYERS COURT REPORTING
2231 First Street
Fort Myers, Florida  33901
(239) 334-1411
FAX (239) 334-1476

22

1    A.   Oh, yes.   That's who I would get my

2    statements from.

3    Q.   And a brokerage firm, are you familiar with

4    that term, what that means?

5    A.   I don't know what it means, but I know that

6    they were a brokerage for holding notes or IRAs and

7    things like that.   That's where I would see on their

8    statements what I had in the notes or any other cash

9    accounts or anything like that.

10    Q.   Uh-huh.   Now, are you aware of what -- strike

11    that.   Are you aware if Bill Lex was affiliated with

12    McGinn Smith?

13    A.   I believe he was.   I mean, that's my

14    thinking.   He trusted these people and I trusted him

15    and that's why I am where I am.

16    Q.   Did you understand him to be one of their

17    brokers?

18    A.   Did I understand that Bill Lex was one of

19    their brokers?

20    Q.   Uh-huh.

21    A.   So now, you know, the confusion becomes my

22    financial advisor and a broker.   I had no idea what

23    the connection was.

24    Q.   Okay.   But you did understand him to be

25    affiliated in some way with McGinn Smith?

1      A.   No.

2      Q.   Okay.  There was no discussion to that

3   effect?

4      A.   No.

5      Q.   Did he ever mention during that first

6   discussion or in connection with any of the other

7   investments there's a possibility you could lose all

8   of your money?

9      A.   It was the same risk I took with every

10   investment that was made, so I believe that if it

11   wasn't mentioned, it was assumed.

12      Q.   Okay.  So whether he said it or not, you

13   understood it?

14      A.   I did.

15      Q.   Okay.  Are you familiar with the term

16   liquidity?

17      A.   Yes, I believe so.  And my interpretation of

18   liquidity would be if I decided to flip it, I mean,

19   take all of my money, it would be liquidated.  Is that

20   correct or am I wrong.

21      Q.   No, the ability to be able to take something

22   out.

23      A.   Okay.

24      Q.   Is that something that you wanted to preserve

25   as part of your investment, the ability to take money

1    out when you saw fit?

2         A.   I believe that was the -- yes, at some point

3    I would be able to do that.  I don't remember in

4    particular asking about those.  Again, it was an

5    assumption on my part that at some point I would be

6    able to liquidate these notes.

7         Q.   And there's a distinction I think between

8    being to able to liquidate them at the end when they

9    become mature and being able to liquidate at any point

10   in time?

11        A.   Sure.

12        Q.   Did you believe you had the ability to

13   liquidate at any point in time?

14        A.   I don't know.  I don't remember.

15        Q.   Was that something that would have been

16   important to you to be able to get the money out

17   whenever you wanted?

18        A.   Well, yes, it would have been.  So I would

19   say that I did not feel that I could not have gotten

20   it, but I don't remember it being stated these

21   particular trust funds you cannot liquidate.  I don't

22   ever remember hearing that.

23        Q.   Okay, understood.  Were you ever provided

24   documentation from Mr. Lex regarding these

25   investments?

1        A.   If I do, I don't remember this.  I mean, I'm

2   familiar.  That word confidential private, what does

3   that say?  It's hard to see.  Memorandum.  Okay.  And

4   what it says -- what is this referring to?  I think I

5   saw four thousand and twenty thousand?

6        Q.   Yeah.  This is the offerings, in between four

7   million and twenty million dollars will be offered

8   total for these notes.

9        A.   Okay.  I don't remember this, to be honest

10  with you.

11       Q.   You don't have any recollection of that

12  particular document being presented to you by Bill

13  Lex?

14       A.   No.

15       Q.   If he had presented it to you, would you have

16  reviewed it?

17       A.   Probably not.  I would have taken his word

18  for it.

19       Q.   Okay.  I'm just going to go through a few

20  things on the document and I'm just going to ask them

21  more generally since you don't have a recollection of

22  having reviewed this.

23       A.   Okay.

24       Q.   Now, there are certain risk factors that are

25  identified in this private placement memorandum,

1     things that, you know, could cause you to lose your

2     money.  I'm going to go through a few of these and

3     just ask you whether or not this is something that you

4     were aware of at the time you made your investment.

5          A.   Okay.

6          Q.   The first one under the heading risk factors,

7     the note may not be a suitable investment for all

8     investors.  Did you have any discussion with Bill Lex

9     regarding whether or not this was suitable for you

10    based on your circumstances?

11         A.   I don't remember.  I do not remember.

12         Q.   Okay.  And one of the things that's noted

13    here is the lack of liquidity making it virtually

14    impossible for someone to get their money out prior to

15    maturity.

16         A.   I don't remember that, either.  I mean, that,

17    I don't recall that at all.

18         Q.   So that's not something that you were aware

19    of?

20         A.   Right.

21         Q.   Okay.  The second risk factor is that the

22    notes will not be registered under the Securities Act

23    and you will not be able to sell the notes quickly or

24    at all.  Is that a specific thing that you had

25    discussed with Bill Lex?

1      A.   I don't remember.  I would think that if I

2  heard those words, maybe I would have thought to

3  investigate it a little bit more.  I don't remember

4  that.

5      Q.   Okay.  And to the first one, too, the

6  inability to -- the illiquidity, I guess, of the

7  investment, is that something you would like to have

8  known at that time you made the investment?

9      A.   Yes.

10     Q.   Would that have some bearing on whether or

11 not you chose to invest or not?

12     A.   It probably would have, or could have.

13     Q.   Okay.  Another risk factor that's noted here

14 is that the secured assets may be inadequate to repay

15 the notes.  It goes on to talk about, you know,

16 depending on the circumstances there would be

17 situations there where you don't end up getting your

18 money back.  I believe you mentioned earlier that

19 while that may not have been discussed, that was

20 something that was assumed?

21     A.   Yes.

22     Q.   So that's something you understood at the

23 time of the investment?

24     A.   I believe so.

25     Q.   Okay.  The next one is the notes will have no

1    as Exhibit 2, and I'll represent to you that this is

2    the subscription agreement with respect to your

3    $75,000 investment in First Independent Income Notes.

4         A.   I don't remember this.

5         Q.   Okay.  Could you flip to the final page?

6         A.   I probably put my signature on it.

7         Q.   That was going to be my next question.  Do

8    you recognize that as your signature on -- I believe

9    it's the second line?

10        A.   That's my signature.

11        Q.   Okay.  There's no question you did sign that

12   document?

13        A.   I signed it, yeah.  And I probably saw this,

14   or have a copy of this, but I couldn't tell you where

15   it is.

16        Q.   Okay.  So you don't have any independent

17   recollection of this document?

18        A.   No.

19        Q.   But you don't deny --

20        A.   I don't deny that it was ever given to me.

21        Q.   Okay.  And based on page 1, do you understand

22   that this was the agreement for the investment of

23   $75,000 in First Independent Income Notes?

24        A.   Obviously.

25        Q.   I'm going to read to you just a few things on

# EXHIBIT 1

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### FIRST INDEPENDENT INCOME NOTES, LLC

**$4,000,000 Minimum Offering**
**$20,000,000 Maximum Offering**

**5.0% Secured Senior Notes due 2004**
**7.5% Secured Senior Subordinated Notes due 2008**
**10.25% Secured Junior Notes due 2008**

We are offering up to $20 million aggregate principal amount of our 5.0% secured senior notes due 2004, (the "original senior notes"), 7.5% secured senior subordinated notes due 2008 (the "senior subordinated notes") and 10.25% secured junior notes due 2008 (the "junior notes" and together with the senior notes (as defined below) and the senior subordinated notes, the "notes"). Upon the maturity of the original senior notes, we may continue to issue additional senior notes (the "additional senior notes" and, together with the original senior notes, the "senior notes") with a one-year maturity date and an interest rate of the then current prime rate +1% up to one year prior to the maturity date of the senior subordinated notes and the junior notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $20 million. The original senior notes will mature on December 15, 2004 and any additional senior notes will mature on December 15, 2005, 2006, 2007 or 2008, respectively. Each of the senior subordinated notes and the junior notes will mature on December 15, 2008. We will pay interest on the notes quarterly on the 15th day of January, April, July and October, commencing on January 15, 2004. The notes are secured by all of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. The senior subordinated notes and the junior notes are subordinated in right of payment to the senior notes. Additionally, the junior note holders' right to payment is subordinated in right of payment to the senior subordinated note holders. At our option, we may redeem a pro rata portion of the notes upon the removal, whether voluntary or involuntary, of an Investment from our portfolio.

The notes will be sold through McGinn, Smith & Co., Inc., which is acting as our placement agent for the notes. No public market exists with respect to the notes.

**The notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation or any other governmental or private fund or entity. Investing in the notes involves a high degree of risk. See "Risk Factors", beginning on page 5, for a discussion of risks that you should consider before making a decision to invest in the notes.**

The notes have not been registered under the Securities Act of 1933 (the "Securities Act"), as amended, or any applicable state or foreign securities laws, nor has the Securities and Exchange Commission or any state or foreign securities commission or other regulatory authority passed upon the accuracy or adequacy of this document or endorsed the merits of this offering. Any representation to the contrary is unlawful. The notes are offered by virtue of exemptions provided by Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, certain state and foreign securities laws and certain rules and regulations promulgated pursuant thereto. The notes may not be resold or otherwise transferred unless we receive an opinion of counsel or other documentation acceptable to us and our counsel that such registration is not required, or there is an effective registration statement under the Securities Act and any applicable state and foreign securities laws.

|  | Per note | Total |
|---|---|---|
| Offering price | 100% | 100% |
| Placement agent commissions | 2% | 2% |
| Proceeds to First Independent Income Notes, LLC, before expenses | 98% | 98% |

McGinn, Smith & Co., Inc. has agreed, as our placement agent, to offer the notes on a "best efforts, all or none" basis with respect to the minimum offering of $4,000,000, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering.

We will issue the notes in certificated form. We expect that delivery of the notes will be made in Albany, New York on or about October 15, 2003. McGinn, Smith Capital Holdings Corp. will act as trustee for the notes. See "Affiliated Transactions."

**McGINN, SMITH & CO., INC.**
The date of this Private Placement Memorandum is September 15, 2003



EXHIBIT
1
10-30-15   JH

**CONFIDENTIAL**

L 21822
PLTF00016280

# TABLE OF CONTENTS

NOTICE TO INVESTORS ................................................................................................. i

DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS ............................... iii

ADDITIONAL INFORMATION ....................................................................................... iii

SUMMARY ...................................................................................................................... 1
    FIIN ............................................................................................................................. 1
    Business ..................................................................................................................... 1
    The Offering ............................................................................................................. 1
    Risk Factors .............................................................................................................. 4

RISK FACTORS ............................................................................................................... 5
    Risk Factors Relating to the Notes .......................................................................... 5
    Risk Factors Relating to FIIN .................................................................................. 7

USE OF PROCEEDS ......................................................................................................... 9

CAPITALIZATION ........................................................................................................... 9

BUSINESS ........................................................................................................................ 9

MANAGEMENT .............................................................................................................. 9

DESCRIPTION OF THE NOTES ...................................................................................... 10

PLAN OF DISTRIBUTION .............................................................................................. 15

OWNERSHIP STRUCTURE AND PRINCIPAL EQUITY HOLDERS ............................... 16

AFFILIATED TRANSACTIONS ...................................................................................... 17

INVESTOR SUITABILITY REQUIREMENTS ................................................................. 17

WHERE YOU CAN FIND MORE INFORMATION .......................................................... 18

EXHIBITS

EXHIBIT A – FORM OF INVESTOR QUESTIONNAIRE ................................................. A-1

EXHIBIT B – FORM OF SUBSCRIPTION AGREEMENT ................................................ B-1

**CONFIDENTIAL**

**L 21823**
PLTF00016281

## NOTICE TO INVESTORS

The information contained in this private placement memorandum (the "memorandum") is not complete and its contents may differ from that of memoranda designed to conform to the requirements applicable to registration statements under United States securities laws. The notes are being offered only to "accredited investors", as that term is defined by Regulation D under the Securities Act, and the rules and regulations thereunder, who directly or through their advisors have the expert knowledge to evaluate information and data and whose potential investment is sufficiently large to justify the utilization by them of the access being granted them to other information. Prospective investors will be granted access to all reasonably available, relevant data concerning First Independent Income Notes, LLC and are urged to request whatever documents or material they believe will be useful in making their investment decision. Potential investors should base their investment decision on their own analysis of all information they deem to be relevant.

The information presented herein was prepared by us and is being furnished by McGinn, Smith & Co., Inc., the placement agent, solely for use by prospective investors in connection with this offering. The placement agent has not independently verified the information contained herein or otherwise made any further investigation of First Independent Income Notes, LLC and makes no representation or warranty, express or implied, as to the accuracy or completeness of such information. Neither we nor the placement agent make any representation or warranty, express or implied, as to our future performance.

Because the notes have not been registered under the Securities Act or any state or foreign securities laws, they may not be resold, transferred or otherwise disposed of unless the resale, transfer or other disposition is registered under the Securities Act or any applicable state and foreign securities laws or an exemption therefrom is available. No public market exists with respect to any of our securities, including the notes. Investors should be aware that they may be required to bear the risks of this investment for an indefinite period.

This memorandum does not constitute an offer to sell or a solicitation of an offer to buy any of our securities to any person in any jurisdiction in which such offer or solicitation is unlawful. This offering is not being made to, nor will subscriptions be accepted from or on behalf of, any person in any jurisdiction in which the making or acceptance thereof would not be in compliance with the laws of such jurisdiction. We may, however, in our sole and absolute discretion, take such action as we deem necessary to make the offering in any such jurisdiction and extend the offering to offerees in such jurisdiction.

This memorandum is submitted to prospective investors on a confidential basis and is for their informational use solely in connection with the offering described herein. The disclosure of any of the information contained herein or its use for any other purpose except with our prior written consent is prohibited. This memorandum may not be reproduced, in whole or in part, and it is accepted with the understanding that it will be returned on request if the recipient does not purchase the securities offered hereby or if the recipient's subscription is not accepted or if the offering is terminated.

This memorandum supercedes any documents previously supplied to prospective investors concerning us and the terms and conditions of the offering being made hereby. This memorandum contains summaries of the contents of certain agreements and other documents. Reference should be made to these agreements and documents for complete information concerning the rights and obligations of the parties thereto and the matters described therein. Subject to any applicable restrictions as to confidentiality, all of these agreements and documents shall be made available upon request.

No person has been authorized to make any representations concerning this offering, and no person other than the placement agent has been authorized to furnish any information, other than as set forth in this memorandum, and, if made or given, these other representations or information must not be relied upon by prospective investors.

Prospective investors are not to construe the contents of this memorandum as legal, tax or investment advice. Each prospective investor should consult its advisors as to legal, tax, financial and related matters concerning an investment in the notes. Without limiting the generality of the foregoing, prospective investors outside the United States should consult their legal, tax or financial advisers in order to ascertain the tax consequences of buying, holding and receiving proceeds from the notes.

Neither the delivery of this memorandum nor any sale made hereunder shall, under any circumstances, create any implication that the information herein is correct as of any time subsequent to the date hereof or that there has not been any change in the information contained herein or in our affairs since the date hereof.

i

**CONFIDENTIAL**

L 21824
PLTF00016282

The notes are offered subject to our acceptance of subscriptions and other conditions as set forth in this memorandum. We reserve the right in our discretion to reject any subscription in whole or in part or to allot to any investor less than the aggregate principal amount of the notes subscribed for, and to withdraw, cancel or modify the offering at any time without notice.

This memorandum does not constitute an offer of or an invitation by or on behalf of the issuer to subscribe or purchase any notes and may not be used for the purpose of an offer to, or a solicitation by, anyone in any circumstances in which such offer or solicitation is not authorized or lawful. The distribution of this document and the offering of the notes in certain jurisdictions may be restricted by law. Persons who obtain this document are required by the issuer to inform themselves about and to observe any such restrictions. No action is being taken to permit a public offering of the notes or the distribution of this document in any jurisdiction where action would be required for such purposes.

### NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

### NOTICE TO FLORIDA RESIDENTS

THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061(11) OF THE FLORIDA SECURITIES ACT. THE SECURITIES BEING OFFERED HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

### NOTICE TO PENNSYLVANIA RESIDENTS

UNDER PROVISIONS OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OR PURCHASE OR IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO WRITTEN BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED.

### NOTICE TO NEW YORK INVESTORS

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT

CONFIDENTIAL

L 21825
PLTF00016283

CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

### NOTICE TO NEW JERSEY RESIDENTS

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED OR REVIEWED BY THE NEW JERSEY BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. NEITHER THE ATTORNEY GENERAL OR THE STATE OF NEW JERSEY BUREAU OF SECURITIES HAS PASSED ON OR ENDORSED THE MERITS OF THIS MEMORANDUM (OR THE PRIVATE OFFERING CONTAINED HEREIN). ANY REPRESENTATIONS TO THE CONTRARY ARE UNLAWFUL. ALL PROCEEDS OF THE OFFERING WILL BE HELD IN TRUST BY THE COMPANY FOR THE BENEFIT OF THE PURCHASERS OF NOTES TO BE USED ONLY FOR THE PURPOSES SET FORTH UNDER THE CAPTION "USE OF PROCEEDS".

### NOTICE TO CONNECTICUT RESIDENTS

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE CONNECTICUT SECURITIES LAW. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND SALE.

### NOTICE TO MASSACHUSETTS RESIDENTS

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE MASSACHUSETTS UNIFORM SECURITIES ACT OR THE SECURITIES ACT OF 1933, AS AMENDED, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

### DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This memorandum includes "forward-looking statements". All statements other than statements of historical facts included in this memorandum may constitute forward-looking statements. In addition, forward-looking statements generally can be identified by the use of forward-looking terminology such as "may", "will", "expect", "intend", "estimate", "anticipate", "believe" or "continue" or the negatives thereof or variations thereon or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to have been correct. Important factors such as those discussed in the "Risk Factors" section could cause actual results to differ materially from our expectations. All subsequent written and oral forward-looking statements attributable to us, the placement agent or any other persons acting on our behalf are expressly qualified in their entirety by this paragraph. These forward-looking statements speak only as of the date of this memorandum. We expressly disclaim any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.

### ADDITIONAL INFORMATION

We have retained McGinn, Smith & Co., Inc. to act as our placement agent in connection with arranging the private placement of the notes. With respect to the minimum offering of $4,000,000, McGinn, Smith & Co., Inc., as our placement agent, has agreed to offer the notes on a "best efforts, all or none" basis, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering. The placement agent will act as primary contact for, and will be available to consult with, any prospective investor who receives this document.

We undertake to make available to every investor, during the course of the offering and prior to sale, the opportunity to ask questions of and receive answers from us concerning the terms and conditions of the offering and to obtain any appropriate additional information necessary to verify the accuracy of the information contained in this document or for any other purpose relevant to a prospective investment in the notes offered hereby.

**CONFIDENTIAL**

L 21826
PLTF00016284

All communications or inquiries relating to the notes should be directed to the following individual at McGinn, Smith & Co., Inc.:

David L. Smith
President
McGinn, Smith & Co., Inc.
Capital Center, 5th Floor
99 Pine Street
Albany, New York 12207
Phone: 518-449-5131
Fax: 518-449-4894
E-Mail: smithd@mcginnsmith.com

CONFIDENTIAL

L 21827
PLTF00016285

## SUMMARY

*This summary highlights selected information from this memorandum and may not contain all the information that may be important to you. The following summary is qualified in its entirety by the more detailed information appearing elsewhere in this memorandum. You should read the entire memorandum before making an investment decision. Unless the context otherwise requires, all references to "FIIN", "we, "us" or "our" refer to First Independent Income Notes, LLC.*

### FIIN

First Independent Income Notes, LLC ("FIIN") is a newly formed, single purpose limited liability company. We were organized in New York in 2003.

Our sole and managing member is McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc.

Our principal offices are located at Capital Center, 5th Floor, 99 Pine Street, Albany, New York, 12207 and our telephone number is (518) 449-5131.

### Business

FIIN has been formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"). We may acquire such Investments directly, or from our managing member or an affiliate of us or our managing member that has purchased the Investment. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the Investment. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission. We may retain the Investments beyond the term of the notes, sell such Investments during the term of the notes or offer the notes to preferred investors. If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we may, at our option, redeem a pro rata portion of the notes. See "Description of the Notes – Redemption at the Option of FIIN".

Our profitability is largely determined by the difference, or "spread," between the effective rate we pay on the Investments we acquire and the full rate of return received on such Investments.

### The Offering

*The following summary is not intended to be complete. For a more detailed description of the notes, see "Description of the Notes."*

Issuer ........................................................First Independent Income Notes, LLC

Amount of Offering....................................Up to $20 million in three tranches: a minimum of $2.5 million and up to $5 million to senior note holders; a minimum of $2.5 million and up to $5 million to senior subordinated note holders; and a minimum of $10 million and up to $15 million to junior note holders

Placement Agent.........................................McGinn, Smith & Co., Inc.

Trustee .......................................................McGinn, Smith Capital Holdings Corp.

Securities Offered.......................................5.0% Secured Senior Notes due 2004 (the "original senior notes"), 7.5% Secured Senior Subordinated Notes due 2008 (the "senior subordinated

- 1 -

CONFIDENTIAL

L 21828
PLTF00016286

notes") and 10.25% Secured Junior Notes due 2008 (the "junior notes" and together with the senior notes (as defined below) and senior subordinated notes, the "notes"). Upon the maturity of the original senior notes, we may continue to issue additional senior notes (the "additional senior notes" and together with the original senior notes, the "senior notes") with a one-year maturity date and an interest rate of the then current prime rate +1% up to one year prior to the maturity date of the senior subordinated notes and the junior notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $20 million. The notes are secured promises to pay issued by us. By purchasing a note, you are lending money to us. The notes represent our obligation to repay your loan with interest.

Security ................................................... All of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses.

First Closing ............................................. Occurs upon the receipt of $4 million aggregate principal amount from the sale of the notes.

Escrow Account ......................................... All subscription proceeds will be held in an escrow account and no subscription agreement will be accepted until the minimum proceeds requirement is met for the first closing.

Method of Purchase .................................... Prior to your purchase of notes, you will be required to complete a subscription agreement that will set forth the principal amount of your purchase and certain other information regarding your ownership of the notes.

Minimum Subscription ............................... Minimum aggregate principal amount of $25,000 for each of the senior notes, senior subordinated notes and junior notes

Offering Price ........................................... 100% of the principal amount per note

Maturity .................................................. December 15, 2004 for the original senior notes and December 15, 2005, 2006, 2007 or 2008, respectively, for any additional senior notes. December 15, 2008 for each of the senior subordinated notes and the junior notes.

Interest Rate ............................................. The notes will accrue interest from the date of the first closing at the following rates per year: 5.0% for the original senior notes and the then current prime rate + 1% for any additional senior notes; 7.5% for the senior subordinated notes; and 10.25% for the junior notes.

Interest Payment Dates ............................... Quarterly on the 15th day of January, April, July and October, commencing on January 15, 2004

Principal Payment ...................................... Unless we choose to redeem a pro rata portion of the notes upon the removal, whether voluntary or involuntary, of an Investment from our asset portfolio, we will not pay principal over the term of the notes. See "Description of the Notes – Redemption at the Option of FIIN". We are obligated to pay the entire principal balance of the outstanding notes upon maturity.

Payment Method ......................................... Principal and interest payments will be made by whatever means you indicate in your subscription agreement, including by an electronic funds transfer to a depository account you designate in your subscription documents.

- 2 -

CONFIDENTIAL

L 21829
PLTF00016287

Redemption at Maturity ................................ Unless we choose to redeem a pro rata portion of the notes, the notes may only be redeemed at, and not prior to, Maturity.

Optional Redemption.................................... At the option of FIIN, a pro rata percentage of the notes may be redeemed if an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes.  See "Description of the Notes -- Redemption at the Option of FIIN".

Ranking.................................................... The senior subordinated notes and junior notes are subordinate in right of payment to the senior notes, and the junior notes are additionally subordinate in right of payment to the senior subordinated notes.

Use of Proceeds .......................................... If all the notes are sold, we would expect to receive approximately $19.6 million of net proceeds from this offering after deducting the placement agent's commissions and estimated offering expenses payable by us. We intend to use the net proceeds to acquire Investments.  Assuming we received the maximum amount of the offering, we will not invest more than 25% of the net proceeds of the offering in any single Investment. See "Use of Proceeds."

Absence of Public Market ............................. There is no existing or public market for the notes. We cannot provide you with any assurance as to:

- the liquidity of any market that may develop for the notes;

- your ability to sell or pledge your notes; or

- the prices at which you will be able to sell your notes.

Transfer Restrictions................................ .... The notes are subject to significant restrictions on resale.   We have not registered, and do not plan to register, the notes under the Securities Act or any state securities laws and you may not offer or sell the notes except under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

Plan of Distribution .................................... We are offering the notes without registration under the Securities Act in reliance upon an exemption afforded by Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.

McGinn, Smith & Co., Inc., as our placement agent, will solicit offers to purchase the notes, for which it will receive commissions equal to 2% of the purchase price of the notes. With respect to the minimum offering of $4,000,000, McGinn, Smith & Co., Inc., as our placement agent, has agreed to offer the notes on a "best efforts, all or none" basis, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering. The offering period will extend until the earlier of (i) the sale of all of the notes, or (ii) December 31, 2003, provided that we have retained the right, in our discretion, and our placement agent has agreed in that event, to extend the offering period for up to six additional months.

Suitability Requirements.............................. The risks associated with an investment in the notes and the lack of liquidity makes this investment suitable only for an investor who has substantial net worth, no need for liquidity with respect to this investment and who can bear the economic risk of a complete loss of the investment. In addition, the investment is suitable only for an investor who has sufficient knowledge and experience in financial and business matters and investments in organizations

- 3 -

CONFIDENTIAL

L 21830
PLTF00016288

such as FIIN to enable the investor to evaluate the merits and risk associated with a purchase of the notes. Subscriptions will be accepted only from "accredited investors," as that term is defined in Regulation D promulgated under the Securities Act.

### Risk Factors

See "Risk Factors", immediately following this summary, for a discussion of risks relating to an investment in the notes.

- 4 -

CONFIDENTIAL

L 21831
PLTF00016289

## RISK FACTORS

*Before you invest in the notes, you should carefully consider these risk factors, as well as the other information contained in this memorandum.*

### Risk Factors Relating to the Notes

**The Notes May Not Be A Suitable Investment for All Investors.** *The notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing notes.*

The risks described below set forth many of the risks associated with the purchase of notes. In addition to those risks, the characteristics of the notes, including maturity, interest rate and lack of liquidity, may not satisfy your investment objectives or otherwise be a suitable investment for you. This may be based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. For instance, prior to purchasing any notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the notes in relation to your other investment holdings and the diversity of those holdings.

**The Notes Will Not Be Registered Under The Securities Act And You May Not Be Able To Sell The Notes Quickly, Or At All.** *Your ability to liquidate your investment is limited because of transfer restrictions and the lack of a trading market.*

The notes are being offered without registration under the Securities Act in reliance upon an exemption afforded by Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act. We have no plans or intention to register the notes. As a result, there are significant restrictions on your ability to sell or otherwise transfer the notes and we cannot assure you that you will be able to sell the notes quickly, or at all. Therefore, the notes are suitable for purchase only by investors who are capable of bearing the economic risks of holding the notes for an indefinite period of time. Due to the non-transferable nature of the notes and the lack of a market for the sale of the notes, you might be unable to sell, pledge or otherwise liquidate your investment. See "Description of the Notes."

**You Will Have Only Limited Protection Under The Indenture.** *The indenture governing the notes contains only limited restrictions on our activities and only limited events of default, and thus, provides only limited protection to you.*

The indenture governing the notes contains limited restrictions on our activities. Because there are only very limited restrictions and limited events of default under the indenture, we will not be required to maintain any ratios of assets to debt in order to increase the likelihood of timely payments to you under the notes. See "Description of the Notes - Events of Default."

**The Senior Subordinate Note Holders And Junior Note Holders Lack Priority In Payment On The Notes.** *The senior subordinated note holders' and junior note holders' right to receive payments on the notes is subordinated in right of payment to the senior note holders.*

The senior subordinated notes and junior notes will be subordinated to the prior payment in full of the senior notes. The junior notes will also be subordinated in right of payment to the senior subordinated notes. The senior note holders will have priority over up to 25% of our secured assets over the senior subordinated and junior note holders, and the senior note holders and senior subordinated note holders will have priority over up to 50% of our secured assets over the junior note holders. Because of the subordination provisions of the notes, in the event of our bankruptcy, liquidation or dissolution, our assets would be available to make payments to the senior subordinated note holders and the junior note holders only after all payments had been made on the senior notes, and to the junior note holders only after all payments had been made on the senior subordinated notes. Sufficient assets may not remain after all such senior note payments have been made to make any payments to the senior subordinated notes and the junior notes, including payments of interest when due or principal upon maturity. Likewise, sufficient assets may not remain after all senior subordinated note payments have been made to make any payments to the junior notes, including payments of interest when due or principal upon maturity.

CONFIDENTIAL

**L 21832**
PLTF00016290

**The Secured Assets May Be Inadequate To Repay The Notes.** *If an Investment is redeemed, prepaid, liquidated or sold, there may be insufficient security for you to collect upon in an event of default.*

Your security interest is in the pool of Investments as a whole, not a particular Investment, and in any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. Even though the proceeds from your purchase of a note may be used to acquire a particular Investment, specific notes are not limited to or payable from a particular Investment. All notes in the same tranche will be equally and ratably secured by all of our Investments. We are not restricted in the indenture from selling any of the Investments that we acquire. Although we have the option to redeem a portion of the notes upon the removal, whether voluntary or involuntary, of an Investment from our asset portfolio, we are not required to do so. Therefore, in an event of default, your security interest in the Investments may be insufficient for you to be repaid on the notes.

**The Notes Will Have No Insurance Or Guarantee.** *There is no insurance or guarantee for our obligation to make payments on the notes, so you will have to rely on our cash flow from operations and the Investments for the repayment of principal and payment of interest.*

The notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the notes, you will have to rely on our cash flow from operations and the Investments for repayment of principal at maturity and payment of interest when due. The senior notes will have priority over the Investments. If, after the payment of the senior notes, the Investments and cash flow from operations and other sources of funds are not sufficient to pay the senior subordinated notes and junior notes, then the senior subordinated note holders and junior note holders may lose all or part of their investment. Likewise, if, after the payment of the senior subordinated notes, the Investments and cash flow from operations and other sources of funds are not sufficient to pay the junior notes, then the junior note holders may lose all or part of their investment.

**Risk Of Redemption At The Option Of FIIN.** *Redemption by us prior to maturity may result in reinvestment risk to you.*

If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we have the option to redeem a pro rata portion of the notes prior to its stated maturity upon 10 days written notice to you. For those notes that are redeemed, 100% of the principal amount plus accrued but unpaid interest up to the redemption date will be paid. Any such redemption may have the effect of reducing the income or return on investment that you may receive in an investment in the notes by reducing the term of the investment. In addition, you may not be able to reinvest the proceeds of any such redemption for the remainder of the original term of the notes at an interest rate comparable to the rate paid on the notes. See "Description of the Notes - Redemption at the Option of FIIN."

**The Trustee May Experience A Conflict Of Interest.** *The trustee under the indenture governing the notes is an affiliate of our managing member, acts as our servicing agent  and represents all three tranches of notes.*

The trustee is McGinn, Smith Capital Holdings Corp., which is an affiliate of our managing member, McGinn, Smith Advisors, LLC and of our placement agent, McGinn, Smith & Co., Inc. In addition, we have retained McGinn, Smith Capital Holdings Corp. to act as our servicing agent. In the event that you feel that you are not adequately represented by the trustee in an event of default, holders of 25% of the aggregate principal amount of all notes outstanding may vote to remove the trustee and elect a successor trustee.

The trustee under the indenture will represent all three tranches of notes. The note holders of a particular tranche of notes may feel that the trustee has a conflict of interest when it acts in a way that favors one tranche of notes over another tranche of notes. In that event, holders of 25% of the aggregate principal amount of notes in a particular tranche may vote to remove the trustee with respect to that tranche of notes and appoint a successor trustee to represent that tranche of notes.

CONFIDENTIAL

L 21833
PLTF00016291

## Risk Factors Relating to FIIN

**FIIN Is A Newly-Formed Limited Liability Company.** *We have no historical financial information or results of operations on which you can base your investment decision.*

FIIN was organized in New York in 2003. We have no historical financial statements or results of operations. As a result, you have no historical data on which to base your estimation of our likelihood success in achieving our business and financial goals.

**We May Be Unable To Finance Our Operations.** *If we are unable to generate a sufficient cash flow, our results of operations and financial condition would be materially and adversely affected and we may be unable to make payments on the notes.*

We require a substantial amount of cash liquidity to operate our business. Among other things, we use such cash liquidity to:

- pay incentive commissions to our managing member's salesmen at the rate of 2% of the aggregate principal amount of the notes per year over the term of the notes;

- pay our managing member a portfolio management fee of 1% of the aggregate principal amount of the notes per year over the term of the notes;

- pay our servicing agent a fee for administering the notes of 0.25% of the aggregate principal amount of the notes per year over the term of the notes;

- satisfy working capital requirements and pay operating expenses, including accounting and legal expenses that we estimate to equal 0.25% of the aggregate principal amount of the notes per year; and

- pay interest expense.

Our cash flow is wholly dependent on our ability to find and acquire suitable Investments. We cannot assure you that our business strategy will succeed or that we will achieve our anticipated financial results. We may not be able to find such opportunities and our ability to generate cash flow depends on market and other factors beyond our control. These factors include:

- the current economic and competitive conditions; and

- any delays in implementing any strategic projects we may have.

Depending upon the outcome of one or more of these factors, we may not be able to generate sufficient cash flow from operations to satisfy all of our obligations, including the notes. If we are unable to pay our debts, we will be required to pursue one or more alternative strategies, such as selling assets, or refinancing or restructuring our indebtedness. These alternative strategies may not be feasible at the time or prove adequate.

**We Are Subject To Rate Fluctuations.** *Rate fluctuations between instruments may materially and adversely affect our results of operations, financial condition and cash flows and our ability to make payments on the notes.*

Our profitability is largely determined by the difference, or "spread," between the effective rate we pay on the Investments we acquire and the full rate received on such Investments. We may not be able to receive the same rate of return on all of our Investments. If one of our Investments is redeemed, prepaid, liquidated or sold prior to maturity, we may not be able to find a comparable Investment to replace it that would generate the same yields.

**We Will Be Adversely Affected When Investments Are Prepaid Or Defaulted.** *If an Investment is prepaid or experiences a default, our results of operations, financial condition and cash flows and our ability to make payments on the notes could be materially and adversely affected.*

Our results of operations, financial condition, cash flows and liquidity, and consequently our ability to make payments on the notes, depend, to a material extent, on the performance of the Investments that we purchase. A portion of

**CONFIDENTIAL**

L 21834
PLTF00016292

the Investments that we acquire may default or prepay. We bear the risk of losses resulting from payment defaults and may not realize the full value of our investment. Our income can also be adversely affected by prepayment of an Investment in our portfolio. Our revenue is based on a percentage of the outstanding principal balance of an Investment in our portfolio. If an Investment is prepaid or charged-off, then our revenue will decline while our servicing costs may not decline proportionately.

**We Depend On Our Managing Member And On Key Personnel.** *The success of our operations depends on our managing member and on certain key personnel.*

Our future operating results depend in significant part upon the continued service of our managing member, to which we pay 1% of the aggregate principal amount of the notes per year over the term of the notes to act as our portfolio manager and give us investment advice. We rely solely on the expertise of our managing member to make the proper investment decisions to generate cash flow.

Our future operating results also depend in part upon our ability to attract and retain qualified management, technical, and sales and support personnel for our operations. Competition for such personnel is intense. We cannot assure you that we will be successful in attracting or retaining such personnel. The loss of any key employee, the failure of any key employee to perform in his or her current position or our inability to attract and retain skilled employees, as needed, could materially and adversely affect our results of operations, financial condition and cash flows.

**Our Industry Is Competitive.** *Increased competition could materially and adversely affect our operations and profitability.*

We may have to compete with other investors. These competitors may have greater financial resources than we do or have better relationships or offer other forms of financing or services not provided by us. Our ability to compete successfully depends largely upon establishing and maintaining relationships in the investment community and acquiring suitable Investments.

**We May Be Harmed By Adverse Economic Conditions.** *Adverse economic conditions could materially and adversely effect our revenues and cash flows.*

A prolonged downturn in the economy could have a material adverse impact upon us, our results of operations and our ability to implement our business strategy. Similarly, adverse economic conditions or other factors might adversely affect the performance of our Investments, including the level of delinquencies, which could materially and adversely affect our results of operation, financial condition and cash flows and our ability to perform our obligations under the notes. These economic conditions could result in severe reductions in our revenues or the cash flows available to us and adversely affect our ability to make payments on the notes.

**We Are Subject To Regulations.** *Failure to materially comply with all laws and regulations applicable to us could materially and adversely affect our ability to operate our business and our ability to make payments on the notes.*

We believe that we are in compliance in all material respects with all such laws and regulations, and that such laws and regulations have had no material adverse effect on our ability to operate our business. However, we will be materially and adversely affected if we fail to comply with:

- applicable laws and regulations;

- changes in existing laws or regulations;

- changes in the interpretation of existing laws or regulations; or

- any additional laws or regulations that may be enacted in the future.

CONFIDENTIAL

L 21835
PLTF00016293

## USE OF PROCEEDS

If all of the notes are sold, we would expect to receive approximately $19.6 million of net proceeds from this offering after deducting the 2% placement agent commission and other offering expenses payable by us.

We intend to use the net proceeds to acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"). Assuming we received the maximum amount of the offering, we will not invest more than 25% of the proceeds of this offering in any single Investment.  All subscription proceeds will be held in an escrow account and no subscription agreement will be accepted until the minimum proceeds requirement is met for the first closing.  Once we achieve the minimum amount required for the first closing, we will begin to acquire Investments.

We may acquire such Investments directly, or from our managing member or an affiliate of us or our managing member that has purchased the Investment. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the Investment. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission. We may retain the Investments beyond the term of the notes, sell such Investments during the term of the notes or offer the notes to preferred investors. If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we may, at our option, redeem a pro rata portion of the notes. See "Description of the Notes – Redemption at the Option of FIIN".

## CAPITALIZATION

Our sole member is our managing member, McGinn, Smith Advisors, LLC, which holds 100% of the membership interest in FIIN.

## BUSINESS

FIIN has been formed to acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments"). We may acquire such Investments directly, or from our managing member or an affiliate of us or our managing member that has purchased the Investment. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the Investment. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission.

Our profitability is largely determined by the difference, or "spread," between the effective rate we pay on the Investments we acquire and the full rate of return received on such Investments.

## MANAGEMENT

We are solely managed by our managing member, McGinn, Smith Advisors, LLC, a New York limited liability company.  McGinn, Smith Advisors, LLC was formed in 2003. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc.

CONFIDENTIAL

L 21836
PLTF00016294

## DESCRIPTION OF THE NOTES

*The following statements with respect to the notes are not complete and are qualified in all respects by the provisions of the indenture, copies of which are available from FIIN upon request. See "Additional Information."*

**General.** We will issue the notes under a indenture between First Independent Income Notes, LLC and McGinn, Smith Capital Holdings Corp., as trustee (the "trustee") in a private transaction that is not subject to the registration requirements of the Securities Act. The terms and conditions of the notes include those stated in the indenture. The following is a summary of some, but not all, provisions of the notes and the indenture. For a complete understanding of the notes, you should review the definitive terms and conditions contained in the actual notes and the indenture, which include definitions of certain terms used below. The indenture, and not this description, defines your rights as holders of the notes. Copies of the form of the notes and the indenture are available from us at no charge upon request.

We are offering up to $20 million aggregate principal amount of our 5.0% secured senior notes due 2004 (the "original senior notes"), 7.5% secured senior subordinated notes due 2008 (the "senior subordinated notes") and 10.25% secured junior notes due 2008 (the "junior notes" and together with the senior notes (as defined below) and the senior subordinated notes, the "notes"). Upon the maturity of the original senior notes, we may continue to issue additional senior notes (the "additional senior notes" and together with the original senior notes, the "senior notes") with a one-year maturity date and an interest rate of the then current prime rate +1% up to one year prior to the maturity date of the senior subordinated notes and the junior notes, provided that the aggregate principal amount of the outstanding notes at any one time does not exceed $20 million.

The notes are secured by all of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. Even though the proceeds from your purchase of a note may be used acquire a particular Investment, specific notes are not limited to or payable from a particular Investment. All notes in the same tranche will be equally and ratably secured by all of our Investments. The senior subordinated notes and junior notes will be subordinated in right of payment to the prior payment in full of the senior notes. Additionally, the junior notes will be subordinated in right of payment to the prior payment in full of the senior subordinated notes. The notes are not insured by the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation or any other agency or company.

If not earlier redeemed, the original senior notes will mature on December 15, 2004 and any additional senior notes will mature on December 15, 2005, 2006, 2007 or 2008, respectively. If not earlier redeemed, each of the senior subordinated notes and the junior notes will mature on December 15, 2008. We will pay interest on the notes quarterly on the 15th day of January, April, July and October, commencing on January 15, 2004.

You may determine the amount (minimum $25,000 plus integral multiples of $5,000) of the notes you would like to purchase when you subscribe. See "- Denomination" below. If your subscription is rejected by us, all funds deposited will be promptly returned to you without any interest. Investors whose subscriptions for notes have been accepted and anyone who subsequently acquires notes in a qualified transfer are referred to as "holders" or "registered holders" in this memorandum and in the indenture.

We may modify or supplement the terms of the notes described in this memorandum from time to time in a supplement to the indenture and this memorandum. Except as set forth under "- Amendment, Supplement And Waiver" below, any modification or amendment will not affect notes outstanding at the time of such modification or amendment.

**Denomination.** You may purchase notes in the minimum principal amount of $25,000 plus integral multiples of $5,000. You will determine the original principal amount of each note you purchase when you subscribe.

**First Closing.** The first closing will occur once a minimum of $4 million aggregate principal amount of the notes is purchased.

**Term.** The original senior notes will mature on December 15, 2004 and any additional senior notes will mature on December 15, 2005, 2006, 2007 or 2008, respectively. Each of the senior subordinated notes and the junior notes will mature on December 15, 2008.

- 10 -

**CONFIDENTIAL**

L 21837
PLTF00016295

**Interest Rate.** The original senior notes will accrue interest at an annual rate of 5% and any additional senior notes will accrue interest at an annual rate of the then current prime rate +1%. The senior subordinated notes will accrue interest at the annual rate of 7.5%. The junior notes will accrue interest at an annual rate of 10.25%.

**Computation of Interest.** We will compute interest on notes on the basis of an actual calendar year. Interest will compound daily and accrue from the date of the first closing.

**Interest Payment Dates.** Interest will be paid quarterly on the 15th day of January, April, July and October, commencing on January 15, 2004, to the person in whose name the note is registered at the close of business on the 15th day of the month preceding the month in which the interest payment date occurs. Your last interest payment will be made on the maturity date. Any interest not paid on an interest payment date will be paid at maturity.

**Place and Method of Payment.** We will pay principal and interest on the notes through our paying agent, by whatever means is chosen by you in your subscription agreement, including the use of an electronic funds transfer to a depository account you specify in your subscription documents.

**Servicing Agent.** We have engaged McGinn, Smith Capital Holdings Corp., an affiliate of our managing member, McGinn, Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc., to act as our servicing agent for the notes. The responsibilities as servicing agent will involve the performance of certain administrative and customer service functions for the notes that we are responsible for performing as the issuer of the notes. For example, the servicing agent will serve as our registrar and transfer agent and paying agent and will manage all aspects of the customer service function for the notes, including handling all phone inquiries, meeting with investors, processing subscription agreements, distributing our annual statement of operations upon request by a note holder, and dealing with any administrative tax matters with regards to the notes. In addition the servicing agent will provide us with monthly reports and analysis regarding the status of the notes and the amount of notes that remain available for purchase, if any.

As compensation for the services as servicing agent, we will pay the servicing agent an annual fee equal to 0.25% of the aggregate principal amount of the notes so long as the servicing agent is engaged. Such ongoing fee will be paid quarterly.

You may contact our servicing agent as follows with any questions about the notes:

McGinn, Smith Capital Holdings Corp.
Capital Center, 5th Floor
99 Pine Street
Albany, New York 12207
Attn: David L. Smith
Tel: 518-449-5131
Fax: 518-449-4894
E-Mail: smithd@mcginnsmith.com

On each interest payment date, the servicing agent will credit interest due on each account and make such payments to the holders.

Our servicing agent, McGinn, Smith Capital Holdings Corp., an affiliate of our managing member McGinn, Smith Advisors, LLC and of our placement agent, McGinn, Smith & Co., Inc., is also the trustee under the indenture governing the notes. As a result, McGinn, Smith Capital Holdings Corp. may experience a conflict of interest between its role as our servicing agent and as the trustee for the note holders. See "Risk Factors – Risk Factors Relating to the Notes – The Trustee May Experience a Conflict of Interest."

**Subscriptions.** Each subscriber will be required to complete an investor questionnaire in the form attached to this memorandum and submit an executed subscription agreement in the form attached to this memorandum. Each prospective investor must deliver with his or her subscription agreement a check in the full amount of the purchase price for the notes for which he or she has subscribed. The checks shall be made payable to CharterOne Bank, FSB, Escrow Agent for First Independent Income Notes, LLC", and upon receipt shall be deposited into an escrow account maintained by the placement agent with CharterOne Bank, FSB for the benefit of the investors (the "escrow account"). The proceeds of sale of the notes will remain in the escrow account until a subscription has been accepted by us and the placement agent, or until a subscription is rejected, at which time the amount of such subscription will be returned to the investor without interest.

- 11 -

CONFIDENTIAL

L 21838
PLTF00016296

Subscriptions will be accepted only after satisfaction of the minimum offering amount and completion of the first closing. All such funds shall continue to be the property of the subscribers and shall be held in trust for their benefit until the subscribers receive their notes. We may reject any subscription for notes in our sole discretion.

**Redemption at the Option of FIIN.** If an Investment is removed, whether voluntarily or involuntarily, from our asset portfolio during the term of the notes, we have the right, at our option, to redeem a pro rata portion of the notes prior to their stated maturity upon 10 days written notice to you. For example, if an Investment that comprises 20% of our secured assets is no longer owned by us, we may redeem 20% of the notes pro rata across all tranches and all note holders within each tranche. The notes that are redeemed will be redeemed at 100% of the principal amount plus accrued but unpaid interest up to but not including the redemption date without any penalty or premium. The holder has no right to require us to prepay or repurchase any note prior to its maturity date.

**Payment upon Maturity.** On the maturity date, we will pay the holder the principal amount and any accrued and unpaid interest.

**Transfers.** The notes are subject to significant restrictions on resale. We have not registered, and do not plan to register, the notes under the Securities Act or any state securities laws. You may not offer or sell the notes except (i) with an opinion of counsel or other documentation acceptable to us that the transfer is exempt from, or not subject to, the registration requirements of the Securities Act, or (ii) under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

**Security.** The notes are secured by all of the various public and/or private investments that we may acquire, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments"), and any cash proceeds from the offering that are not used to acquire an Investment, after deducting commissions, fees and expenses. Even though the proceeds from your purchase of a note may be used to acquire a particular Investment, specific notes are not limited to or payable from a particular Investment. All notes in the same tranche will be equally and ratably secured by all of our Investments.

**Subordination.** The indebtedness evidenced by the senior subordinated notes and the junior notes, and any interest thereon, are subordinated in right of payment to the senior notes. The indenture does not prevent holders of the senior notes from disposing of, or exercising any other rights with respect to, any or all of the collateral securing the senior notes. See "Risk Factors - Risk Factors Relating to the Notes – The Senior Subordinate Note Holders and Junior Note Holders Lack Priority in Payment on the Notes." Likewise, the indebtedness evidenced by the junior notes, and any interest thereon, are subordinated in right of payment to the senior subordinated notes. The indenture does not prevent holders of the senior subordinated notes from disposing of, or exercising any other rights with respect to, any or all of the collateral securing the senior subordinated notes. The notes are not guaranteed by any of our subsidiaries, affiliates or control persons.

In the event of any liquidation, dissolution or any other winding up of us, or of any receivership, insolvency, bankruptcy, readjustment, reorganization or similar proceeding under the U.S. Bankruptcy Code or any other applicable federal or state law relating to bankruptcy or insolvency, no payment may be made on the senior subordinated notes and junior notes until all the senior notes have been paid in full, and no payment may be made on the junior notes until all the senior notes and senior subordinated notes have been paid in full. If any of the above events occurs, holders of the senior notes may also submit claims on behalf of holders of the senior subordinated and junior notes and retain the proceeds for their own benefit until they have been fully paid, and any excess will be turned over to the holders of the senior subordinated notes and junior notes. If any distribution is nonetheless made to holders of the senior subordinated notes or junior notes, the money or property distributed to them must be paid over to the holders of the senior notes to the extent necessary to pay the senior notes in full.

In the event and during the continuation of any default in the payment of principal of or interest on the senior notes, we will not make any payment, direct or indirect, on the senior subordinated and junior notes unless and until (i) the default has been cured or waived or has ceased to exist or (ii) the end of the payment blockage period. Any payment blockage period will commence on the date the trustee receives written notice of default from a holder of the senior notes and will end on the earlier of (a) 179 days after the trustee's receipt of the notice of default; (b) the trustee's receipt of a valid waiver of default from the holders of the senior notes; or (c) the trustee's receipt of a written notice from the holders of the senior notes terminating the payment blockage period.

**CONFIDENTIAL**

L 21839
PLTF00016297

**Consolidation, Merger or Sale.** The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- we survive such merger or consolidation;

- such consolidation, merger or transfer is with one of our affiliates;

- the resulting or acquiring entity, if other than us, is organized and existing under the laws of a domestic jurisdiction and expressly assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the applicable indenture; and

- immediately after the transaction, and giving effect to the transaction, no event of default under the indenture exists.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, such successor entity may exercise our rights and powers under the indenture, in our name and we will be released from all our liabilities and obligations under the indenture and under the notes.

**Events Of Default.** The indenture provides that each of the following constitutes an event of default:

- a failure to pay interest on a note within 30 days after the due date for such payment (whether or not prohibited by the subordination provisions of the indenture);

- failure to pay principal on a note within 30 days after the due date for such payment (whether or not prohibited by the subordination provisions of the indenture);

- our failure to observe or perform any material covenant or our breach of any material representation or warranty, but only after we have been given notice of such failure or breach and such failure or breach is not cured within 60 days after our receipt of notice;

- certain events of bankruptcy, insolvency, liquidation or reorganization with respect to us, whether voluntary or involuntary; and

- any security interest granted to the Trustee on behalf of the Note Holders on any material portion of the Investments shall cease to be valid and effective.

If any event of default occurs and is continuing (other than an event of default involving certain events of bankruptcy or insolvency with respect to us) for a particular tranche of notes, the trustee or the holders of at least a majority in aggregate principal amount of the then outstanding notes for such tranche may declare the unpaid principal and any accrued interest on the notes to be due and payable immediately. In the case of an event of default arising from certain events of bankruptcy or insolvency, with respect to us, all outstanding notes will become due and payable without further action or notice.

Holders of the notes may not enforce the indenture or the notes except as provided in the indenture. Subject to certain limitations, holders of a majority in principal amount of the then outstanding notes for a particular tranche of notes may direct the trustee in its exercise of any trust or power. The trustee may withhold from holders of the notes notice of any continuing default or event of default (except a default or event of default relating to the payment of principal or interest) if the trustee in good faith determines that withholding notice would have no material adverse effect on the holders.

The holders of a majority in aggregate principal amount of the notes then outstanding for a particular tranche of notes by notice to the trustee may, on behalf of all holders of such tranche, waive any existing default or event of default and its consequences under the indenture, except a continuing default or event of default in the payment of interest on, or the principal of, a note.

- 13 -

CONFIDENTIAL

L 21840
PLTF00016298

**Amendment, Supplement And Waiver.** Except as provided in this memorandum or the indenture, the terms of the notes then outstanding may be amended or supplemented with the consent of the holders of at least a majority in aggregate principal amount of the notes affected by such amendment or supplement, and any existing default or compliance with any provision of the indenture or the notes may be waived with the consent of the holders of a majority in aggregate principal amount of the notes affected.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the notes held by a holder who has not consented if it has any of the following consequences:

- reduces the principal of or changes the fixed maturity of any note or alters the redemption provisions or the price at which we shall offer to redeem the note;

- reduces the rate of or changes the time for payment of interest on any note;

- makes any note payable in money other than that stated in the notes;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of notes to receive payments of principal of or interest on the notes;

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of notes; or

- makes any change in the foregoing amendment and waiver provisions.

Notwithstanding the foregoing, without the consent of any holder of the notes, we and the trustee may amend or supplement the indenture or the notes:

- to cure ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the notes in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional certificates; or

- to make any change that would provide any additional rights or benefits to the holders of the notes or that does not materially adversely affect the legal rights under the indenture of any such holder.

**The Trustee.** McGinn, Smith Capital Holdings Corp. has agreed to be the trustee for all of the notes under the indenture. McGinn, Smith Capital Holdings Corp. is an affiliate of our managing member, McGinn, Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc., and has been engaged to act as our servicing agent. Because of the trustee's affiliation with our managing member and its role as our servicing agent, you may not feel that you are adequately represented by the trustee in an event of default. In that instance, holders of 25% of the aggregate principal amount of all notes outstanding may vote to remove the trustee and replace it with a successor trustee.

As earlier stated, the trustee represents all three tranches of note holders. As a result, a conflict of interest may arise in situations where one tranche of note holders wishes the trustee to act in a way that is not beneficial to another tranche of note holders. If such conflict arises, holders of 25% of the aggregate principal amount of notes for a particular tranche may remove the trustee with respect to that tranche and appoint a successor trustee with respect to that tranche pursuant to the procedures set forth in the indenture.

Subject to certain exceptions, the holders of a majority in aggregate principal amount of notes for a particular tranche of notes will have the right to direct the time, method and place of conducting any proceeding or exercising any remedy available to the trustee. The indenture provides that in case an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs.

- 14 -

CONFIDENTIAL

L 21841
PLTF00016299

Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of notes, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

**Resignation or Removal of The Trustee.** The trustee may resign at any time, may be removed by the holders of 25% of the aggregate principal amount of all outstanding notes, or may be removed by the holders of 25% of the aggregate principal amount of notes of a particular tranche with respect to that tranche. In addition, upon the occurrence of contingencies relating generally to the insolvency of the trustee or the trustee's ineligibility to serve as trustee, we may remove the trustee or a court of competent jurisdiction may remove the trustee. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

**Reports To Trustee.** We will provide to the trustee reports containing any information reasonably requested by the trustee. These reports may include information on each note outstanding during the preceding quarter, including outstanding principal balance, interest credited and paid, transfers made, any redemption and interest rate paid.

**No Personal Liability of Our or Our Servicing Agent's Directors, Officers, Employees, Members and Stockholders.** None of our or our servicing agent's directors, officers, employees, incorporators, members or stockholders will have any liability for any of our obligations under the notes, the indenture or for any claim based on, in respect to, or by reason of, these obligations or their creation. Each holder of the notes waives and releases these persons from any liability. The waiver and release are part of the consideration for issuance of the notes. We have been advised that the waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the Securities and Exchange Commission that such a waiver is against public policy.

**Service Charges.** Our servicing agent may assess service charges for changing the registration of any note to reflect a change in name of the holder or transfers (whether by operation of law or otherwise) of a note by the holder to another person.

**Reports.** At the request of the holder, our servicing agent will provide to the holders of the notes our annual statement of the operations consisting of a balance sheet and income statement.

**Variations By State.** We may offer different securities and vary the terms and conditions of the offer (including, but not limited to, different interest rates and service charges for all notes) depending upon the state where the purchaser resides.

**Liquidity.** There is not currently a public market for the notes, and we do not expect that a public market for the notes will develop.

**Satisfaction and Discharge of Indenture.** The indenture shall cease to be of further effect upon the payment in full of all of the outstanding notes and upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding notes.

## PLAN OF DISTRIBUTION

McGinn, Smith & Co., Inc., as our placement agent, will solicit offers to purchase the notes, for which it will receive commissions equal to 2% of the purchase price of the notes. With respect to the minimum offering of $4,000,000, McGinn, Smith & Co., Inc., as our placement agent, has agreed to offer the notes on a "best efforts, all or none" basis, and on a "best efforts" basis thereafter until the earlier of the termination of the offering or the completion of the maximum offering. The offering period will extend until the earlier of (i) the sale of all of the notes, or (ii) December 31, 2003, provided that we have retained the right, in our discretion, and our placement agent has agreed in that event, to extend the offering period for up to six additional months. The placement agent is not obligated to purchase any of the notes. We have agreed to indemnify the placement agent and certain affiliated persons with respect to certain liabilities, including certain liabilities under the Securities Act. We also have agreed to reimburse the placement agent for reasonable expenses, including legal fees of its counsel. Affiliates of the placement agent may purchase a portion of the notes offered hereby.

CONFIDENTIAL

**L 21842**
PLTF00016300

The following table summarizes the compensation we will pay the placement agent for its services in selling the notes:

Form of Compensation

| | |
|---|---|
| Total commissions | $   400,000(1) |
| Reimbursement of expenses | $50,000 |

(1) Assumes the sale of 100% of aggregate principal amount of notes offered.

The placement agent agreement provides for reciprocal indemnification between us and the placement agent, including the placement agent's and our officers, directors and controlling persons, against civil liabilities in connection with this offering, including certain liabilities under the Securities Act. Insofar as indemnification for liabilities arising under the Securities Act may be permitted pursuant to such indemnification provisions, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

We are offering the notes without registration under the Securities Act in reliance upon an exemption afforded by Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.

The foregoing is a summary of the material provisions relating to selling and distribution of the notes in the placement agent agreement.

## OWNERSHIP STRUCTURE AND PRINCIPAL EQUITY HOLDERS

**History**

First Independent Income Notes, LLC, a New York limited liability company, was formed in 2003 for the purpose of identifying and acquiring various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our asset portfolio (individually an "Investment" and collectively, the "Investments").

**Principal Equity Holders of FIIN**

First Independent Income Notes, LLC is solely owned by our managing member, McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc.

**Key Governance Provisions**

Management of FIIN is vested in our managing member. Our managing member has authority to take all actions necessary or appropriate in connection with the operation and financing of FIIN. The managing member is solely responsible for finding suitable Investments and is paid an annual fee of 1% of the aggregate principal amount of the notes to make such decisions and manage our portfolio.

**Indemnification of Managing Member**

Our articles of operation provide that FIIN will indemnify and hold harmless our managing member from any loss or damage, including attorney's fees incurred by such managing member, relating to any action taken, or failed to be taken, on behalf of FIIN so long as the managing member acted in good faith. The managing member is not entitled to be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence.

- 16 -

**CONFIDENTIAL**

L 21843
PLTF00016301

## AFFILIATED TRANSACTIONS

Our managing member is McGinn, Smith Advisors, LLC, a New York limited liability company. McGinn, Smith Advisors, LLC is a wholly-owned subsidiary of McGinn, Smith Holdings, LLC, a New York limited liability company and an affiliate of this offering's placement agent, McGinn, Smith & Co., Inc. David L. Smith, who is 50% owner of McGinn, Smith Holdings Corp. and the President and Chief Executive Officer of our placement agent, McGinn, Smith & Co., Inc., is the principal officer of McGinn, Smith Advisors, LLC. We will pay our managing member 1% of the aggregate principal amount of the notes per year over the term of the notes to act as our portfolio manager and give us investment advice. In addition, we will pay incentive commissions to our managing member's salesmen at the rate of 2% of the aggregate principal amount of the notes per year over the term of the notes. We may acquire Investments from our managing member or an affiliate of our managing member that has purchased the Investments. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any of its affiliates, we will pay the same price for the Investment that we would have paid if we had purchased the Investment directly. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., Inc. is acting as underwriter or placement agent and for which McGinn, Smith & Co., Inc. will receive a commission.

Our servicing agent, McGinn, Smith Capital Holdings Corp., is an affiliate of our managing member, McGinn Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc. McGinn, Smith Capital Holdings Corp. is 50% owned by David L. Smith, principal officer of our managing member, McGinn, Smith Advisors, LLC, and President and Chief Executive Officer of our placement agent, McGinn, Smith & Co., Inc. We will pay our servicing agent a fee for administering the notes in the amount of 0.25% of the aggregate principal amount of the notes per year over the term of the notes.

The trustee under the indenture governing the notes is also McGinn, Smith Capital Holdings Corp., an affiliate of our managing member, McGinn Smith Advisors, LLC, and of our placement agent, McGinn, Smith & Co., Inc. McGinn, Smith Capital Holdings Corp. is 50% owned by David L. Smith, principal officer of our managing member, McGinn, Smith Advisors, LLC, and President and Chief Executive Officer of our placement agent, McGinn, Smith & Co., Inc.

## INVESTOR SUITABILITY REQUIREMENTS

**General**

An investment in the notes involves significant risks and is suitable only for persons of adequate financial means who have no need for liquidity with respect to their investment and who can bear the economic risk of a complete loss of their investment. This offering is made in reliance on exemptions from the registration requirements of the Securities Act and applicable state and foreign securities laws and regulations.

The suitability standards discussed below represent minimum suitability standards for prospective investors. The satisfaction of such standards by a prospective investor does not necessarily mean that the notes are a suitable investment for such prospective investor. Prospective investors are encouraged to consult their personal financial advisors to determine whether an investment in the notes is appropriate. We may reject subscriptions, in whole or in part, in our sole discretion.

We will require each investor to represent in writing that, among other things, (i) by reason of the investor's business or financial experience, or that of the investor's professional advisor, the investor is capable of evaluating the merits and risks of an investment in the notes and of protecting its own interests in connection with the transaction; (ii) the investor is acquiring the notes for its own account, for investment only and not with a view toward the resale or distribution thereof; (iii) the investor is aware that the notes have not been registered under the Securities Act or any state or foreign securities laws and that transfer thereof is restricted by the Securities Act, applicable state or foreign securities laws and the absence of a market for the notes; and (iv) such investor meets the suitability requirements set forth below.

**Suitability Requirements**

Each investor must represent in writing that it qualifies as an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act, and must demonstrate the basis for such qualification. To be an accredited investor, an investor must fall within any of the following categories at the time of the sale of the notes to that investor:

- 17 -

L 21844
PLTF00016302

- a bank as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity, a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; an insurance company as defined in Section 2(13) of the Securities Act; an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(48) of that Act; a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of the Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

- a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940,

- an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended; a corporation; a Massachusetts or similar business trust; or a partnership; in each case, not formed for the specific purpose of acquiring the notes and with total assets in excess of $5,000,000;

- a manager, member or executive officer of FIIN;

- a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of such person's purchase of the notes, exceeds $1,000,000;

- a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

- a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the notes, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D; or

- any entity in which all of the equity owners are accredited investors.

In order to meet the conditions for exemptions from the registration requirements under the securities laws of certain jurisdictions, investors who are residents of such jurisdictions may be required to meet additional suitability requirements.

## WHERE YOU CAN FIND MORE INFORMATION

Upon request of a prospective investor, we will make available to such investor the opportunity to ask questions of and receive answers from us concerning the terms and conditions of the offering. Further, we will, subject to confidentiality agreements and other considerations, obtain and make available additional information reasonably requested by such investor to the extent we possess such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of any of the information concerning the terms and conditions of the offering or any of the transactions referred to herein.

Copies of our certificate of formation, operating agreement and certain other documents referred to in this memorandum are available from the placement agent upon request.

CONFIDENTIAL

L 21845
PLTF00016303

**EXHIBIT A**

**FORM OF INVESTOR QUESTIONNAIRE**

**CONFIDENTIAL**

**L 21846**
PLTF00016304

**CONFIDENTIAL**

**PURCHASER QUESTIONNAIRE FOR INDIVIDUALS**

**FIRST INDEPENDENT INCOME NOTES, LLC**
**(A New York Limited Liability Company)**

The offering is being made pursuant to Regulation D under the Securities Act of 1933 (the "Act"). One of the requirements of the Regulation is that the persons involved in the offering and sale of the securities must have reasonable grounds to believe:

      (i)    that the Offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment;

      (ii)   the undersigned is acquiring the Notes for investment purposes only and not with a view towards resale; and

      (iii)  the undersigned is aware that this offering will involve Notes for which no resale market exists, thereby requiring this investment to be maintained for the stated term of each Note.

Your answers will, at all times, be kept strictly confidential; however, each party who signs the questionnaire hereby agrees that the Company may present this questionnaire to such parties as may seem appropriate in order to insure that the offer and sale of the Notes to you will not result in violation of any exemption from registration under the Act which may be relied upon by the Company in connection with the sale of the Notes.

Please complete this questionnaire as thoroughly as possible and sign, date and return to the Company c/o McGinn, Smith & Co., Inc., 5th Floor, 99 Pine Street, Albany, New York 12207.

Please print or type:

Name: _____

Home Address: _____

_____

Date of Birth: _____

Social Security No.: _____

Occupation: _____

Business Address: _____

Business Telephone: _____

Home Telephone: _____

Communications should be sent to:

Home Address _____      or      Business Address _____

1.      What is your approximate net worth?

              _____ $50,000 - $100,000
              _____ $100,000 - $250,000
              _____ $250,000 - $500,000
              _____ $500,000 - $1,000,000

- A-1 -

**L 21847**
PLTF00016305

_____Greater than $1,000,000

2.      Did your individual income exceed $200,000.00 in 2001 and 2002, or did your joint income with   your      spouse exceed $300,000.00 in each of those years?

Yes _____          No_____

3.      If the answer to #2 above is "yes", do you expect to reach the same income level in 2003?

Yes _____          No _____

4.      What was your approximate gross income for calendar year 2002?

_____ $25,000 - $100,000
_____ $100,000 - $200,000
_____ $200,000 - $300,000
_____ $300,000 - $500,000
_____ Greater than $500,000

5.      What will your approximate gross income be for calendar year 2003?

_____ $25,000 - $100,000
_____ $100,000 - $200,000
_____ $200,000 - $300,000
_____ $300,000 - $500,000
_____ Greater than $500,000

6.      I understand that in order to qualify as a purchaser of Notes, I must have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company or I must engage an attorney, accountant or other financial advisor for the purpose of this particular transaction.

I hereby represent, by initialing on the Representation A or Representation B line below, that:

A.      I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of an investment in the Notes and will not require a Purchase Representative.

Representation A._____

B.      I have relied upon the advice of the following Purchaser Representative(s) in evaluating the merits and risks of an investment in the Notes:

Representation B._____

_____          _____
Name                                              Name

_____          _____
Relationship                                    Relationship

To the best of my information and belief, the above information is accurate and complete in all respects. I agree to notify the Company promptly of any changes which occur prior to sale of the Notes.

Purchaser:                                     Date:

_____          _____
Name (printed)

_____
Signature

- A-1 -

CONFIDENTIAL

L 21848
PLTF00016306

<u>**CONFIDENTIAL**</u>

**PURCHASER QUESTIONNAIRE FOR CORPORATIONS AND PARTNERSHIPS**

**FIRST INDEPENDENT INCOME NOTES, LLC**
**(A New York Limited Liability Company)**

The offering is being made pursuant to Regulation D under the Securities Act of 1933 (the "Act"). One of the requirements of the Regulation is that the persons involved in the offering and sale of the securities must have reasonable grounds to believe either:

      (i)   that the Offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment; or

      (ii)   that the Offeree and its Offeree Representative(s), together, have such knowledge and experience in financial and business matters, that they are capable of evaluating the merits and risks of the prospective investment and that the Offeree is able to bear the economic risk of the invest.

The purpose of this Questionnaire is to assist FIRST INDEPENDENT INCOME NOTES, LLC (the "Company") in complying with the above requirement.

Please contact McGinn, Smith & Co, Inc., 5th Floor, 99 Pine Street, Albany, New York 12207 (518-449-5131) if you have any questions in answering this questionnaire.

If the answer to any questions is "None" or "Not Applicable", please so state.

Your answers will, at all times, be kept strictly confidential; however, each party who signs the Questionnaire hereby agrees that the Company may present this Questionnaire to such parties as may seem appropriate in order to insure that the offer and sale of the Notes to you will not result in violation of any exemption from registration under the Act which may be relied upon by the Company in connection with the sale of the Notes.

Please complete this Questionnaire as thoroughly as possible and sign, date and return one (1) copy to the Company c/o McGinn, Smith & Co., Inc., 5th Floor, 99 Pine Street, Albany, New York 12207.

Please print or type:

Name of Organization: _____

Business Address: _____

Business Telephone: _____

Federal ID Number: _____

1.    Was the organization formed for the specific purpose of acquiring the Company's Notes?

        Yes_____           No_____

2.    Does the organization possess total assets in excess of $5,000,000?

        Yes_____           No_____

3.    Does each equity owner of the organization:

    A. Have a net worth, exclusive of home, furnishings, and automobiles, of at least $1,000,000?

        Yes_____           No_____

- A-1 -

**CONFIDENTIAL**

L 21849
PLTF00016307

B.  Have an individual net income in excess of $200,000 in 2001 and 2002, or joint income with that person's spouse in excess of $300,000 in each of those years, and have a reasonable expectation of reaching the same income level in 2003?

       Yes_____          No_____

4.     I am aware that the Notes proposed to be offered will not be readily marketable or transferable.

       Yes_____          No_____

5.     The organization can afford the complete loss of its investments in the Notes and has no need for liquidity in this investment.

       Yes_____          No_____

6.     Stated below are the organization's previous investments in similar securities and other private placements during the past five years:

_____

_____

_____

7.     I understand that, unless the organization satisfies certain criteria, in order to qualify as a purchaser of Notes, I must have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company or I must engage an attorney, accountant or other financial advisor for the purpose of this particular transaction.

I hereby represent, by initialing on the Representation A or Representation B line below, that:

A.     I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of an investment in the Notes and will not require a Purchase Representative.

               Representation A._____

B.     I have relied upon the advice of the following Purchaser Representative(s) in evaluating the merits and risks of an investment in the Notes:

               Representation B._____

_____     _____

Name                             Name

_____     _____

Relationship                     Relationship

     To the best of my information and belief, the above information is accurate and complete in all respects.  I agree to notify the Company promptly of any changes which occur prior to sale of the Company's Notes.

Purchaser:                    Date:

_____     _____

Print Name of Organization

By:
Title

- A-1 -

CONFIDENTIAL

L 21850
PLTF00016308

## PURCHASER REPRESENTATIVE QUESTIONNAIRE

### FIRST INDEPENDENT INCOME NOTES, LLC

The information contained herein is being furnished to **FIRST INDEPENDENT INCOME NOTES, LLC** (the "Company") in order to facilitate a determination as to whether the undersigned may act as a Purchaser Representative, as such term is used in Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"), in connection with the proposed offer and sale by the Company of its Notes. The answers below are correct, and the Trustee is entitled to rely on them in making the foregoing determination.

### REPRESENTATIONS

I represent, warrant and covenant to you that:

(a)  the information contained herein is complete and accurate and may be relied upon by you in determining whether I may act as a Purchaser Representative pursuant to Regulation D in connection with offers and sales of the Notes;

(b)  I will notify you immediately of any material change in any of such information occurring within ninety (90) days of the close of sale of the Notes to the Purchaser;

(c) (i)  I have been designated, or will be designated, pursuant to the Purchaser Questionnaire of each Purchaser, as the Purchaser Representative of such Purchaser, in connection with evaluating the merits and risks of his prospective investment in the Notes;

(ii)  I have disclosed or will disclose, to each Purchaser, in writing, prior to the designation referred to above, any material relationship between me or my affiliates and the Company, which now exists or is mutually understood to be contemplated, or which has existed at any time during the previous two (2) years, and any compensation received as a result of such relationship, including any compensation received in connection the offering of Notes herein; and

(iii)  I will deliver to each of you a counterpart of the disclosure statement referred to in (ii) above, and such other documents or information as each of you may request relating to the performance by me of my duties as a Purchaser Representative.

*(Attach additional sheets if required)*

1.   Name: _____

   Age: _____

   Social Security No.: _____

2.   Names of offerees I am representing:

   _____

   _____

   _____

3.   Firm name: _____

   Empl. Iden. No.: _____

   Position: _____

   Nature of Duties: _____

   Business Address: _____

- A-1 -

**CONFIDENTIAL**

**L 21851**
PLTF00016309

Business telephone number:  (_____) _____

4.   Prior occupations or positions during the past five years:

_____

_____

_____

_____

5.   Description of prior experience in advising clients with respect to investments, including a description of the types of investments, the dollar amounts involved, and the number of years of experience which you have in financial, business and tax oriented matters:

General Investments (specify)

_____

_____

_____

Private Placements (specify)

_____

_____

Other Investments (specify)

_____

_____

6.   The Professional licenses or registrations (including bar admissions, accounting licenses, real estate brokerage licenses, broker-dealer or investments advisory registrations) held by me are as follows:

| Registration | Year Received | Is License or Registration Still Effective? |
|---|---|---|
|  |  |  |
|  |  |  |

7.   My educational background, including degrees obtained and date of attendance:

_____

_____

8.   (a) Neither I nor any of my affiliates now have or have had any material relationship with the Company or any of its affiliates, are not affiliates or the Company, and no such relationship is contemplated in the future, except as follows:

_____

_____

(b) The amounts of compensation received or to be received as a result of the material relationship(s) described in Item 8(a)(including any compensation received or to be received in connection with this transaction) are as follows:

_____

- A-1 -

**CONFIDENTIAL**

L 21852
PLTF00016310

_____
_____

9.   Neither I nor any of my affiliates own beneficially any interest in the Company except as follows:

_____
_____

10.   I have received and read the Company's Private Placement Memorandum dated September 15, 2003 and Exhibits thereto and have reviewed it with the Offeree.

11.   Other comments or disclosures:

_____
_____

_____
Purchaser Representative Signature

_____
Type Purchaser Representative Name

_____
Firm Name

_____
Street Address

_____
City and State

( _____ ) _____
Telephone

Acknowledgement of Investor(s)

I acknowledge receipt of the foregoing disclosures this _____ day of _____, 2003, and this represents my acknowledgment in writing to the Company that I have read the foregoing and desire that the above stated person serve as my Purchaser Representative with respect to the offering of the Company's Notes.

_____
Investor's Signature

_____
Investor's Signature

_____
Investor's Signature

- A-1 -

**CONFIDENTIAL**

L 21853
PLTF00016311

**EXHIBIT B**

**FORM OF SUBSCRIPTION AGREEMENT**

**CONFIDENTIAL**

Read Carefully Before Signing

## SUBSCRIPTION AGREEMENT FOR THE PURCHASE OF
## NOTES OF FIRST INDEPENDENT INCOME NOTES, LLC

The undersigned hereby subscribes for $ _____ principal amount of ____ (A) 5% Secured Senior Notes Due 2004 ("Original Senior Notes"); ____ (B) 7.5% Secured Senior Subordinated Notes Due 2008 ("Senior Subordinated Notes"); ____ (C) 10.25% Secured Junior Notes Due 2008 ("Junior Notes"); or ____ (D) One-year Secured Senior Notes Due 2005/2006/2007/2008 at an interest rate of the then current prime rate + 1% ("Additional Senior Notes" and together with the Original Senior Notes, Senior Subordinated Notes and Junior Notes, the "Notes") of First Independent Income Notes, LLC (the "Company") at a purchase price equal to the principal amount of Notes being subscribed for (the "Offering").

The Company is offering up to $20,000,000 principal amount of Notes to purchasers who qualify as "accredited investors" as the term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), through McGinn, Smith & Co., Inc. ("MS"). The entire purchase price is due and payable upon the execution of this Subscription Agreement, and shall be paid by check, subject to collection, or by wire transfer, made payable to the order of "CharterOne Bank, FSB, Escrow Agent for First Independent Income Notes, LLC." CharterOne Bank, FSB, the escrow agent (the "Escrow Agent") shall disburse the proceeds in accordance with the terms of the Escrow Agreement between the Company and the Escrow Agent, which are consistent with the terms of this Agreement. The Company shall have the right to reject this subscription in whole or in part.

**Prospective Investors should retain their own professional advisors to review and evaluate the economic, tax and other consequences of an investment in the Company.**

**THE SECURITIES OFFERED PURSUANT TO A CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DATED SEPTEMBER 15, 2003, AND EXHIBITS ATTACHED THERETO (COLLECTIVELY, THE "OFFERING MATERIALS"), HAVE NOT BEEN FILED OR REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING MATERIALS. NO STATE SECURITIES LAW ADMINISTRATOR HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR THE ADEQUACY OF THE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

**IT IS INTENDED THAT THE SECURITIES OFFERED HEREBY WILL BE MADE AVAILABLE ONLY TO ACCREDITED INVESTORS, AS DEFINED IN RULE 501 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE SECURITIES OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS FOR NON-PUBLIC OFFERING. SUCH EXEMPTIONS LIMIT THE NUMBER AND TYPES OF INVESTORS TO WHICH THE OFFERING WILL BE MADE AND RESTRICT SUBSEQUENT TRANSFER OF THE INTERESTS.**

## CONFIDENTIAL INFORMATION

**THE INFORMATION CONTAINED IN THE MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY TO THE COMPANY AND BEING SUBMITTED TO PROSPECTIVE INVESTORS SOLELY FOR SUCH INVESTORS' CONFIDENTIAL USE WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT THE PRIOR WRITTEN PERMISSION OF THE COMPANY, SUCH PERSONS WILL NOT RELEASE THIS DOCUMENT OR DISCUSS THE INFORMATION CONTAINED HEREIN OR**

L 21855
PLTF00016313

MAKE REPRODUCTIONS OF OR USE THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN EVALUATING A POTENTIAL INVESTMENT IN THE SECURITIES.

THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

WE DRAW YOUR ATTENTION TO THE ANTI-FRAUD PROVISIONS OF THE FEDERAL AND STATE SECURITIES LAWS, PARTICULARLY RULE 10b-5 UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, WHICH PROHIBITS THE PURCHASE OR SALE OF SECURITIES ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION.  IN LIGHT OF THESE PROVISIONS, INCLUDING RULE 10b-5, WE ADVISE YOU THAT, IF YOU ARE IN POSSESSION OF MATERIAL INFORMATION RELATING TO THE COMPANY WHICH YOU KNOW OR HAVE REASON TO KNOW IS NON-PUBLIC, YOU SHOULD NOT PURCHASE OR SELL OR CAUSE TO BE PURCHASED OR SOLD ANY OF THE COMPANY'S SECURITIES. IN ADDITION, YOU SHOULD NOT DISCLOSE ANY OF SUCH INFORMATION UNLESS AND UNTIL SUCH INFORMATION HAS BEEN PUBLICLY DISCLOSED.

THE MEMORANDUM CONSTITUTES AN OFFER ONLY TO THE OFFEREE TO WHOM THE MEMORANDUM IS INITIALLY DISTRIBUTED AND DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY BY ANYONE IN ANY COUNTRY OR STATE IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.  THE COMPANY AND THE PLACEMENT AGENT RESERVE THE RIGHT TO ACCEPT OR REJECT ANY SUBSCRIPTION FOR SECURITIES, IN WHOLE OR IN PART, OR TO ALLOT TO ANY PROSPECTIVE INVESTOR FEWER THAN THE NUMBER OF SECURITIES SUCH INVESTOR DESIRES TO PURCHASE.

IN DECIDING WHETHER TO PURCHASE SECURITIES, EACH INVESTOR MUST CONDUCT AND RELY ON ITS OWN EVALUATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE SECURITIES.  PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY, OR ANY PROFESSIONAL ASSOCIATED WITH THE OFFERING, AS LEGAL OR TAX ADVICE.  THE OFFEREE AUTHORIZED TO RECEIVE THE MEMORANDUM SHOULD CONSULT ITS OWN TAX COUNSEL, ACCOUNTANT OR BUSINESS ADVISOR, RESPECTIVELY, AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING ITS PURCHASE OF THE SECURITIES.

THE INFORMATION PRESENTED HEREIN WAS PREPARED BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN SUPPLIED BY THE COMPANY AND HAS BEEN INCLUDED HEREIN IN RELIANCE ON THE COMPANY.  THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS, BELIEVED BY THE COMPANY TO BE ACCURATE, BUT REFERENCE IS HEREBY MADE TO SUCH DOCUMENTS FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO.  COPIES OF SUCH DOCUMENTS ARE AVAILABLE AT THE OFFICES OF THE COMPANY.  ALL OF SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE.

EXCEPT AS OTHERWISE INDICATED, THE MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL,

L 21856
PLTF00016314

UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGES IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO GENERAL SOLICITATION WILL BE CONDUCTED AND NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM WILL OR MAY BE EMPLOYED IN THE OFFERING OF THE NOTES, EXCEPT FOR THIS MEMORANDUM (INCLUDING AMENDMENTS OR SUPPLEMENTS HERETO) AND THE DOCUMENTS SUMMARIZED HEREIN. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS SUMMARIZED HEREIN AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.

BY ACCEPTING DELIVERY OF ANY OFFERING MATERIAL, THE OFFEREE AGREES (I) TO KEEP CONFIDENTIAL THE CONTENTS THEREOF, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH OFFEREE OF A POTENTIAL PRIVATE INVESTMENT IN THE COMPANY, AND (II) TO RETURN THE SAME TO THE PLACEMENT AGENT IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES, (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN. THE COMPANY WILL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR, PRIOR TO THE CLOSING, THE OPPORTUNITY TO ASK QUESTIONS OF AND TO RECEIVE ANSWERS FROM REPRESENTATIVES OF THE COMPANY CONCERNING THE COMPANY OR THE TERMS AND CONDITIONS OF THE OFFERING AND TO OBTAIN ANY ADDITIONAL RELEVANT INFORMATION TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. INVESTORS AGREE TO ADVISE THE COMPANY IN WRITING IF THEY ARE RELYING UPON ANY SUCH INFORMATION.

<u>FOR RESIDENTS OF ALL STATES</u>

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATIONS TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF SECURITIES, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE UNDERSIGNED ACKNOWLEDGES THAT THE NOTES HAVE NOT BEEN REGISTERED UNDER THE ACT, OR THE SECURITIES LAWS OF ANY STATE, THAT THE NOTES ARE BEING PURCHASED FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, NOR WITH THE INTENTION OF SELLING, TRANSFERRING OR OTHERWISE DISPOSING OF ALL OR ANY PART OF SUCH NOTES FOR ANY PARTICULAR PRICE, OR AT ANY PARTICULAR TIME, OR UPON THE HAPPENING OF ANY PARTICULAR EVENT OR CIRCUMSTANCES, EXCEPT SELLING, TRANSFERRING, OR DISPOSING OF SAID NOTES MADE IN FULL COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE SECURITIES ACT, THE RULES AND REGULATIONS PROMULGATED BY THE COMMISSION THEREUNDER, AND APPLICABLE STATE SECURITIES LAWS; AND THAT SUCH NOTES MUST BE HELD

L 21857
PLTF00016315

INDEFINITELY UNLESS THE NOTES ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE, AND WILL REQUIRE AN OPINION OF COUNSEL THAT REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OR SUCH STATE SECURITIES LAWS.

**CONFIDENTIAL**

L 21858
PLTF00016316

1. The undersigned represents, warrants, and agrees as follows:

(a) The undersigned agrees that this Agreement is and shall be irrevocable.

(b) The undersigned has carefully read the Offering Materials, all of which the undersigned acknowledges have been provided to the undersigned. The undersigned has been given the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of this Offering and the Offering Materials and to obtain such additional written information, to the extent the Company possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of same as the undersigned desires in order to evaluate the investment. The undersigned further acknowledges that he, she or it fully understands the Offering Materials, and the undersigned has had the opportunity to discuss any questions regarding any of the Offering Materials with his, her or its counsel or other advisor(s). Notwithstanding the foregoing, the only information upon which the undersigned has relied is that set forth in the Offering Materials and his, her or its own independent investigation. The undersigned acknowledges that the undersigned has received no representations or warranties from the Company, or its employees or agents in making this investment decision other than as set forth in the Offering Materials.

(c) The undersigned is aware that the purchase of Notes is a speculative investment involving a high degree of risk and that there is no guarantee that the undersigned will realize any gain from this investment, and that the undersigned could lose the total amount of the undersigned's investment.

(d) The undersigned understands that no federal or state agency has made any finding or determination regarding the fairness of this offering for investment, or any recommendation or endorsement of the Offering.

(e) The undersigned is acquiring the Notes for the undersigned's own account, with the intention of holding the Notes, with no present intention of dividing or allowing others to participate in this investment or of reselling or otherwise participating, directly or indirectly, in a distribution of the Notes, and shall not make any sale, transfer, or pledge thereof without registration under the Securities Act and any applicable securities laws of any state or unless an exemption from registration is available under those laws.

(f) The undersigned represents that the undersigned, if an individual, has adequate means of providing for his or her current needs and personal and family contingencies and has no need for liquidity in this investment in the Notes. The undersigned represents that the undersigned is an "Accredited Investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. The undersigned has no reason to anticipate any material change in his or her personal financial condition for the foreseeable future.

(g) The undersigned is financially able to bear the economic risk of this investment, including the ability to hold the Notes indefinitely or to afford a complete loss of his, her or its investment in the Notes.

(h) The undersigned represents that the undersigned's overall commitment to investments, which are not readily marketable, is not disproportionate to the undersigned's net worth, and the undersigned's investment in the Notes will not cause such overall commitment to become excessive. The undersigned realizes that in the view of the Commission, a purchase now with a present intent to resell by reason of a foreseeable specific contingency or any anticipated change in the market value, or in the condition of the Company, or that of the industry in which the business of the Company is engaged or in connection with a contemplated liquidation, or settlement of any loan obtained by the undersigned for the acquisition of the Notes, and for which such Notes may be pledged as security or as donations to religious or charitable institutions for the purpose of securing a deduction on an income tax return, would, in fact, represent a purchase with an intent inconsistent with the undersigned's representations to the Company and the Commission would then regard such sale as a sale for which the exemption from registration is not available. The undersigned will not pledge, transfer or assign this Agreement.

(i) FOR PARTNERSHIPS, CORPORATIONS, TRUSTS, OR OTHER ENTITIES ONLY: If the undersigned is a partnership, corporation, trust or other entity, (i) the undersigned has enclosed with this Agreement appropriate evidence of the authority of the individual executing this Agreement to act on its behalf (e.g., if a trust, a certified copy of the trust agreement; if a corporation, a certified corporate resolution authorizing the signature and a certified copy of the articles of incorporation; or if a partnership, a certified copy of the partnership agreement), (ii) the undersigned represents and warrants that it was not organized or reorganized for the specific

L 21859
PLTF00016317

purpose of acquiring Notes, (iii) the undersigned has the full power and authority to execute this Agreement on behalf of such entity and to make the representations and warranties made herein on its behalf, and (iv) this investment in the Company has been affirmatively authorized, if required, by the governing board of such entity and is not prohibited by the governing documents of the entity.

(j)    The undersigned has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Notes.

(k)    The undersigned acknowledges that the certificates for the Notes ("Certificates") which the undersigned will receive will contain a legend substantially as follows:

**THE SECURITIES WHICH ARE REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND MAY NOT BE SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNTIL A REGISTRATION STATEMENT WITH RESPECT THERETO IS DECLARED EFFECTIVE UNDER SUCH ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE COMPANY THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT IS AVAILABLE.**

2.    The undersigned expressly acknowledges and agrees that the Company is relying upon the undersigned's representations contained in the Offering Materials.

3.    The undersigned subscriber acknowledges that the undersigned understands the meaning and legal consequences of the representations and warranties which are contained herein and hereby agrees to indemnify, save and hold harmless the Company, and its officers, directors and counsel, from and against any and all claims or actions arising out of a breach of any representation, warranty or acknowledgment of the undersigned contained in any of the Offering Materials. Such indemnification shall be deemed to include not only the specific liabilities or obligations with respect to which such indemnity is provided, but also all reasonable costs, expenses, counsel fees and expenses of settlement relating thereto, whether or not any such liability or obligation shall have been reduced to judgment.

4.    The undersigned acknowledges that MS will receive a commission equal to 2% of the principal amount of the Certificate being purchased for acting as a placement agent in the Offering.

5.    The Company has been duly and validly organized and is validly existing and in good standing as a limited liability company under the laws of the State of New York. The Company has all requisite power and authority, and all necessary authorizations, approvals and orders required as of the date hereof to conduct its business and to enter into this Subscription Agreement and the other Offering Materials and to be bound by the provisions and conditions hereof or therein.

6.    Except as otherwise specifically provided for hereunder, no party shall be deemed to have waived any of his or her or its rights hereunder or under any other agreement, instrument or papers signed by any of them with respect to the subject matter hereof unless such waiver is in writing and signed by the party waiving said right. Except as otherwise specifically provided for hereunder, no delay or omission by any party in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion. All rights and remedies with respect to the subject matter hereof, whether evidenced hereby or by any other agreement, instrument, or paper, will be cumulative, and may be exercised separately or concurrently.

7.    The parties have not made any representations or warranties with respect to the subject matter hereof not set forth herein, and this Agreement, together with any instruments executed simultaneously herewith,

**CONFIDENTIAL**

constitutes the entire agreement between them with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Agreement, which alone fully and completely expresses their agreement.

8. This Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Agreement.

9. The parties agree to execute any and all such other and further instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intent and purposes hereof.

10. If any provision or any portion of any provision of this Agreement or the application of any such provision or any portion thereof to any person or circumstance, shall be held invalid or unenforceable, the remaining portion of such provision and the remaining portion of such provision as is held invalid or unenforceable to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

11. This Agreement shall be governed by and construed in accordance with the laws of the State of New York and the undersigned hereby consents to the jurisdiction of the courts of the State of New York and/or the United States District Court for the Southern District of New York

**CONFIDENTIAL**

**L 21861**
PLTF00016319

ALL SUBSCRIBERS MUST COMPLETE THIS PAGE

Print Exact Name in Which Title is to be Held

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement on this

____ day of _____ 2003.

1.  |___| Individual

2.  |___| Joint Tenants with
        Right of Survivorship

3.  |___|  Community Property

4.  |___| Tenants in Common

5.  |___| Corporation/Partnership

6.  |___|  IRA
    of_____

7.  |___|  Trust
        Date Opened

    _____

8.  |___|  As A Custodian
        For

    _____
    Under the Uniform
    Gift to Minors Act of
    the State of

    _____

**L 21862**

**CONFIDENTIAL**

PLTF00016320

**EXECUTION BY SUBSCRIBER WHICH IS A CORPORATION,
PARTNERSHIP, TRUST, ETC.**

_____
Exact Name in Which Title is to be Held

_____
(Signature)

_____
Name (Please Print)

_____
Residence: Number and Street

_____
City                          Zip Code                State

_____
Social Security Number or Tax ID Number

Accepted this _____ day of _____, 2003, on behalf of First Independent Income Notes, LLC.


By:_____
   David L. Smith

**CONFIDENTIAL**

L 21863
PLTF00016321

EXECUTION BY SUBSCRIBER WHO IS A NATURAL PERSON

_____

Exact Name in Which Title is to be Held

_____

(Signature)

_____

Name (Please Print)

_____

Residence: Number and Street

_____

City                                State

                                Zip Code

_____

Social Security Number

Accepted this _____ day of _____, 2003, on behalf of First Independent Income Notes, LLC.

By: _____

     David L. Smith

- B-1 -

**CONFIDENTIAL**

**L 21864**

PLTF00016322

# **<u>EXHIBIT 2</u>**

*READ CAREFULLY BEFORE SIGNING*

## SUBSCRIPTION AGREEMENT FOR THE PURCHASE OF
## NOTES OF FIRST INDEPENDENT INCOME NOTES, LLC

The undersigned hereby subscribes for $ 25000 principal amount of ____ (A) 5% Secured Senior Notes Due 2004 ("Original Senior Notes"); ____ (B) 7.5% Secured Senior Subordinated Notes Due 2008 ("Senior Subordinated Notes"); ____ (C) 10.25% Secured Junior Notes Due 2008 ("Junior Notes"); or X (D) One-year Secured Senior Notes Due 2005/2006/2007/2008 at an interest rate of the then current prime rate + 1% ("Additional Senior Notes" and together with the Original Senior Notes, Senior Subordinated Notes and Junior Notes, the "Notes") of **First Independent Income Notes, LLC** (the "Company") at a purchase price equal to the principal amount of Notes being subscribed for (the "Offering").

The Company is offering up to $20,000,000 principal amount of Notes to purchasers who qualify as "accredited investors" as the term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), through McGinn, Smith & Co., Inc. ("MS"). The entire purchase price is due and payable upon the execution of this Subscription Agreement, and shall be paid by check, subject to collection, or by wire transfer, made payable to the order of "CharterOne Bank, FSB, Escrow Agent for First Independent Income Notes, LLC." CharterOne Bank, FSB, the escrow agent (the "Escrow Agent") shall disburse the proceeds in accordance with the terms of the Escrow Agreement between the Company and the Escrow Agent, which are consistent with the terms of this Agreement. The Company shall have the right to reject this subscription in whole or in part.

**Prospective Investors should retain their own professional advisors to review and evaluate the economic, tax and other consequences of an investment in the Company.**

**THE SECURITIES OFFERED PURSUANT TO A CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DATED SEPTEMBER 15, 2003, AND EXHIBITS ATTACHED THERETO (COLLECTIVELY, THE "OFFERING MATERIALS"), HAVE NOT BEEN FILED OR REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING MATERIALS. NO STATE SECURITIES LAW ADMINISTRATOR HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR THE ADEQUACY OF THE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

**IT IS INTENDED THAT THE SECURITIES OFFERED HEREBY WILL BE MADE AVAILABLE ONLY TO ACCREDITED INVESTORS, AS DEFINED IN RULE 501 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE SECURITIES OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS FOR NON-PUBLIC OFFERING. SUCH EXEMPTIONS LIMIT THE NUMBER AND TYPES OF INVESTORS TO WHICH THE OFFERING WILL BE MADE AND RESTRICT SUBSEQUENT TRANSFER OF THE INTERESTS.**

## CONFIDENTIAL INFORMATION

**THE INFORMATION CONTAINED IN THE MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY TO THE COMPANY AND BEING SUBMITTED TO PROSPECTIVE INVESTORS SOLELY FOR SUCH INVESTORS' CONFIDENTIAL USE WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT THE PRIOR WRITTEN PERMISSION OF THE COMPANY, SUCH PERSONS WILL NOT RELEASE THIS DOCUMENT OR DISCUSS THE INFORMATION CONTAINED HEREIN OR MAKE REPRODUCTIONS OF OR USE THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN EVALUATING A POTENTIAL INVESTMENT IN THE SECURITIES.**



EXHIBIT
2
10-30-15 JH

THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

WE DRAW YOUR ATTENTION TO THE ANTI-FRAUD PROVISIONS OF THE FEDERAL AND STATE SECURITIES LAWS, PARTICULARLY RULE 10b-5 UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, WHICH PROHIBITS THE PURCHASE OR SALE OF SECURITIES ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION. IN LIGHT OF THESE PROVISIONS, INCLUDING RULE 10b-5, WE ADVISE YOU THAT, IF YOU ARE IN POSSESSION OF MATERIAL INFORMATION RELATING TO THE COMPANY WHICH YOU KNOW OR HAVE REASON TO KNOW IS NON-PUBLIC, YOU SHOULD NOT PURCHASE OR SELL OR CAUSE TO BE PURCHASED OR SOLD ANY OF THE COMPANY'S SECURITIES. IN ADDITION, YOU SHOULD NOT DISCLOSE ANY OF SUCH INFORMATION UNLESS AND UNTIL SUCH INFORMATION HAS BEEN PUBLICLY DISCLOSED.

THE MEMORANDUM CONSTITUTES AN OFFER ONLY TO THE OFFEREE TO WHOM THE MEMORANDUM IS INITIALLY DISTRIBUTED AND DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY BY ANYONE IN ANY COUNTRY OR STATE IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION. THE COMPANY AND THE PLACEMENT AGENT RESERVE THE RIGHT TO ACCEPT OR REJECT ANY SUBSCRIPTION FOR SECURITIES, IN WHOLE OR IN PART, OR TO ALLOT TO ANY PROSPECTIVE INVESTOR FEWER THAN THE NUMBER OF SECURITIES SUCH INVESTOR DESIRES TO PURCHASE.

IN DECIDING WHETHER TO PURCHASE SECURITIES, EACH INVESTOR MUST CONDUCT AND RELY ON ITS OWN EVALUATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE SECURITIES. PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY, OR ANY PROFESSIONAL ASSOCIATED WITH THE OFFERING, AS LEGAL OR TAX ADVICE. THE OFFEREE AUTHORIZED TO RECEIVE THE MEMORANDUM SHOULD CONSULT ITS OWN TAX COUNSEL, ACCOUNTANT OR BUSINESS ADVISOR, RESPECTIVELY, AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING ITS PURCHASE OF THE SECURITIES.

THE INFORMATION PRESENTED HEREIN WAS PREPARED BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN SUPPLIED BY THE COMPANY AND HAS BEEN INCLUDED HEREIN IN RELIANCE ON THE COMPANY. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS, BELIEVED BY THE COMPANY TO BE ACCURATE, BUT REFERENCE IS HEREBY MADE TO SUCH DOCUMENTS FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO. COPIES OF SUCH DOCUMENTS ARE AVAILABLE AT THE OFFICES OF THE COMPANY. ALL OF SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE.

EXCEPT AS OTHERWISE INDICATED, THE MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT

PLTF00000025

L 10537

THERE HAS BEEN NO CHANGES IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO GENERAL SOLICITATION WILL BE CONDUCTED AND NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM WILL OR MAY BE EMPLOYED IN THE OFFERING OF THE NOTES, EXCEPT FOR THIS MEMORANDUM (INCLUDING AMENDMENTS OR SUPPLEMENTS HERETO) AND THE DOCUMENTS SUMMARIZED HEREIN.  NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS SUMMARIZED HEREIN AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.

BY ACCEPTING DELIVERY OF ANY OFFERING MATERIAL, THE OFFEREE AGREES (I) TO KEEP CONFIDENTIAL THE CONTENTS THEREOF, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH OFFEREE OF A POTENTIAL PRIVATE INVESTMENT IN THE COMPANY, AND (II) TO RETURN THE SAME TO THE PLACEMENT AGENT IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES, (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN. THE COMPANY WILL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR, PRIOR TO THE CLOSING, THE OPPORTUNITY TO ASK QUESTIONS OF AND TO RECEIVE ANSWERS FROM REPRESENTATIVES OF THE COMPANY CONCERNING THE COMPANY OR THE TERMS AND CONDITIONS OF THE OFFERING AND TO OBTAIN ANY ADDITIONAL RELEVANT INFORMATION TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. INVESTORS AGREE TO ADVISE THE COMPANY IN WRITING IF THEY ARE RELYING UPON ANY SUCH INFORMATION.

### FOR RESIDENTS OF ALL STATES

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATIONS TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF SECURITIES, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE UNDERSIGNED ACKNOWLEDGES THAT THE NOTES HAVE NOT BEEN REGISTERED UNDER THE ACT, OR THE SECURITIES LAWS OF ANY STATE, THAT THE NOTES ARE BEING PURCHASED FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, NOR WITH THE INTENTION OF SELLING, TRANSFERRING OR OTHERWISE DISPOSING OF ALL OR ANY PART OF SUCH NOTES FOR ANY PARTICULAR PRICE, OR AT ANY PARTICULAR TIME, OR UPON THE HAPPENING OF ANY PARTICULAR EVENT OR CIRCUMSTANCES, EXCEPT SELLING, TRANSFERRING, OR DISPOSING OF SAID NOTES MADE IN FULL COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE SECURITIES ACT, THE RULES AND REGULATIONS PROMULGATED BY THE COMMISSION THEREUNDER, AND

APPLICABLE STATE SECURITIES LAWS; AND THAT SUCH NOTES MUST BE HELD INDEFINITELY UNLESS THE NOTES ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE, AND WILL REQUIRE AN OPINION OF COUNSEL THAT REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OR SUCH STATE SECURITIES LAWS.

PLTF00000027

L 10539

1. The undersigned represents, warrants, and agrees as follows:

(a) The undersigned agrees that this Agreement is and shall be irrevocable.

(b) The undersigned has carefully read the Offering Materials, all of which the undersigned acknowledges have been provided to the undersigned. The undersigned has been given the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of this Offering and the Offering Materials and to obtain such additional written information, to the extent the Company possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of same as the undersigned desires in order to evaluate the investment. The undersigned further acknowledges that he, she or it fully understands the Offering Materials, and the undersigned has had the opportunity to discuss any questions regarding any of the Offering Materials with his, her or its counsel or other advisor(s). Notwithstanding the foregoing, the only information upon which the undersigned has relied is that set forth in the Offering Materials and his, her or its own independent investigation. The undersigned acknowledges that the undersigned has received no representations or warranties from the Company, or its employees or agents in making this investment decision other than as set forth in the Offering Materials.

(c) The undersigned is aware that the purchase of Notes is a speculative investment involving a high degree of risk and that there is no guarantee that the undersigned will realize any gain from this investment, and that the undersigned could lose the total amount of the undersigned's investment.

(d) The undersigned understands that no federal or state agency has made any finding or determination regarding the fairness of this offering for investment, or any recommendation or endorsement of the Offering.

(e) The undersigned is acquiring the Notes for the undersigned's own account, with the intention of holding the Notes, with no present intention of dividing or allowing others to participate in this investment or of reselling or otherwise participating, directly or indirectly, in a distribution of the Notes, and shall not make any sale, transfer, or pledge thereof without registration under the Securities Act and any applicable securities laws of any state or unless an exemption from registration is available under those laws.

(f) The undersigned represents that the undersigned, if an individual, has adequate means of providing for his or her current needs and personal and family contingencies and has no need for liquidity in this investment in the Notes. The undersigned represents that the undersigned is an "Accredited Investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. The undersigned has no reason to anticipate any material change in his or her personal financial condition for the foreseeable future.

(g) The undersigned is financially able to bear the economic risk of this investment, including the ability to hold the Notes indefinitely or to afford a complete loss of his, her or its investment in the Notes.

(h) The undersigned represents that the undersigned's overall commitment to investments, which are not readily marketable, is not disproportionate to the undersigned's net worth, and the undersigned's investment in the Notes will not cause such overall commitment to become excessive. The undersigned realizes that in the view of the Commission, a purchase now with a present intent to resell by reason of a foreseeable specific contingency or any anticipated change in the market value, or in the condition of the Company, or that of the industry in which the business of the Company is engaged or in connection with a contemplated liquidation, or settlement of any loan obtained by the undersigned for the acquisition of the Notes, and for which such Notes may be pledged as security or as donations to religious or charitable institutions for the purpose of securing a deduction on an income tax

PLTF00000028

return, would, in fact, represent a purchase with an intent inconsistent with the undersigned's representations to the Company and the Commission would then regard such sale as a sale for which the exemption from registration is not available. The undersigned will not pledge, transfer or assign this Agreement.

(i)     FOR PARTNERSHIPS, CORPORATIONS, TRUSTS, OR OTHER ENTITIES ONLY: If the undersigned is a partnership, corporation, trust or other entity, (i) the undersigned has enclosed with this Agreement appropriate evidence of the authority of the individual executing this Agreement to act on its behalf (e.g., if a trust, a certified copy of the trust agreement; if a corporation, a certified corporate resolution authorizing the signature and a certified copy of the articles of incorporation; or if a partnership, a certified copy of the partnership agreement), (ii) the undersigned represents and warrants that it was not organized or reorganized for the specific purpose of acquiring Notes, (iii) the undersigned has the full power and authority to execute this Agreement on behalf of such entity and to make the representations and warranties made herein on its behalf, and (iv) this investment in the Company has been affirmatively authorized, if required, by the governing board of such entity and is not prohibited by the governing documents of the entity.

(j)     The undersigned has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Notes.

(k)     The undersigned acknowledges that the certificates for the Notes ("Certificates") which the undersigned will receive will contain a legend substantially as follows:

THE SECURITIES WHICH ARE REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND MAY NOT BE SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNTIL A REGISTRATION STATEMENT WITH RESPECT THERETO IS DECLARED EFFECTIVE UNDER SUCH ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE COMPANY THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT IS AVAILABLE.

2.     The undersigned expressly acknowledges and agrees that the Company is relying upon the undersigned's representations contained in the Offering Materials.

3.     The undersigned subscriber acknowledges that the undersigned understands the meaning and legal consequences of the representations and warranties which are contained herein and hereby agrees to indemnify, save and hold harmless the Company, and its officers, directors and counsel, from and against any and all claims or actions arising out of a breach of any representation, warranty or acknowledgment of the undersigned contained in any of the Offering Materials. Such indemnification shall be deemed to include not only the specific liabilities or obligations with respect to which such indemnity is provided, but also all reasonable costs, expenses, counsel fees and expenses of settlement relating thereto, whether or not any such liability or obligation shall have been reduced to judgment.

4.     The undersigned acknowledges that MS will receive a commission equal to 2% of the principal amount of the Certificate being purchased for acting as a placement agent in the Offering.

5.     The Company has been duly and validly organized and is validly existing and in good standing as a limited liability company under the laws of the State of New York. The Company has all requisite power and authority, and all necessary authorizations, approvals and orders required as of the date hereof to conduct its business and to enter into this Subscription Agreement and the other Offering Materials and to be bound by the provisions and conditions hereof or therein.

6.     Except as otherwise specifically provided for hereunder, no party shall be deemed to have waived any of his or her or its rights hereunder or under any other agreement, instrument or papers signed by any of

PLTF00000029

them with respect to the subject matter hereof unless such waiver is in writing and signed by the party waiving said right. Except as otherwise specifically provided for hereunder, no delay or omission by any party in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion. All rights and remedies with respect to the subject matter hereof, whether evidenced hereby or by any other agreement, instrument, or paper, will be cumulative, and may be exercised separately or concurrently.

7.     The parties have not made any representations or warranties with respect to the subject matter hereof not set forth herein, and this Agreement, together with any instruments executed simultaneously herewith, constitutes the entire agreement between them with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Agreement, which alone fully and completely expresses their agreement.

8.     This Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an agreement in writing, which is signed by all of the parties to this Agreement.

9.     The parties agree to execute any and all such other and further instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intent and purposes hereof.

10.     If any provision or any portion of any provision of this Agreement or the application of any such provision or any portion thereof to any person or circumstance, shall be held invalid or unenforceable, the remaining portion of such provision and the remaining portion of such provision as is held invalid or unenforceable to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York and the undersigned hereby consents to the jurisdiction of the courts of the State of New York and/or the United States District Court for the Southern District of New York

PLTF00000030

L 10542

**ALL SUBSCRIBERS MUST COMPLETE THIS PAGE**

Deanna M. Ayers

Print Exact Name in Which Title is to be Held

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement on this _13_ day of _December_ 2004.

| | | | | |
|---|---|---|---|---|
| 1. | [ ] Individual | 7. | [ ] | Trust<br>Date Opened |
| 2. | [ ] Joint Tenants with<br>Right of Survivorship | | | |
| 3. | [ ] Community Property | | | _____ |
| 4. | [ ] Tenants in Common | 8. | [ ] | As A Custodian<br>For |
| 5. | [ ] Corporation/Partnership | | | _____ |
| 6. | [X] IRA<br>of _Deanna M. Ayers_ | | | Under the Uniform<br>Gift to Minors Act of<br>the State of<br>_____ |

8

PLTF00000031

L 10543

**EXECUTION BY SUBSCRIBER WHO IS A NATURAL PERSON**

_Deanna M. Ayers      IRA_
Exact Name in Which Title is to be Held

_[signature]_
(Signature)

_Deanna M. Ayers_
Name (Please Print)

_128 Mulberry Drive_
Residence: Number and Street

City     _Holland      PA    18966_
            State          Zip Code

_054 - 34 - 6100_
Social Security Number

Accepted this _____ day of _____, 200_, on behalf of First Independent Income Notes, LLC.

By:_____
      David L. Smith

PLTF00000032

L 10544

# **<u>EXHIBIT 5</u>**

## First Independent Income Notes, LLC
99 Pine Street
Albany, NY 12207
Phone 518-449-5131
Fax 518-449-4894

October 13, 2008



This communication is being sent to investors of First Independent Income Notes, LLC (the FUND) in each of the three classes of Notes, Senior, Senior Subordinated, and Junior maturing on December 15, 2008. The purpose of the communication is to apprise you of the status of your investment and also inform you of the restructuring plan that has been presented to the FUND's Trustee, McGinn, Smith Capital Holdings Corp. by the FUND's managing member, McGinn, Smith Advisors, LLC.

McGinn, Smith Advisors, LLC (MSA) has determined that as a result of losses incurred in the FUND's investments and the total illiquidity for the vast majority of the FUND's investments it is not possible to redeem the Notes on the due date of December 15, 2008 and will require a restructuring of all classes of Notes. In restructuring the notes, MSA has taken into account the responsibility of the Trustee to address both the principal and interest payments due to the Senior noteholders and therefore must reschedule future interest and principal payments for all three classes of noteholders, giving priority to the Senior noteholders. Based on best estimates of current cash flow and present liquidity, MSA has developed a plan that alters scheduled interest and principal payments for all three classes. All three classes are having their maturities extended and their interest payments reduced. MSA has the responsibility to manage the FUND consistent with the provisions of the note's indenture and in a manner that best protects the assets of the FUND. Accordingly, MSA will be presenting a plan outlined later in this communication that in its sole judgment provides for an orderly liquidation of assets, payment of reasonably expected cash flows, and gives priority to the Senior Noteholders over the Senior Subordinated Noteholders and the Junior Noteholders. The plan takes into account that current conditions in financial credit markets presently offer



CONFIDENTIAL

company required an $85 billion cash infusion and equity investors were wiped out. Hundreds of banks and mortgage companies have been closed including the forced sales of Wachovia to Wells Fargo and Citi Corp. Virtually all financial institutions have had to either cut or eliminate dividends in order to strengthen their balance sheets. Other evidence of the cessation of liquidity in the credit markets include:

1.)   billion dollar hedge funds such as D.B. Zwirn and Pardus Capital Management refused to allow investors to redeem because they were unable to sell assets to raise cash

2.)   last week $120 billion of commercial paper not marketable, causing companies to lose liquidity for normal operating functions like payroll

3.)   despite a lowering of interest rates, banks refusing to lend overnight to other banks from fear of not knowing the financial soundness of the borrower

4.)   Reserve Money Market Fund assets fall below the one dollar redemption price and overnight withdrawal of $40 billion of the $60 billion in assets forces the fund to cease redemptions

5.)   The College Fund, who manages assets for 1500 college endowments and their operating funds restrict access to their money market fund to 38% of their deposits and state that 100% of your capital won't be available until 2010

There are hundreds of other examples that have occurred and demonstrate the liquidity crisis. Most of you are aware of this because the media has been giving this story full attention for months. The reason that it is important for you to be aware of the freezing of the credit markets is because it impacts the investments in the FUND in a variety of ways. First, if the most liquid and strongest investment assets such as money market funds, commercial paper, and mortgages are having difficulty in finding buyers, than the ability for almost all other assets to have liquidity is impossible. Second, if forced to sell these assets in order to redeem the notes, the market price would be far below fair market value. As an example, Merrill Lynch in July, in an effort to get some of these assets off their balance sheet and receive cash, sold $30 billion worth for just 22 cents on the dollar. And even then, the buyer forced Merrill Lynch to finance 75% of the purchase with a non-recourse loan which meant the true cost of the purchase was just 6 cents on the dollar. Third, many of the assets, including loans of the companies in our portfolio, were dependent on subsequent financing in order to repay us. Often, our loans were bridge loans to companies until they could get permanent financing through stock or bond offerings. The initial public offerings (IPO's) hit a 5 year low in July and included only some of the most visible companies in the world such as Visa International. Of the 25 billion dollars in offerings through July, Visa accounted for 18 billion dollars, leaving just 6 billion dollars for the other 23 companies taken public. Thus, the companies in our portfolio have been totally shut out, and in several instances the capital raises included money to satisfy their debts to us or to provide us with liquidity for our investments. When these offerings will once again be available is not determinable, but it is not likely to be anytime soon.

CONFIDENTIAL

PLTF00006973

In conclusion, we thank you in advance for your patience and understanding of the very difficult position that we are in.  If there are any questions regarding your accounts or this memorandum, please contact your McGinn, Smith & Company representative.

Sincerely,

David L. Smith
Managing Partner
McGinn, Smith Advisors

DLS/gg

CONFIDENTIAL

PLTF00006974

**First Independent Income Notes, LLC**
**Restructuring Plan of October 2008**

I. Senior Notes 7%, due December 15, 2008

   Payments: October 15th
        January 15th
        April 15th
        July 15th

   1. Starting October 15, 2008 through July 15, 2009
     Annual rate of 5%, interest only

   2. Starting October 15, 2009 through October 15, 2014
     Annual rate of 5%
     10 year amortization

   3. Maturity – October 15, 2014

   <u>Example of $100,000 note:</u>

   1st year: 5% interest
        4 quarterly payments of $1,250

   2nd – 6th year  - 5% interest, 10 year amortization
           20 quarterly payments of $3,192.14

   Maturity payment - $56,179.51

*Note:* *50% of all liquidated investment proceeds will be applied immediately to*
*principal.*

II. Senior Subordinated Notes 7.5%, due December 15, 2008

   Payments: October 15th
        January 15th
        April 15th
        July 15th

CONFIDENTIAL      PLTF00006976

1. 1st payment October 15, 2010 through July 15, 2013
   Annual rate of 3%,
   10 year amortization

2. Starting October 15, 2013 through July 15, 2020
   Annual rate of 6%
   7 year amortization

   Final payment July 15, 2020

   <u>Example of $100,000 note</u>:

   | | | |
   |---|---|---|
   | Year 1-2 | no payments | |
   | Year 3-5 | 3% interest, 10 year amortization | |
   | | 12 quarterly payments of $2,903.02 | |
   | Year 6-12 | 6% interest, 7 years amortization | |
   | | 28 quarterly payments of $3,215.20 | |

Note:   *Starting in year 7, 50% of all liquidated investment proceeds will be applied*
        *immediately to principal.*

III.   Junior Subordinated Notes 10.25%, due December 15, 2008

       Payments:  October 15th
                  January 15th
                  April 15th
                  July 15th

   1. 1st payment October 15, 2010 through July 15, 2014
      5% principal only

   2. Starting October 15, 2014 through July 15, 2023
      Annual rate of 5%,
      15 year amortization

   3. Maturity July 15, 2003

      <u>Example of $100,000 note</u>:

      | | | |
      |---|---|---|
      | Year 1-2 | no payments | |
      | Year 3-6 | 5% principal only 16 quarterly payments of $1,250 | |
      | Year 7-15 | 5% cpn, 15 year amortization | |
      | | 36 payments of $1,903.19 | |

      Maturity payment - $39,251.93

CONFIDENTIAL                    PLTF00006977

# **Exhibit 14**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OR NEW YORK**

_____
                                                    :
NEAL A. CUPERSMITH, *et al.*                 :    3.14 – cv- 01303-TJM-DEP
                                                    :
            Plaintiffs,                          :
                                                    :
       v.                                        :
                                                    :
PIAKER & LYONS P.C., *et al.*                :
                                                    :
            Defendants.                         :
_____

Expert Report

by

Stephen J. Scherf, CPA, CFF, CFE

September 17, 2015

TABLE OF CONTENTS

1. BACKGROUND ........................................................................................................ 2

2. BASIS FOR ANALYSIS ......................................................................................... 9

3. ANALYSIS ............................................................................................................ 10

   3.1. THE PONZI SCHEME ....................................................................................... 10

   3.2. APPLICABLE PROFESSIONAL STANDARDS ...................................................... 11

   3.2.1   AICPA Code of Professional Conduct ............................................. 11

   3.2.2   Rule 102 – Integrity and Objectivity ................................................ 12

   3.2.3   Rule 201 – General Standards........................................................... 13

   3.2.4   Rule 202 – Compliance with Standards............................................ 13

   3.2.5   Statement on Standards for Tax Services ......................................... 13

   3.3   ANALYSIS OF DEFENDANTS' DEPARTURE FROM PROFESSIONAL STANDARDS ... 14

   3.4   ANALYSIS OF DEFENDANTS' CONTRIBUTION TO DAMAGES TO INVESTORS AND RELATED ISSUES ....................................................................................................... 26

   3.5   DAMAGES .................................................................................................... 28

   3.5.1   Analysis of Losses Suffered by the Plaintiffs .................................... 28

   3.5.2   Prejudgment Interest ......................................................................... 28

4. CONCLUSION....................................................................................................... 29

Appendix A: *Curriculum vitae* of Stephen J. Scherf, CPA, CFF, CFE

Appendix B: Documents Considered

Exhibit 1 – Damages



*www.asterion-consulting.com*

215 S. Broad Street, 3rd Floor        *t*  215 893 9901
Philadelphia, PA 19107               *f*  215 893 9903

## Neal A. Cupersmith, et al.
## v.
## Piaker & Lyons P.C., et al.

I have been engaged by counsel ("Kang, Haggerty & Fetbroyt, LLC") for Neal A. Cupersmith et al. ("Plaintiffs") to: (1) Determine whether Defendants Piaker & Lyons P.C. ("Piaker"), Ronald L. Simons ("Simons") and Timothy N. Paventi ("Paventi"), collectively referred to as ("Defendants"), knowingly or recklessly disregarded applicable professional standards in connection with the performance of certain services provided to McGinn Smith & Co., Inc. and certain related entities[1] ("MS" or "McGinn Smith") whom for many years operated a Ponzi scheme and (2) Determine the amount of damage sustained by Plaintiffs as a result of the actions of the Defendants.  I understand that of the counts in the complaint that remain are fraud[2] and aiding and abetting fraud.[3]  As a result, our analysis will not address the other counts in the complaint.

This report sets out the results of our analysis and is structured as follows:

     1.     Background
     2.     Basis for Analysis
     3.     Analysis
     4.     Conclusions
            Appendix
            Exhibit

---

[1] To be defined more fully in the following section.

[2] Under New York law, the elements of fraud are: "(1) defendant made a material, false representation; (2) defendant intended to defraud the plaintiff thereby; (3) plaintiff reasonably relied upon the representation; and (4) plaintiff suffered damage as a result of the reliance." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 494 (S.D.N.Y. 2001).

[3] Under New York law, the elements of aiding and abetting fraud are: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).

# 1. BACKGROUND

For purposes of the opinions expressed in this report, I have assumed the following facts are true and correct.

> McGinn and Smith and their affiliated entities

McGinn, Smith & Co., Inc. ("MS") was a registered broker-dealer established in 1981 by Timothy McGinn ("McGinn") and David Smith ("Smith").[4]  During the period from 2003 to 2009, Smith owned 50% of MS, McGinn owned 30% and 20% was owned by others.   At the end of 2009, MS began winding down its broker-dealer business.  McGinn Smith Advisors, LLC ("MS Advisors"), an SEC registered investment advisor, is a wholly owned subsidiary of McGinn Smith Holdings LLC.  MS Advisors served as investment adviser to the Funds (as defined below) until April 2009. McGinn, Smith Capital Holdings Corp. ("MS Capital"), another affiliated entity is owned by MS Holdings LLC (52%), McGinn (24%) and Smith (24%).  MS Capital is indenture trustee for the Funds and the trustee for all the Trusts (as defined below) created between 2006 and 2009. Smith was President of MS Capital and McGinn was chairman of its board of directors.

Between 2003 and 2009, McGinn and Smith, acting through MS and MS Advisors, raised over $136 million dollars in more than 20 unregistered debt offerings, including the Four Funds (the "Funds") and numerous trust entities (the "Trusts").   McGinn and Smith, directly or indirectly, controlled all of the Funds and the Trusts.   All of the bank accounts of the Funds and Trusts were established and controlled by MS and all of the accounting and business records of the Funds and Trusts were maintained by MS.  David P. Rees ("Rees") is an accountant employed by MS from August 2002 through April 2009, and served as Comptroller of MS.  Rees reported to Smith.  Rees and a staff accountant he supervised were responsible for maintaining all the accounting and financial records of the Funds, the Trusts and various McGinn Smith entities.

---

[4] Registered broker-dealers are required as conditions to operating as such, to maintain audited financial statements and a required amount of "net capital" to the protection of customers and the investing public.

### The Funds

The Funds at issue in this report are First Independent Income Notes LLC ("FIIN"); First Excelsior Income Notes LLC ("FEIN"); First Albany Income Notes LLC ("FAIN") and Third Albany Income Notes LLC ("TAIN").  Between 2003 and October 2005, MS Advisors formed the Funds and owned 100% of the membership interest in each fund and was the sole managing member. MS was placement agent for debt offerings made by each of the Funds by means of private placement memoranda ("PPMs").  The Funds raised an aggregate of approximately $90 million from hundreds of investors by issuing Senior Secured Notes, Senior Subordinated Notes and Secured Junior Notes, each bearing interest between 5% and 10.25%, with interest payable quarterly to the note holders and the principal amounts due on various dates between 2004 and 2010.

Each of the PPMs represented that the applicable Fund was,

> Formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and other investments that may add value to our portfolio . . . .

Each of the PPMs represented with respect to possible transactions with affiliates that,

> [The Fund] may acquire investments from our managing member or an affiliate of our managing partner that has purchased the Investments.  If the Investment is purchased from our managing partner or any affiliate, we will not pay above the price paid by our managing partner or such affiliate for the Investment, other than to reimburse our managing partner or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship.  In other words, if we purchase an Investment from our managing member or any of its affiliates, we will pay the same price for the Investment that we would have paid if we had purchased the Investment directly.  We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., is acting as underwriter or placement agent and for which McGinn, Smith & Co. will receive a commission.

Although there was no disclosure that the Funds would make any loans to or transfers or investments in affiliated entities, the Funds made such loans, transfers to and investments in

entities owned or controlled by McGinn and Smith (the "McGinn Smith Entities").  By September 2009, over half of all the assets of the Funds had been loaned or invested in McGinn Smith Entities.

Many of the McGinn Smith Entities and the other entities in which the Funds invested did not make interest and other payments to the Funds they were obligated to make.   Even though many of the Funds' investments were non performing, the Funds continued to value these non-performing assets at the original or book value, according to David Rees, the Comptroller of MS. By the end of 2007, MS estimated that the combined book value of the Funds was approximately $69,385,000 and the total notes payable to investors was $86,046,000.  MS estimated that the "net realizable" assets of the Funds aggregated only $37,160,299.

As of September 30, 2009, the Funds had revenues generated of only $12.9 million since inception while spending a total of $37 million for a combined loss from operations of $24 million over the time period.

The Trusts

Between 2006 and 2009, MS acted as placement agent for four Firstline Jr. and Sr. 07 offerings (the "Firstline Trusts"); TDM Cable Trust 06 ("TDM Cable 06"); TDM Luxury Cruise Trust 07 ("TDM Cruise"); TDM Verifier Trust 07 ("Verifier 07"); TDM Verifier Trust 08 ("Verifier 08"); Cruise Charter Venture Trust 08 ("CCV Trust"); Fortress Trust 08 ("Fortress Trust"); Integrated Excellence Jr. and Sr. Trusts 08, TDM Cable Trust 08; TDM Verifier Trust 09; TDMM Benchmark Trust 09 ("Benchmark 09"); TDMM Cable Jr. and Sr. Trusts 09 ("TDMM Cable 09"); TDM Verifier Trust 07R, and TDM Verifier Trust 08R and other offerings, including affiliate McGinn Smith Transaction Funding Corp ("MSTF").

The Trusts issued notes to investors with annual interest rates ranging from 7.75% to 13% and maturity dates ranging from approximately 15 months to five years.  The Trust offerings indicated the purpose of the Trusts was to invest in promissory notes, in fact, investor funds were used to

pay excessive fees to MS, to pay "earned interest" to other investors, to make "loans" to McGinn, Smith and other affiliates and to cover the payroll of MS.

<u>Involvement of Defendants Piaker & Lyons, Simons and Paventi</u>

Piaker is a New York professional corporation performing accounting services to clients.  Piaker is an accounting firm and member of the American Institute of Certified Public Accountants ("AICPA").  Simons is a certified public accountant, principal and CEO or President of Piaker. Paventi is a Certified Public Accountant and employee of Piaker.

The Defendants prepared tax returns or performed Audits of the above mentioned entities as detailed in ***Table 1*** below:

**Table 1 – McGinn Smith Entities and the Four Funds, Services by Defendants**

| Entity | Service Performed | Period | Engagement Partner | Staff Acct.[5] | 2nd Partner[6] |
|--------|-------------------|--------|--------------------|----------------|-----------------|
| McGinn Smith | Audit, Tax Returns | 2003-2008 | Simons | Paventi | A.   Piaker |
| MS Advisors | Tax Returns | 2003-2007 | Simons | Paventi | |
| MS Capital | Tax Returns | 2003-2008 | Simons | Paventi | |
| FIIN | Tax Returns | 2003-2007 | Simons | Paventi | |
| FEIN | Tax Returns | 2004-2007 | Simons | Paventi | |
| TAIN | Tax Returns | 2004-2007 | Simons | Paventi | |
| FAIN | Tax Returns | 2005-2007 | Simons | Paventi | |

In addition, there were services performed by the Defendants for the principals of McGinn Smith as shown in ***Table 2*** below:

**Table 2 – McGinn Smih Principals, Services by Defendants**

| Entity | Service Performed | Period | Engagement Partner | Staff Acct. | Preparer |
|--------|-------------------|--------|--------------------|-------------|----------|
| McGinn | Tax Returns | 2003-2008 | Simons | Paventi | |
| Smith | Tax Returns | 2003-2008 | Simons | Paventi | |
| McGinn | Personal Financial Statements | 2007 | | | Simons |
| Smith | Personal Financial Statements | 2007-2008 | | | Simons |

---

[5] In 2003, Anne Eschler and Sally Fults were the staff accountants for the Audit.
[6] Second partner review is valid in Audits only.

Subsequent to the Fund offerings, a series of Trusts were established beginning in 2006 which raised over $34 million.  Once again, Simons and Paventi were the team representing Piaker and performing services as shown in ***Table 3*** below:

**Table 3 – Trust Offerings, Services by Defendants[7]**

| Entity | Service Performed | Period | Engagement Partner | Staff Acct. |
|---|---|---|---|---|
| Firstline Trust 07 | Tax Returns | 2007-2008 | Simons | Paventi |
| Firstline Trust 07 Series B | Tax Returns | 2007-2008 | Simons | Paventi |
| Fortress Trust 08 | Tax Returns | 2008 | Simons | Paventi |
| Integrated Excellence Senior Trust 08 | Tax Returns | 2008 | Simons | Paventi |
| Integrated Excellence Junior Trust 08 | Tax Returns | 2008 | Simons | Paventi |
| TDM Verifier Trust 08 | Tax Returns | 2007-2008 | Simons | Paventi |
| TDM Verifier Trust 07 | Tax Returns | 2007-2008 | Simons | Paventi |

Beginning in 1992, Piaker performed accounting and auditing services for MS and other affiliated entities as well as serving as personal accountants for McGinn, Smith and other individuals affiliated with MS.  Between 2003 and 2008, Piaker prepared audited financial statements for MS. In addition in 2007, Piaker prepared personal financial statements for McGinn and for Smith and also prepared personal financial statements for Smith through August 31, 2008.

In addition, between 2003 and 2008 Piaker prepared tax returns and related income tax services to MS and MS Holdings and did the same for MS Advisors from 2003 through 2007.  Piaker also prepared the income tax returns for the Four Funds through 2007 and for many of the Trusts. Piaker also prepared the personal income tax returns for McGinn and Smith.

Simons was the partner in charge of all of the engagements and Paventi was the staff accountant on all of the engagements.  In connection with performing the engagements, Piaker, acting through Simons, Paventi and others had extensive dealings and interactions with McGinn, Smith and Rees. In connection with performing the engagements, the Defendants requested and received copies of the PPMs, bank statements, and other records of the Funds, the Trusts, MS, McGinn and Smith.

---

[7] Only those Trusts for which Defendants prepared tax returns are presented.

The proceeds of the Funds and Trust offerings were used to pay investor redemptions and interest for other McGinn Smith offerings; to enrich Smith, McGinn and Matthew Rogers, a Senior Vice President at McGinn Smith; to make loans to entities controlled by McGinn and Smith; and to invest in some performing and other non-performing assets.  Proceeds from these offerings were also used to support McGinn Smith.[8]

McGinn Smith made numerous false and misleading statements or omissions of material fact while their operations made insufficient returns to pay investors and new investor money was used to pay returns on existing investors in a classic Ponzi scheme.[9]  The Ponzi scheme was discovered in 2010 and the Securities & Exchange Commission ("SEC") sued MS, McGinn, Smith and others, including the Funds and Trusts which they controlled.   Subsequently, the principals of McGinn Smith were convicted of numerous federal crimes and Simons, one of the defendants in this action, pled guilty to one count of delivering and disclosing a false tax return.[10]

As summarized in ***Tables 1 through 3***, Defendants performed audits of McGinn Smith and prepared tax returns for various other McGinn Smith entities including the Funds and a number of Trusts.  It must be emphasized and cannot be overstated that not only did the accounting firm, Piaker, perform services but the same individuals, Simons and Paventi, performed a majority of the work, gaining an intimate knowledge of multiple entities involved in the Ponzi scheme.  Plaintiffs allege that Defendants cooperated with McGinn Smith in the fraud which resulted in the Plaintiffs suffering damages.

SEC Civil Action and Criminal Prosecutions

In April 2010, the Securities and Exchange Commission ("SEC") filed a complaint against MS, McGinn, Smith, MS Advisors, MS Capital, the Funds and the Trusts alleging numerous violations

---

[8] Declaration of K. Palen, pg. 7.
[9] A Ponzi scheme occurs when returns to investors in the fund are paid from monies from other investors rather than from the profits generated from the fund.
[10] In delivering and disclosing a false tax return, Mr. Simons violated the AICPA Statements on Standards for Tax Services and in the process violated numerous other AICPA professional standards.

of the antifraud provisions of Section 10(b) and Rule 10b-5 of the Securities Exchange Act against McGinn, Smith, MS, MS Advisors and MS Capital in connection with the offerings of the Funds and Trusts together with other statutory violations.  Subsequently, the federal court for the Northern District of New York, issued a Temporary Restraining Order against the Defendants, preliminarily enjoined them from violation of the securities laws and appointed a receiver to administer the assets of the named defendants for the benefit of investors.

On November 8, 2011, Simons pled guilty to one count of delivering and disclosing a false federal tax return for the year 2006 on behalf of David and Lynn Smith.

On October 11, 2012, a 32 count indictment was filed in the Northern District of New York against McGinn and Smith accusing each of twenty-nine federal crimes including filing false federal income tax returns for 2006, 2007 and 2008.  Following a four week trial in early 2013, the jury convicted McGinn and Smith of numerous counts in the indictment including mail and wire fraud, conspiracy, securities fraud and three counts of filing a false tax return in 2006, 2007 and 2008.

During the criminal trial, Simons testified on behalf of the prosecution and admitted that he prepared false federal income tax returns for David and Lynn Smith for not only 2006 but also 2007 and 2008.  He also admitted that he prepared false federal tax returns for McGinn for 2006, 2007 and 2008.  In addition, he admitted that he prepared false financial statements for McGinn and Smith for 2007 that he submitted on their behalf to the Pennsylvania and Texas Departments of Insurance.  Simons also admitted to making adjusting journal entries to one of the Trusts so that the entity's books would conform to the false information in the tax returns.

McGinn Smith Comptroller David Rees also testified in the criminal trial of McGinn and Smith. He testified that MS had mounting financial difficulties and was kept alive by the private placement revenues.  He explained that in November 2008, McGinn or Smith caused funds to be removed from the bank accounts of the Funds and deposited in the bank account of MS Transaction Funding, then moved to MS to make its payroll.  Even so, he testified that to avoid violating the

Net Capital requirements,[11] he did not record payables on a timely basis in the accounting records of MS.[12]

In a subsequent related SEC administrative proceeding, SEC staff accountant Kerri L. Palen ("Palen") testified at length about the results of her analysis of the financial and accounting records of McGinn Smith and the work papers of Piaker & Lyons.  She testified that based upon such review she believed that Piaker would have known of the fraud conducted by MS, McGinn and Smith.

## 2. BASIS FOR ANALYSIS

The analysis and opinions in this report are based primarily upon the documentation available to date, my independent research, education, and experience in performing similar financial analyses and making determinations as to whether applicable professional standards were adhered to when providing professional accountancy services to the public.  I have been qualified and have presented testimony on numerous occasions, including the presentation of financial analysis in courts throughout the United States.  I am a Certified Public Accountant, past President of the Greater Philadelphia Chapter of the Pennsylvania Institute of Certified Public Accountants ("PICPA") and a former member of PICPA Council and the PICPA Executive Committee.  In addition, I am a Certified Fraud Examiner, Certified Forensic Accountant, and have a Master of Science with a concentration in Finance.  Attached, as *Appendix A*, is my current *curriculum vitae* and information concerning testimony history, publications and speaking engagements.

My analysis was based primarily on the documents and information listed in *Appendix B* and other related documents.  The documents and information utilized are the types of documents and information experts in my field typically rely upon in performing such an analysis.  I, and others

---

[11] McGinn Smith was required to maintain net capital of $100,000 during the relevant time period, according to Rees.

[12] By not recording payables, the accounting records did not reflect all the liabilities of McGinn Smith, and to that extent, falsely represented the amount of its net capital.

under my direct supervision, have performed the analysis contained in this report with the information available to date.  Accordingly, I reserve the right to amend this analysis and report should additional or updated information become available.  When I testify at trial, I may illustrate my testimony with demonstrative aids such as graphs, charts and/or slides.

I am being compensated at my standard rate of $455 per hour and others in our firm are being compensated on a non-contingent basis at our standard hourly rates.  Our fees are not contingent on the outcome of this matter.

This report has been prepared in connection with the above referenced matter and should not be used for any other purpose without our express written consent.

# 3. ANALYSIS

This section addresses:  (1) The Ponzi scheme, (2) Whether the Defendants adhered to applicable professional standards when rendering services; and (3) The amount of damages sustained by the Plaintiffs as a result of the actions of the Defendants.

## 3.1. THE PONZI SCHEME

In the ten years prior to 2003, McGinn Smith set up dozens of other Trusts, ("Alarm Trusts") whose Trustee was usually McGinn Smith and Co., Inc.  The primary investment vehicle utilized by the Alarm Trusts were security alarm contracts, ("Security Contracts").[13]  To raise capital, the Trusts offered Participation Certificates for sale.  A majority of the Security Contracts were eventually included as part of an initial public offering and the associated investors' Participation Certificates satisfied.  The remaining Trusts, which still retained interests in Security Contracts and had investors via the Participation Certificates, served as the genesis of what would become a Ponzi scheme. Ponzi schemes occasionally begin as legitimate businesses, until the business fails

---

[13] Declaration of Kerri L. Palen, pg. 8.

to achieve the returns expected. The business becomes a Ponzi scheme if it then continues under fraudulent terms.

A Ponzi scheme can be simply defined as paying returns to investors out of funds invested by others rather than profits.  Whatever the initial situation, the perpetuation of the losses requires an ever-increasing flow of money from new investors to sustain the scheme.   Operators of Ponzi schemes commonly entice new investors by offering high returns that are unusually consistent. Ultimately, the scheme collapses when it is discovered or when an insufficient number of new investors are attracted to pay the promised returns and withdrawal demands of earlier investors.

As noted above, between 2003 and 2009, McGinn and Smith, acting through MS and MS Advisors raised over $136 million in more than 20 unregistered debt offerings including the Funds and Trusts. The offerings of the Funds and Trusts promised rates of return to investors that could not be achieved because excessive amounts of offering proceeds were diverted to McGinn Smith and affiliated entities while the investments made by the Funds and Trusts failed to perform.  As a result, funds raised from investors in other private placement offerings were used to pay redemptions and interest due to previous investors.   Regulatory authorities discovered and shutdown the Ponzi scheme in 2010.

### 3.2. APPLICABLE PROFESSIONAL STANDARDS

I evaluated whether Piaker & Lyons P.C.[14] adhered to professional standards by reference to the American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct.

#### 3.2.1   AICPA Code of Professional Conduct

According to the AICPA Code of Professional Conduct:

---

[14] According to their website Piaker & Lyons P.C. is a member of the AICPA.

"Membership in the American Institute of Certified Public Accountants is voluntary.  By accepting membership, a certified public accountant assumes an obligation of self-discipline above and beyond the requirements of laws and regulations.  These Principles of the Code of Professional Conduct of the American Institute of Certified Public Accountants express the profession's recognition of its responsibilities to the public, to clients, and to colleagues.  They guide members in the performance of their professional responsibilities and express the basic tenets of ethical and professional conduct.  The Principles call for an unswerving commitment to honorable behavior, even at the sacrifice of personal advantage."[15]

Members of the AICPA have responsibilities to all those who use their professional services.

"As professionals, certified public accountants perform an essential role in society.  Consistent with that role, members of the American Institute of Certified Public Accountants have responsibilities to all those who use their professional services.  Members also have a continuing responsibility to cooperate with each other to improve the art of accounting, maintain the public's confidence, and carry out the profession's special responsibilities for self-governance.  The collective efforts of all members are required to maintain and enhance the traditions of the profession." [16]

AICPA members commit to honor the public trust which requires them to perform services and to discharge their responsibilities with integrity, objectivity, due professional care, and a genuine interest in serving the public.[17]

"A distinguishing mark of a profession is acceptance of its responsibilities to the public.  The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce.  This reliance imposes a public interest responsibility on certified public accountants.  The public interest is defined as the collective well-being of the community of people and institutions the profession serves."[18]

### 3.2.2   Rule 102 – Integrity and Objectivity

AICPA Code of Professional Conduct Rule 102 – Integrity and Objectivity states:

"In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others."

---

[15] Preamble, paragraphs .01 and .02.
[16] ET Section 52, Article 1 – Responsibilities.
[17] ET Section 53, Article 2 – The Public Interest; See also ET Section 54 through 56.
[18] ET Section 53, Article 2 – The Public Interest.

### 3.2.3    Rule 201 – General Standards

When performing professional services, the Defendants were required to follow Rule 201 – General Standards, which states:

> "A member shall comply with the following standards and with any interpretations thereof by bodies designated by Council.
> A. *Professional Competence.* Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence.
> B. *Due Professional Care.* Exercise due professional care in the performance of professional services.
> C. *Planning and Supervision.* Adequately plan and supervise the performance of professional services.
> D. *Sufficient Relevant Data.* Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed."[19]

### 3.2.4    Rule 202 – Compliance with Standards

A member who performs auditing, review, compilation, management consulting, tax, or other professional services shall comply with standards promulgated by bodies designated by Council.[20]

### 3.2.5    Statement on Standards for Tax Services

The Defendants prepared tax returns for the Four Funds and the Trusts. As a result, the Defendants were required to comply with Statement on Standards for Tax Services Number 1 through 8.

Specifically, I note the following:

> In preparing or signing a return,…a member should not ignore the implications of information furnished and should make reasonable inquiries if the information furnished appears to be incorrect, incomplete, or inconsistent either on its face or on the basis of other facts known to a member. Further a member should refer to the taxpayers' returns from one or more prior years whenever feasible.

---

[19] ET 201.01.
[20] Council refers to the Council of the American Institute of Certified Public Accountants.

When preparing a tax return, a member should consider information actually known to that member from the tax return of another taxpayer if the information is relevant to that tax return and its consideration is necessary to properly prepare that tax return.

### 3.3   ANALYSIS OF DEFENDANTS' DEPARTURE FROM PROFESSIONAL STANDARDS

The Defendants performed the audit of the financial statements of McGinn Smith & Co., Inc. which required them to follow generally accepted auditing standards ("GAAS") and to determine whether the financial statements of McGinn Smith & Co., Inc. were stated in accordance with generally accepted accounting principles ("GAAP"). I note that despite the Ponzi scheme, the Defendants provided unqualified opinions on the financial statements of McGinn Smith & Co, Inc. until 2008, when they provided an explanatory paragraph concerning the substantial doubt about McGinn Smith & Co., Inc.'s ability to continue as a going concern. In performing their audit, the Defendants failed to properly adhere to professional standards or ignored the information that should have been obtained during the course of the audit which would have indicated the nature of the fraud. Specifically, I note the following:

- Defendants failed to maintain the proper professional skepticism in analyzing transactions or in performing proper analytical procedures to determine whether the expected returns and payments from such transactions were feasible. In other words, had they applied professional skepticism and proper analytical procedures, and adhered to Generally Accepted Auditing Standards, AU 150 and AU 329, Analytical Procedures, it should have been clear that timely payments were not able to be maintained under the investor notes given the performance of the underlying collateral.

- Defendants failed to properly analyse related party transactions, AU 334, Related Parties, and their effect on the financial statements including the risk of whether the financial statements were materially misstated, AU 314, Understanding the Entity and its Environment and Assessing the Risks of Material Misstatement.

- David Rees testified in the criminal matter that there were excessive fees taken by McGinn Smith with respect to the TDM Cable Funding deal. Simons admits to knowing about the fee in his testimony, yet fails to do additional audit work to investigate the

excessive fees.  In addition, David Rees testified that he initiated transfers from the Four Funds to pay McGinn Smith payroll and that a decision was made to hide the bankruptcy of Firstline to investors and to continue to fund the interest stream due to the investors since it would affect McGinn Smith's ability to do future deals, yet Piaker did not detect any of these frauds despite a requirement under Generally Accepted Auditing Standards AU 314 and AU 316 that required Piaker to Understand the Entity and its Environment and Assessing the Risk of Material Misstatement and the Consideration of Fraud in a Financial Statement Audit.

- In addition, the workpapers I reviewed contained numerous instances wherein fees were recomputed by Piaker staff.  The calculations contain rates and percentages represented by McGinn Smith which were not consistent with the PPMs from various related parties.[21] These inconsistencies are examples of Defendants' failure to properly address related party transactions and demonstrate a reckless disregard for the AICPA Code of Conduct including Rule 102 and Rule 201.

In addition to performing audits of McGinn Smith & Co., Inc., the Defendants performed other services for McGinn Smith including preparing tax returns for the Funds and a number of Trusts. In order to comply with professional standards, the Defendants needed to honor the public trust which requires them to perform services and to discharge their responsibilities with integrity, objectivity, due professional care, and a genuine interest in serving the public while performing their work.

I note that in accordance with applicable professional standards, the Defendants were also required to obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.  In reviewing the documents produced to date, I note that the Defendants obtained private placement memoranda ("PPMs"), bank statements and the documents that provided them with knowledge as to the proper operations of the various entities for which they rendered professional services.  Specifically, I note the emails wherein

---

[21] PL019693, PL019703, PL019698, PL019763.

Timothy Paventi of Piaker has included in a list of questions a caption entitled, "Investment Details/Private Placement Memo/Loan Details/K-1's." Included in these emails, addressing the following funds: FIIN, FEIN, TAIN and FAIN, were questions regarding various investments, information concerning interest payable calculations, listing of investor notes and other details.   In addition, I noted email requests for bank statements and reconciliations for both contract accumulation and escrow amounts and schedules of investments, notes and interest calculations. As Piaker requested bank statements as part of their tax return preparation procedures, they had the ability to analyze activity in these accounts.

*Defendants knew or should have known that Investments were not consistent with the PPM*

Based upon the documents obtained by the Defendants, had the Defendants applied the appropriate level of professional skepticism as required by applicable professional standards, it should have been clear to the Defendants that the Private Placement Memorandums were not being adhered to and that this improper use of the Funds' proceeds took multiple forms.  For example, the Security Contracts were purchased from the Alarm Trusts for an amount greater than that which the Alarm Trusts initially paid and loans were made to the Alarm Trusts, as well as other McGinn Smith controlled entities.[22]  Specifically, I noted the following:

The amounts paid by the Trusts violated the terms of the Funds' Private Placement Memorandum ("PPM") which all contain the following statement in the "Use of Proceeds" section:.

> "If the investment is purchased from our managing member or an affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment…In other words, if we purchase an Investment from our managing member or any affiliate, we will pay the same price for the Investment that we would have paid if we had directly purchased the investment."[23]

---

[22] Declaration of Palen, pg. 9.
[23] Confidential Private Placement Memorandum of FEIN, FIIN, & FAIN pg. 9 and TAIN pg. 13.

The Funds purchased Security Participation Trusts 1 through 4, part of the Alarm Trusts, for approximately $10.7 million.[24]   Security Participation Trusts 1 through 4 had paid a total of approximately $7.1 million for the underlying Security Contracts.[25]  The purchases by the Funds:

> "were negotiated by and between Smith for the Four Funds, as the "buyer," and McGinn for the pre-2003 alarm trusts as the "Seller."  The Purchase Agreements were signed by Smith on behalf of the Four Funds and McGinn on behalf of the SPT's"

Given the foregoing, it is apparent the purchase of these Security Participation Trusts was a violation of the Trusts' provision regarding affiliated transactions.  In addition, I note that the purchase amount paid for the Security Participation Trusts approximated the amount needed to redeem the related investors in them.[26]   This is a clear red flag that a fraudulent Ponzi scheme existed.

In addition to the purchase of the Security Participation Trusts, loans were made to the Alarm Trusts or their successor entities[27] from the Four Funds totaling over $2.1 million.  The purchases and loans from the Four Funds expended on the Alarm Trusts totaled approximately $12.8 million.[28]  Loans by the Funds were not limited to the Alarm Trusts as the Funds made loans to each other and, after their establishment, the Trusts.

The Funds' PPMs state an identical purpose in the Use of Proceeds:

> "We intend to use the net proceeds to acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferred, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio."[29]

---

[24] Palen Exhibit 9.
[25] A Fund did not provide the entire amount used to acquire one of the Security Participation Trusts.  Only the amount paid by the Fund is reflected in the purchase price.  One Fund also ultimately purchased one of the Security Participation Trusts which was initially acquired by another Fund (TAIN purchased from FAIN).
[26] Declaration of Palen, pg. 10.
[27] Successor entities represent entities which the Alarm Trusts were "rolled over" or transferred to.
[28] Declaration of Palen Exhibit 8.
[29] Confidential Private Placement Memorandum of FEIN, FIIN & FAIN pg. 9 and TAIN pg. 13.

The loans made to affiliated companies do not meet the investment criteria as defined by the PPMs. In additions to loans, investments were made in affiliates of McGinn Smith. As of December 31, 2007, investments in affiliates accounted for over half of the investments of the Funds.[30]  In fact, Smith, principal of McGinn Smith, who controlled the Funds and Trusts, acknowledged this questionable use of funds:

> "One of the most troubling aspects of the (Four Funds) investments has been my willingness to make substantial investments in affiliated entities, both because they were available and in some cases, such as Coventry, new investments were needed to support past investments. Thus, in the case of Coventry, alseT, EXBV the pattern was often the same; invest more money to support the original investment. In all cases this has proved to be a poor decision and has not only aggravated our cash flow problems, but puts us in some legal jeopardy as well."[31]

The Trusts commenced in 2006 and, as in the case of the Funds, amounts raised were also misused. Proceeds:

> "were supposed to be used to invest in specific streams of receivables, usually related to long term contracts for burglar alarm service, "triple play" (broadband, cable and telephone) service or luxury cruise cabin bookings."[32]

In the case of fifteen of the Trusts, approximately $32.5 million was raised and, according to their PPM's, on average, 85% of the amount, or $28.6 million, was to be invested. [33]  However, only approximately $18.7 million was used in accordance with the PPMs. The Defendants prepared the initial tax returns for at least six of these entities.[34]  In direct contrast to the PPMs, excessive underwriting fees were paid to McGinn Smith of approximately $3.2 million and individual McGinn Smith members received approximately $4.7 million.[35]  One member of this group of Trusts, TDM Cable Funding, LLC, distributed $407,000 to Smith in 2006 which was not reported as income on his individual tax return. As previously noted, defendant Simons, principal and CEO of Piaker and Lyons, P.C., pled guilty to one count of delivering and disclosing a false 2006 federal

---

[30] Declaration of Palen, pg. 17 & Exhibit 14.
[31] Declaration of Palen, pg. 16-17.
[32] Declaration of Palen, pg. 21.
[33] Declaration of Palen, pg. 22, paragraph 68.
[34] Four of the six Trusts' began in 2007. McGinn Smith prepared tax returns for all six Trusts in 2008.
[35] Declaration of Palen, pg. 23.

income tax return for Smith.  It is our understanding Simons, as part of the falsification, made an adjusting journal entry which reclassified the above $407,000 in fees paid to a loan, thereby understating income and overstating the assets of TDM Cable Funding.  Given the facts and circumstances, this entry was improper and an obvious violation of the professional standard enumerated previously.

As noted previously from the record of the criminal proceeding, Simons testified that additional amounts of fees were recorded as loans for McGinn on his 2006 tax return and for both McGinn and Smith when they should have been treated as income rather than loans.  In the criminal proceedings, Simons testified that when he asked questions about the loans, the email response answering the questions about the loans was in quotation marks ("loans"), yet despite the clear emphasis, Simons ignored his duty of professional skepticism, allowing the fraudulent tax return to be filed.  Moreover, Simons admitted to preparing false personal financial statements for McGinn and Smith, which did not take into account the loan positions that were being taken on the fraudulent tax returns.  These examples are consistent with our analysis of the Piaker work product which ignored various "red flags" of the fraud due to their long term relationship with McGinn Smith and its principals.  Simons viewed McGinn Smith as a "trusted client for a number of years."  This classification ignores Piaker's professional responsibilities.

Similar to the Funds, the Trusts did not generate enough income to make interest and principal payments.  As a results, one Trust would be used to pay liabilities for another.    This is another red flag concerning the existence of a fraudulent Ponzi scheme.

A look at the tax returns over time indicate that the Funds were not complying with the terms of the PPM.

Routinely, a trial balance serves as a starting point for an accountant's preparation of tax returns.  Trial balances covering multiple years were obtained for the Funds.  Contrary to the PPMs for

each of the Funds, a significant portion of their assets consisted of investments[36] in affiliated companies.  **Table 4** below presents the high and low percentage of assets for each Fund invested in related companies during the period indicated.

**Table 4 – Fund Trial Balances, Percentage of Assets Invested in Affiliates**

| Abbr | Fund Name | Years | Min. % of Assets | Max. % of Assets |
|---|---|---|---|---|
| FAIN | First Advisory Income Notes | 2005-2007 | 63.5% | 69.1% |
| FEIN | First Excelsior Income Notes | 2004-2007 | 48.2% | 56.2% |
| FIIN | First Independent Income Notes | 2004-2007 | 10.8% | 27.9% |
| TAIN | Third Albany Income Notes | 2004-2007 | 33.1% | 51.5% |

Despite the notable violation of the PPM's, the Defendants signed the tax returns.  As the auditor of McGinn Smith, and as a responsible tax return preparer, basic knowledge of the components of assets, specifically related party transactions, would have made the Defendants familiar with the composition of these investments.

Each trial balance I examined contained adjustments.  As mentioned, for the preparation of a tax return, acquiring a trial balance is a preliminary step in the process.  Adjustments were determined and then posted to the trial balance.  A separate listing of Adjusting Journal Entries accompanied each year's trial balance.  The captions indicate the adjustments were prepared by the Defendants rather than McGinn Smith.  Captions routinely contained the word, "Client" which provides evidence the adjustments were prepared by the Defendants rather than internal accounting staff. In order for an accountant to propose an adjustment, a basis for the entry must be established.  In other words, the accountant presents an adjustment whose purpose is to correct a balance, classification or allocation.  Inherent in the adjustment process is the determination of a correct presentation which can only be ascertained if an understanding is obtained which is sufficient to provide the accountant a basis to determine the client's presentation is incorrect and the tax return preparer's adjustment can correct it.  The Defendants did not always accept the client's data without question when preparing the tax return but rather proposed adjusting entries.  In reviewing

---

[36] Investments is defined broadly as any asset, regardless of form, included on the trial balance.

the adjustments included with the Four Fund's trial balances, I noted the following accounts had adjustments proposed by the Defendants:

|  |  |
|---|---|
| Due to McGinn Smith | Management Fees |
| Security Participation Trust 4 | Underwriting |
| Due to Others – FEIN | Due to FAIN |
| Security Participation Trust 3 | Contract Revenue |
| Equity Contribution | Other Income |
| Legal Fees | Due to FIIN |
| M&S Partners Loan | Interest Income |

In order to adjust the accounts in accordance with applicable professional standards, the Defendants had to possess an intimate knowledge of the Funds' operations which revealed improprieties.

As illustrated earlier, McGinn Smith was an audit client of the Defendants. The preceding paragraph described adjustments proposed by McGinn Smith in the preparation of Trust tax returns. Given the history of Defendants providing tax services to the Funds and Trusts, it would be an expected result to increase the level of professional skepticism regarding related parties and the transactions associated. In the audit workpapers provided, we did not find evidence of an increased level of scrutiny, beyond the identification of related party transactions, applied to this type of transaction.

The AICPA, in AU Section 334, provides guidance. Excerpts from the guidance provides insight into the increased level of scrutiny suggest by the AICPA

After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining

and evaluating the sufficient appropriate audit evidence and should extend beyond inquiry of management.  Procedures that should be considered include the following

> A. Obtain an understanding of the business purpose of the transaction.
> B. Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.
> C. Determine whether the transaction has been approved by those charged with governance.
> D. Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements.
> E. Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.
> F. Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.[37]

Further, the Section explains:

When necessary to fully understand a particular transaction, the following procedures, which might not otherwise be deemed necessary to comply with generally accepted auditing standards, should be considered.

> A. Confirm transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction.
> B. Inspect evidence in possession of the other parry or parties to the transaction.
> C. Confirm or discuss significant information with intermediaries, such as banks, guarantors, agents, or attorneys, to obtain a better understanding of the transaction.
> D. Refer to financial publications, trade journals, credit agencies, and other information sources when there is a reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.
> E. With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transactions.  Such information may obtained from audited financial statements, unaudited financial statements, income tax returns, and reports issued by regulatory agencies, taxing authorities, financial publications, or credit agencies.  The auditor should decide on the degree of assurance required and the extent to which available information provides such assurance.[38]

---

[37] AU Section 334.09
[38] AU Section 334.10

An analytical procedure which compared revenue received from each related party with the amounts indicated in the related private placement memo would have been a useful audit procedure for McGinn Smith.

*Losses being sustained were a Red Flag of the Fraud*

The Funds were routinely incurring losses under a number of different measures. Such losses would have alerted the accountant to the possibility of irregularities and, at a minimum, would have evoked an attitude of professional skepticism which would have expanded the procedures involved with the tax returns preparation.

*Table 5* presents Net Income as reflected on the Trial Balances of the Funds.

| | | Table 5 – Net Income (Loss) per Trial Balance, 2004-2007 | | | |
|---|---|---|---|---|---|
| **Entity** | **2004** | **2005** | **2006** | **2007** | **Total 2004-2007** |
| FAIN | $N/A | ($213,636) | ($225,317) | $229,142 | ($209,811) |
| FEIN | (909,877) | (1,321,125) | (1,516,349) | (2,570,916) | (6,318,267) |
| FIIN | 294,634 | (409,229) | (160) | 90,236 | (24,519) |
| TAIN | (417,154) | (2,803,384) | 199,012 | (2,943,133) | (5,964,659) |
| **Total** | **( $1,032,397)** | **($4,747,374)** | **($1,542,814)** | **($5,194,671)** | **($12,517,256)** |

As clearly illustrated above, profitability, as measured by net income, was positive in just four of the fifteen periods presented. The combined deficit for the Funds during the period presented was in excess of $12 million, a figure that would invariably lead to questions regarding the sustainability of the Funds.

It is our understanding the trial balances provided were prepared using the accrual basis of accounting. In contrast to the trial balances, the tax returns for the Funds were prepared using the cash basis of accounting. The cash basis of accounting recognizes cash when received and expenses when paid. Simply, an analysis of cash basis tax returns may give a better idea of the sustainability of the business. *Table 6* presents net income as reported on tax returns.

| Table 6 – Net Income (Loss) per Tax Returns, 2004-2007[39] | | | | |
|---|---|---|---|---|
| **Entity** | **2004** | **2005** | **2006** | **2007** | **Total 2004-2007** |
| FAIN | $N/A | ($164,896) | ($718,766) | ($328,270) | ($1,211,932) |
| FEIN | (478,518) | (1,279,564) | (1,041,551) | (1,552,547) | (4,352,180) |
| FIIN | 278,672 | (380,546) | 217,158 | (502,305) | (387,021) |
| TAIN | (251,811) | (1,693,670) | (1,496,593) | (625,389) | (4,067,463) |
| **Total** | **( $451,657)** | **($3,518,676)** | **($3,039,752)** | **($3,008,511)** | **($10,018,596)** |

Over the four year period presented, not one of the Funds had cumulative positive net income and the Funds had combined losses totaling over $10 million.  It would have been apparent that these entities were not viable on a tax return net income basis.

An additional level of analysis can perhaps best illustrate the Fund's cash shortages generated on a recurring basis.  Eliminating transactions reported on a cash basis tax return which do not directly affect the amount of cash on hand in a particular year, can more accurately present the financial condition of the entity.  Such a presentation is similar to a statement of cash flows.  Examples of these types of transactions include gains and losses reported and amortization expenses.  ***Table 7*** presents the cash basis net income or loss of the Four Funds by eliminating transactions which did not involve a source or use of cash during the period:.

| Table 7 – Cash Basis Net Income (Loss), 2004-2007[40] | | | | |
|---|---|---|---|---|
| **Entity** | **2004** | **2005** | **2006** | **2007** | **Total 2004-2007** |
| FAIN | $N/A | ($79,373) | ($693,265) | ($326,192) | ($1,098,830) |
| FEIN | (185,685) | (750,238) | (583,250) | (364,504) | (1,883,677) |
| FIIN[41] | 428,005 | (231,213) | 366,491 | (352,972) | 210,311 |
| TAIN | (251,811) | (1,350,331) | (1,301,167) | (489,740) | (3,393,049) |
| **Total** | **( $9,491)** | **($2,411,155)** | **($2,211,191)** | **($1,533,408)** | **($6,165,245)** |

Even using this most conservative measure of cash flow, the Funds expended over $6 million more than received during this period.  The Funds' purpose was to provide a certain level of returns to its investors.  The deficits reveal the Funds were not operating as intended and the cash deficiency

---

[39] Declaration of K. Palen, Exhibit 15 – 15d.
[40] Declaration of K. Palen, Exhibit 15 – 15d.
[41] If FIIN's loss of $417,154 in 2003 is included it would make their cumulative total negative also.

had to be "made good" in some manner.  The Defendants had to realize the cash used to meet obligations needed to be provided and would have led to the discovery of improprieties.

*Other examples of wrongdoing by McGinn and Smith*

It should be noted that both McGinn and Smith were found guilty in 2013 of the following offenses:[42]

|  |  |
|---|---|
| McGinn: | Conspiracy to commit mail and wire fraud. |
|  | Mail fraud (7 counts) |
|  | Wire fraud (10 counts) |
|  | Securities fraud (6 counts) |
|  | Filing a false tax return (3 counts) (Years 2006 -2008) |
| Smith: | Conspiracy to commit mail and wire fraud. |
|  | Mail fraud (3 counts) |
|  | Wire fraud (2 counts) |
|  | Securities fraud (6 counts) |
|  | Filing a false tax return (3 counts) (Years 2006 -2008) |

*Defendants knew of the Ponzi scheme*

As demonstrated in the tax returns and related workpapers, FEIN's 2006 tax workpapers included a handwritten note which stated, "Per Dave Rees – represents funding of RTC Trust monthly cash flow shortages.  To be repaid with Trust receipts – after Trust debt is paid off - OR – will be purchased by another entity.  Not accruing any interest income on above loans as of 12/31."[43] In essence, the above handwritten note documents that Piaker knew of the Ponzi scheme as early as 2006 or recklessly disregarded applicable professional standards and failed to do anything about it.

---

[42] United States of America v. Timothy M. McGinn and David L. Smith.
[43] PL013477.

I found numerous others examples in the Piaker workpapers of similar instances wherein elements of the Ponzi scheme were documented, specifically I note:

- FEIN workpaper which identifies a $300,000 payment between FEIN and FIIN as being a "PMT to Cover Interest"[44]
- A borrowing from TAIN to FEIN to "cover redemptions"[45]
- A $300,000 general journal entry transaction showing a transfer between FIIN and FEIN for the Hill Redemptions.[46]
- Various payments between the Funds regarding alseT IP management showing transfers between FIIN, TAIN and FAIN.[47]

Based upon our analysis of the records and the cumulative knowledge gained by the Defendants during the longstanding relationship between Defendants and McGinn Smith, which included audit and tax services performed over a period of many years, made it likely that the Defendants knew of or recklessly disregarded the fraud.

### 3.4 ANALYSIS OF DEFENDANTS' CONTRIBUTION TO DAMAGES TO INVESTORS AND related ISSUES

In preparing my analysis, I have considered causation and mitigation issues, from a damages perspective, in order to determine if Defendants' acts were a significant or material factor in contributing to the loss suffered by the Plaintiffs.

Section 102 of the AICPA Code of Professional Conduct has provided an interpretation under Rule 102- Integrity and Objectivity.  It states:

---

[44] PL013500, PL013529
[45] PL013501
[46] PL014091, PL013529
[47] PL013972, PL013821

Knowing misrepresentations in the preparation of financial statements or records. A member shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET Section 102.01] when he or she knowingly-

    A.   Makes or permits or directs another to make, materially false and misleading entries in an entity's financial statements or records; or

    B.   Fails to correct an entity's financial statements or records that are materially false and misleading when he or she has the authority to record an entry; or

    C.   Signs, or permits or directs another to sign, a document containing materially false and misleading information.[48]

My analysis identified that Defendants' actions were a significant or material factor in the economic loss sustained by the Plaintiffs. Further, it was likely that Defendants knew or were reckless in disregarding the fraud and their actions or inactions in abdicating their professional responsibilities aided in the perpetration of the fraud. Specifically, I note:

- The Private Placement Memorandums indicates the types of securities that were permissible investments to be held by the Funds or the Trusts. The Defendants obtained this information plus other information including bank statements, listing of investor purchases, rollovers, interest rate calculations, details and information on the various investments held. Given the documents that I have seen to date, had the Defendants performed their services with integrity, objectivity and used due professional care, it would have been clear that these entities were not complying with the terms of their agreements with the investors.

- Trial balances for the Funds and the Trusts which showed the entities were operating at a loss indicating that the investments were not performing in a manner to pay investors in full.

- Defendants ignored handwritten notes in their 2006 tax return workpapers that documented the Ponzi scheme.

- Simons directed that false journal entries be entered in the client's accounting records.

- Simons, on behalf of Piaker, falsely characterized fees as loans which materially overstated assets of McGinn Smith entities.

---

[48] ET Section 102.02

- The Defendants ignored bank statement transactions of the Funds and Trusts reflecting improper withdrawals and the absence of interest payments due to the Funds and Trusts.

It may be argued that Plaintiffs have a duty to mitigate their damages. I note that Piaker, acting through Simons and Paventi did not withdraw from performing professional services for the McGinn Smith entities, when they became aware of extensive improper transactions in the course of their engagements. Had Piaker simply withdrawn as independent certified public accountants, the withdrawal would have necessarily become known by regulatory authorities, since registered broker-dealers *must* have audited financial statements. McGinn Smith would not have been able to continue to operate as a broker-dealer conducting private placements such as the Funds and Trust. Given the nature of the Ponzi scheme, it is unclear how the Plaintiffs could have mitigated their losses, except through actions such as this one to recover the losses that have been sustained.

### 3.5 DAMAGES

#### 3.5.1   Analysis of Losses Suffered by the Plaintiffs

The Plaintiffs each invested into various of the Funds and Trusts. Damages to the Plaintiffs rather simply, represent the amounts that they are still owed. ***Exhibit 1*** lists the current amount still due to the Plaintiffs (i.e. the Plaintiffs' damages).

#### 3.5.2   Prejudgment Interest

Counsel has informed us that Plaintiffs' are entitled to prejudgment interest. We reserve the right to update the calculation of prejudgment interest at the time of trial.

# 4. CONCLUSION

As noted previously, discovery is ongoing and I am waiting for Defendants to produce certain documents.   As a result, I may amended my conclusions as additional documents become available.   Based on the foregoing analysis, it is my opinion within a reasonable degree of professional certainty that:

- The Defendants knowingly or recklessly disregarded applicable professional standards  in performing services to McGinn Smith and their actions or inactions in abdicating their professional responsibilities aided in the perpetration of the fraud:

- Based upon the documents reviewed, either the Defendants knew about the Ponzi scheme or recklessly disregarded evidence of the fraud which would have led to its discovery.

- Defendants failure to adhere to professional standards was a significant or material factor in contributing to the loss suffered by the Plaintiffs;

- Plaintiffs have suffered damages in the amount of $10,712,712.62 as shown in ***Exhibit 1***.

Stephen J. Scherf, CPA/ABV, CVA

Principal

*www.asterion-consulting.com*



ASTERION

PHILADELPHIA

215 S. Broad Street, 3rd Floor    *t*  215 893 9901
Philadelphia, PA 19107    *f*  215 893 9903

NEW YORK

575 Lexington Avenue, 4th Floor    *t*  646 495 9340
New York, NY 10022

# Appendix A
# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
# Principal

sscherf@asterion-consulting.com

**Biography**

Mr. Scherf has provided a wide array of accounting and consulting services to clients with an emphasis on business valuations, fraud investigations, bankruptcy, and litigation matters.  Mr. Scherf has testified on numerous occasions in arbitrations, depositions and Federal Court.  Mr. Scherf has taught for the American Institute of Certified Public Accountants, The National Association of Certified Valuators & Analysts and other professional organizations.

Mr. Scherf's employment experience includes "Big Four," regional and a "boutique" accounting firm.  In the private sector, Mr. Scherf held officer positions at a $2.5 billion financial institution, a major real estate developer and an investment firm.

**Professional Memberships**

- American Arbitration Association National Roster of Commercial Panel of Neutrals
- FINRA Public Arbitrator
- American Institute of Certified Public Accountants
- Pennsylvania Institute of Certified Public Accountants
- Turnaround Management Association

- National Association of Certified Valuators & Analysts
- American Bankruptcy Institute
- American College Board of Forensic Examiners
- Association of Certified Fraud Examiners
- Association of Insolvency and Restructuring Advisors
- Institute for Internal Controls

**Education**

Mr. Scherf has a B.B.A. in Accounting from Temple University (1980) and a Master of Science in Finance (1986) and an Advanced Professional Certificate in Taxation (1987) from Drexel University.  His education has been supplemented by various continuing education courses offered by a variety of professional organizations.  He has spoken before professional and educational groups on various aspects of business valuation, litigation consulting, fraud investigations and economic damages.



## Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
### Rule 26 Disclosure – Testimony

| *Date* | *Jurisdiction* | *Type* | *Matter* |
| --- | --- | --- | --- |
| 2015 | United States District Court<br>District of Utah | Deposition | N8 Medical, Inc. et al. v. Colgate Palmolive Company |
| 2015 | Court of Chancery<br>State of Delaware | Trial | Currency, Inc. et al. v. API Technologies, Corp. et al. |
| 2015 | Court of Common Pleas<br>Montgomery County, PA | Hearing | Joel Rosenwasser and Engraving Technologies, Inc. v.<br>C.J.D., Inc. et al. |
| 2015 | Court of Common Pleas<br>Luzerne County, PA | Hearing | Natalie Gunnshannon et al. v. Albert/Carol Mueller t/a<br>McDonalds et al. |
| 2014 | Court of Common Pleas<br>Northampton County, PA | Trial | John Cancelliere et al. v. Buckno Lipsicky & Company et al. |
| 2014 | United States District Court<br>Eastern District of Pennsylvania | Trial | David's Bridal, Inc. v. CELS Enterprises, Inc. |
| 2014 | Court of Common Pleas<br>Delaware County, PA | Hearing | Joseph F. Delaney, III v. F. Sean Bonner and Carne Capital, LLC |
| 2014 | United States District Court<br>Eastern District of Pennsylvania | Deposition | David's Bridal, Inc. v. CELS Enterprises, Inc. |
| 2014 | United States District Court<br>District of New Jersey | Hearing | United States of America v. Ashokkummar R. Babaria |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
## Rule 26 Disclosure – Testimony

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2014 | Court of Chancery<br>State of Delaware | Trial | Kathryn Mennen et al. v. Wilmington Trust Company et al. |
| 2014 | Court of Chancery<br>State of Delaware | Deposition | Kathryn Mennen et al. v. Wilmington Trust Company et al. |
| 2014 | United States District Court<br>Eastern District of Pennsylvania | Trial | Pure Earth, Inc. v. Gregory Call v. Pure Earth Inc., et al. |
| 2013 | Court of Common Pleas<br>Bucks County, PA | Trial | Brian Opielski and Trimline Windows, Inc. v. Dennis Teeling et al. |
| 2013 | Superior Court of New Jersey<br>Camden County | Trial | Ozcan Yildiz and Storm Master West v. Storm Master Co., Inc. et al. |
| 2013 | United States District Court<br>Eastern District of Michigan | Deposition | Fen F, LLc v. Taylor Gifts, Inc. |
| 2013 | United States District Court<br>District of Delaware | Deposition | Jonathan and Trude Yarger et al. v ING Bank, FSB |
| 2013 | Superior Court of New Jersey<br>Camden County | Deposition | Ozcan Yildiz and Storm Master West v. Storm Master Co., Inc. et al. |
| 2013 | Court of Common Pleas<br>Montgomery County, PA | Trial | Howard Lapensohn, Trustee v. Jill Lapensohn, Trustee et al. |



## Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
### Rule 26 Disclosure – Testimony

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2013 | United States Bankruptcy Court Eastern District of Pennsylvania | Trial | In Re: Amy L Styer Commonwealth of Pennsylvania v. Amy L. Styer |
| 2012 | Court of Common Pleas Philadelphia County, PA | Hearing | Unicon Holdings, Inc. et al.  v. New Start, LLC. |
| 2012 | United States Bankruptcy Court Eastern District of Pennsylvania | Trial | In Re: Amy L Styer Commonwealth of Pennsylvania v. Amy L. Styer |
| 2012 | Superior Court of New Jersey Law Division Middlesex County | Trial | Thomas J. Sharp & Associates, Inc. et al. v. JH Cohn LLP et al. |
| 2012 | United States Bankruptcy Court Southern District of Florida | Deposition | Maury Rosenberg v. DVI Receivables, XIV, LLC et al. |
| 2012 | Court of Common Pleas Bucks County, PA | Hearing | In Re: Charles J. Bozzo, Deceased |
| 2012 | United States Bankruptcy Court Eastern District of Pennsylvania | Hearing | 400 Walnut Associates, LP. |
| 2012 | United States Bankruptcy Court Eastern District of Pennsylvania | Deposition | 400 Walnut Associates, LP. |
| 2011 | Superior Court of New Jersey Law Division Camden County | Deposition | Camden County Community College et al. v Whitson's Food Service  et al. |



## Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
### Rule 26 Disclosure – Testimony

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2011 | United States District Court<br>Eastern District of Pennsylvania | Trial | Pure Earth, Inc. v. Gregory Call v. Pure Earth Inc., et al. |
| 2011 | Court of Common Pleas<br>Montgomery County, PA | Hearing | Ashley B. Fienman, et al. v. SCA, L.P. et al. |
| 2011 | Court of Common Pleas<br>Berks County, PA | Trial | Commonwealth of Pennsylvania v. Wesley Snyder et al. |
| 2011 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Hearing | 400 Walnut Associates, LP. |
| 2011 | United States Bankruptcy Court<br>Eastern District of North Carolina | Hearing | Croatan Surf Club, LLC |
| 2011 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Deposition | 400 Walnut Associates, LP. |
| 2011 | FINRA Arbitration<br>Philadelphia, PA | Hearing | John and Eiko Nernoff v. William Lex |
| 2011 | Court of Common Pleas<br>Bucks County, PA | Trial | Benjamin E. Long v Accentra, Inc. et al. |
| 2011 | United States Bankruptcy Court<br>Southern District of New York | Deposition | Responsible Person for Musicland Holding Corp. et al. v. Best Buy Co., Inc. et al. |



## Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
### Rule 26 Disclosure – Publications

| <u>*Date*</u> | <u>*Publication*</u> | <u>*Title*</u> |
| --- | --- | --- |
| 2011 | National Litigation Consultant's Review | *Fair Value Accounting's Impact on Damages* |
| 2010 | National Litigation Consultant's Review | *Business Valuation in the "But For" World* |
| 2007 | ABF Journal (Co-Author with G Urbanchuk) | *Newton and Fraud: What Goes Up Must Come Down* |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2015 | Pennsylvania Bar Institute<br>Tales from the Shareholder Wars | Philadelphia, PA<br>Mechanicsburg, PA |
| 2015 | Pennsylvania Bar Institute<br>Minority Shareholder Freezeout Litigation | Philadelphia, PA |
| 2015 | Pennsylvania Bar Institute<br>Commercial Litigation Institute – Damages and Remedies | Philadelphia, PA |
| 2015 | National Business Institute<br>Handling the Sale of a Business | Philadelphia, PA |
| 2014 | National Association of Certified Valuation Analysts<br>Solvency and Insolvency Testing | Webinar |
| 2014 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | New Orleans, LA |
| 2014 | Pennsylvania Institute of Certified Public Accountants<br>AICPA Testing for Goodwill Impairment Guide | Philadelphia, PA |
| 2014 | Montgomery County Bar Association<br>Intersection of Forensic Accounting and Bankruptcy | Norristown, PA |
| 2013 | Rutgers School of Law<br>Business Divorce | Camden, NJ |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| _Date_ | _Description_ | _Location_ |
|---|---|---|
| 2013 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Chicago, IL |
| 2013 | Pennsylvania Bar Institute<br>Advanced Piercing the Corporate Veil | Philadelphia, PA |
| 2013 | Accounting for Lawyers<br>Schnader Harrison Segal & Lewis LLP | Philadelphia, PA |
| 2013 | Pennsylvania Bar Institute<br>Business Divorce | Mechanicsburg, PA |
| 2012 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Philadelphia, PA |
| 2011 | Pennsylvania Institute of Certified Public Accountants<br>Ethics and Other Issues – An Update | Valley Forge, PA |
| 2011 | Pennsylvania Institute of Certified Public Accountants<br>Impairment Testing for Financial Reporting | Harrisburg, PA |
| 2011 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Orlando, FL |
| 2011 | National Business Institute<br>Accounting 101 for Attorneys | Allentown, PA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2010 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Chicago, IL |
| 2010 | Pennsylvania Institute of Certified Public Accountants<br>Fair Value Measurements | Harrisburg, PA |
| 2010 | American Society of Appraisers - Southern<br>New Jersey Chapter<br>Lost Profits and Business Destruction Damage Claims | Cherry Hill, NJ |
| 2010 | Office of Auditor Accounts – State of DE<br>The Expert's Role and Testimony | Dover, DE |
| 2009 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Jersey City, NJ |
| 2009 | Pennsylvania Institute of Certified Public Accountants<br>Financial Institutions Conference<br>Valuation and SFAS 141R | Hershey, PA |
| 2009 | Montgomery County Bar Association and the Greater<br>Philadelphia Chapter of the PICPA – Strategies for<br>Clients in the Current Economic Crisis | Norristown, PA<br>Philadelphia, PA |
| 2008 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | San Diego, CA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|--------|---------------|------------|
| 2008 | Pennsylvania Institute of Certified Public Accountants<br>Business Valuation Conference<br>FASB Valuation Issues | Harrisburg, PA |
| 2008 | Association of Government Accountants<br>Ponzi Schemes | Philadelphia, PA |
| 2007 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Washington, DC |
| 2007 | Fair Value Measurements SFAS 157<br>Pennsylvania Institute of Certified Public Accountants | Conshohocken, PA |
| 2007 | National Association of Certified Valuation Analysts<br>Normalizing and Projecting Earnings<br>Valuation Methods:  Alternatives and Decision Criteria | Philadelphia, PA |
| 2007 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Brookfield, WI |
| 2006 | Discounting of Damages, Selecting Appropriate Discount<br>Rate - Forensic & Litigation Services Conference<br>Pennsylvania Institute of Certified Public Accountants | King of Prussia, PA |
| 2006 | Business Valuation: How to Make or Break Your Case<br>Montgomery County Bar Association<br>Pennsylvania Institute of Certified Public Accountants | Norristown, PA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2006 | National Business Institute<br>Financial Statement Analysis for the Non-Financial<br>Advisor in Pennsylvania | Philadelphia, PA |
| 2006 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | San Antonio, TX |
| 2006 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Chicago, IL |
| 2005 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Ft. Lauderdale, FL |
| 2005 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Jersey City, NJ |
| 2005 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Philadelphia, PA |
| 2005 | Association of Government Accountants<br>Philadelphia Chapter<br>Business Valuation Fundamentals and Techniques | Lester, PA |
| 2005 | Association of Government Accountants<br>Philadelphia Chapter<br>Ownership and Acquisition Disputes and the Role of the<br>Forensic Accountant | Lester, PA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| _Date_ | _Description_ | _Location_ |
|--------|---------------|------------|
| 2004 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Las Vegas, NV |
| 2004 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Chicago, IL |
| 2004 | AICPA Conferences on Fraud and Litigation Services<br>Case Management | Phoenix, AZ |

Appendix B
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Documents Considered

| Document Description | Bates Range | |
|---|---|---|
| Amended Complaint | | |
| Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Amended Complaint | | |
| Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint | | |
| Defendants' Responses to Plaintiffs' First Set of Interrogatories with Exhibits A, B, C & D. | | |
| AICPA Code of Professional Conduct | | |
| Generally Accepted Auditing Standards | | |
| Statements on Auditing Standards | | |
| Declaration of Kerri L. Palen | | |
| Administrative Proceedings dated January 27,, 2014 and January 28, 2014 before the Securities and Exchange Commission, In the Matter of Donald Anthony, Jr., Frank H. Chiappone, Richard D. Feldmann, William F. Lex, Thomas E. Livingston, Brian T. Mayer, Philip S. Rabinovich and Ryan C. Rogers. | | |
| Plaintiff Investor Information, Schedule A, dated November 10, 2014 | | |
| Various spreadsheets of Investor Information | | |
| Various internet search information | | |
| Various documents regarding United States v. Timothy M. McGinn and David L. Smith and matters regarding the Securities and Exchange Commission and Receivership | | |
| Documents from Computer Hard drive | | |
| Plaintiff individual investor information | | |
| FEIN AND TAIN trial balances, 2004- 2007 | | |
| FIIN trial balances, 2003 - 2007 | | |
| FAIN trial balances, 2004 - 2007 | | |
| Private Placement Memorandums | | |
| United States of America v. Timothy M. McGinn and David L. Smith, Superseding Indicment. | | |
| United States of America v. David L. Smith, Judgement of Acquital | | |
| United States of America v. Timothy M. McGinn, Judgement of Acquittal | | |
| United States of America v. Timothy M. McGinn, Verdict Form. | | |
| United States of America v. David L. Smith, Amended Judgement | | |
| United States of America v. David L. Smith, Judgement of Acquital | | |
| United States of America v. Timothy M. McGinn and David L. Smith, Verdict Form, David L. Smith | | |
| United States of America v. Timothy M. McGinn and David L. Smith, Verdict Form, Trial Transcipt. | | |
| Securities and Exchange Commision v. McGinn Smith and Co., et al, and Lynn A. Smiith and Nancy McGinn | | |
| Securities and Exchange Commision v. McGinn Smith and Co., et al, and Lynn A. Smiith and Nancy McGinn, Final Judgement as to Defendant Timothy M. McGinn. | | |
| Securities and Exchange Commision v. McGinn Smith and Co., et al, and Lynn A. Smiith and Nancy McGinn, Final Judgement as to Defendant David L. Smith. | | |
| United States of America v. Ronald Simons Plea Agreement. | | |
| Testimony of Ronald Simons dated May 9, 2014. | | |
| United States of America v. Timothy M. McGinn and David L. Smith, Verdict Form, David L. Smith. | | |
| SEC v. McGinn, Smith & Co., et.al., Order to Show Casue, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief | | |
| SEC v. McGinn, Smith & Co., et.al., Plaintiff's Memorandum of Law in Support of Application for Emergency Relief | | |
| SEC v. McGinn, Smith & Co., et.al., Declaration of Israel Maya. | | |
| SEC v. McGinn, Smith & Co., et.al., Declaration of Lara Shalov Mehraban | | |
| SEC v. McGinn, Smith & Co., et.al., Declaration of RoseAnn Daniello | | |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL003548 | PL012075 |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL012204 | PL015069 |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL015725 | PL016527 |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL016589 | PL017148 |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL018931 | PL020370 |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL023747 | PL024176 |
| Documents furnished in response to first demand for production of documents of Piaker & Lyons | PL030000 | PL030123 |

Exhibit 1
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Damages

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| **Ayers, Deanna M.** | McGinn Smith | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $75,000.00 |
| | McGinn Smith | FIIN Secured Senior Notes | | | $68,199.64 |
| | McGinn Smith | TDM Verifier Trust 11 Contract Certificates 9% | | | $28,619.55 |
| | McGinn Smith | TDM Verifier Trust 11 Contract Certificates 9% | | | $9,539.85 |
| | | | | Total | $181,359.04 |
| **Borel, Garth S. & Elizabeth C.** | McGinn Smith (Garth S.) | TDM Verifier Trust 08R Contract Certificate 9% | | | $75,000.00 |
| | McGinn Smith (Joint) | FAIN Secured Senior Notes | | | $91,995.36 |
| | McGinn Smith (Joint) | FIIN Secured Senior Notes | | | $90,932.86 |
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | | | $90,932.86 |
| | | | | Total | $348,861.08 |
| **Bove, Richard L.  & Lynn A.** | McGinn Smith (Richard L.) | FIIN Secured Senior Notes | | | $45,466.43 |
| | McGinn Smith (Richard L.) | FAIN Secured Senior Notes | | | $13,799.30 |
| | McGinn Smith (Richard L.) | FAIN Secured Senior Notes | | | $32,198.37 |
| | McGinn Smith (Richard L.) | FAIN Secured Senior Subordinated Notes | | | $50,000.00 |
| | McGinn Smith (Richard L.) | FAIN Secured Senior Subordinated Notes | | | $15,000.00 |
| | McGinn Smith (Richard L.) | TDM Verifier Trust 11 Contract Certificates 9% | | | $9,539.85 |
| | McGinn Smith (Richard L.) | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $9,023.75 |
| | McGinn Smith (Richard L.) | FIIN Secured Senior Notes | | | $22,733.21 |
| | McGinn Smith (Richard L.) | Integrated Excellence Senior Trust 08 | | | $6,836.50 |
| | McGinn Smith (Richard L.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $105,000.00 |
| | McGinn Smith (Richard L.) | FIIN Secured Senior Subordinated Notes | | Due: 12/15/2008 | $30,000.00 |
| | McGinn Smith (Richard L.) | FIIN Secured Senior Subordinated Notes | | Due: 12/15/2008 | $15,000.00 |
| | McGinn Smith (Richard L.) | FIIN Secured Senior Notes | | | $45,466.43 |
| | McGinn Smith (Lynn A.) | TAIN Secured Senior Notes | #112 | | $50,013.07 |
| | | | | Total | $450,076.91 |
| **Burke, James J.** | | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $285,000.00 |

**Exhibit 1**
**Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.**
**Damages**

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | | Integrated Excellence Senior Trust 08 | | | $10,254.75 |
| | | FAIN Secured Senior Subordinated Notes | | | $20,000.00 |
| | | FAIN Secured Senior Notes | | | $22,998.83 |
| | | FAIN Secured Senior Notes | | | $18,399.07 |
| | | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $10,000.00 |
| | | | | Total | $366,652.65 |
| **Connell, Kathleen A.** | | TAIN Secured Senior Notes | | | |
| | McGinn Smith | | | | $45,466.43 |
| | McGinn Smith | TAIN Secured Senior Notes | | | $22,733.21 |
| | | | | Total | $68,199.64 |
| **Conti, Pierre & Beverly J.** | McGinn Smith (Beverly J.) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $40,000.00 |
| | McGinn Smith (Beverly J.) | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $13,535.63 |
| | McGinn Smith (Beverly J.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $140,000.00 |
| | McGinn Smith (Beverly J.) | FAIN Secured Senior Notes | | | $13,799.30 |
| | McGinn Smith (Beverly J.) | FAIN Secured Senior Notes | | | $73,596.29 |
| | McGinn Smith (Beverly J.) | FAIN Secured Senior Notes | | | $13,799.30 |
| | McGinn Smith (Beverly J.) | FAIN Secured Senior Notes | | | $13,799.30 |
| | McGinn Smith (Beverly J.) | FIIN Secured Senior Notes | | | $113,666.07 |
| | McGinn Smith (Beverly J.) | FIIN Secured Senior Notes | | | $13,639.93 |
| | McGinn Smith (Pierre) | TAIN Secured Senior Notes | | | $59,106.36 |
| | McGinn Smith (Pierre) | FIIN Secured Senior Subordinated Notes | | Due 12/15/2008 | $55,000.00 |
| | McGinn Smith (Pierre) | FAIN Secured Senior Notes | | | $41,397.91 |
| | McGinn Smith (Pierre) | TAIN Secured Senior Notes | | | $250,137.36 |
| | McGinn Smith (Pierre) | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $18,047.50 |
| | McGinn Smith (Pierre) | FIIN Secured Senior Notes | | | $13,639.93 |
| | McGinn Smith (Pierre) | FIIN Secured Senior Notes | | | $90,932.86 |
| | McGinn Smith (Pierre) | TAIN Secured Subordinated Notes 7.75% | | Due: 12/15/2009 | $200,000.00 |
| | McGinn Smith (Pierre) | FIIN Secured Senior Notes | | | $45,466.43 |
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | | | $45,466.43 |
| | | | | Total | $1,255,030.60 |
| **Cote, Peter C. & Gayle L.** | McGinn Smith (Joint) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $200,000.00 |

Exhibit 1
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Damages

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | | | $181,865.72 |
| | McGinn Smith (Joint) | FAIN Secured Senior Subordianted Notes | | | $100,000.00 |
| | McGinn Smith (Joint) | TDM Verifier Trust 11 Contract Certificates 9% | | | $23,849.63 |
| | McGinn Smith (Joint) | FIIN Secured Senior Notes | | | $181,865.72 |
| | McGinn Smith (Joint) | Firstline Trust 07 B Senior Contract Certificates 9.5% | | Due: 10/1/2011 | $41,383.90 |
| | McGinn Smith (Joint) | Firstline Trust 07 B Junior Contract Certificates 11% | | Due: 10/1/2012 | $39,678.45 |
| | | | | Total | $768,643.42 |
| Criniti, Sharon L. & Criniti, Charles | McGinn Smith (Joint) | FIIN (non-qualified) | #62 | | $22,733.21 |
| | McGinn Smith (Charles) | Firstline Trust 07 9.25% Senior Contract Certificates | #R20 | 7/16/2007 Due: 9/1/2010 | $44,241.80 |
| | McGinn Smith (Charles) | McGinn Smith Firstline Funding, LLC | | | $6,500.00 |
| | McGinn Smith (Charles) | TDM Verifier Trust 08R Contract Certificate 9% | #8 | 6/30/2009 Due: 12/31/2010 | $50,000.00 |
| | McGinn Smith (Charles) | Integrated Excellence Senior Trust 08 | #21 | 7/8/2008 Due: 6/1/2013 | $20,509.50 |
| | McGinn Smith (Charles) | Fortress Trust 08 | #53 | 12/19/2008 Due: 10/01/2011 | $39,822.21 |
| | McGinn Smith (Joint) | TDMM Cable SR. Trust 09 9% | #41 | 7/7/2009 Due: 2/1/2012 | $72,497.68 |
| | | | | Total | $256,304.40 |
| Crist, Henry S. | McGinn Smith | Firstline Trust 07 B Senior Contract Certificates 9.5% | | Due: 10/1/2011 | $24,830.34 |
| | McGinn Smith | Firstline Trust 07 B Junior Contract Certificates 11% | | Due: 10/1/2012 | $59,517.68 |
| | McGinn Smith | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $31,583.13 |
| | McGinn Smith | FAIN Secured Senior Subordinated Notes | | | $40,000.00 |
| | McGinn Smith | FAIN Secured Senior Subordinated Notes | | | $20,000.00 |
| | McGinn Smith | TAIN Secured Senior Notes | | | $272,798.58 |
| | | | | Total | $448,729.73 |
| Cupersmith, Neal A. & Frances | McGinn Smith (Joint) | FEIN Secured Senior Notes | #18 | 1/30/2008 1/30/2009 | $91,995.36 |
| | | | | Total | $91,995.36 |
| Dale, Mary S. & Kenneth | McGinn Smith (Kenneth) | TDMM Cable Senior Trust 09 9% | | | $31,173.04 |
| | McGinn Smith (Kenneth) | FEIN Secured Senior Notes | | | $22,998.83 |

**Exhibit 1**
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Damages

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | McGinn Smith (Joint) | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $45,118.75 |
| | McGinn Smith (Joint) | Firstline Trust 07 B Senior Contract Certificates 9.5% | | Due: 10/1/2011 | $41,383.90 |
| | McGinn Smith (Mary S.) | Fortress Trust 08 | | | $35,839.98 |
| | McGinn Smith (Mary S.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $65,000.00 |
| | McGinn Smith (Mary S.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $55,000.00 |
| | McGinn Smith (Mary S.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $25,000.00 |
| | | | | Total | $321,514.50 |
| DeSantis, Barry & Jean A. | McGinn Smith (Joint) | FEIN Secured Senior Notes | #20 | 1/30/2008 Due: 1/30/2009 | $68,996.51 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | #24 | 2/5/2007 Due: 1/30/2009 | $50,000.00 |
| | | | | Total | $118,996.51 |
| Dittmann, Gerald & Kathy | | TDM Verifier Trust 08R Contract Certificate 9% | | | $45,000.00 |
| | | | | Total | $45,000.00 |
| Forsyth, Alice J. & Susan J. | McGinn Smith (Alice) | Firstline Trust 07 9.25% Senior Contract Certificates | | Due: 9/1/2010 | $24,332.99 |
| | McGinn Smith (Alice) | FAIN Secured Senior Notes | | | $13,799.30 |
| | McGinn Smith (Alice) | FAIN Secured Senior Notes | | | $50,597.44 |
| | McGinn Smith (Alice) | FAIN Secured Senior Subordinated Notes | | | $65,000.00 |
| | McGinn Smith (Alice) | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $31,583.13 |
| | McGinn Smith (Alice) | FIIN Secured Senior Notes | | | $45,466.43 |
| | McGinn Smith (Alice) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $45,000.00 |
| | McGinn Smith (Alice) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $120,000.00 |
| | McGinn Smith (Alice) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $20,000.00 |
| | McGinn Smith (Alice) | TDM Verifier Trust 07 R Contract Certificates | | | $10,000.00 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | | Due: 9/1/2010 | $35,000.00 |
| | McGinn Smith (Joint) | Firstline Trust 07 9.25% Senior Contract Certificates | | Due: 9/1/2010 | $28,757.17 |
| | McGinn Smith (Joint) | TDMM Cable Senior Trust 09 9% | | | $23,379.78 |
| | | | | Total | $512,916.24 |

**Exhibit 1**
**Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.**
**Damages**

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| **Gavin, George M. & Nancy A.** | IRA Services (George M.) | FIIN Secured Senior Notes | IRA143406 | | $104,575.79 |
| | IRA Services (George M.) | FIIN Secured Subordinated Notes | IRA143406 | Due: 12/15/2008 | $35,000.00 |
| | IRA Services (George M.) | TAIN Secured Senior Subordinated Notes 7.75% | IRA143406 | Due: 12/15/2009 | $15,000.00 |
| | IRA Services (George M.) | FIIN Secured Senior Notes | IRA143406 | | $72,746.29 |
| | IRA Services (George M.) | FEIN Secured Senior Subordinated Notes | IRA143406 | Due: 1/30/2009 | $10,000.00 |
| | IRA Services (George M.) | FEIN Secured Senior Subordinated Notes | IRA143406 | Due: 1/30/2009 | $10,000.00 |
| | IRA Services (George M.) | FEIN Secured Senior Subordinated Notes | IRA143406 | Due: 1/30/2009 | $85,000.00 |
| | IRA Services (George M.) | FAIN Secured Senior Notes | IRA143406 | | $18,399.07 |
| | IRA Services (George M.) | FAIN Secured Subordinated Notes | IRA143406 | | $20,000.00 |
| | IRA Services (George M.) | Integrated Excellence Senior Trust 08 | IRA143406 | 7/16/2008 Due: 6/1/2013 | $10,254.75 |
| | McGinn Smith (Nancy) | FAIN Secured Senior Notes | | | $36,798.14 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $35,000.00 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $10,000.00 |
| | McGinn Smith (Joint) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $25,000.00 |
| | | | | Total | $487,774.04 |
| **Gillis, Angus T. & Joanne V.** | McGinn Smith (Angus T.) | TAIN Secured Senior Notes | | | $118,212.72 |
| | McGinn Smith (Angus T.) | FINN Secured Senior Subordinated Notes | | Due: 15/15/2008 | $105,000.00 |
| | McGinn Smith (Angus T.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $15,000.00 |
| | McGinn Smith (Angus T.) | Firstline Trust 07 B Senior Contract Certificates 9.5% | | 12/19/2007 Due: 10/1/2011 | $12,415.17 |
| | McGinn Smith (Angus T.) | Integrated Excellence Senior Trust 08 | | 7/2/2008 Due: 6/1/2013 | $6,836.50 |
| | McGinn Smith (Angus T.) | TDMM Cable Senior Trust 09 9% | | 2/19/2009 Due: 2/1/2012 | $7,793.26 |
| | McGinn Smith (Joanne V.) | TDM Verifier Trust 08 Contract Certificate 36 | | 1/10/2008 Due: 12/31/2010 | $55,000.00 |
| | McGinn Smith (Joanne V.) | TDMM Cable Senior Trust 09 9% | | 6/12/2009 Due: 2/1/2012 | $7,793.26 |
| | | | | Total | $328,050.91 |
| **Glasgow, Katherine C.** | McGinn Smith | TDMM Cable Senior Trust 09 9% | DLY-059749 | 5/19/2009 Due: 2/1/2012 | $77,932.60 |
| | | | | Total | $77,932.60 |
| **Harnish, Richard** | | TDM Verifier Trust 08R Contract Certificate 9% | | | $50,000.00 |

Exhibit 1
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Damages

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | | FAIN Secured Senior Notes | | | $9,199.54 |
| | | FAIN Secured Senior Notes | | | $9,199.54 |
| | | TAIN Secured Senior Notes | | | $22,733.21 |
| | | TDM Verifier Trust 08R Contract Certificate 9% | | | $25,000.00 |
| | | TDM Verifier Trust 08R Contract Certificate 9% | | | $25,000.00 |
| | | TAIN Secured Senior Subordinated Notes 7.75% | | 12/15/2009 | $200,000.00 |
| | | TDM Verifier Trust 08R Contract Certificate 9% | | | $100,000.00 |
| | | | | Total | $441,132.29 |
| **Judge, Joanne M. & Oppenheimer, Paul E.** | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | #30 | 1/30/2008 Due: 1/30/2009 | $50,000.00 |
| | McGinn Smith (Joint) | TAIN Secured Senior Subordinated Notes 7.75% | #90 | 12/15/2007 Due: 15/15/2009 | $100,000.00 |
| | McGinn Smith (Joint) | FEIN Secured Senior Notes | #65 | 39112 | $45,997.68 |
| | McGinn Smith (Joint) | FAIN Secured Senior Subordinated Notes | #49 | 38804 | $100,000.00 |
| | McGinn Smith (Joint) | TDM Verifier Trust 11 Contract Certificates 9% | R09-107 | 8/15/2009 Due: 2/15/2011 | $66,778.95 |
| | | | | Total | $362,776.63 |
| **Lynch, Kenneth John** | | TAIN Secured Senior Subordiated Notes 7.75% | | | $40,000.00 |
| | | TAIN Secured Senior Subordinated Notes 7.75% | | | $15,000.00 |
| | | | | Total | $55,000.00 |
| **Mayberry, Joseph J. Mary Alice** | McGinn Smith (Joseph) | Integrated Excellence Senior Trust 08 | | | $10,254.75 |
| | McGinn Smith (Joseph) | FIIN Secured Senior Notes | | | $68,199.64 |
| | McGinn Smith (Joseph) | TAIN Secured Senior Notes | | | $9,093.29 |
| | McGinn Smith (Joseph) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $30,000.00 |
| | McGinn Smith (Joseph) | FAIN Secured Senior Notes | | | $9,199.54 |
| | McGinn Smith (Joseph) | FAIN Secured Senior Subordinated Notes | | | $10,000.00 |
| | McGinn Smith (Joint) | FIIN Secured Senior Notes | | | $45,466.43 |
| | McGinn Smith (Joint) | FAIN Secured Senior Subordinated Notes | | | $10,000.00 |
| | McGinn Smith (Joint) | FIIN Secured Senior Notes | | | $4,546.64 |
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | | | $9,093.29 |
| | | | | Total | $205,853.58 |

**Exhibit 1**
**Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.**
**Damages**

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| **Mazda, Russell** | | | | | |
| | McGinn Smith | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $40,000.00 |
| | McGinn Smith | FAIN Secured Senior Subordinated Notes | | | $30,000.00 |
| | McGinn Smith | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $10,000.00 |
| | McGinn Smith | FAIN Secured Senior Subordinated Notes | | | $25,000.00 |
| | | | | Total | $105,000.00 |
| **Mohr, Barry J.** | | | | | |
| | McGinn Smith | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $225,000.00 |
| | McGinn Smith | FAIN Secured Senior Subordinated Notes | | | $200,000.00 |
| | | | | Total | $425,000.00 |
| **Morrison, John & Nancy** | | | | | |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | #63 | 1/30/2007 Due: 1/30/2009 | $30,000.00 |
| | McGinn Smith (Joint) | FIIN Secured Senior Notes | #38 | 39431 | $22,733.21 |
| | McGinn Smith (Joint) | TDM Verifier Trust 07 9% 24 Month Contract Certificates | | | $10,000.00 |
| | | | | Total | $62,733.21 |
| **Myers, Ellen L. & Ray M.** | McGinn Smith (Ellen) | FAIN Secured Senior Notes | | | $13,799.30 |
| | McGinn Smith (Ellen) | FEIN Secured Senior Notes | | | $119,593.97 |
| | McGinn Smith (Ellen) | FAIN Secured Senior Subordinated Notes | | | $15,000.00 |
| | McGinn Smith (Ellen) | Integrated Excellence Senior Trust 08 | | | $6,836.50 |
| | McGinn Smith (Ellen) | FIIN Secured Senior Subordinates | | Due: 12/15/2008 | $10,000.00 |
| | McGinn Smith (Ellen) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $80,000.00 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $77,500.00 |
| | | | | Total | $322,729.77 |
| **Nemeth, Ilene and Robert** | Ilene Nemeth | FAIN Secured Senior Notes | | | $55,197.22 |
| | Ilene Nemeth | Fortress Trust 08 | | | $7,964.44 |
| | Robert Nemeth | FAIN Secured Senior Subordinated Notes | | | $20,000.00 |
| | Joint | Firstline Trust 07 9.25% Senior Contract Certificates | | | $11,060.45 |
| | Joint | FAIN Secured Senior Subordinated Notes | | | $15,000.00 |
| | Joint | FAIN Secured Senior Subordinated Notes | | | $45,000.00 |
| | Joint | FAIN Secured Senior Notes | | | $13,799.30 |

Exhibit 1
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Damages

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | | | | Total | $168,021.41 |
| **Nixon, Macon L. & Audrey E.** | McGinn Smith (Macon L.) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $25,000.00 |
| | McGinn Smith (Macon L.) | FIIN Secured Senior Notes | | | $18,186.57 |
| | McGinn Smith (Macon L.) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $40,000.00 |
| | McGinn Smith (Macon L.) | FAIN Secured Senior Subordinated Notes | | | $80,000.00 |
| | McGinn Smith (Macon L.) | FAIN Secured Senior Subordinated Notes | | | $25,000.00 |
| | McGinn Smith (Macon L.) | FEIN Secured Senior Notes | #29 | | $22,998.83 |
| | McGinn Smith (Audrey E.) | FEIN Secured Senior Notes | #28 | | $18,399.07 |
| | | | | Total | $229,584.47 |
| **Pavlishin, Paul & Dolores** | McGinn Smith (Joint) | TDM Verifier Junior Notes | | Due: 12/15/2009 | $30,000.00 |
| | McGinn Smith (Joint) | Integrated Excellence Senior Trust 08 | | | $17,091.25 |
| | McGinn Smith (Joint) | TDM Verifier Trust 07R Contract Certificates | | | $50,000.00 |
| | | | | Total | $97,091.25 |
| **Peters, Mary Wanda** | McGinn Smith | Integrated Excellence Senior Trust 08 | | | $51,273.75 |
| | McGinn Smith | TDMM Cable Sr Trust 09 | | | $19,483.15 |
| | | | | Total | $70,756.90 |
| **Robbins, Cynthia** | McGinn Smith | TDM Verifier Trust 08R Contract Certificate 9% | TDM Verifier Trust 08R Contract Certificate 9% | | $25,000.00 |
| | | | | Total | $25,000.00 |
| **Rogers, Albert K. & Ruth C.** | McGinn Smith (Albert) | FAIN Secured Senior Notes | | | $275,986.08 |
| | McGinn Smith (Albert) | FIIN Secured Senior Notes | | | $122,759.36 |
| | McGinn Smith (Albert) | FIIN Secured Senior Notes | | | $183,684.37 |
| | McGinn Smith (Albert) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $150,000.00 |
| | McGinn Smith (Albert) | FAIN Secured Senior Subordinated Notes | | | $80,000.00 |
| | McGinn Smith (Joint) | FIIN Secured Senior Notes | | | $27,279.86 |
| | McGinn Smith (Ruth) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $75,000.00 |
| | McGinn Smith (Ruth) | FIIN Secured Senior Notes | | | $11,821.27 |
| | | | | Total | $926,530.94 |
| **Seigford, Patricia E., William L.** | McGinn Smith (Patricia E.) | TDM Verifier Trust 08R Contract Certificate 9% | IRA144915 | 39994 | $55,000.00 |
| | McGinn Smith (Joint) | TDM Verifier Trust 08R Contract Certificate 9% | | 40008 | $10,000.00 |

Exhibit 1
Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.
Damages

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | | | | Total | $65,000.00 |
| Shannon, David T. & Kathleen M. | McGinn Smith (Joint) | FEIN Secured Senior Notes | #35 | 1/30/2008 Due: 1/30/2009 | $22,998.83 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | #28 | 3/1/2007 Due: 1/30/2009 | $50,000.00 |
| | McGinn Smith (Joint) | TDM Verifier Trust 07 9% 24 Month Contract Certificates | | | $25,000.00 |
| | | | | Total | $97,998.83 |
| Spurrier, David J. & Esther D. | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | #79 | Due: 1/30/2009 | $95,000.00 |
| | McGinn Smith (Joint) | TAIN Secured Senior Subordinated Notes 7.75% | #66 | Due: 12/15/2009 | $25,000.00 |
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | #90 | | $18,186.57 |
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | | | $9,093.29 |
| | | | | Total | $147,279.86 |
| Starr, Harvey T. | McGinn Smith | FAIN Secured Senior Subordinated Notes | | | $40,000.00 |
| | | | | Total | $40,000.00 |
| Sullivan, Linda M. | McGinn Smith (Linda M.) | FEIN Secured Senior Notes | MSA-000868 | 1/30/2008 Due: 1/30/2009 | $22,998.83 |
| | | | | Total | $22,998.83 |
| Trainor, Charles W. & Patricia M. | McGinn Smith (Joint) | FAIN Secured Senior Subordinated Notes | #120 | 39096 | $50,000.00 |
| | | | | Total | $50,000.00 |
| Vanasek, John M. | McGinn Smith | FAIN Secured Senior Subordinated Notes | IRA145233 | | $30,000.00 |
| | McGinn Smith | Firstline Trust 07 B Senior Contract Certificates 9.5% | IRA145233 | 1/31/2008 Due: 10/1/2011 | $8,276.78 |
| | | | | Total | $38,276.78 |
| Vossenberg, Anne H. | McGinn Smith | TDMM Cable Senior Trust 09 9% | | 6/12/2009 Due: 2/1/2012 | $116,898.90 |
| | | | | Total | $116,898.90 |
| Wargo, Robert J. (St. Joseph the Worker Church) | McGinn Smith | TDM Verifier Trust 08 Contract Certificate 36 | | | $100,000.00 |
| | McGinn Smith | TDMM Cable Senior Trust 09 9% | | | $77,932.60 |
| | McGinn Smith | Integrated Excellence Senior Trust 08 | | | $27,346.00 |
| | | | | Total | $205,278.60 |
| Wright, David M. | McGinn Smith | TDMM Cable Senior Trust 09 9% | | | $7,793.26 |
| | McGinn Smith | FEIN Secured Senior Notes | | | $78,196.05 |
| | McGinn Smith | FIIN Secured Senior Notes | | | $9,093.29 |
| | | | | Total | $95,082.60 |
| Zakroff, Peter S. and Theresa M. | McGinn Smith (Peter) | TDM Verifier Trust 09 10% Contract Certificates | | Due: 12/31/2011 | $13,535.63 |
| | McGinn Smith (Joint) | McGinn, Smith Firstline Funding, LLC | | | $6,000.00 |

**Exhibit 1**
**Neal A. Cupersmith et al. v. Piaker & Lyons, P.C. et al.**
**Damages**

| Name (Last, First) | Company Name | Product / Market | Contract Number | Issue Date / Maturity Date | Contract Value |
|---|---|---|---|---|---|
| | McGinn Smith (Joint) | FAIN Secured Senior Subordinated Notes | | | $20,000.00 |
| | McGinn Smith (Joint) | FAIN Secured Senior Notes | | | $22,998.83 |
| | McGinn Smith (Joint) | TAIN Secured Senior Notes | | | $27,279.86 |
| | McGinn Smith (Joint) | Firstline Trust 07 B Junior Contract Certificates 11% | | Due: 10/1/2012 | $15,871.38 |
| | McGinn Smith (Joint) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $40,000.00 |
| | McGinn Smith (Joint) | TAIN Secured Senior Subordinated Notes 7.75% | | Due: 12/15/2009 | $30,000.00 |
| | McGinn Smith (Joint) | FEIN Secured Senior Subordinated Notes | | Due: 1/30/2009 | $25,000.00 |
| | McGinn Smith (Joint) | Fortress Trust 08 | | | $7,964.44 |
| | | | | Total | $208,650.14 |

| | |
|---|---|
| **Total Damages** | **$10,712,712.62** |

# **Exhibit 15**

```
 1                           UNITED STATES DISTRICT COURT
                             NORTHERN DISTRICT OF NEW YORK
 2                           CIVIL ACTION NO. 3:14-CV-01303

 3                       - - -

 4   Neal A. Cupersmith., et al

 5        Plaintiffs

 6        v

 7   Piaker & Lyons, P.C., Ronald L.
     Simons and Timothy N. Paventi,
 8
          Defendants
 9                       - - -

10

11           Oral deposition of Richard Bove, taken at

12   the law offices of Kang, Haggerty & Fetbroyt, 123 South

13   Broad Street, Suite 1670, Philadelphia, Pennsylvania,

14   on Wednesday, October 1, 2015, commencing at 9:00 a.m.,

15   before Alan L. Lesky, Certified Court Reporter of the

16   State of New Jersey, pursuant to notice.

17

18

19

20

21

22                    ALAN L. LESKY & ASSOCIATES
                          Six Highspire Court
23                     Medford, New Jersey 08055
                              609-257-3146
24
```

**Page 14**

1 In fact, I signed it.
2    Q.   Do you recall receiving similar documents like
3 this for each of the investments that you made?
4    A.   I presume.  I don't recall, but having gone
5 through my records in the past I think I've seen them even
6 again.
7    Q.   Looking at this particular document, does that
8 look like an investment that you made that was $50,000 in
9 the First Independent Income Notes?
10    A.   Yes.
11    Q.   Do you recall specifically making that particular
12 investment?
13    A.   No.
14    Q.   In your meetings with Mr. Lex do you recall how
15 long they lasted?
16    A.   I met with him so many times I couldn't possibly
17 tell you.
18    Q.   Do you recall whether they were lengthy meetings?
19    A.   Well, it depends what you consider lengthy.  I
20 would say 10 minutes maybe we talked about this.  I really
21 can't answer that correctly.
22    Q.   Did Mr. Lex mention if he received any fees or
23 commissions in connection with your investments in the
24 funds?

**Page 15**

1    A.   Oh, I'm sure he did.  I was quite aware that he
2 makes money from these.
3    Q.   But there was no specific discussions as far as
4 what --
5    A.   No, I really wasn't interested to be honest with
6 you.
7    Q.   Did Mr. Lex ever describe to you any risks
8 involved with the investments in the four funds?
9    A.   Well, as I mentioned before with the letter I got
10 from Smith or McGinn, whichever one that was, I thought
11 these were basically risk free.  I mean they weren't
12 absolutely guaranteed but it seemed like they were
13 covered.
14    Q.   And Mr. Lex didn't state anything to make you
15 believe otherwise?
16    A.   No.
17    Q.   Did he specifically tell you they were safe
18 investments?
19    A.   I don't recall, but --
20    Q.   You don't recall discussing whether or not there
21 was a risk of losing a portion or all of your investment?
22    A.   Well, I would presume I asked some questions
23 regarding that.  I'm not a gambler.  I occasionally play
24 the lottery, but other than that, the money I make I try

**Page 16**

1 to hold onto.
2    Q.   So you presume you had it but do you have a
3 particular recollection of discussing that?
4    A.   No, not really.  I don't have a specific
5 recollection.
6    Q.   Do you recall if you discussed the possibility of
7 not getting the interest rate that was promised?
8    A.   No, I don't recall discussing much of anything,
9 to be honest with you.
10    Q.   Did you discuss with Mr. Lex the amount of risk
11 you were willing to take in making your investments?
12    A.   Well, because I had such a close relationship
13 with him I think he knew what type of person I am.  I'm
14 not a risk taker.
15    Q.   I know you said this a couple times that you
16 thought that there wasn't much of a risk based on the
17 letter that you received from McGinn Smith.  But did you
18 understand that there was some inherent risk in making
19 investments in the four funds?
20    A.   I had the understanding with any investment there
21 could be a risk.  I didn't think it would happen to me.
22    Q.   Are you familiar with the term liquidity?
23    A.   I heard the term.  I can't give you a definition
24 of it.

**Page 17**

1    Q.   So that wasn't something that you were concerned
2 about in making your investments through Mr. Lex?
3    A.   I thought this was a good company.  I had no
4 idea.  I didn't know they were in Albany to be honest with
5 you.  Although the letterhead has that.  I probably just
6 completely overlooked that.
7    Q.   Do you recall whether you discussed with Mr. Lex
8 when you would be able to take your money out?
9    A.   I thought I'd get my money out in 2008 initially.
10    Q.   Was there any concern for you to possibly be able
11 to retrieve your money earlier than that point in time?
12    A.   I don't think there was any reason to even think
13 about it.
14    Q.   Did anyone provide you with written materials
15 regarding your investments prior to making the
16 investments?
17    A.   I think Bill gave me papers like this, I guess,
18 that I looked at.
19    Q.   Do you recall whether you reviewed the documents
20 that Mr. Lex gave you?
21    A.   Well, I'm sure I read a bit of it but honestly I
22 wouldn't understand all of it to be quite frank with you.
23    Q.   I didn't see this in the documents that you
24 provided so I'm not sure whether or not you did, but do

**Page 30**

1  McGinn Smith was in receivership?

2      A.   Not until I knew there was a lawsuit against

3  them.

4      Q.   Do you recall when you learned about the lawsuit?

5      A.   I don't recall exactly when that was.

6      Q.   Do you recall how you became aware of the

7  lawsuit?

8      A.   Probably through Bill Lex but I'm not a hundred

9  percent sure.

10     Q.   Are you aware that a receiver has been appointed

11 for money to be collected from McGinn Smith?

12     A.   Oh, yes.  I've contacted him numerous times.

13     Q.   Have you received any response from the receiver?

14     A.   Never a satisfactory response, no.

15     Q.   Do you recall your first communication with the

16 receiver?

17     A.   I'm sure it was a little hostile.

18     Q.   Do you recall when that was?

19     A.   When it was set up.

20     Q.   Do you know when that was?

21     A.   No, but I look at it all the time on the

22 internet.  So I'm aware of when it was.  I just don't know

23 the date.

24     Q.   How did you become aware of the internet receiver

**Page 31**

1  website?

2      A.   From the very beginning I think I was either

3  contacted by the court or Bill Lex told me, one or the

4  other.

5      Q.   You said you reached out to the receiver a few

6  times.  What was the purpose of the correspondence?

7      A.   Well, I like to know what the receiver is making

8  and that's never -- where it's coming from.  Obviously I

9  know where it's coming from.  I want to know why he isn't

10 doing his job and distributing funds eventually the way it

11 should be distributed as it was set up in the original

12 documents and he says that was all hearsay.  So we have a

13 little discussion going on.

14     Q.   Do you continue to correspond with the receiver

15 to this day?

16     A.   Yes.  In fact, the last two months I sent a

17 letter to the court because I presumed the judge is a

18 little better judge of his character than I am.  I'm not

19 too thrilled with him.  I believe he's dragging this on

20 and therefore making more money, taking more money away

21 from the people who have suffered.  Is that clear enough?

22     Q.   Yes.

23     A.   Okay.

24     Q.   How often would you say you visit the website for

**Page 32**

1  the receiver?

2      A.   Well, I've been looking at it almost daily in the

3  last two, three weeks to see if I get a response from my

4  letters.

5      Q.   When did you first start viewing the website, do

6  you recall?

7      A.   When it was first set up.

8      Q.   How often would you say you viewed the website

9  from that point until --

10     A.   Certainly every couple weeks.

11     Q.   What is your understanding regarding the type of

12 information that's available on the web site?

13     A.   The only thing I understand are the letters that

14 are sent in because they're written by people with normal

15 vocabulary and it tells you exactly how they feel.  Then

16 the response sometimes by the receiver which is nonsense.

17 So I do read that.

18     Q.   Do you know if there's anything other than

19 letters available on the website?

20     A.   Oh, yeah, that McGinn Smith were convicted, went

21 to jail, that kind of stuff.  They're appealing.  I'm

22 aware of all that.  I read it over and over and that they

23 have used some of our money to buy a house in Florida,

24 that kind of stuff I knew.

**Page 33**

1      Q.   Do you know whether the website identifies the

2  accountants or tax preparers who provided services to

3  McGinn Smith?

4      A.   I'm not aware of that.

5      Q.   Have you made any efforts to identify who the

6  accountants or tax preparers were for McGinn Smith?

7      A.   I think I asked later on, last couple years who

8  they are.

9      Q.   Who did you ask?

10     A.   First I think I had conversations with my

11 accountant.  After all he would come every three to four

12 months to my office and I had a good rapport with Neal.  I

13 knew there was somebody behind all this.  That's how I

14 became aware of who they were.

15     Q.   So Mr. Cupersmith identified --

16     A.   I think he brought to my attention that there has

17 to be accountants.  I used to look -- you have to remember

18 since I'm no longer practicing surgery I have lots of time

19 on the computer.  I was able to look up McGinn Smith.  Not

20 only does the receivership come up in the court case but a

21 lot of literature from Albany and New York because a lot

22 of these investors were obviously in New York and there

23 are all kind of things that I read.  One of them was that

24 this fellow Simons was guilty and pleaded guilty to

**Page 34**

1 mishandling of tax reports for McGinn Smith.  That was an
2 awakening so to speak.
3     Q.   Do you recall when you would have discovered
4 that?
5     A.   Certainly after that was put in the paper and
6 correspondence to the fact of it.
7     Q.   Was that after your discussions with
8 Mr. Cupersmith regarding the accountants or before?
9     A.   I can't -- I really have no idea.  But I did talk
10 with Neal Cupersmith and Bill Lex often.
11     Q.   Were you interested in the work that had been
12 performed by the accountants or tax preparers for McGinn
13 Smith?
14     A.   Well, I didn't understand what they were doing
15 all these years.
16     Q.   Did you have any discussions -- I know you
17 mentioned Mr. Cupersmith, but did you have specific
18 discussions with Mr. Cupersmith regarding the work that
19 was performed by the accountants?
20     A.   I may have.
21     Q.   Have you made a complaint to any governmental
22 entity regarding your investments that are at issue in
23 this action?
24     A.   I only made a complaint to them and they said

**Page 35**

1 they passed it on to an agency.  But I have not.
2     Q.   I think you referenced earlier you were aware of
3 the legal proceedings against McGinn Smith.  Do you know
4 if there's more than one legal proceeding that was brought
5 against them?
6     A.   I really can't remember all the things that were
7 brought against them.
8     Q.   Do you know whether there is a criminal matter
9 brought against them?
10     A.   I think that's why they're in jail.
11     Q.   Are you aware there was an SEC action?
12     A.   I'm aware there was an SEC action.
13     Q.   Did you become aware of both of those actions in
14 the same manner?
15     A.   Either reading articles in the internet or the
16 website itself.
17     Q.   Have you read any of the court documents involved
18 in those matters?
19     A.   I may have read some of them, yes.
20     Q.   Do you recall whether the accountants or tax
21 preparers were mentioned in any of those letters or any of
22 those court documents?
23     A.   I know they were mentioned in some of them but I
24 don't recall which ones.

**Page 36**

1     Q.   Do you recall when you would have first seen
2 reference to who the accountants were for McGinn Smith?
3     A.   No.  I can't remember.
4     Q.   You mentioned earlier Ronald Simons.  Who do you
5 understand him to be?
6     A.   I think he is or was the CEO of the company.
7     Q.   Did you first become aware of Mr. Simons from
8 your internet research?
9     A.   I believe so.
10     Q.   Have you reviewed any of the court documents
11 related to the legal action against Mr. Simons?
12     A.   Not the court documents, just whatever was in the
13 paper in Albany.
14     Q.   Are you aware of an SEC action that was brought
15 against certain brokers employed by McGinn Smith?
16     A.   Yes.
17     Q.   Do you know specifically who those brokers were?
18     A.   I think there's 15 of them.
19     Q.   Do you know if Mr. Lex is one of them?
20     A.   Oh, yes, he is.
21     Q.   Do you know any of the other individuals who were
22 part of that action?
23     A.   Not really.  I may have met one or two but I
24 don't know who they are.

**Page 37**

1     Q.   So you never used any of the services of those
2 other individuals?
3     A.   No.
4     Q.   Are you aware of an individual by the name of
5 Kerri Palen?
6     A.   I heard that name.
7     Q.   Do you know how you heard it?
8     A.   No.
9     Q.   Are you aware that she testified in the SEC
10 action against the brokers of McGinn Smith?
11     A.   Yes.
12     Q.   How did you become aware of that?
13     A.   I, on Bill Lex's behalf, went up to New York to
14 testify on his character, so to speak.  At that time his
15 attorney, I believe mentioned something of that nature and
16 how this may be beneficial in the future.
17     Q.   What was your understanding as far as the
18 substance of her testimony?
19     A.   The only thing I realized is that there was an
20 accounting firm that screwed up.
21     Q.   Is that what the attorney meant by it being
22 helpful?
23     A.   Yes.  They were negligent in what they did.
24     Q.   Did you ever read her testimony?

**Page 42**

1    A.    No.

2    Q.    Did you ever review any of the auditing reports

3 prepared by Piaker and Lyons for McGinn Smith?

4    A.    No.

5    Q.    Did you ever review any of Piaker and Lyons'

6 work product for McGinn Smith?

7    A.    No.

8    Q.    Did you ever have any discussions with Mr. Lex

9 regarding auditing reports being prepared for McGinn

10 Smith?

11    A.    No.

12    Q.    Have any of your investments in the four funds

13 and the trust been redeemed at this point?

14    A.    I don't think so.

15    Q.    Nothing received as a result of the criminal

16 action against McGinn Smith?

17    A.    Just the settlement with --

18         MR. DEAN:  I would caution you not to go into

19 that.

20    A.    I'm not going to go into it but I was involved

21 with that.

22    Q.    Anything received as a result of the broker

23 litigation involving Mr. Lex and the other --

24    A.    No.

**Page 43**

1    Q.    Is there any expectation you will be receiving

2 funds from either of the matters brought against McGinn

3 Smith?

4    A.    I hope so.

5    Q.    Have you been given any indication as far as when

6 you may receive such funds?

7    A.    It's always tomorrow.

8    Q.    Who is giving that information as far as when you

9 may be receiving funds?

10    A.    Lack of information from William Smith.

11    Q.    Aside from the settlement you referred to earlier

12 have you received any other funds from any other sources

13 to reimburse your losses from these investments?

14    A.    Not that I'm aware of.

15         MS. PIETRASZEWSKI:  I don't have any other

16 questions for you.

17 EXAMINATION BY MR. DEAN:

18    Q.    Good morning, Dr. Bove.  I'm just going to ask

19 you a couple of questions.  I think we may have gotten

20 into this before, but do you recall what the terms were of

21 your various -- the length of time.  Strike that.

22         Do you recall what the maturity period was for the

23 different notes you purchased?

24    A.    No, I don't recall.

**Page 44**

1    Q.    Over the course of the time that you were

2 invested in these notes did you have the occasion to make

3 the decision either to roll them over or to redeem them?

4    A.    Well, I rolled them over each and every time.

5    Q.    But at some point the different notes came due

6 and you had a decision to make about whether to redeem

7 them or roll them over?

8    A.    I believe so, yes.

9    Q.    Did you understand at that time that you did have

10 the option to redeem them?

11    A.    I guess I had the option to redeem them.  I don't

12 recall.

13    Q.    Do you recall if at any point when you were

14 presented with the option to roll over or redeem these

15 notes --

16         MS. PIETRASZEWSKI:  Objection.  He just said he

17 wasn't certain if he had the option.

18    Q.    When the maturity date was approaching on these

19 various notes would you receive a letter?

20    A.    Yes.  I received letters.

21    Q.    Do you recall if you chose to renew or roll over

22 a particular note, if the interest rate going forward was

23 always the same?

24    A.    I don't recall what the interest rate would be

**Page 45**

1 but I believe, I thought that the interest rate would be

2 similar, perhaps a little lower but similar.

3    Q.    Do you recall if you were presented with what the

4 interest rate would be going forward when you had to make

5 that choice?

6    A.    I presume I was.

7    Q.    And you said you spoke with Bill Lex regularly?

8    A.    Yes.

9    Q.    About your investments?

10    A.    All kinds of things.

11    Q.    If you had been made aware either when you were

12 making a decision to purchase new notes or when you had to

13 make a decision whether to roll over a note, if you had

14 been made aware that McGinn Smith's auditor had resigned

15 because of some sort of dispute with McGinn Smith, would

16 that have influenced the decisions that you were making

17 regarding your investments?

18         MS. PIETRASZEWSKI:  Objection.  Speculative.

19    Q.    You can answer.

20    A.    If I thought there was something going on that

21 wasn't so-called kosher, yes, I would have thought twice

22 about rolling over these funds.

23         MR. DEAN:  I don't have any further questions.

24 BY MS. PIETRASZEWSKI:

**Page 46**

1    Q.   Just a couple follow-up.  At any point after
2  making your initial investments with McGinn Smith did you
3  add any additional monies to your investments?
4    A.   I don't really recall.
5    Q.   You don't recall doing it or you don't recall
6  whether or not you did?
7    A.   Both.  I don't recall doing it.  I know my wife
8  did just before -- I think she did it in 2008.
9    Q.   That was a new investment?
10   A.   Yes.
11   Q.   Do you recall when the last time was that you
12 made a brand new investment?
13   A.   No.
14   Q.   Mr. Dean asked a question whether if you had
15 heard the auditor for McGinn Smith had resigned due to a
16 dispute if that would have influenced any of the decisions
17 you made with respect to your investments.  Do you know
18 under what circumstances an auditor may resign from
19 providing circumstances to a client?
20   A.   No.
21   Q.   Would you think that it is possible that the
22 dispute could be for personality reasons?
23   A.   I find that hard to believe.  I guess it could
24 but --

**Page 47**

1    Q.   Under what circumstances do you think an auditor
2  might resign from services?
3    A.   Well, the auditor in question was Fidelity?
4    Q.   I'm just asking.  His was a hypothetical question
5  so mine is as well.
6    A.   Bear Stearns and then I got reports from
7  Fidelity.  Yeah, if Fidelity was pulling out, what's going
8  on.  That's how I took it.
9    Q.   But even when you had heard about that particular
10 instance you didn't pull your money out of your
11 investments, correct?
12   A.   That's correct.
13        MS. PIETRASZEWSKI:  I don't have anything else.
14 I do just want to state again on the record we're going to
15 leave this deposition open in the event that additional
16 documents that might be forthcoming require additional
17 questions.
18        MR. DEAN:  I do have a couple of follow-up
19 questions.  I want to clarify a couple things.
20 BY MR. DEAN:
21   Q.   Dr. Bove, if you had over the course of making
22 your investments, if you had heard that the accountant for
23 McGinn Smith had resigned from its representation, would
24 that have led you to make a different investment decision?

**Page 48**

1        MS. PIETRASZEWSKI:  Objection.  Speculative.
2    A.   Yes, I believe it would have.
3        MR. DEAN:  I have no further questions.
4  BY MS. PIETRASZEWSKI:
5    Q.   I'm just following up.  What specifically would
6  you have done differently in the hypothetical that
7  Mr. Dean proposed?
8    A.   I would have sent my letter sooner and asked for
9  my money back.
10   Q.   Again I would just ask the question, are you
11 familiar with the various types of circumstances under
12 which an accountant may resign from services?
13   A.   Death.
14   Q.   Any other circumstances that you can think of?
15   A.   I can't imagine unless they moved out of the
16 area.  Even that wouldn't change things.
17        MS. PIETRASZEWSKI:  I don't have any other
18 questions.
19        MR. DEAN:  Nothing further for me.
20        MS. PIETRASZEWSKI:  Restating that it's open.
21
22        (Deposition concluded)
23
24

**Page 49**

1
2
3
               WITNESS CERTIFICATION
4
5    I, Richard Bove, have read the foregoing
6  deposition.  Aside from the corrections noted on my errata
7  sheet, it is a true and correct transcript of my testimony
8  in the above matter.
9
10 _____
11
12
13             CERTIFICATION
14
     I, Alan L. Lesky, a Certified Shorthand Reporter of
15 New Jersey, license number XI000730, approved reporter of
   the United States District Court and notary public, hereby
16 certify that the foregoing is a true and accurate
   transcript.
17
     I further certify that I am neither attorney nor
18 counsel for, not related to nor employed by any of the
   parties to the action in which this transcript was taken;
19 and further, that I am not a relative or employee of any
   attorney or counsel employed in this action, nor am I
20 financially interested in this case.
21
22 Alan L. Lesky,
   Certified Court Reporter
23
24

# Exhibit 16

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF NEW YORK
 2         CIVIL ACTION NO. 3:14-cv-01303-TJM-DEP

 3

 4

 5   NEAL A. CUPERSMITH, ET AL.,

 6        Plaintiffs,

 7        v.

 8   PIAKER & LYONS, P.C.,
     RONALD L. SIMONS AND
 9   TIMOTHY N. PAVENTI,

10        Defendants.

11

12

13               Oral deposition of JAMES J. BURKE, taken

14   at the law offices of Kang, Haggerty & Fetbroyt, 123

15   South Broad Street, Suite 1670, Philadelphia,

16   Pennsylvania, on Thursday, December 17, 2015,

17   commencing at 9:38 a.m., before Suzanne Walinsky, a

18   Court Reporter and Notary Public, pursuant to notice.

19

20

21

22

23

24
```

**Page 18**

1  Q.      Okay.  And Mr. Lex was William Lex,
2  right?
3  A.      Yeah.  Bill Lex, yeah.
4  Q.      Do you recall the first meeting you had
5  with Bill Lex regarding your annuities?
6  A.      No.
7  Q.      Do you know how many meetings you had
8  with Bill Lex regarding the annuity?
9  A.      No.
10 Q.      Would it have been more than ten?
11 A.      I would say no.
12 Q.      Okay.  How often did you meet with him?
13 A.      I don't recall.
14 Q.      Would you have met with him on an annual
15 basis?
16 A.      I don't recall.
17 Q.      What's the first investment you made
18 other than the tax-sheltered annuity?
19 A.      When I went -- the first investment I
20 made -- you said after the tax-sheltered annuity or...
21 Q.      Other than the tax-sheltered annuity.
22 A.      Nothing until I left in 2003 at St. Mary
23 Medical Center.
24 Q.      Up until that time, had you made any

**Page 19**

1  investments in stocks?
2  A.      No.
3  Q.      Any investments in bonds?
4  A.      No.
5  Q.      Notes?
6  A.      No.
7  Q.      Mutual funds?
8  A.      No.  Piggy banks?  No.
9  Q.      So it's fair to say, then, as of 2003,
10 the only type of investment you had made is in the
11 tax-sheltered annuities?
12 A.      Yes.
13 Q.      Are you familiar with a brokerage firm
14 named McGinn Smith & Company?
15 A.      Slightly.
16 Q.      When it is that you first made an
17 investment with McGinn Smith?
18 A.      When I left St. Mary Medical Center in
19 2003, and I was invested in the tax-sheltered annuity,
20 because I was no longer employed by a facility that
21 was -- I'm trying to think of the correct term here.
22 Well, the medical facility didn't have to pay taxes,
23 so basically it was not-for-profit.
24         So once I left the non-for-profit and

**Page 20**

1  the TSA could no longer be held, so I had to invest it
2  in something else.  And I was contacted by Bill Lex to
3  invest in notes.
4  Q.      Okay.  So this was after your employment
5  with St. Mary's had terminated?
6  A.      Some -- yeah, sometime after 2003 when I
7  left there.
8  Q.      And he reached out to you to advise you
9  about these other investments?
10 A.      Yes.
11 Q.      Is that the first time that he mentioned
12 McGinn Smith as a possible investment?
13 A.      I don't even know -- I'm sure -- no, let
14 me backtrack on that.
15         I'm not sure he said it was McGinn
16 Smith.  Basically, I don't recall specifics, but I
17 believe he might have said, I have these bonds that
18 have different rates.  And there are -- and he
19 explained -- and this was over the telephone.
20         He explained that there were -- they
21 were getting a good return.  They were senior notes.
22 And, again, I knew nothing of bonds prior to this.
23         He explained the difference between
24 senior, senior subordinate, junior, et cetera.  The

**Page 21**

1  senior and the senior subordinate didn't get as high a
2  return as the junior notes.
3         And he said there was -- they were more
4  secure.  I don't -- and, again, I'm speculating on the
5  exact words he said.
6         But, basically, I was led to believe
7  that if you were investing in senior or senior
8  subordinate notes, there's very little risk.
9  Q.      Did he explain to you the reasons why
10 one was more secure than the other?
11 A.      I don't believe he explained to me --
12 the way of my understanding of it is, there was just
13 basically less risk, senior, subordinate -- senior and
14 senior subordinate versus junior.
15         And the reason why the juniors paid more
16 is because there was, I guess, more risk than the
17 senior or senior subordinate.
18 Q.      Did he explain to you that that might be
19 related to priority in the event of liquidation?
20 A.      Again, I could --
21         (Brief interruption.)
22         THE WITNESS:  I would have to say he
23 must have.
24 BY MR. HOPPE:

**Page 42**

1    A.    Yeah, originally.  And then it switched
2  over.  But I believe -- again, I used to look at these
3  things and then literally rip them up and throw them
4  in the trash.
5          But somewhere in here there is the
6  copies.  There it is.  Thanks.
7          MS. FETBROYT:  It's 17732.
8          THE WITNESS:  So it would show you the
9  cash accrued interest, et cetera, in those documents.
10  That's about as much as I looked at it.
11  BY MR. HOPPE:
12    Q.    And what do you understand the role of
13  National Financial Services to be as custodian?
14    A.    What did I?
15    Q.    Yeah.  What do you understand their role
16  to be?  What did they do?
17    A.    Back in the day, I just, again, assumed
18  that they held these notes.
19    Q.    And any interest that accrued on these
20  notes, as stated in the National Financial Services
21  statement, you didn't see that money?
22    A.    No.  Wish I had.
23    Q.    Do you know if you had the opportunity
24  or the option to get that money?

**Page 43**

1    A.    Never really even thought about it.
2    Q.    Okay.  The expectation was that when you
3  retired, it would be available then?
4    A.    Yes.
5    Q.    If I could see again that exhibit,
6  No. 2.
7    A.    I got it buried here.
8    Q.    Now, when you first met with Bill Lex
9  and you discussed this particular investment --
10    A.    I didn't meet with him.  I spoke with
11  him on the phone.
12    Q.    When you spoke with Mr. Lex on the phone
13  to discuss this particular investment, was there any
14  discussion at that time about all the various risk
15  factors that were involved in that investment?
16    A.    Again, as I stated earlier, I believe my
17  understanding of what he told me was that the pecking
18  order of the senior, senior subordinate and down the
19  line, the lower you went, the more risk that was
20  involved and they paid a higher percentage.
21          So I, again, I opted to go with the
22  senior and the senior subordinate because there was
23  less risk.
24    Q.    So that was the extent of the

**Page 44**

1  discussions you had regarding risk?
2    A.    Yes.
3          MS. FETBROYT:  Form.
4  BY MR. HOPPE:
5    Q.    Now, the $285,000 investment, that was
6  done in the November of 2004 time period, correct?
7    A.    If you say so.
8    Q.    I'll represent that this document was
9  signed on November 29, 2004.  I'm referring to Exhibit
10  3, the Subscription Agreement.
11          Do you have any recollection of any
12  discussions with Mr. Lex at or around that time
13  regarding the various risk factors relating to the
14  Third Albany Income Notes, LLC, investment?
15    A.    No.
16    Q.    Well, back to Exhibit No. 2, I'm going
17  to show you pages 9 through 11.  And if you could just
18  review those real quickly.
19    A.    (Witness reviews document.)  You said
20  how many pages?
21    Q.    9 through 11.
22    A.    (Witness reviews document.)
23          MS. FETBROYT:  Can I take a look at it?
24          THE WITNESS:  (Witness reviews

**Page 45**

1  document.)  Okay.
2  BY MR. HOPPE:
3    Q.    Mr. Burke, I believe you testified
4  earlier that you do not have a recollection of
5  reviewing this document, correct?
6    A.    That's correct.
7    Q.    Do you have a recollection of Mr. Lex
8  ever going over any of the risk factors that are noted
9  on pages 9 through 11?
10          MS. FETBROYT:  Objection.
11          THE WITNESS:  No.
12  BY MR. HOPPE:
13    Q.    Other than what you testified to
14  regarding the different interest rate levels for the
15  notes and the risks generally associated with those,
16  anything else that you remember regarding any risk
17  factors associated with this investment?
18    A.    No.
19    Q.    Well, I'm going to go over a few of
20  these with you that are noted in this document.  Maybe
21  that will refresh your recollection a bit.
22          Do you see on page 9 where it notes that
23  "This investment isn't suitable for all investors"?
24    A.    I see that.

**Page 46**

1       Q.       Okay.  Is that something that you had
2   discussed with Bill Lex at any point in time before
3   making this investment?
4       A.       No.
5               MS. FETBROYT:  Objection.
6               THE WITNESS:  No.
7   BY MR. HOPPE:
8       Q.       Did he advise you as to whether or not
9   this was, in fact, suitable for you?
10              MS. FETBROYT:  Objection.
11              THE WITNESS:  No.
12  BY MR. HOPPE:
13      Q.       Did he discuss with you what type of
14  investor this investment was suitable for?
15      A.       No.
16      Q.       Okay.  Let me see that real quick.
17               Did you assume that this investment was
18  suitable for you based on Mr. Lex recommending it?
19      A.       Yes.
20      Q.       Risk Factor No. 2, do you see where it
21  notes where "The securities are not registered and may
22  not be able to be sold"?
23      A.       I read it when I was reading through it.
24  I don't see exactly where it is now.  But, yes, I

**Page 47**

1   recollect reading it when you handed it to me.
2       Q.       Did you have a discussion with Bill Lex
3   at any point in time as to whether or not these
4   particular notes would be registered?
5       A.       No.
6       Q.       Did you have any discussion with Mr. Lex
7   as to whether or not there was a market for these
8   notes?
9       A.       No.
10      Q.       Did you believe there would be a market
11  for these notes?
12      A.       Never thought about it.
13      Q.       Did you ever have a discussion with
14  Mr. Lex at any point during the course of these
15  investments whether or not you could sell your notes?
16      A.       No.
17      Q.       Now, if you move to the next page.  Do
18  you see a risk factor that states that the security
19  interest may not be sufficient for repayment of the
20  notes?
21      A.       I remember reading it when you handed it
22  to me.
23      Q.       Did you have any discussion with Bill
24  Lex regarding, you know, whether or not these notes

**Page 48**

1   were actually secured?
2       A.       No.
3       Q.       Did you expect that they were secured?
4       A.       Never really thought about it.
5       Q.       Okay.  Now, you mentioned earlier that
6   it was your understanding that the risk was based, at
7   least partly, on the interest rate, correct?
8       A.       Again, my understanding was the higher
9   the percentage, the more risk was involved.  So,
10  again, senior -- the risk factor from least to the
11  most would go from the senior being the least, senior
12  subordinate and junior as being the most risk.  That's
13  as much as my understanding.
14      Q.       Did you have any understanding as to
15  whether or not the lower interest rate meant that it
16  was a secured investment?
17      A.       No idea.
18      Q.       Also, on that same page, do you see
19  where it states that the notes aren't insured or
20  guaranteed?
21      A.       I remember reading that.
22      Q.       Is that something that you had discussed
23  with Bill Lex at any point in time?
24      A.       I may have asked somewhere during our

**Page 49**

1   discussion if, for instance, you invested in a --
2   let's say, in a bank note that that was backed --
3   covered by -- if there was a loss, by the government.
4               And I might have asked that question.
5   And he might have said, no, that it wasn't.  That's
6   the best of my recollection.
7       Q.       So you do have some recollection as to a
8   discussion or at least having an understanding that
9   these weren't guaranteed or they weren't insured?
10      A.       Again, to the best of my recollection.
11  We're going back many years.  I know I asked -- I
12  might have asked that question.  That perhaps I would
13  have known that.
14      Q.       So, then, is it fair to say at the time
15  you made the investment, you were aware that if the
16  companies you were investing in failed, that you could
17  lose everything?
18      A.       I never really thought of it, honestly.
19      Q.       Now, on that same page, I believe it's
20  the last risk factor, do you see where it states
21  "There are conflicts of interest"?
22      A.       On the last page?  Page --
23      Q.       I'm sorry.  On this page, the last
24  entry.

**Page 58**

1    A.    No.

2    Q.    Now, the risk factors we went over in

3 the Private Placement Memorandum, did you know about

4 any of those at the time you made the investment?

5    A.    No.  No.

6    Q.    Had you known about the risk factors,

7 would you have made the investment?

8         MS. FETBROYT:  Objection.  Speculative.

9 BY MR. HOPPE:

10    Q.    You can answer.

11    A.    No.

12    Q.    Now, let's go over this Subscription

13 Agreement real quick.  It's been marked as Exhibit 3.

14         Do you have a recollection of reviewing

15 that document in or around November of 2004?

16    A.    Honestly, no.

17    Q.    That is your signature, though, on the

18 last --

19    A.    Oh.

20    Q.    -- page, correct?

21    A.    Yes.

22    Q.    Do you have a recollection of that

23 document being presented to you?

24    A.    No.

**Page 59**

1    Q.    Whenever you made an investment with the

2 McGinn Smith company, was it always through Mr. Lex?

3    A.    Yes.

4    Q.    And how would he get documents to you

5 for those particular investments?

6    A.    Most likely, through the mail.

7    Q.    Do you recall a meeting where he

8 presented documents to you?

9    A.    I don't recall.

10    Q.    And when he mailed documents to you,

11 generally speaking, I mean, did you review the

12 documents?

13    A.    Again, as I said, I was a pretty naive

14 person when it came to investments.  So, most likely,

15 I may have read it, I may not have read it.  I may not

16 even have received it, other than the signing sheet.

17 I don't really recall.

18    Q.    Okay.  Did you ever call Mr. Lex after

19 receiving the documents to have him walk through any

20 of them with you?

21    A.    No.

22    Q.    Do you have any specific recollection,

23 as you sit here today, of actually, you know, having

24 that document and looking through it?

**Page 60**

1         MS. FETBROYT:  Objection.  Asked and

2 answered.

3         THE WITNESS:  I already answered this

4 question.

5 BY MR. HOPPE:

6    Q.    Do you have any specific recollection of

7 having received any McGinn Smith documents?

8    A.    I really don't recall, honestly.

9    Q.    Let's go to Section 1(c).

10         Actually, it might be quicker if I...

11    A.    I got it.

12    Q.    Okay.

13    A.    It's what?  Section C?

14    Q.    Yes.  That is 1(c).

15         And if you just take a look at 1(c) real

16 quick and let me know when you've had a chance to

17 review it.

18    A.    (Witness reviews document.)  Okay.  Go

19 ahead.

20    Q.    Do you see where it states that "The

21 undersigned is aware the purchase of notes is a

22 speculative investment involving a high degree of

23 risk"?

24    A.    Yes.

**Page 61**

1    Q.    Did you have any discussion with Bill

2 Lex regarding the degree of risk involved in this

3 investment?

4    A.    No.

5         MS. FETBROYT:  Objection.  Asked and

6 answered.

7 BY MR. HOPPE:

8    Q.    Did he advise you that this was,

9 quote -- there was, quote, a high degree of risk?

10         MS. FETBROYT:  Objection.  Asked and

11 answered.

12         THE WITNESS:  No.

13 BY MR. HOPPE:

14    Q.    Did he advise you that this was a

15 speculative investment?

16    A.    No.

17    Q.    Is reading this document the first time

18 you were made aware that this was a speculative

19 investment involving a high degree of risk?

20    A.    To the best of my recollection, yes.

21    Q.    And then it goes on to state that "There

22 is no guarantee the undersigned will realize any gain

23 from the investment and that the undersigned can lose

24 the total amount of the undersigned's investment."

**Page 62**

1          Do you see that?

2     A.     Yes, I do.

3     Q.     Did Mr. Lex advise you of this before
4  you made the investment?

5     A.     To the best of my recollection, no.

6     Q.     That said, you did sign this document,
7  correct?

8     A.     Yes, I did.

9     Q.     And you agreed to the statement that's
10 in paragraph 1(c)?

11          MS. FETBROYT:  Objection.

12          THE WITNESS:  Again, I -- again, I don't
13 recall seeing this document other than I signed it.

14 BY MR. HOPPE:

15     Q.     Okay.  But by signing that document,
16 you're agreeing to the terms of the Subscription
17 Agreement, correct?

18          MS. FETBROYT:  Objection.

19          THE WITNESS:  My answer to that would
20 have to be yes, since I signed it.

21 BY MR. HOPPE:

22     Q.     Let's move on to Section 1(b).

23     A.     Make sure that's the right page.  Okay.

24     Q.     And before I ask you a question about

**Page 63**

1  that one, I just want to go back to 1(c) just real
2  quick.

3          The note here that it was a speculative
4  investment involving a high degree of risk, is that
5  something you would have wanted to know before making
6  the investment?

7     A.     Yes.

8     Q.     Would that have impacted your decision
9  as to whether or not you made the investment?

10     A.     Yes.

11     Q.     Would you have made the investment had
12 you known there was a high degree of risk involved?

13     A.     Merely speculative at this point, but
14 most likely not.

15     Q.     Now, down to 1(b), do you see where it
16 states that you have carefully read the offering
17 materials, all of which the undersigned acknowledges
18 have been provided to the undersigned?

19     A.     Yes.

20     Q.     And you are the undersigned, correct?

21     A.     Yes.

22     Q.     But you didn't carefully read this
23 document, did you?

24     A.     No.

**Page 64**

1     Q.     And did you read any other offering
2  materials?

3     A.     Best of my recollection, no.

4     Q.     And it says here that you acknowledge
5  that you have been provided certain offering
6  materials.

7          Do you know what the offering materials
8  are that are being noted here?

9     A.     No.

10     Q.     Other than the Subscription Agreement,
11 do you have any recollection of being provided any
12 other offering materials?

13     A.     No.

14     Q.     And then it continues, on that same
15 paragraph, "The undersigned has been given an
16 opportunity to ask questions of and receive answers
17 from the company concerning the terms and conditions
18 of the offering and the offering materials and obtain
19 such additional written information to the extent the
20 company possesses such information or can acquire it
21 without unreasonable effort or expense necessary to
22 verify the accuracy of the same as the undersigned
23 desires in order to evaluate the investment."

24          Do you see that?

**Page 65**

1     A.     This is paragraph which?

2     Q.     It was the same paragraph.  It goes on
3  to say that.

4     A.     Oh, yeah.  Yes.  Yes, I read that.

5     Q.     Did you ask any questions?

6     A.     No.

7     Q.     Did you ask Mr. Lex if you could get in
8  touch with McGinn Smith?

9     A.     No.

10     Q.     Did you ask to see any underlying
11 documentation that supports the investment?

12     A.     No.

13     Q.     Before making the investment, did you
14 understand you had that opportunity and that right?

15     A.     I really never thought about it.

16     Q.     Okay.  Continue on to Section 1(g).  I
17 believe that's at the bottom of the page.

18     A.     Go ahead.

19     Q.     Do you see where it states, "The
20 undersigned is financially able to bear the economic
21 risk of the investment including the ability to hold
22 the notes indefinitely and to afford a complete loss
23 of his or her or its investment in the notes"?

24     A.     Yes, I see that.

**Page 158**

1    Q.       And you mentioned that you had believed
2  that Bill Lex could no longer act as a broker,
3  correct?
4    A.       I believe I read that, yes.
5    Q.       Did you read or did you find out from
6  someone else that he was barred from this industry in
7  general?
8    A.       I believe I read that.
9    Q.       Did you read or were you advised by
10 someone that the basis for that decision, at least
11 part of it, was Mr. Lex's failure to do any due
12 diligence with respect to these investments?
13   A.       If it was on --
14           MS. FETBROYT:  Objection to form.
15           Go ahead.
16           THE WITNESS:  If it was on that website,
17 I read it.
18 BY MR. HOPPE:
19   Q.       Okay.  Does it surprise you to learn,
20 either, you know, through the website or today, that
21 Mr. Lex was found to have done no due diligence?
22   A.       Does it surprise me?  Is that --
23   Q.       Yes.
24   A.       -- the question?

**Page 159**

1    A.       Sure.
2    Q.       Would you have expected at least some
3  due diligence to have been done?
4    A.       Again, as I answered previously, I put
5  my faith in the hands of professionals.  And as a
6  professional, one would have expected him to have done
7  it, yes.
8    Q.       Are you suing Mr. Lex?
9    A.       Not yet.  No, no.  I'm just joking.  No.
10   Q.       Well, I ask because you're suing my
11 client.  Why is it that you're suing my client?
12   A.       Because deeper pocket -- no, I'm just
13 joking.
14           Because accountants, just like
15 attorneys, just like professional brokers, have a --
16 have a duty to represent their clients.
17           So I would think that accountants, if
18 they're representing McGinn and Smith -- I never
19 thought in my wildest dreams that I was going to be
20 defrauded out of almost -- whatever you want to say
21 the number is, 360-some-thousand dollars --
22 accountants representing a firm like McGinn Smith, as
23 accountants there's no way in the world they wouldn't
24 have seen what was going on here.

**Page 160**

1    Q.       So, if, indeed, they did see what was
2  going on, why didn't they present it to somebody?
3  Because, again, I would think, accountants have a
4  responsibility to do that.  So that's the reason why.
5    Q.       Do you have any personal knowledge as to
6  what accounting work my client, Piaker & Lyons, did
7  for any McGinn Smith entities?
8    A.       None whatsoever.
9    Q.       Do you know whether or not they did any
10 audits of financial statements for any of these
11 companies?
12   A.       I do not know that.  But one would
13 expect they would have.
14   Q.       Okay.  Do you know or do you have reason
15 to believe that Piaker & Lyons performed accounting
16 work or did auditing work for any of the four funds
17 that are at issue in this case?
18   A.       No idea.
19   Q.       Do you have any personal knowledge as to
20 any tax-related work that my clients did for McGinn
21 Smith or its principals?
22   A.       No idea.
23   Q.       Do you have any personal knowledge
24 supporting your claims as against Piaker & Lyons or

**Page 161**

1  any of the defendants in this action?
2            MS. FETBROYT:  Objection.
3            THE WITNESS:  Do I have any what?
4  BY MR. HOPPE:
5    Q.       Personal knowledge.
6            MS. FETBROYT:  Objection.
7            THE WITNESS:  No.
8  BY MR. HOPPE:
9    Q.       And you understand what I mean by
10 "personal knowledge," correct?
11   A.       Elaborate.
12   Q.       Do you have specific facts in your
13 possession that you know that support your claims?
14   A.       No.
15   Q.       Do you know who Ronald Simons is?
16   A.       No.  Who is he?  No answer?
17   Q.       You like to ask me questions.
18   A.       Hey, it's a two-way give-and-take thing
19 here.
20   Q.       Do you know who Kerri Palen is?
21   A.       Palen?
22   Q.       Palen, P-A --
23   A.       Any relation?
24   Q.       No.

# **<u>Exhibit 17</u>**

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF NEW YORK
2              CIVIL ACTION NO. 3:14-CV-01303

3                    - - -

4    Neal A. Cupersmith., et al

5        Plaintiffs

6        v

7    Piaker & Lyons, P.C., Ronald L.
     Simons and Timothy N. Paventi,
8
         Defendants
9                    - - -

10

11          Oral deposition of CHARLES CRINITI, taken at

12   the law offices of Kang, Haggerty & Fetbroyt, 123 South

13   Broad Street, Suite 1670, Philadelphia, Pennsylvania,

14   on Wednesday, October 14, 2015, commencing at 10:00 a.m.,

15   before Alan L. Lesky, Certified Court Reporter of the

16   State of New Jersey, pursuant to notice.

17

18

19

20

21

22            ALAN L. LESKY & ASSOCIATES
                 Six Highspire Court
23            Medford, New Jersey 08055
                   609-257-3146
24

**Page 14**

1    Q.   Do you recall how long you would typically meet
2  with Mr. Lex?
3    A.   How long the meeting was?
4    Q.   Yes.
5    A.   We always tied it up with lunch.  So it was like
6  an hour, hour-and-a-half maybe.
7    Q.   Did Mr. Lex have the authority to buy investments
8  without your authorization?
9    A.   No.
10   Q.   Had you used any other broker to make purchases
11 and investments?
12   A.   From this firm, from McGinn Smith?
13   Q.   Yes.
14   A.   No.
15   Q.   What about from any other firm during the same
16 time period that you were investing with McGinn Smith?
17   A.   I invested with other firms but nothing to do
18 with McGinn Smith.
19   Q.   Did Mr. Lex give you advice regarding each of
20 these investments prior to making that decision?
21   A.   He would always say that any investment has a
22 degree of risk and he would say that.  I would do it
23 myself.  He would tell me.  I would say to myself if he's
24 -- if it's good for him it's good for me.

**Page 15**

1    Q.   Did you ask Mr. Lex any questions regarding the
2  various products that he brought to your attention?
3    A.   No.
4    Q.   Did Mr. Lex indicate whether any due diligence
5  was done on the investments?
6    A.   No.
7    Q.   Did you ask him if any due diligence was done?
8    A.   No.
9    Q.   Did you conduct any independent investigation
10 into the investments?
11   A.   No.
12   Q.   So you basically deferred to Mr. Lex's judgment?
13   A.   I did.
14   Q.   Did you discuss with Mr. Lex your investment
15 goals?
16   A.   No.
17   Q.   At the time of making the various investments
18 that are at issue in this lawsuit did you have a
19 particular risk tolerance in mind?
20   A.   I wanted zero risk but it seemed like it was a
21 good investment but given as I said earlier every
22 investment has a degree of risk.  So I never anticipated
23 that this would be a zero, a total loss.  I expected the
24 money to be coming back.

**Page 16**

1    Q.   But was there some level of risk that you were
2  willing to take?
3    A.   No.  If the risk was that the money was going to
4  be lost I would have not done it.
5    Q.   Did you discuss with Mr. Lex what your risk
6  tolerance was?
7    A.   No.
8    Q.   Do you recall completing a new account
9  information form for McGinn Smith?
10   A.   Can you repeat that, please?
11   Q.   Sure.  Do you recall completing a new account
12 information form for McGinn Smith?
13   A.   I don't know what that form is.
14   Q.   Can you mark this 2.  Sir, do you have exhibit
15 number 2 in front of you?  Do you recognize that document?
16   A.   I do.
17   Q.   Did you complete this form?
18   A.   I did.
19   Q.   That's your signature at the bottom?
20   A.   It is.
21   Q.   Do you see up towards the top there's a section
22 that says risk tolerance?
23   A.   Where are you?
24   Q.   There's kind of a block at the top that has your

**Page 17**

1  contact information and there's net worth and then right
2  below that it says risk tolerance?
3    A.   Tax bracket?
4    Q.   Right below that.
5    A.   Moderate.  I see that.
6    Q.   Do you recall completing that particular section
7  of this form?
8    A.   Yes.
9    Q.   So it's accurate at the time you felt that you
10 were willing to take a moderate risk in your investments?
11   A.   Right.
12   Q.   Do you recall how you got this form?
13   A.   I do not.
14   Q.   I think you answered this earlier but I just want
15 to ask again just to be clear, why did you ultimately
16 decide to make the investments that are at issue in this
17 lawsuit?
18   A.   On the first time the return was better than what
19 the bank was paying.
20   Q.   And the subsequent investments?
21   A.   They even got better than the first one.
22   Q.   Did Mr. Lex recommend each of the investments
23 that you made?
24   A.   Yes.

# Exhibit 18

1           UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF NEW YORK
2           CIVIL ACTION NO. 3:14-CV-01303

3

4  NEAL A. CUPERSMITH, ET AL.,

5        Plaintiffs,

6        v.

7  PIAKER & LYONS, P.C., RONALD L.
   SIMONS AND TIMOTHY N. PAVENTI,
8
         Defendants.
9

10

11

12               Oral deposition of HENRY S. CRIST, MD,

13  taken at the law offices of Kang, Haggerty &

14  Fetbroyt, 123 South Broad Street, Suite 1670,

15  Philadelphia, Pennsylvania, on Tuesday, November 3,

16  2015, commencing at 1:54 p.m., before Suzanne

17  Walinsky, a Court Reporter and Notary Public,

18  pursuant to notice.

19

20

21

22

23

24

**Page 34**

1    A.    With each one that I -- I received,
2  I -- I would -- he would explain the interest rate
3  and the maturity time.  And I would look at, like,
4  the top right here where we see it's 5 -- .75
5  percent or 7.75 or whatever.  And that's all I
6  would look at.  And then I would file it.
7        And then after a decade or something,
8  I just cleaned out and threw it all away.
9    Q.    Understood.  I'm going to ask you some
10  specific questions --
11    A.    Sure.
12    Q.    -- about that document.
13        (Deposition Exhibit Crist-3 was marked
14  for identification.)
15  BY MR. HOPPE:
16    Q.    Before I do, I want to show you
17  another document and I'll get back to that one.
18  I'm showing you what's been marked as Exhibit 3.
19    A.    This looks -- I have seen documents
20  that look just like this.
21    Q.    Okay.  And at the top it states that
22  that's the Subscription Agreement for the Third
23  Albany Income Notes investment, correct?
24    A.    Yes.

**Page 35**

1    Q.    And that's in the amount of $400,000,
2  correct?
3    A.    Yes.
4    Q.    Could you flip to the last page.  And
5  is that your signature on the document?
6    A.    Yes.
7    Q.    So by signing that document, you're
8  agreeing to invest the $400,000 into Third Albany
9  Income Notes, LLC, correct?
10    A.    Yes.
11    Q.    I'll ask some questions about that
12  document in a moment.  But I want to go back to
13  Exhibit 2 real quick.
14        And Exhibit 2 is the Private Placement
15  Memorandum for that Third Albany Income Notes, LLC,
16  correct?
17    A.    Yes.
18    Q.    Okay.  Now, you said when you received
19  documents like these, you just filed them away?
20    A.    Yes.
21    Q.    Did you have any discussion with
22  Mr. Lex regarding any of the contents of that
23  document?
24    A.    No.

**Page 36**

1    Q.    Did he explain to you any of the risk
2  factors associated with the investment as stated in
3  that document?
4    A.    No.
5    Q.    Did you expect, based on your prior
6  instructions, that this investment would be of the
7  lower-risk variety?
8    A.    When I said no, I don't -- I don't
9  mean specifically with each thing.  I had -- I had
10  said that I want the low risk.  And he said this is
11  low risk.  So that would be, I guess, his -- his
12  comment about it.
13    Q.    Okay.  Could you flip to, let's see,
14  page 5 of that document.  It's going to have the
15  heading "Risk Factors" on it.
16    A.    Okay.
17    Q.    Do you see what I'm referring to?  Do
18  you have the right page?  Actually, let me see
19  that.  I apologize.
20        There we go.  Wrong page number.  And
21  that's page 9 of the document that we're referring
22  to.  Do you see where it states "Risk Factors" at
23  the top?
24    A.    Yes.

**Page 37**

1    Q.    Do you have any recollection of
2  reviewing the different risk factors for this
3  investment?
4    A.    I did not review them.
5    Q.    Do you have any recollection of Bill
6  Lex advising you of the risk factors that are noted
7  here in the Private Placement Memorandum?
8    A.    Not of specific risk factors.  Again,
9  it was the -- under the umbrella that these were
10  secured notes.
11    Q.    Let me see that real quick again.
12  There's just a few I want --
13    A.    Sure.
14    Q.    -- to go over with you.  Okay.
15        The second risk factor notes that
16  "This note will not be registered under the
17  Securities Act and you may not be able to sell
18  notes quickly or at all."
19        Is that something you understood at
20  the time you made the investment?
21    A.    I don't know what it means, registered
22  under the Security Act.  Selling them quickly or
23  easily, I knew that they couldn't necessarily be
24  sold quickly or easily.

**Page 38**

1    Q.        And that's because there's a maturity
2    date a couple years down the road, correct?
3        A.        Yes.
4        Q.        And that's something you understood
5    and realized at the time you made the investment?
6        A.        Yes.
7        Q.        And you were okay with that?
8        A.        Yes.
9        Q.        And now I've turned to page 10 of the
10   document.  And it's the first risk factor at the
11   top of this page.
12                 It states that the secured assets may
13   be inadequate to repay the notes.  Is that
14   something that you were made aware of by Mr. Lex?
15       A.        Not specifically.  I think that that's
16   a given statement with anything.
17       Q.        You noted earlier that you were
18   advised that these investments were secured or were
19   secure.  What was your understanding of that?
20       A.        I understand the question.  They were
21   secure in the sense that it was a broad base that
22   would be most unlikely that the sources of them
23   would not pay them back.  That's how I understood
24   the word secure.

**Page 39**

1    Q.        Okay.  So you understood at the time
2    you made the investment that there was always a
3    risk that everything could be lost?
4        A.        Yes.
5        Q.        But based on the circumstance of this
6    investment you felt that it was secure?
7        A.        Yes.
8        Q.        That makes sense.
9        A.        I could substitute the word safe.  I
10   think that implies what I meant.
11       Q.        No, I understand.  The next risk
12   factor states that the notes will have no insurance
13   or guarantee.  Is that consistent with your
14   understanding as well?
15       A.        I didn't know that.  I didn't -- I
16   didn't think about it.
17       Q.        Would you take that to mean that if
18   the money is lost, it is forever lost and you're
19   not going to get it back?
20       A.        You mean now or at the time did I know
21   that?
22       Q.        I'm asking -- yeah, if you knew this
23   at the time you made the investment?
24       A.        If I knew that -- if I knew -- if I

**Page 40**

1    knew that if I made the investment and there was
2    not money to pay it back, that I might not be paid
3    back.  Is that the question?
4        Q.        Yes.
5        A.        Yes.  And the answer is I would assume
6    that to be the case.
7        Q.        Would you have expected there to be
8    any kind of insurance or anything out there to
9    cover your investment?
10       A.        I know there is -- let me -- let me
11   state what I understand your question to be.
12       Q.        Okay.
13       A.        And that is, is -- is there insurance
14   that the investment money that I make in a company
15   or something specific is going to be paid back
16   because that entity will have the money to pay it
17   back.  And I don't -- let me start that.
18                 Could you read that to me?  Or either
19   that or I'll just -- I'll start it again.
20                 When you make -- when you make an
21   investment in something or you purchase something,
22   you don't have a guarantee that it can be paid back
23   by the people who, you know, you've loaned it to.
24       Q.        Understood.  And I guess my question

**Page 41**

1    is a little simpler than that.
2                 At the time you made the investment,
3    was it your understanding or your expectation that
4    there was some insurance out there that would cover
5    you in the event that the investment was lost?
6        A.        I didn't think about that.
7        Q.        Okay.  Now, later on in this same
8    section there is a risk factor stating that the
9    trustee may experience a conflict of interest.  And
10   that's the last risk factor I'm going to go over.
11                 Were you aware at the time you made
12   the investment that there could be conflicts of
13   interest with respect to the investments made by
14   the trustee?
15       A.        No.
16       Q.        That wasn't something that Mr. Lex
17   made you aware of?
18       A.        I guess my understanding is what
19   conflict of interest -- of interest could there be
20   if I -- if someone offers to sell me something and
21   I decide to buy it and I purchase it.  I don't
22   understand where there is a conflict of interest.
23       Q.        Well, let me ask you this one:  Would
24   you consider it to be a conflict of interest if the

**Page 46**

1  McGinn Smith entity, would that give you concern
2  about whether or not this is a prudent investment?
3      A.      Yes.
4      Q.      And let's move on to the Subscription
5  Agreement, which is Exhibit No. 3.
6              Now, we went over that earlier.  And
7  you testified that that is, in fact, your
8  signature?
9      A.      Yes.
10     Q.      Do you have a specific recollection of
11  that particular investment?
12     A.      No.
13     Q.      Do you have any specific recollection
14  as to when that was provided to you?
15     A.      When this was given to me?
16     Q.      Yes.
17     A.      No.
18     Q.      I would assume that it'd be given to
19  you prior to you making the investment.  Is that a
20  safe assumption?
21     A.      Yes.
22     Q.      Do you know how long before you
23  executed that document that it was provided to you?
24     A.      No.

**Page 47**

1      Q.      And it would have been provided to you
2  by Mr. Lex; is that correct?
3      A.      Yes.
4      Q.      Do you remember asking any questions
5  of Mr. Lex regarding that Subscription Agreement?
6      A.      The same questions that I had -- he had
7  asked before.  And that is that this represents a
8  low risk, and I'll use the word safe, instead of
9  secure, safe investment.
10     Q.      Okay.
11     A.      And he said, Yes, it's the same -- it
12  is as the others.
13     Q.      And you relied on his statement that
14  it is, in fact, a low-risk investment?
15     A.      Yes.
16     Q.      Now, how did it typically work with
17  these investments?  Did he send the documents to
18  you by mail?  Did he come to your home or come to
19  your place of business and drop them off?
20     A.      He would occasionally come to work and
21  show them to me.  But, as I recall, when he would
22  come, it would be more to discuss the various
23  investments and discuss them rather than to bring
24  an individual one.  It would be sent to me, and I'd

**Page 48**

1  sign it and send it back.
2      Q.      And generally speaking, how much time
3  did you take to review the documents before you
4  signed them?
5      A.      Fifteen seconds.
6      Q.      Now, I want to ask you just a few
7  questions about Exhibit No. 3.  And specifically I
8  want to refer you to numbered paragraph 1(c).  I
9  think David knows exactly where it's at at this
10  point.
11             MR. DEAN:  I think I've gotten good at
12  this.
13  BY MR. HOPPE:
14     Q.      And just let me know when you find it.
15     A.      Yep.
16     Q.      Do you see where it states that "The
17  undersigned is aware the purchase of notes is a
18  speculative investment involving a high degree of
19  risk and there is no guarantee the undersigned will
20  realize any gain from the investment and that the
21  undersigned can lose the total amount of the
22  undersigned's investment"?
23     A.      Yes.
24     Q.      And you're the undersigned, correct?

**Page 49**

1      A.      Yes.
2      Q.      Now, we went over earlier that you
3  understood that you could lose everything.  So
4  that's not a surprise to you, correct?
5      A.      That is my understanding of all
6  investments.
7      Q.      What about the part where it states
8  that this is a speculative investment involving a
9  "high degree of risk," is that something that you
10  were aware of when you made this investment?
11     A.      No.
12     Q.      But by signing this Subscription
13  Agreement you acknowledged that --
14     A.      Yes.
15     Q.      -- that's, in fact, the truth?
16             Is that a surprise to you to see that
17  today?
18     A.      Not necessarily.
19     Q.      Okay.
20     A.      Statements like this are in
21  everything.  You know, they say if you -- you know,
22  before you go into any treatment, you can die from
23  whatever they do, if they just look at you.  It's a
24  cover everything.

**Page 50**

```
 1              I don't read the agreements every time
 2 I buy software, every time I upgrade software.
 3 It's infinitely long and complex, convoluted and
 4 has no real meaning.
 5              And it is just there to -- just to
 6 cover themselves in case of anything.  And to be
 7 able to separate the real from the blanket requires
 8 a lot of knowledge.
 9      Q.     But you did advise Mr. Lex that you
10 were looking for low-risk investments, correct?
11      A.     Yes.
12      Q.     And he did tell you that this was a
13 low-risk investment, correct?
14      A.     Yes.
15      Q.     And it does state in there that it's
16 high risk, correct?
17      A.     Yes.  I am not sure that he
18 specifically told me about this one.  But that is
19 the way in which it was all done.  So in effect,
20 yes.
21      Q.     And I want to move on to numbered
22 paragraph 1(b).  And this is right at the beginning
23 where it states that you have carefully read the
24 offering materials, all of which the undersigned
```

**Page 51**

```
 1 acknowledges have been provided to the undersigned.
 2              Do you see that?
 3      A.     Yes.
 4      Q.     Do you have any recollection of
 5 reading that paragraph?
 6      A.     No.  So did I fraudulently sign that?
 7      Q.     I'm not suggesting anything like that.
 8 I'm just saying that you acknowledging that you did
 9 that when you signed this agreement, correct?
10      A.     Yeah.  I guess there's a universal
11 fraud committed by everyone in this country.
12      Q.     I'm going to continue on in that
13 paragraph.
14      A.     Okay.
15      Q.     Do you see where it states "The
16 undersigned has been given an opportunity to ask
17 questions of and receive answers from the company
18 concerning the terms and conditions of the offering
19 and the offering materials and obtain such
20 additional written information to the extent the
21 company processes such information or can acquire
22 it without unreasonable effort or expense necessary
23 to verify the accuracy of the same as the
24 undersigned desires in order to evaluate the
```

**Page 52**

```
 1 investment"?
 2      A.     Yes.
 3      Q.     Do you see?
 4              Okay.  And, again, you're the
 5 undersigned, correct?
 6      A.     Yes.
 7      Q.     Do you have any recollection of
 8 reading this paragraph?
 9      A.     No.
10      Q.     Did Mr. Lex advise you at the time he
11 presented you with these documents that you had the
12 right to speak with someone at McGinn Smith and
13 find out what you can about the investment?
14      A.     Not specifically, but that is an
15 assumption.  I assume that anything that I needed
16 to know and wanted to know, that I would be allowed
17 to find out.
18      Q.     Did you ever exercise that right?
19      A.     No.
20      Q.     Then the last question from this
21 document, it's paragraph, numbered paragraph 1(g).
22              Do you see that?
23      A.     Yes.
24      Q.     And it states that the undersigned is
```

**Page 53**

```
 1 financially able to bear the economic risk of the
 2 investment, including the ability to hold the notes
 3 indefinitely and to afford a complete loss of his
 4 or her or its investment in the notes.
 5              Do you see that?
 6      A.     Yes.
 7      Q.     And, again, you are the undersigned,
 8 correct?
 9      A.     I wasn't fraudulent in that.
10      Q.     I would like to ask you about one part
11 of this.  Do you see where it states that there's
12 the ability to hold the notes indefinitely?
13      A.     Yes.
14      Q.     Do you understand that to mean that
15 the company has the right to hold those notes?
16      A.     I thought it meant that I could hold
17 the notes.
18      Q.     Okay.
19      A.     I mean, that's what I -- I didn't read
20 it then.  I mean, that's what it means to me, that
21 I could hold the notes.
22      Q.     So your understanding is you could
23 hold the notes indefinitely?
24      A.     Yes.
```

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF NEW YORK
 2            CIVIL ACTION NO. 3:14-CV-01303

 3

 4 NEAL A. CUPERSMITH, ET AL.,

 5    Plaintiffs,

 6    v.

 7 PIAKER & LYONS, P.C., RONALD L.
   SIMONS AND TIMOTHY N. PAVENTI,
 8
      Defendants.
 9

10

11

12            Oral deposition of GEORGE

13 MICHAEL GAVIN, MD, taken at the law

14 offices of Kang, Haggerty & Fetbroyt,

15 123 South Broad Street, Suite 1670,

16 Philadelphia, Pennsylvania, on

17 Friday, October 16, 2015, commencing

18 at 9:01 a.m., before Suzanne

19 Walinsky, a Court Reporter and Notary

20 Public, pursuant to notice.

21

22

23

24
```

**Page 30**

1   mailed.  But Mr. Lex may have brought
2   them when we met.  But not -- not all
3   of them.  But I would say majority
4   were mailed.
5       Q.   And do you recall whether
6   you would have received and signed
7   one of these each time you were
8   making an investment?
9       A.   I would imagine so, I did.
10      Q.   And do you know whether you
11  read the document before signing it?
12      A.   Yes, I probably did.  I
13  probably wouldn't put my signature to
14  something, particularly this short.
15      Q.   Any idea how long you would
16  have spent reviewing it?
17      A.   No.
18      Q.   Did you ever ask Mr. Lex
19  questions regarding the document?
20      A.   I don't recall.
21      Q.   And if you flip to Page 2,
22  Paragraph 8B, it says, "I recognize
23  that investment in the certificates
24  involve substantial risk factors

**Page 31**

1   including those set forth under risks
2   in the memorandum."
3           Do you recall reading
4   something like that?
5       A.   No.
6       Q.   Do you recall reading
7   anything about risk in a memorandum?
8       A.   Yes.
9       Q.   Do you recall whether you
10  had any questions for Mr. Lex
11  regarding those risks?
12      A.   I don't know if I -- I
13  don't remember asking him other than
14  when we talked about the investment
15  vehicle from beginning about the
16  risks that were involved.  There's
17  no -- it wasn't secured by the
18  government.
19      Q.   And would you say you
20  agreed to those risks by signing the
21  document?
22      A.   Financial risks, yes.
23          MR. MATHEWS:  Objection.
24          MS. PIETRASZEWSKI:  Can you

**Page 32**

1   mark this.
2           (Deposition Exhibit Gavin-3
3   was marked for identification.)
4           THE WITNESS:  I was aware
5   of the financial risk.
6   BY MS. PIETRASZEWSKI:
7       Q.   You've got another document
8   that's been marked as Exhibit 3.
9           Do you recognize that
10  document, Dr. Gavin?
11      A.   Once again, my signature's
12  affixed to it, so I've, you know, saw
13  it before.
14      Q.   And does it generally look
15  familiar as something you would have
16  received in connection with your
17  investments?
18      A.   Yes.
19      Q.   And I'm noticing, actually,
20  this is an incomplete; there's pages
21  missing.
22          But do you recall whether
23  you would have read this document
24  before signing it?

**Page 33**

1       A.   Yes.  I would read
2   something this length.
3           MS. PIETRASZEWSKI:  And if
4   I could, maybe we'll just make
5   another copy.
6           MR. MATHEWS:  Which one?
7           MS. PIETRASZEWSKI:  Can we
8   just go off the record for a minute.
9           (Discussion off the
10  record.)
11          MS. PIETRASZEWSKI:  If you
12  could just mark this one as 4.
13          (Deposition Exhibit Gavin-4
14  was marked for identification.)
15  BY MS. PIETRASZEWSKI:
16      Q.   Dr. Gavin, if you could
17  please look at Exhibit 4 and let me
18  know whether you recognize that
19  document.
20      A.   I recognize it.
21      Q.   What do you recognize the
22  document as?
23      A.   The information regarding
24  the investment.

**Page 34**

1    Q.   And did you sign this
2 document?
3    A.   Yes, I did.
4    Q.   And does this appear to be
5 a more complete version of the
6 document that's been marked as
7 Exhibit 3?
8        MR. MATHEWS:  Objection.
9        THE WITNESS:  It's longer.
10 BY MS. PIETRASZEWSKI:
11    Q.   Okay.  And do you recall
12 how you would have received Exhibit
13 4?
14    A.   Probably through the mail.
15    Q.   And do you recall whether
16 you read this document?
17    A.   Word for word, I can't say
18 that.
19    Q.   Did you read any of it?
20    A.   Most likely I would have
21 read some of it, you know, the
22 initial portion of it, what I was
23 signing, the area I was signing at.
24 Okay?

**Page 35**

1        I mean, you've -- when
2 you've signed these, you've probably
3 seen others like it in the past with
4 different investments.
5    Q.   Okay.  And do you know
6 whether you had any questions for
7 Mr. Lex regarding this document?
8    A.   No, I don't remember.
9    Q.   And I'd like to direct your
10 attention to Section 1C.
11        Do you see that?
12    A.   Yes.
13    Q.   Do you recall reading that
14 particular portion of this document?
15    A.   I would say I probably did.
16    Q.   And did you understand that
17 section at the time that you read it?
18    A.   Yes, to the point that the
19 degree of financial risk.
20    Q.   And did you have any
21 discussion with Mr. Lex about that?
22    A.   No.
23    Q.   I'd also like to direct
24 your attention to Section 1B.  It

**Page 36**

1 says, "The undersigned has carefully
2 read the offering materials."
3        Do you recall reading that
4 section?
5    A.   I don't recall.
6    Q.   Do you recall receiving
7 offering materials?
8    A.   Yes.
9    Q.   And did you review those?
10    A.   To a degree, probably.
11    Q.   Approximately how much time
12 would you say you spent reviewing
13 this document?
14    A.   I wouldn't recall that.
15    Q.   If you could flip to --
16 there's a later portion of that
17 document that says "Confidential" at
18 the top.
19    A.   How far back?  Oh, there it
20 is.
21    Q.   Do you recognize this
22 portion of the document?
23    A.   Yes.  It's something I've
24 signed.

**Page 37**

1    Q.   Is that your handwriting on
2 both -- you know, the entire section
3 of this document?
4    A.   I don't believe it is.
5    Q.   Do you know when this was
6 provided to you?
7    A.   No.
8    Q.   Do you know whether you
9 would have signed it in the presence
10 of Mr. Lex?
11    A.   I don't recall with this
12 one.  I probably did some, but others
13 I said they were mailed and I signed
14 and returned.
15    Q.   And you said you don't
16 believe that you completed this
17 entire form?
18    A.   I don't think that's my
19 printing.
20    Q.   What about if you look at
21 Questions 1, 2, 3, 4, 5, do you know
22 whether you made the Xs or if someone
23 else did?
24    A.   I don't recall.

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF NEW YORK
 2                    CIVIL ACTION NO. 3:14-CV-01303

 3              - - -

 4   Neal A. Cupersmith., et al

 5       Plaintiffs

 6       v

 7   Piaker & Lyons, P.C., Ronald L.
     Simons and Timothy N. Paventi,
 8
         Defendants
 9                         - - -

10

11         Oral deposition of RICHARD HARNISH, taken at

12   the law offices of Kang, Haggerty & Fetbroyt, 123 South

13   Broad Street, Suite 1670, Philadelphia, Pennsylvania,

14   on Wednesday, October 14, 2015, commencing at 1:15 p.m.,

15   before Alan L. Lesky, Certified Court Reporter of the

16   State of New Jersey, pursuant to notice.

17

18

19

20

21

22             ALAN L. LESKY & ASSOCIATES
                    Six Highspire Court
23             Medford, New Jersey 08055
                     609-257-3146
24
```

**Page 18**

1  investigation into the various products that he was
2  bringing to your attention?
3      A.   No.
4      Q.   I think I asked this earlier but did you do any
5  independent research regarding the investments prior to
6  making your decision?
7      A.   No.
8      Q.   Are you familiar with the term liquidity?
9      A.   Yes.
10     Q.   What is your understanding of that term?
11     A.   If it's something that if it's liquid you are
12 able to get your hands on it rather quickly from a
13 financial standpoint.
14     Q.   Did you discuss with Mr. Lex the liquidity of the
15 investments at issue here?
16     A.   Not that I recall.
17     Q.   Was it your understanding that the investments
18 were liquid?
19     A.   No.
20     Q.   Was liquidity of the investment important to you
21 at that time?
22     A.   No.
23     Q.   Did you ever discuss with Mr. Lex the prospect
24 you might need to get your money out earlier than the

**Page 19**

1  maturity dates?
2      A.   No.
3      Q.   What was your understanding about your ability to
4  take money out earlier than the end of the term?
5      A.   I don't know that we ever discussed it so I don't
6  have an answer for you.
7      Q.   Was it important for you to be able to get your
8  money out early before the end of the term?
9      A.   No.
10     Q.   Did anyone provide you with any written materials
11 regarding your investments prior to the time you actually
12 decided to invest?
13     A.   No.
14     Q.   At the time that you agreed to make the
15 investments did you review any materials?
16     A.   No.
17     Q.   Do you recall whether you were ever provided with
18 a private placement memorandum?
19     A.   No.
20     Q.   Do you recall whether you were ever provided with
21 what's called a subscription agreement?
22     A.   No.
23              (Off the record)
24 BY MS. PIETRASZEWSKI:

**Page 20**

1      Q.   Mr. Harnish, have you had a chance to look at the
2  document that's marked Exhibit 2?
3      A.   Yes.
4      Q.   Do you recognize that document?
5      A.   Yes.
6      Q.   What do you recognize it to be?
7      A.   It goes with one of these notes we had.  So I
8  would have signed these things and in thinking about it it
9  was like a little booklet or something we got.  So I guess
10 this was in with that.
11     Q.   Do you recall where the booklet came from?
12     A.   I'm assuming it came from McGinn Smith.
13     Q.   Do you recall if you read this document?
14     A.   I do not recall reading the document.
15     Q.   Is that your signature on the second page?
16     A.   Yes.
17     Q.   Do you believe you would have signed it even
18 though you had not read it?
19     A.   Yes.
20     Q.   Do you recall whether Mr. Lex was present when
21 you signed this document?
22     A.   I believe that he would have given it to me to
23 sign.  So I would say yes.  I don't recall doing it in the
24 mail or anything like that.

**Page 21**

1      Q.   Do you recall asking him any questions about the
2  document?
3      A.   No.
4      Q.   Could you flip to the final two pages of that
5  document.  Do you recognize that portion of the document
6  as well?
7      A.   Yes.
8      Q.   Is that your signature on the last page?
9      A.   Yes.
10     Q.   Do you recall whether you completed this entire
11 form?
12     A.   I believe Bill Lex would have put this in.
13 That's not my printing.  It's legible.
14     Q.   Do you know whether you read this document?
15     A.   Meaning this --
16     Q.   The top section above it?
17     A.   I do not recall reading the document.
18     Q.   Did Mr. Lex tell you that there was a net worth
19 requirement for the investment?
20     A.   Yes.
21     Q.   Do you recall what that was?
22     A.   At that time, no, I do not.
23     Q.   Do you recall whether you met whatever the
24 requirement was?

**Page 26**

1 investment?

2    A.   I'm not sure I understand the question.

3    Q.   Did you send a check to Mr. Lex or McGinn Smith?

4    A.   When I wanted to renew them, is that your

5 question?

6    Q.   When you were making the investments.

7    A.   Yes.  I would just send a check.  I don't recall.

8 It wasn't made to Bill Lex.  I think it was McGinn Smith

9 and then I guess he sent it in or his office, anyway.

10    Q.   Do you recall the last time you wrote a check to

11 McGinn Smith?

12    A.   No.

13    Q.   What was your total investment in the funds and

14 trusts that are at issue in this lawsuit?

15    A.   I believe it said 440 some thousand on this, 435,

16 I believe.  I think it was 435 actually and what they --

17 they had an interest check that I received from McGinn

18 Smith and before I deposited it in the bank they closed

19 down the account so there's a minor discrepancy but I

20 believe it was just that interest.

21    Q.   At the time you were making the investments with

22 McGinn Smith did you have other investments as well

23 outside of McGinn Smith?

24    A.   Yes.

**Page 27**

1    Q.   What percentage of your overall investments were

2 dedicated to the funds and trusts at issue in this

3 lawsuit?

4    A.   I'd probably say 25 percent with McGinn Smith and

5 the balance with other investments.

6    Q.   Do you recall how much of your money, your

7 investments with McGinn Smith were in funds as opposed to

8 trusts?

9    A.   I don't know.

10    Q.   After you had made your investments did you ever

11 receive communications from anyone regarding your

12 investments?

13    A.   No.

14    Q.   Do you recall whether you received a letter from

15 National Financial Services saying they were no longer

16 going to be holding the certificates for McGinn Smith?

17    A.   I don't recall.

18    Q.   Do you recall whether you received a letter from

19 Mr. Lex stating that he was no longer affiliated with

20 McGinn Smith?

21    A.   Not that I recall.

22    Q.   Did you ever receive any letters indicating that

23 there was a suspension of interest or a change in terms of

24 the investments?

**Page 28**

1    A.   I did.

2    Q.   Do you recall when you received -- how many times

3 you received that type of letter?

4    A.   I believe there were two occasions and one of

5 them was restructuring the interest and they were paying

6 at a lower rate.  That I'm certain of.  But I believe we

7 had another one at one point but I don't remember the

8 details of that.

9    Q.   Do you recall when you would have received those

10 letters?

11    A.   I'm going to say probably around 2008.

12    Q.   Did those letters raise any red flags for you?

13    A.   They should have.

14    Q.   Had you received similar letters regarding any of

15 your other investments?

16    A.   No.

17    Q.   Did you invest any new money in McGinn Smith

18 after receiving the letters you were just describing?

19    A.   No.

20    Q.   Did there come a time you were advised that the

21 investments had collapsed and redemptions had been

22 suspended?

23    A.   No.

24    Q.   Were you ever advised that McGinn Smith was in

**Page 29**

1 receivership?

2    A.   No.

3    Q.   Are you aware that a receiver has been appointed

4 for money to be collected from McGinn Smith?

5    A.   Yes.

6    Q.   When did you become aware of that?

7    A.   I want to say at least three or four years ago.

8    Q.   Do you recall how you became aware?

9    A.   No.

10    Q.   What is your understanding regarding the

11 situation with the receiver?

12    A.   Based on what I've been just following on the

13 public website they're still trying to sell off assets and

14 according to the website there should be cents on the

15 dollar going to the folks.  I believe one of the issues

16 now is the several of us had the senior versus the junior

17 notes, the risk tolerance type thing, and it appears to me

18 that was not taken into consideration based on the

19 comments that I read.  I don't know if there's anything

20 new on that at this point but that's what we should

21 receive on that or could receive is cents on the dollar.

22 What that is we don't really know for sure at this point.

23 They had posted something, I believe, I think it was 15 or

24 20 cents on the dollar I think was on that, the last I