# **Exhibit 21**

```
 1                           UNITED STATES DISTRICT COURT
                             NORTHERN DISTRICT OF NEW YORK
 2                           CIVIL ACTION NO. 3:14-CV-01303

 3                                    -  -  -

 4
    Neal A. Cupersmith., et al.,
 5
         Plaintiffs,
 6
         v
 7
    Piaker & Lyons, P.C., Ronald L.
 8  Simons and Timothy N. Paventi,

 9       Defendants.

10                                    -  -  -

11

12          Oral deposition of Joseph Mayberry, taken at

13  the law offices of Kang, Haggerty & Fetbroyt, 123 South

14  Broad Street, Suite 1670, Philadelphia, Pennsylvania,

15  on Tuesday, September 29, 2015, commencing at 1:30 p.m.,

16  before Alan L. Lesky, Certified Court Reporter of the

17  State of New Jersey, pursuant to notice.

18

19

20

21

22                      ALAN L. LESKY & ASSOCIATES
                              Six Highspire Court
23                      Medford, New Jersey 08055
                              609-257-3146
24
```

**Page 26**

1  hashed out, the amount of risk I was taking with each
2  individual case that I was doing.  Bill Lex probably knew
3  my risk tolerance better than, again, anyone else
4  including my wife from all the time I had dealt with
5  investments he was at.  Incidentally, my risk tolerance is
6  rather low.
7      Q.  Are you familiar with the term liquidity?
8      A.  Yes.
9      Q.  What is your understanding of that term?
10     A.  Whether you can get your money or not.
11     Q.  Was that something that was important to you in
12 making your investments?
13     A.  It was part of the deal.
14     Q.  Did you discuss that with Mr. Lex?
15     A.  Specifically did I discuss liquidity?  I don't
16 recall having a discussion regarding liquidity, but again,
17 that would be like having a discussion on default because
18 the money was due on a given day.  So I'm not sure how you
19 have a discussion on default because it's never planned by
20 anybody.  Did I know there was a risk?  Yes.
21     Q.  Did you expect that you would be able to get your
22 money out prior to the maturity date?
23     A.  No.  No, I didn't.
24     Q.  Did you have any concern or possible need to take

**Page 27**

1  your money out prior to the maturity date?
2      A.  No.  Most of it was IRA money and the money that
3  was non IRA money was just money to invest and grow for
4  the future.
5      Q.  I think we touched on this a little bit earlier,
6  but were you provided written materials regarding the
7  actual investments?
8      A.  Yes.
9      Q.  Do you recall what types of documents you
10 received regarding the investments?
11     A.  Yeah.  I had said earlier -- I know I got a
12 booklet, certainly on the first one.  And I did get some
13 paper explanation as to how it all worked, but I don't
14 know specifically that I could delineate everything that's
15 said or what it said.  The booklet was large and intense.
16     Q.  Does the term subscription agreement sound
17 familiar to you?
18     A.  No.
19     Q.  Let's mark this one as 3.  I just want you to
20 take a look at that and see if that looks familiar and
21 whether it refreshes your recollection as far as your
22 awareness of the subscription agreement.
23     A.  I can't say it looks familiar.  The subject
24 matter of notes is certainly familiar, but I can't say

**Page 28**

1  that this specifically looks familiar.  I guess this is
2  all one document.  My signature is on it, but I don't
3  remember signing it.
4      Q.  Let me direct you to one section.  If you could
5  read paragraph 1c.  That is page 5.
6      A.  What do you want me to read?
7      Q.  1c.
8      A.  The undersigned is aware that the purchase of
9  notes is a speculative investment involving a high degree
10 of risk and there are no guarantees that the undersigned
11 will realize any gain from the investment, that the
12 undersigned could lose the total amount of the
13 undersigned's investment.
14     Q.  After reading that do you recall previously
15 reading similar language?
16     A.  No, I don't have any specific recall.  If I could
17 comment on that.  If you read enough about the information
18 in the prospectus on an investment or anything, you go
19 between stuff you don't understand and stuff that makes
20 you scared.  At some point in time, unless you want to put
21 your money under a pillow, you have to rely on an advisor.
22 I understood that I could lose all my money.  I understood
23 that as a result of market forces and interest, but I
24 didn't think I was going to lose it this way and I don't

**Page 29**

1  think it says that in here.
2      Q.  So you don't recall any specific language that
3  you would have received in any of the materials that were
4  given to you prior to your investments?
5      A.  Specific language from 10 years ago?  No.  I
6  assume that if my signature is on that, that I was given
7  that paper sometime.
8      Q.  And if you signed off on it that meant you at
9  least were agreeing to the terms contained in the
10 document?
11         MR. DEAN:  Objection.  Calls for a legal
12 conclusion.
13     Q.  Would you have signed a document if you didn't
14 understand what was contained in it?
15     A.  I have done that.  I believe we all have.  I'm a
16 physician.  I ask you to think of what you sign when you
17 go in a hospital.  The answer is yes.  If people that I
18 trusted assured me of certain things I would go, based
19 upon what that person trusted.  Don't ever take any
20 medication if you're not willing to bypass everything you
21 read.
22     Q.  Hopefully I won't have to take any.
23     A.  I'm sorry.  I had to say that.
24     Q.  So you're not disputing that -- you were aware

**Page 46**

1 McGinn Smith and McGinn Smith's family and the trusts
2 they've had for their kids and it was temporarily
3 suspended.  We didn't have any information while it went
4 to criminal trial because they didn't publish that.  Now
5 it's mostly correspondence that's on there and updates on
6 events.  Like for instance, IRS had -- before there could
7 be any disgorgement of the funds -- had to sign off on it
8 and I understand they have just recently done that.
9 Things like that are on the site.
10     Q.    At any point when you were reviewing the website
11 did you make any efforts -- not when you were reviewing
12 the website, but at any point make any efforts to identify
13 the accountants or tax preparers who provided services to
14 McGinn Smith?
15     A.    Did I attempt to?  No.  I didn't attempt to do
16 anything except read what was on there.
17     Q.    Did you ever think that you were interested in
18 learning the identity of the accountants or tax preparers
19 for McGinn Smith?
20     A.    I never thought that was necessary.
21     Q.    And why not?
22     A.    Because I presume there was auditing being done
23 and it was appropriate and it satisfied regulatory
24 personnel and so it was only a name to me.  What good

**Page 47**

1 would that do me?
2     Q.    Were you interested in seeing the work that the
3 accountants or tax preparers performed for McGinn Smith?
4     A.    I don't think I would even understand it.
5     Q.    Did you ever make a complaint to any governmental
6 entity regarding your investments at issue in this
7 lawsuit?
8     A.    To a governmental agency?  No.  No.  It seemed to
9 me there were plenty of governmental agencies into it
10 without me making a complaint, so I didn't.
11     Q.    Did you at some point learn there was a legal
12 proceeding against McGinn Smith and any of the principals?
13     A.    Sure.  The receiver told us that.
14     Q.    Do you recall when that was?
15     A.    That was April of 2010 because that's when the
16 SEC filed their suit against McGinn Smith.
17     Q.    After you became aware of that did you have any
18 conversations with Mr. Lex about the situation?
19     A.    There were numerous conversations with Mr. Lex
20 because he was trying to help me understand what was going
21 on.  He was also -- and I appreciated this -- trying to
22 help me to place these notes to avoid what ultimately
23 happened with IRS.  Ultimately he did help me to place
24 those notes into the custody of someone who looks after

**Page 48**

1 IRA type of things.
2     Q.    Did there come a time when you learned of a
3 criminal proceeding against McGinn Smith?
4     A.    I did.
5     Q.    Do you recall when that was?
6     A.    Well, it was probably a couple months afterwards
7 because the way I became aware of that was by the website.
8 The website didn't chronicle every detail, but it did make
9 us aware of the fact there were criminal procedures.
10     Q.    Did you do anything after you learned of that
11 proceeding by way of investigation or speaking to Mr. Lex?
12     A.    I've continued to speak to Mr. Lex so it's hard
13 to say.
14     Q.    About this, though.
15     A.    Well, it's the elephant in the room.  But I don't
16 know that we had any cause and effect or action steps or
17 anything else.  We talked about -- we've talked about what
18 happened.  Yeah, I don't know if you have any specific
19 questions about what we could have talked about, but we
20 talked about what happened.  We talked about the notes.
21 We talked about writing to congressmen.  We talked about
22 what the -- Mr. Brown might do with what's going on.  We
23 talked about the decisions of unfairness on the part of
24 the receiver where he wasn't going to honor the relative

**Page 49**

1 risk of the notes.  He was going to consider them all in
2 one, things like that.  There's been lots to talk about,
3 but I don't think it will help you.
4     Q.    At that point did you discuss who may have
5 provided any professional services to McGinn Smith,
6 accountants?
7     A.    With Mr. Lex?
8     Q.    Yes.
9     A.    No.
10     Q.    Did you at that point make any efforts to
11 determine who was providing those types of services?
12     A.    What types of services are you talking about?
13     Q.    Accounting or tax return services?
14     A.    No.
15     Q.    Did you at any point hear the name Ronald Simons?
16     A.    I did.
17     Q.    When did you hear that name?
18     A.    I heard that -- I'm just trying to think.  I need
19 to change that.  I might have initially heard about
20 Mr. Simons from Bill Lex.  I'm not certain of that, but it
21 very well may have been.
22     Q.    Do you recall when that may have been?
23     A.    Probably a little over a year ago.
24     Q.    Who is Mr. Simons?

# EXHIBIT 4

# First Independent Income Notes, LLC

99 Pine Street
Albany, NY 12207
Phone 518-449-5131
Fax 518-449-4894



DEPOSITION
EXHIBIT
Mayberry 4
Qee 9/29/15

October 13, 2008

Mr. & Mrs. Joseph J. Mayberry
105 Huntingwood Road
Lancaster, PA 17602-1390

Re: $50,000 First Independent Income Notes 7% due 12/15/08
    Internal Investment # 5682
    Registration: JOSEPH J. MAYBERRY & MARY A. MAYBERRY JTWROS

Dear Mr. & Mrs. Mayberry:

    This communication is being sent to investors of First Independent Income Notes, LLC (the FUND) in each of the three classes of Notes, Senior, Senior Subordinated, and Junior maturing on December 15, 2008.  The purpose of the communication is to apprise you of the status of your investment and also inform you of the restructuring plan that has been presented to the FUND's Trustee, McGinn, Smith Capital Holdings Corp. by the FUND's managing member, McGinn, Smith Advisors, LLC.

    McGinn, Smith Advisors, LLC (MSA) has determined that as a result of losses incurred in the FUND's investments and the total illiquidity for the vast majority of the FUND's investments it is not possible to redeem the Notes on the due date of December 15, 2008 and will require a restructuring of all classes of Notes.  In restructuring the notes, MSA has taken into account the responsibility of the Trustee to address both the principal and interest payments due to the Senior noteholders and therefore must reschedule future interest and principal payments for all three classes of noteholders, giving priority to the Senior noteholders.  Based on best estimates of current cash flow and present liquidity, MSA has developed a plan that alters scheduled interest and principal payments for all three classes.  All three classes are having their maturities extended and their interest payments reduced.  MSA has the responsibility to manage the FUND consistent with the provisions of the note's indenture and in a manner that best protects the assets of the FUND.  Accordingly, MSA will be presenting a plan outlined later in this communication that in its sole judgment provides for an orderly liquidation of assets, payment of reasonably expected cash flows, and gives priority to the Senior Noteholders over the Senior Subordinated Noteholders and the Junior Noteholders.  The plan takes into account that current conditions in financial credit markets presently offer

PLTF00008336

no liquidity for almost any financial instrument other than U.S. Treasury Notes and Bonds. The investments in the FUND are primarily non public securities that presently have no secondary market for resale and in fact do not have the ability to even establish a fair market value. The plan makes assumptions that cannot be relied upon with any certainty. Events in the US and world financial markets have been changing with a degree of volatility never before experienced at any time in history. The Credit market crisis that started approximately 18 months ago with the troubles in the sub prime mortgage market has accelerated to the point that threatens to impair the entire world's financial foundations and has spread from Wall Street to Main Street. Under these conditions, any planning has to be subject to changing events. We have assumed that markets will continue to be unstable and primarily illiquid for at least two years. The damage to the world's banking system and investment markets is very severe and in our judgment will dramatically change the nature of markets for years to come. While governments, worldwide are rushing to shore up the system with liquidity and taking steps to restore confidence the fact is that no one knows what the ultimate impact of their actions and the reaction of markets will be. What was initially a financial crisis is now a full blown worldwide economic crisis with unknown consequences. MSA is fully confident that financial markets will eventually stabilize and that investor confidence and liquidity will be restored. Anything less is just not acceptable, and therefore the allocation of resources, new efforts of governmental oversight and regulation, and cooperation on a global scale of financial markets is expected to ultimately resolve the present crisis. But the aforementioned intervention in markets will certainly change the way markets work and with any change comes the need for patience and time for investors to first understand and then accept those changes.

As I write this memo the US Stock Market has just finished the day with the Dow Jones Industrial average down over 500 points and down almost 900 points for the last two days. This of course is subsequent to the "rescue bill" or formally the "Emergency Economic Stabilization Act of 2008" signed into law last Friday after several weeks of Congressional wrangling. While in my opinion this was a necessary first step, the idea in some circles that its ultimate passage would bring instant cure to what was ailing the credit markets was ill founded. The stock market's decline is just a symptom of the credit crisis, and while I am in total sympathy for all of us suffering market losses, the real issue is the total lack of liquidity in the credit markets. This is the major issue that impacts your investment in the FUND. Lack of liquidity simply means that there are no efficient markets to buy and sell investments because investors have lost confidence that they can fairly judge what those investments are worth. As the events of the mortgage markets and eventually all fixed income markets played out over the last 18 months, investors repeatedly got burned on making a decision to invest. A sophisticated hedge fund investor made a $1.8 billion investment last April in Washington Mutual, the country's largest saving bank, only to see it reduced to zero after being taken over by the FDIC last month. National political leaders assured us this summer that Fannie Mae and Freddie Mac, our two leading GSE (Government Sponsored Enterprises) mortgage lenders, were financially sound only to be declared bankrupt and taken over by the FDIC in mid September. Three of the five largest investment banks, Bear Stearns, Merrill Lynch, and Lehman Brothers no longer exist. AIG, the world's largest insurance

CONFIDENTIAL

company required an $85 billion cash infusion and equity investors were wiped out. Hundreds of banks and mortgage companies have been closed including the forced sales of Wachovia to Wells Fargo and Citi Corp. Virtually all financial institutions have had to either cut or eliminate dividends in order to strengthen their balance sheets. Other evidence of the cessation of liquidity in the credit markets include:

1.) billion dollar hedge funds such as D.B. Zwirn and Pardus Capital Management refused to allow investors to redeem because they were unable to sell assets to raise cash

2.) last week $120 billion of commercial paper not marketable, causing companies to lose liquidity for normal operating functions like payroll

3.) despite a lowering of interest rates, banks refusing to lend overnight to other banks from fear of not knowing the financial soundness of the borrower

4.) Reserve Money Market Fund assets fall below the one dollar redemption price and overnight withdrawal of $40 billion of the $60 billion in assets forces the fund to cease redemptions

5.) The College Fund, who manages assets for 1500 college endowments and their operating funds restrict access to their money market fund to 38% of their deposits and state that 100% of your capital won't be available until 2010

There are hundreds of other examples that have occurred and demonstrate the liquidity crisis. Most of you are aware of this because the media has been giving this story full attention for months. The reason that it is important for you to be aware of the freezing of the credit markets is because it impacts the investments in the FUND in a variety of ways. First, if the most liquid and strongest investment assets such as money market funds, commercial paper, and mortgages are having difficulty in finding buyers, than the ability for almost all other assets to have liquidity is impossible. Second, if forced to sell these assets in order to redeem the notes, the market price would be far below fair market value. As an example, Merrill Lynch in July, in an effort to get some of these assets off their balance sheet and receive cash, sold $30 billion worth for just 22 cents on the dollar. And even then, the buyer forced Merrill Lynch to finance 75% of the purchase with a non-recourse loan which meant the true cost of the purchase was just 6 cents on the dollar. Third, many of the assets, including loans of the companies in our portfolio, were dependent on subsequent financing in order to repay us. Often, our loans were bridge loans to companies until they could get permanent financing through stock or bond offerings. The initial public offerings (IPO's) hit a 5 year low in July and included only some of the most visible companies in the world such as Visa International. Of the 25 billion dollars in offerings through July, Visa accounted for 18 billion dollars, leaving just 6 billion dollars for the other 23 companies taken public. Thus, the companies in our portfolio have been totally shut out, and in several instances the capital raises included money to satisfy their debts to us or to provide us with liquidity for our investments. When these offerings will once again be available is not determinable, but it is not likely to be anytime soon.

So what is next for what former Chairman of the Federal Reserve, Alan Grenspan, has identified as the once in a century financial crisis? First, the Federal Government continues to be active through all of its agencies. As mentioned earlier, Congress recently passed a bill that is to provide $700 billion dollars to help purchase some of these distressed assets and restore liquidity to the banks so that they can begin to make the loans and provide the credit that allows our economy to begin to function normally. The SEC has decreed that short selling in financial stocks is no longer permitted until further notice. The FDIC has instituted an insurance program for money market funds. They have raised FDIC insurance on bank deposits from $100,000 per account to $250000. This week they have opened the discount window, normally reserved only for banks, to allow for the purchase of commercial paper. Those actions are designed to both restore a semblance of confidence and provide sufficient liquidity for the most critical markets of our economy. However, time is what ultimately is required for banks and financial institutions to deleverage their balance sheets and restore sufficient liquidity that will allow them to once again start lending to businesses and consumers. J.P. Morgan, one of our leading financial institutions, believes that credit losses will eventually exceed 4 trillion dollars and that the housing price decline will bottom out down 30% from 2006 levels and last until 2010.

MSA has tried to evaluate and model the impact of the current crisis on its own investments and put forth a plan that provides for all classes of note holders to first get their principal back and second provide them with some return on their investment in the interim. We have communicated with some of you earlier in the year indicating that MS was working on a plan to meet those objectives, mindful of the Senior notes and the subordination issues of the other two classes. Anything that we would have proposed earlier this year certainly would have already proven to be too optimistic. Thus, our current plan we believe to be very achievable, and we are hopeful that as markets and liquidity are restored to a more normal operational mode, we in fact may be able to accelerate the repayment. However, we must emphasize that we are in unchartered waters and what we have learned from the last 18 months is to expect the unexpected.

The plan calls for immediate implementation on the next interest payment due date. We have taken great care, and with consultation with our attorneys, to present a plan that we believe to be fair, protect all classes, and still give priority to the rule of seniority. We understand that many of you have personal liquidity issues due to retirement or other financial needs and this plan may put a personal hardship on you. MSA and its affiliate McGinn, Smith & Co. will be making its own sacrifice. Management fees, commissions, and administrative fees aggregate approximately $2,750,000 per year for all of our FUNDs that are part of this reorganization. In an effort to improve liquidity we have agreed to forfeit all such future fees while this reorganization plan is in effect. Legal fees attributed to defense of our actions and fees incurred in the pursuit of recovering any of our investments will be the responsibility of the FUNDs. The plan will be implemented for the benefit of all investors. Obviously, to be fair and acceptable to all investors, we cannot entertain a different approach for individual investors. If circumstances change in the future, hopefully for the better, we reserve the right to restructure and implement a new plan.

In conclusion, we thank you in advance for your patience and understanding of the very difficult position that we are in. If there are any questions regarding your accounts or this memorandum, please contact your McGinn, Smith & Company representative.

Sincerely,

David L. Smith
Managing Partner
McGinn, Smith Advisors

DLS/gg

CONFIDENTIAL                    PLTF00008340

# **EXHIBIT 6**

**MS Advisors**
99 Pine Street, 5th Floor
Albany, New York  12207


DEPOSITION EXHIBIT
Mayberry 6
all 9/29/15

November 11, 2009

Dear Investor,

Approximately one year ago we communicated to you the state of the worldwide capital markets, the impact of those markets on your investment, and a proposed restructuring plan to deal with both the diminished cash flow the Fund was undergoing and the total illiquidity the Fund was facing regarding the sale or refinancing of its underlying assets.  We emphasized that in our judgment markets would continue to be unstable and illiquid for at least two years and that the damage done by the credit crisis would require patience before economic growth and investor confidence would be restored.  For six months after that communication, markets plummeted, bank failures soared, unprecedented government intervention in the markets and in private business was deemed necessary to forestall total economic collapse, and investors experienced devastating losses in virtually all asset classes; stocks, bonds, real estate, commodities, hedge funds, and even those investments previously considered to be free of risk, such as money market funds.

In April of this year, stock markets around the world finally bottomed, and in fact the major indices have rallied approximately 60% off their lows.  However, despite massive inflows of stimulus money, the Federal Reserve keeping interest rates at virtually 0 percent and governmental programs ranging from credits for new homebuyers to new car subsidies, economic growth and employment have remained negative.  The third quarter GDP showed a positive 3.5% growth rate, providing the first evidence of this very deep recession coming to a close.  However, the recent unemployment rate of 10.2% tells us that recovery is likely to be difficult and longer than normal.  The legendary Bill Gross, founder, managing director, portfolio manager, and co-chief investment officer with Pacific Investment Management, Co, LLC believes the market collapse resulted in what he calls the "new normal"- a market atmosphere in which the economy will grow 1% - 2% over the next few years, unemployment will range from 8% - 10%, and inflation will be on the rise.  If he is right, and Gross is right more than almost anyone in the investment business, the news for investors remains sobering.

Investors tend to focus on the stock markets, which is understandable, because outside of their homes, most investors have the bulk of their investments through direct stock ownership or through retirement plans that tend to be more equity oriented.  Your investment in the Fund is not impacted so much by the stock markets, as by the activity of the credit markets.  In other words, are lenders willing and capable of providing capital

CONFIDENTIAL

PLTF00008414

to businesses that need money for working capital, research and product development, inventory purchasing, seasonal cash flow needs, and often the critical needs to refinance existing debt?  It is in the credit area that things have remained very sluggish.  Banks, under heavy regulatory pressure to shore up their capital base, and leery of making any loans that might go bad in the present soft economy, have tended to make loans to only to customers who enjoy a pristine credit rating.  Alternative credit sources such as CIT Group, Inc. and GMAC have their own problems.  CIT, whose business model is similar to the Fund's in that they advance credit to smaller and less capitalized companies, recently had to file for bankruptcy restructuring, likely wiping out the recent $2.3 billion in taxpayer money advanced earlier this year.  Similarly, GMAC Financial Services, Inc. is in advanced talks with the Treasury Department to prop up the lender with its third helping of taxpayer money, likely in the $3 billion to $6 billion area on top of the $12.5 billion that GMAC has received since December 2008.  Thus, middle market borrowers continue to face increasing defaults and capital markets lacking "easy" solutions for leveraged companies.  Additionally, the M&A market remains challenging, with wide spreads between seller expectations and buyer return thresholds.

The market has proved equally difficult for portfolio lenders such as ourselves. We are frequently met with fragmented bank groups, who are often in the senior position and in no mood to be accommodative to subordinate lenders such as ourselves.  Without an accommodative debt capital solution or an M&A (mergers and acquisitions) market to provide an exit, lenders are often confronted with decisions to either take sizable discounts to par for their loans or amend/extend terms and maturities.  Neither of those alternatives is helpful in our quest to work out of our problems.

Regarding the restructuring plan that we put forth last year, we have remained on track for the first year.  We met all of our principal and interest payments due to our Senior class investors in all four Funds:  First Independent Income Notes, (FIIN), First Excelsior Income Notes (FEIN), Third Albany Income Notes (TAIN), and First Advisory Income Notes (FAIN).  The vast majority of our investors have been patient and willing to let the manager, MS Advisors, proceed with the restructuring plan, and we appreciate that patience.  We continue to believe that it is in the best interest of all classes of noteholders to remain committed to the restructuring plan, as it is the best and least expensive way to work out of a difficult and unfortunate situation for clients whom we value tremendously and whose trust we hope to demonstrate is not misplaced.  As the credit markets improve, the valuation of assets becomes more obtainable, and liquidity hopefully increases, we hope to have a clearer picture as to how best to proceed, including unwinding the Funds if that seems economically prudent and in the best interest of all.

Our specific plan for now is to stay with the original proposal.  We are working with a number of our borrowers to restructure their loans both with us and their senior lenders.  As mentioned earlier, these workouts are often contentious and difficult, as there are a variety of interested parties involved, and any one of them can often forestall progress in completing a plan that will provide the borrower with sufficient capital and relief from debt service that will allow him to continue operating his business.  One of our concerns continues to be the lack of new capital for the Funds themselves.  We are not much different from our own portfolio companies.  If we had new capital we would

PLTF00008415

be able to not only to provide necessary capital to our portfolio companies to assist them, but also to take advantage of new and attractive opportunities that might provide additional earnings to the Funds to help them meet, on an accelerated basis, their obligations. Obviously, with the lack of performance by the underlying borrowers and the credit markets lending only to the most creditworthy, the goal of obtaining more capital remains elusive. However, we are constantly reviewing our options and opportunities, and if we believe that a different approach other than the current proposal would be beneficial to noteholders, we will not hesitate to offer another, better plan.

Finally, under the "good news" column, the accountants for the Funds have notified us that because the notes are technically in default, all payments received should be considered as a return of principal, rather than a payment of interest and principal. Thus, the payments that you receive in 2009 will not be considered as taxable income. You will not receive a 1099 for 2009. Your last payment was for the full amount under the restructuring proposal, including principal and interest. We have not reduced that payment amount, but rather have simply characterized it entirely as a principal payment. This approach is favorable to you as you won't be taxed on the return of your own capital. We intend to make the full amount of payments as originally proposed under the restructuring plan. This determination only impacts the senior noteholders as they were the only noteholders receiving payments in 2009.

Sincerely,

McGinn, Smith Advisors
Managing Member

DLS/gbg

3

CONFIDENTIAL                    PLTF00008416

# **Exhibit 22**

1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF NEW YORK
2                CIVIL ACTION NO. 3:14-CV-01303

3

4   NEAL A. CUPERSMITH, ET AL.,

5        Plaintiffs,

6        v.

7   PIAKER & LYONS, P.C., RONALD L.
    SIMONS AND TIMOTHY N. PAVENTI,
8
         Defendants.
9

10

11

12              Oral deposition of ELLEN MYERS, taken

13   at the law offices of Kang, Haggerty & Fetbroyt,

14   123 South Broad Street, Suite 1670, Philadelphia,

15   Pennsylvania, on Thursday, December 10, 2015,

16   commencing at 9:27 a.m., before Suzanne Walinsky, a

17   Court Reporter and Notary Public, pursuant to notice.

18

19

20

21

22

23

24

**Page 50**

1    Q.      Now, this was an investment of
2  $80,000 -- correct? -- as noted on the first page?
3    A.      Yes.
4    Q.      Okay.  Do you typically invest $80,000
5  in something that you know nothing about?
6         MR. DEAN:  Objection.
7  BY MR. HOPPE:
8    Q.      If you can answer.
9         MR. DEAN:  You can answer.
10        THE WITNESS:  I rely on the expertise of
11 the person who is -- that I'm dealing with.
12 BY MR. HOPPE:
13   Q.      Okay.  Do you understand this investment
14 to be a note?
15   A.      Do I understand it?  No.
16   Q.      Okay.  Do you understand that this
17 investment would be a loan to a company?
18   A.      No.
19   Q.      Do you understand that there's a
20 maturity date on this investment?
21   A.      I don't know.
22   Q.      But you did not read this document, as
23 far as you can recall?
24   A.      No.

**Page 51**

1    Q.      I'm going to show you what's been marked
2  as Exhibit 3.  And we'll come back to Exhibit 2 in
3  just a few minutes.
4    A.      There's no signatures on this.
5    Q.      And I'll represent to you that that's
6  the Private Placement Memorandum for the First
7  Excelsior Income Notes, LLC, investment.
8         Have you ever seen that before?
9    A.      I have no idea.
10   Q.      Okay.  If that was provided to you by
11 Bill Lex, would you have read it?
12   A.      Probably not.
13   Q.      Would you have had any discussions with
14 Bill Lex regarding the document that was provided to
15 you by him?
16   A.      I'm certain Bill would have discussed it
17 with me.
18   Q.      Do you have any recollection of Bill
19 having discussed that particular document with you?
20   A.      No.
21   Q.      Okay.  I'm just going to go through a
22 few things on this document.  And I understand that
23 you're not sure whether or not you received it.
24        I'm going to start with numbered page 1

**Page 52**

1  on this document under the heading Business.  Could
2  you review that real quick.
3    A.      (Witness reviews document.)
4    Q.      Have you read it?
5    A.      Yes.
6    Q.      Okay.  Is it fair to characterize that
7  paragraph as describing where your money's going to be
8  going?
9    A.      Yes.
10   Q.      Okay.  Do you remember having a
11 discussion with Bill Lex about where your money was
12 going to be going?
13   A.      No.
14   Q.      Is this the first time that you've
15 learned where your money was going to be going for
16 this investment?
17   A.      I don't know.
18   Q.      Is what's listed in the Business heading
19 on numbered page 1 of that exhibit, is that news to
20 you today?
21   A.      Is it what?
22   Q.      Is it news to you?  Is it the first time
23 that you've learned of this?
24   A.      I don't recall.

**Page 53**

1    Q.      Can I see that real quick.
2         At the time you made an investment in
3  First Excelsior Income Notes, LLC -- and I believe you
4  testified earlier that this is one of the ones you do
5  remember, that name, correct?
6    A.      I remember that name, yes.
7    Q.      Okay.
8    A.      I remember an agreement with that name.
9    Q.      Okay.
10   A.      Only because I flipped through the
11 documents yesterday.
12   Q.      Did Mr. Lex advise you that your money
13 would be used to, among other things, acquire debt
14 securities, collateralized debt obligations, bonds,
15 equity securities, things of that nature?
16   A.      I have no idea.
17   Q.      Do you remember having a discussion to
18 that effect?
19   A.      No.
20   Q.      Do you remember having a discussion with
21 Bill Lex where he advised you that First Excelsior
22 Income Notes, LLC, may acquire assets directly from an
23 affiliate company?
24   A.      No.

**Page 54**

1    Q.        Okay.  Do you understand what that
2  means, direct --
3    A.        Yes.
4    Q.        -- purchasing assets from an affiliate?
5              Hearing that today, would that give you
6  cause for concern if you knew that your money was
7  going to acquire assets from affiliated companies?
8    A.        It could.
9    Q.        Okay.  If you knew that, would you
10 question what's going on with that?
11   A.        (No response.)
12   Q.        Let me ask you this:  Would that strike
13 you as a potential conflict of interest?
14             MR. DEAN:  Objection.
15             THE WITNESS:  I don't know.
16 BY MR. HOPPE:
17   Q.        Let's look at page 5, and, actually, it
18 continues to page 7.  And I want you just to review
19 those few pages.
20   A.        (Witness reviews document.)  I read
21 them.  I didn't read everything.  I read the captions.
22   Q.        Okay.  So you have a recollection of
23 reading the captions?
24   A.        No, I don't.

**Page 55**

1    Q.        Okay.  Do you have a recollection of
2  reviewing the Risk Factor section of that document?
3    A.        No.
4    Q.        Do you have a recollection of Bill Lex
5  ever discussing with you the various risk factors
6  associated with this investment?
7    A.        I knew that they were not federally
8  insured.  Beyond that, I can't answer.
9    Q.        Let me just see that real quick.  I'm
10 going to go over a couple of these with you.
11             Now, the first risk factor on page 5
12 states that the notes may not be a suitable investment
13 for all investors.
14   A.        I saw that.
15   Q.        Is that something that you were aware of
16 at the time you made this investment?
17   A.        No.
18   Q.        Did you have a discussion with Bill Lex
19 as to whether or not this was suitable for you?
20   A.        You're asking me something that happened
21 so far -- long ago.
22             Do I remember a specific thing on this?
23 No.
24   Q.        Well, I asked you just more generally if

**Page 56**

1  he went over risk factors with you.
2    A.        He did go through risk -- some risk
3  factors.  What -- I don't recall what he went through.
4    Q.        Okay.  Maybe these will refresh your
5  recollection, then.
6              Now, you had said that you were aware
7  that these investments were not insured --
8    A.        That's right.
9    Q.        -- correct?  Okay.
10             Now, on the top of page 6 a risk factor
11 states that the secured assets may be inadequate to
12 repay the notes.
13   A.        I saw that.
14   Q.        Is that something you were aware of when
15 you made the investment?
16   A.        No.
17   Q.        Okay.  Would you have wanted to know
18 that before making an investment?
19   A.        Probably.
20   Q.        Now, at the bottom of page 6, a risk
21 factor states that the trustee may experience a
22 conflict of interest.
23   A.        I saw that.
24   Q.        Okay.  Do you understand that a trustee

**Page 57**

1  is the one who's making the investments on your
2  behalf?
3    A.        Yes.
4    Q.        Did Mr. Lex explain to you that the
5  trustee may experience conflicts of interest?
6    A.        I can't answer that.
7    Q.        Would you have wanted to know at the
8  time you made this investment whether or not there
9  were conflicts of interest on the part of the trustee?
10   A.        Probably.
11   Q.        Now, at the top of page 7, risk factors
12 relating to First Excelsior Income Notes.  Do you see
13 at the top where it says, "FEIN is a newly formed
14 limited liability company"?
15   A.        Yes.
16   Q.        Okay.  Do you understand that to mean
17 that there is no track record for this company?
18   A.        No.
19   Q.        As a newly formed company, would a
20 company have a track record of performance?
21   A.        Probably not.
22   Q.        Would you want to know at the time you
23 made this investment whether or not this was a newly
24 formed company or a company with an established track

# **Exhibit 23**



# Compressed Transcript of the Testimony of
# **ILENE NEMETH, 11/4/15**

**Case:** Cupersmith v. Piaker & Lyons, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

**Cupersmith v. Piaker & Lyons, et al.**                    **ILENE NEMETH, 11/4/15**

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

NEAL A. CUPERSMITH,   : CIVIL ACTION
et al.,                          :
                                     :
    Plaintiffs,   :
                                     :
    vs.               :
                                     :
PIAKER & LYONS,       :
P.C., RONALD L.       :
SIMONS, and TIMOTHY   : No.: 3:14-cv-01303-TJM-DEP
N. PAVENTI,           :
                                     :
    Defendants.   :

- - -

        Oral deposition of ILENE NEMETH, taken
at Court House Lane, LLC, 204 Court House Lane,
Toms River, New Jersey, on Wednesday, November 4,
2015, beginning at approximately 11:00 a.m., before
Christine Brown, Certified Court Reporter, and
Notary Public in and of the State of New Jersey.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

---

Page 2

1  APPEARANCES:
2
3  KANG, HAGGERTY & FETBROYT, LLC
   BY:  DAVID P. DEAN, ESQUIRE
   123 BROAD STREET, SUITE 1670
4  PHILADELPHIA, PENNSYLVANIA 19109
   (215) 525-5850
5  -- Representing the Plaintiffs
6  JAECKLE FLEISCHMANN & MUGEL, LLP
   BY:  BRADLEY A. HOPPE, ESQUIRE
7  200 DELAWARE AVENUE
   AVANT BUILDING, SUITE 900
8  BUFFALO, NEW YORK 14202
   (716) 856-0600
9  -- Representing the Defendants
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1                    INDEX
2  WITNESS                        PAGE
3  ILENE NEMETH
      EXAMINATION
4
      BY:  Mr. Hoppe              4
5
6             EXHIBITS
   NUMBER       DESCRIPTION       PAGE
7
8  1    Spreadsheet               39
9  2    Confidential Private Placement  48
        Memorandum
10
11 3    Subscription Agreement for the  58
        Purchase of Notes of First
        Advisory Income Notes, LLC
12
13 4    Subscription Agreement for the  59
        Purchase of Notes of First
        Advisory Income Notes, LLC
14
15 5    Purchaser Questionnaire for     69
        Individuals
16 6    Purchaser Questionnaire for     76
        Individuals
17
18 7    Subscription Agreement          79
19 8    Contract Certificate            83
20 9    10/22/08 Letter                 95
21 10   8/22/07 Letter                  92
22 11   11/11/09 Letter                 103
23 12   9/25/09 Letter                  104
24
25

---

Page 4

1        (It is hereby stipulated and agreed
2  by and among counsel for the respective
3  parties that sealing, filing and
4  certification are waived; and that all
5  objections, except as to the form of the
6  question, are reserved to the time of
7  trial.)
8        THE COURT REPORTER:  Usual
9  stipulations, Counsel?
10       MR. HOPPE:  Yes.  I think the
11 witness is going to do the read and sign;
12 is that correct?
13       MR. DEAN:  Yes.
14              - - -
15       ILENE NEMETH, after having been duly
16 sworn, was examined and testified as
17 follows:
18              - - -
19           EXAMINATION
20              - - -
21 BY MR. HOPPE:
22    Q.  Good morning, ma'am.
23    A.  Good morning.
24    Q.  My name is Brad Hoppe.  We were just
25 introduced just a moment ago.

**Cupersmith v. Piaker & Lyons, et al.**                    **ILENE NEMETH, 11/4/15**

---

Page 33

1    Q.  Okay.
2    A.  He called, um-hum.
3    Q.  Okay.  So he would have called at some
4    point in the '90s to advise you that there's this
5    investment opportunity through McGinn Smith &
6    Company?
7    A.  Yes.
8    Q.  Now, when he called you that first
9    time, what did he explain to you about these
10   investments?
11   A.  They -- that there was a pretty sure --
12   the fact that these investments were safe to invest
13   in.  And if I took them at a lower risk and my
14   husband wanted it, his -- he could take it at a
15   higher risk.  There was a couple risk offer.  I
16   always stayed to the lower risk of that investment.
17   Q.  Okay.  And your husband was more of a risk
18   taker?
19   A.  Yeah, he was more of a risk taker.
20   Q.  Okay.
21   A.  But he didn't invest as much money.
22   Q.  Um-hum.  Now, did he explain to you at
23   this time when he made that phone call where your
24   money would ultimately be going?
25   A.  He told me just the trust company and what

---

Page 34

1    that trust -- or whatever that company was that it
2    was in -- being invested in.  They were notes --
3    Q.  Um-hum.
4    A.  -- that -- what they were going for, yes.
5    Q.  Now, did he explain to you -- strike that.
6         Were these alarm security contract notes?
7    A.  I know some were.
8    Q.  Okay.  So there was a point in time in the
9    '90s where you invested in alarm security contract
10   notes?
11   A.  Yes.
12   Q.  Okay.  Do you have any recollection as to
13   what the interest rate was on those notes?
14   A.  That was high.  That was up around
15   9 percent or somewhere around that figure,
16   9 percent.
17   Q.  Okay.  And that was 9 percent for your
18   investments?
19   A.  Yeah, but only a part of my investment.
20   Q.  Okay.
21   A.  Because on that same investment that's how
22   I found out about the fraud.
23   Q.  Okay.
24   A.  Because I went -- I had the interest on
25   that, or I had the money divvied over a 20-year

---

Page 35

1    period I think it was.  It was either a 20 or
2    10-year period.  I would get a certain amount that
3    would be put into my savings account or bank
4    account.  And that was like extra money for me each
5    month.  And that was going to be stretched out.
6    Well, I only got part of that because in November
7    of 1999 I called and my account never -- it never
8    went into my account.  There was nothing there.
9    Q.  Do you mean November of 2009?
10   A.  Yes.
11   Q.  Okay.  All right.  You said "1999."
12   A.  Yeah.
13   Q.  Okay.
14   A.  2009.  Yes, I'm sorry.
15   Q.  I was like "Wow, long time ago."
16   A.  No, no.
17   Q.  Okay.  Just so I understand your testimony
18   and it's clear on the record, these notes that you
19   invested in, you were getting quarterly interest
20   payments; is that correct?
21   A.  Yes.
22   Q.  Okay.
23   A.  Well --
24   Q.  Is that the money you're talking about
25   that was going into your savings account?

---

Page 36

1    A.  The one on the savings account was a fee
2    that -- it grew interest as -- but the money came
3    down because it was that type of investment where
4    that 20 -- or that money was stretched out over and
5    I got -- it drew interest, but I got a certain
6    amount each month.
7    Q.  Okay.
8    A.  -- put into the bank account.
9    Q.  Okay.  So in November of 2009 that money
10   stopped, those payments stopped?
11   A.  Stopped when I called up.
12   Q.  Okay.
13   A.  Or it wasn't in November.  It was
14   September.  I'm sorry.  September of 2009 --
15   Q.  Okay.
16   A.  -- I called for the statement, you know,
17   that had been deposited, if it was deposited.  And
18   nothing there.  So right away I called Mr. Lex.
19   And they said there was something going on, but
20   they didn't know what.  At that time I got scared.
21   So I said, "Am I going to lose all my money?"
22        And they said, "Well, we don't know that."
23   That was just a receptionist.  That wasn't Bill.
24   Q.  So at that point in time did you suspect
25   that there was a fraud going on?

9 (Pages 33 to 36)

**Cupersmith v. Piaker & Lyons, et al.**                                    **ILENE NEMETH, 11/4/15**

Page 37

1    A.  I knew something was going on, but I
2  didn't know there was a fraud.
3    Q.  Okay.
4    A.  Because I had statements coming to me all
5  the time.  My quarterly statements came faithful.
6  Showed what I should have earned on that money.  I
7  mean, I thought I was doing very good.
8    Q.  Um-hum.
9    A.  Because I had figured on retiring at the
10  age of 55 because my husband's nine years older
11  than me.  And I had set it up.  I said to Bill, I
12  said, "I want to retire at the age of 55.  My
13  husband will be 65, or close to 65."  So that's why
14  he was trying to put investments where, but still
15  stay on the low-risk end for me so I would have
16  money to retire with because the hospital
17  retirement was poor.
18    Q.  Okay.  Now, in September of 2009 when the
19  payments ceased, after you had that conversation
20  with someone at Bill Lex's office, did you follow
21  up with Bill Lex again?
22    A.  Yes.  I called a few times and so did they
23  call me and would inform me that the receptionist
24  or his helpers or whatever, assistants would call
25  and tell me, you know, "This is going on and that's

Page 38

1  going on.  And everything at McGinn & Smith has
2  been locked up.  We can't" -- "Nothing comes in or
3  nothing goes out," so...
4    Q.  Okay.  After September of 2009, did you
5  ever receive payments again?
6    A.  Never.
7    Q.  Okay.  Did you ever --
8    A.  Just like all disappeared.
9    Q.  Okay.  Did you ever make a phone call to
10  anyone at McGinn Smith to find out what was going
11  on?
12    A.  Let's see.  I'm not real sure how that
13  went.
14    Q.  Okay.
15    A.  We did make some calls.  It wasn't to
16  them.
17    Q.  Okay.  I'm going to get back to all that
18  in a little while.  But first, I want to get back
19  to these investments and just find out a little bit
20  more about each of your investments with the McGinn
21  Smith companies.  We will go into the September of
22  2009 time frame again.
23         But before that, I just want to confirm
24  what we're talking about in this case, which
25  investments are the subject of this action.

Page 39

1         MR. HOPPE:  And can we have this
2    marked as Exhibit 1.
3              - - -
4         (Whereupon, Exhibit 1, Spreadsheet,
5    was marked for identification.)
6              - - -
7  BY MR. HOPPE:
8    Q.  I'm showing you what's been marked as
9  Exhibit 1.  I'll represent to you that this is a
10  spreadsheet that was provided to my office from
11  your attorney's office showing all the investments
12  from each of the investors.  And if you could flip
13  to the page that summarizes your investments in
14  McGinn Smith entities.
15         MR. DEAN:  It goes up to there.
16         THE WITNESS:  Okay.  Yes.
17  BY MR. HOPPE:
18    Q.  Okay.  And how much according to that
19  spreadsheet did you invest in the McGinn Smith
20  entities?
21    A.  I invested up to -- well, how can I say
22  this?  Out of my own pocket I had to invest at
23  least $160,000.
24    Q.  Okay.  And that spreadsheet, how much does
25  that state that you and your husband invested?

Page 40

1    A.  168 --
2    Q.  Okay.
3    A.  -- 021.41.  And that's probably very close
4  to it because I know it was up in the --
5    Q.  Okay.
6    A.  It was up in the 160s.  I know that.
7    Q.  Okay.  Do you have any reason to doubt the
8  number that's stated on that spreadsheet?
9    A.  No.
10    Q.  Okay.
11    A.  Um-um.
12    Q.  Now, the spreadsheet shows a number of
13  different investments.  I just want to confirm that
14  those are the entities that you did, in fact,
15  invest in.  I'm just going to go over some of the
16  names.
17         Do you see investments there with First
18  Albany Income Notes, LLC?
19    A.  First Albany.  Hmm...
20         MR. DEAN:  Looks like it has the
21    abbreviation.
22  BY MR. HOPPE:
23    Q.  Oh, FAIN, F-A-I-N.
24    A.  Oh, okay.  Yes.  Um-hum.
25    Q.  Do you see four investments with F-A-I-N,

10  (Pages 37 to 40)

**Cupersmith v. Piaker & Lyons, et al.**                                  **ILENE NEMETH, 11/4/15**

Page 49

1          for identification.)
2              - - -
3    BY MR. HOPPE:
4      Q.   Ms. Nemeth, I'm showing you what's been
5    marked as Exhibit 2.  I'll represent to you that
6    this is the private placement memorandum for your
7    First Advisory Income Notes, LLC investment.  In
8    other words, FAIN.
9      A.   I know I've seen a lot of this.  I've read
10   a lot of it, but to tell you that did I understand
11   it, no.
12     Q.   Okay.  Do you have a specific recollection
13   of having reviewed that document that's in front of
14   you as Exhibit 2?
15     A.   Yes.
16     Q.   Okay.
17     A.   This document was read.
18     Q.   Okay.
19     A.   But to say I really remember or
20   understand, no, a lot of it I don't.
21     Q.   I understand.  I'm just going to ask you a
22   few questions about that document.  Before I ask
23   you the questions about that document, there's a
24   few things that I forgot to ask you earlier and I
25   want to ask them now while they're on my mind.

Page 50

1          Did you ever have any discussion with Bill
2    Lex regarding his affiliation, if any, with McGinn
3    Smith?
4      A.   I never did ask.  Um-um, never asked.
5      Q.   Did you have any understanding as to
6    whether he was a broker for McGinn Smith?
7      A.   No.
8      Q.   Do you understand what a broker is?
9      A.   Not really.  I mean, I've heard of the
10   word passed by, but I don't know what a broker is.
11     Q.   Did you have any understanding as to how
12   Mr. Lex was getting paid for these investments?
13     A.   Well, according to what I read on here, it
14   was a certain percent that he was paid, but I don't
15   know how he got paid.
16     Q.   Okay.  Did you have that discussion with
17   him or is that just from reading this document now?
18     A.   That's just from this document.
19     Q.   Okay.
20     A.   I did not get -- like I say, my trust was
21   put in Bill.
22     Q.   Understood.  And I'm just trying to
23   understand, you know, and get a better idea of what
24   discussions you had with him and what information
25   you had in your possession at the time you made

Page 51

1    these investments.  So is it safe to say that you
2    weren't aware of whatever financial arrangement
3    Mr. Lex had with McGinn Smith?
4      A.   No.
5      Q.   Okay.  What kind of financial arrangement
6    did you have with Mr. Lex?  Did you pay him
7    anything for his services?
8      A.   I never paid for services with him.
9      Q.   Okay.  Did you have any understanding at
10   all as to whether Mr. Lex was getting paid directly
11   from McGinn Smith?
12     A.   No.
13     Q.   Now, back to Exhibit 2.
14     A.   Um-hum.
15     Q.   You said that you reviewed this at one
16   point in time.  Do you know how long you reviewed
17   this?
18     A.   I always reviewed everything as soon as it
19   came in.
20     Q.   Okay.
21     A.   So if it came in after each investment I
22   reviewed it then.  But, of course, I was younger
23   and didn't take as much interest in these type of
24   things because my trust was in Bill.
25     Q.   Okay.

Page 52

1      A.   I didn't ask -- I didn't question him.
2      Q.   The type of review that you undertook with
3    this document that's been marked as Exhibit 2,
4    would you characterize it as a detailed review or
5    more of a quick review of the document?
6      A.   I would say it was -- I would think it was
7    a quick review.
8      Q.   Okay.  And that's partly because, as you
9    noted earlier, you really didn't understand a lot
10   of the stuff that was in there?
11     A.   Yes.
12     Q.   Did Mr. Lex walk you through the contents
13   of that document?
14     A.   This document I signed in front of him, I
15   think.  No, take that back.  I don't remember.
16   Everything came to me at home.
17     Q.   Okay.  And then would you execute it and
18   return it?
19     A.   Yes.
20     Q.   Okay.
21     A.   I would exe -- yeah, because I would sign
22   it wherever I was supposed to sign it and return
23   it, right.
24     Q.   And I'm going to represent to you that
25   this document here isn't the document that was

13 (Pages 49 to 52)

**Cupersmith v. Piaker & Lyons, et al.**                                     **ILENE NEMETH, 11/4/15**

Page 53

1   signed.  This is a document that is the offering
2   materials for the First Advisory Income Note, LLC
3   investment.
4       A.  Um-hum.
5       Q.  Okay.  I'll show you the document that you
6   signed in just a few moments.
7       A.  Um-hum.
8       Q.  Did he explain to you any of the risk
9   factors that were associated with this investment?
10      A.  No.
11      Q.  Okay.  Did he direct you to the section of
12  this private placement memorandum that goes over
13  some of those risk factors?
14      A.  No.
15      Q.  Do you have a recollection of reviewing
16  that part of the document that goes through the
17  various risk factors?
18      A.  No.
19      Q.  Okay.  Let's turn to that in the document
20  then.  I think David at this point knows exactly
21  where to go.  I believe it's page 5 on this one.
22          MR. DEAN:  Okay.  You're right.
23  BY MR. HOPPE:
24      Q.  I'd like you to take a quick look at
25  pages 5 and 6, the different risk factors for this

Page 54

1   investment.
2          And the first one I want to go over is
3   the -- it's the first risk factor on page 5 --
4       A.  Um-hum.
5       Q.  -- where it notes that "This investment is
6   not suitable for all investors."  Do you see that?
7   It's right at the top.
8       A.  Yes.
9       Q.  Okay.  Did he explain to you whether or
10  not this was, in fact, suitable for you?
11      A.  No.  I was never explained anything about
12  the risk factors --
13      Q.  Okay.
14      A.  -- on any of them, really.
15      Q.  Okay.
16      A.  In fact, I don't even know if I read that
17  before.
18      Q.  Okay.
19      A.  That I -- I know like up in here I
20  remember reading all of this.
21      Q.  Okay.
22      A.  But I don't know about risk factors.
23      Q.  Is it fair --
24      A.  I didn't know nothing about them.
25      Q.  Okay.  Is it fair to say that you assumed

Page 55

1   that this was suitable for you based on the fact
2   that it was being recommended by Mr. Lex?
3       A.  Yes.
4       Q.  Okay.  The next risk factor on that --
5   actually, it's on page 6, the next one I want to
6   touch upon.
7       A.  Um-hum.
8       Q.  Do you see where it states that "The
9   security interest may not be sufficient for
10  repayment of the notes"?
11      A.  "Security."  No.  Where is it at?  Yes.
12      Q.  Do you see that?  Okay.
13          MR. DEAN:  Just to clarify.  I think
14      I guess the heading at least, "The secured
15      assets may be inadequate to repay the
16      notes."
17          THE WITNESS:  Um-hum.  Um-hum.
18          MR. HOPPE:  That's fine.
19  BY MR. HOPPE:
20      Q.  Did you review -- do you have any
21  recollection of reviewing that risk factor?
22      A.  No.
23      Q.  Okay.  Do you have any recollection of
24  Bill Lex advising you that the secured assets may
25  be insufficient to pay the notes?

Page 56

1       A.  No.
2       Q.  Okay.  As you read that today, do you
3   understand that to mean that there's -- that
4   situations are possible where you're not going to
5   get your money back?
6       A.  Yeah.
7       Q.  Okay.  And that's because there may not be
8   assets sufficient to cover the note?
9       A.  I know that now from reading this.
10      Q.  If you would have known that at the time
11  that you made this investment, would you have
12  considered not making the investment?
13      A.  I wouldn't have made the investment, no.
14      Q.  Okay.  I'm also going to show you the next
15  risk factor, or another risk factor on that page.
16  If you could open it up again to page 6.  Do you
17  see where it says that "The notes are not insured
18  or guaranteed"?
19      A.  Yes.
20      Q.  Okay.  Were you advised by Mr. Lex at the
21  time you made this investment that there is no
22  insurance for these notes?
23      A.  I was never told that.
24      Q.  Okay.  Would that have impacted your
25  decision as to whether or not you made this

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

# **Exhibit 24**

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF NEW YORK
2              CIVIL ACTION NO. 3:14-CV-01303

3

4  NEAL A. CUPERSMITH, ET AL.,

5       Plaintiffs,

6       v.

7  PIAKER & LYONS, P.C., RONALD L.
   SIMONS AND TIMOTHY N. PAVENTI,
8
        Defendants.
9

10

11

12              Oral deposition of PAUL PAVLISHIN,

13  taken at 94 Signal Hill Road, Holland,

14  Pennsylvania, on Friday, December 4, 2015,

15  commencing at 9:06 a.m., before Suzanne Walinsky,

16  a Court Reporter and Notary Public, pursuant to

17  notice.

18

19

20

21

22

23

24

**Page 38**

1    Q.    Okay.  When you spoke with him, was it
2  in person or over the telephone?
3    A.    Don't remember.  Could have been over
4  a dinner.  We go out to dinner quite often.  Don't
5  remember if my wife was there, though.
6         I -- no, I don't know if it was
7  telephone or face-to-face.
8    Q.    Okay.  Did Mr. Lex say anything about
9  the risk involved in the investment?
10   A.    He might have said that it wasn't
11  insured, but I can't be sure that -- that he made
12  that statement.
13   Q.    Okay.  And what would that mean to you
14  knowing that an investment wasn't insured?
15   A.    That if something went wrong, it
16  wasn't insured.  But, again, I go back to the FDIC,
17  SIPC and -- and George's statement, They've never
18  been a dollar late -- or, excuse me -- a day late
19  or a dollar short.
20   Q.    Did you understand that there was a
21  risk in your investment?
22   A.    Oh, sure.  That's almost any -- well,
23  yes.  Very, very slight, though, because of their
24  past history.  Very slight.  That's why I only put

**Page 39**

1  25 in.
2    Q.    Okay.  And then so this would be a
3  good time because we're ready to move to the next
4  one.
5         So after the 25,000, you said you were
6  receiving your interest payments, correct?
7    A.    Yes.  Yes.
8    Q.    And so then at some point later, you
9  decided to make an additional investment?
10   A.    Yes.  Another 25.
11   Q.    Okay.  And you said you didn't recall
12  whether that was in the same -- whether it was a
13  note or a trust, whatever it was?
14   A.    It was the same deal with McGinn
15  Smith.  I don't know if it was the same exact
16  vehicle.  But it was -- I'm pretty sure 9 percent
17  with McGinn Smith.
18   Q.    And at that point in time, did you
19  have another meeting with George or another phone
20  call with George?  How did you --
21   A.    Either one or the other.  Either we
22  either met or a phone call.
23         Or I might have called him and said,
24  George, is there any more of that McGinn Smith

**Page 40**

1  stuff left?  And he either said, Yes, no, or
2  whatever.
3         And I said, Well, I'm ready -- you
4  know, I've gotten -- I don't know -- six, seven
5  checks.  I'm putting another 25 in.
6    Q.    Okay.  And then would he have sent you
7  more paperwork?
8    A.    Probably, yes, he would have.
9    Q.    And do you know whether the document
10  that you received for the second investment were
11  the same as the documents you received for the
12  initial investment?
13   A.    Don't know.  I'm assuming they were,
14  but I --
15   Q.    Do you know --
16   A.    Go ahead.
17   Q.    Do you know if you had to sign
18  anything to make that second set of -- that second
19  investment?
20   A.    Don't know, but I assume I did.  If I
21  had to sign for the first, I'm assuming I had to
22  sign for the second.
23   Q.    And did you review those documents?
24   A.    No.

**Page 41**

1    Q.    Did you have any discussions with
2  Mr. Lex regarding those documents?
3    A.    Other than to -- other than to confirm
4  that it was -- I'm saying 9 percent, no.
5    Q.    And did you discuss with Mr. Lex at
6  that time any due diligence that may have been
7  performed on the investments?
8    A.    On my part or his?
9    Q.    Well, either.
10   A.    No.
11   Q.    And did you review anything at that
12  point to satisfy yourself to the safety of the
13  investment?
14   A.    No.  I was convinced that it was
15  relatively safe because I was getting my dividend
16  checks on the first 25.
17   Q.    Do you recall whether you had a
18  meeting with Mr. Lex --
19   A.    No.
20   Q.    -- regarding that second investment?
21   A.    No.  Either I called him and said,
22  Hey, is there any more left?  Or we were out to
23  dinner or we were down the shore or something.  No,
24  I don't remember.

# **Exhibit 25**

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF NEW YORK
 2                    CIVIL ACTION NO. 3:14-CV-01303

 3                    - - -

 4   Neal A. Cupersmith., et al

 5      Plaintiffs

 6      v

 7   Piaker & Lyons, P.C., Ronald L.
     Simons and Timothy N. Paventi,
 8
        Defendants
 9                         - - -

10

11           Oral deposition of MARY WANDA PETERS, taken at

12   the law offices of Kang, Haggerty & Fetbroyt, 123 South

13   Broad Street, Suite 1670, Philadelphia, Pennsylvania,

14   on Wednesday, September 30, 2015, commencing at 9:00 a.m.,

15   before Alan L. Lesky, Certified Court Reporter of the

16   State of New Jersey, pursuant to notice.

17

18

19

20

21

22                   ALAN L. LESKY & ASSOCIATES
                          Six Highspire Court
23                   Medford, New Jersey 08055
                          609-257-3146
24
```

**Page 6**

1    A.    August 4th, 1951.

2    Q.    And your educational background?

3    A.    I have two years of college.

4    Q.    And your employment background since high school?

5    A.    Since high school.  I worked for First

6    Pennsylvania Bank for a couple years.  I worked for an

7    architectural firm a couple blocks away.  In the middle of

8    that I had my children.  Then I went back to work.  I

9    worked for a savings and loan.  Went out of business.

10   Worked for an electronics company.  And for the past 25

11   years I've been with St. Mary Medical Center as an

12   administrative assistant.

13   Q.    In some of the other earlier jobs that you

14   mentioned what type of positions did you hold with the

15   bank?

16   A.    With the bank it was usually working for vice

17   presidents, assistant to vice presidents.

18   Q.    What is your current employment status?

19   A.    Twenty-five years at St. Mary Medical Center as

20   an administrative assistant to three vice presidents.

21   Q.    Could you please describe for me your current

22   financial situation, net worth?

23   A.    My net worth not including my house?

24   Q.    Including your house.

**Page 7**

1    A.    Including my house, okay.  You're including my

2    retirement?

3    Q.    Your total net worth at this particular time.

4    A.    Probably a million four.

5    Q.    Do you just have one home?

6    A.    Yes.

7    Q.    Any time shares, condos?

8    A.    No, I do not.

9    Q.    How many cars do you own?

10   A.    One.

11   Q.    Have you ever taken any courses regarding the

12   stock market or securities?

13   A.    No.

14   Q.    Any financial courses?

15   A.    No.

16   Q.    Have you ever read any investment publications or

17   on-line articles regarding investments?

18   A.    On the internet a couple times.

19   Q.    Do you recall specifically which sites?

20   A.    Reading about annuities.

21   Q.    When did you read those articles?

22   A.    Just recently.

23   Q.    Have you ever invested in stocks or bonds?

24   A.    My husband did.

**Page 8**

1    Q.    Do you know the circumstances surrounding those

2    investments?

3    A.    Well, he worked for the phone company, he worked

4    for Verizon for 40 years.  A lot of that was AT&T, Bell

5    Telephone, Bell Atlantic and so on and so forth.

6    Q.    Do you recall when those investments were made?

7    A.    Over the years that he was working with the phone

8    company.

9    Q.    What was the general time period?

10   A.    Well, when did we get married.  He started

11   working there around '67 and for the next 40 years.  He

12   was a saver.  He always saved.

13   Q.    Was there a broker involved in those investments?

14   A.    Whoever the phone company used, I do not know.

15   Q.    Do you know whether there were profits or losses

16   on those accounts?

17   A.    Profits.

18   Q.    Do you know whether there was any due diligence

19   performed on those investments?

20   A.    I do not know that for a fact.

21   Q.    Are you familiar with the brokerage firm McGinn

22   Smith and Company?

23   A.    Yes.

24   Q.    Are you familiar with the term brokerage firm?

**Page 9**

1    A.    Yes.

2    Q.    What do you know that to mean?

3    A.    They invest your money for you and they make sure

4    it's safe and they advise you.  Pretty much that's it.

5    Q.    When did you first become familiar with McGinn

6    Smith?

7    A.    When our financial advisors told us about the

8    notes and he spoke with my husband.

9    Q.    Who was that advisor?

10   A.    Bill Lex.

11   Q.    Do you recall approximately when Mr. Lex notified

12   you guys about McGinn Smith?

13   A.    Seven, eight years ago.  I'm having a hard time

14   with the time line.  My husband passed away last year.

15   It's been a little difficult.

16   Q.    How did you know Mr. Lex?

17   A.    I've known Bill for 25 years.  He was the advisor

18   for St. Mary Medical Center, financial advisor.  That's

19   how I met him working there.

20   Q.    Did you ever use the services of McGinn Smith?

21   A.    Just for those notes.  That's it.

22   Q.    Had you used Mr. Lex for other investments prior

23   to --

24   A.    Yes.

**Page 14**

1    Q.   Did your husband describe for you his
2  conversations with Mr. Lex regarding the investments?
3    A.   I'm afraid I don't remember.
4    Q.   Do you know whether your husband told Mr. Lex of
5  any specific goals or objectives you had in making your
6  investments?
7    A.   At the point in time that he was working on the
8  notes I was not involved in that, no.
9    Q.   Were you aware at the time that your husband was
10 making the investments in the two trusts?
11   A.   Yes.
12   Q.   Do you know whether Mr. Lex had discretionary
13 authority to make investments on behalf of you and your
14 husband?
15        MR. MATHEWS:  Objection.  You can still answer.
16 I'm just making a record.  So don't let me divert you from
17 answering the question.
18   A.   He did not.
19   Q.   So Mr. Lex needed to have approval from you or
20 your husband before making investments?
21   A.   Yes.
22   Q.   Did Mr. Lex recommend these two particular
23 investments, the trust and the integrated trust and the
24 cable trust?

**Page 15**

1    A.   I believe so, to my husband.
2    Q.   Do you know whether he provided any specific
3  advice regarding the investments?
4    A.   No, I do not.
5    Q.   Do you know whether Mr. Lex performed any due
6  diligence on the investments?
7    A.   I do not know that.
8    Q.   Did you or your husband perform any due diligence
9  prior to making the investments?
10   A.   No.
11   Q.   Do you know whether your husband asked Mr. Lex if
12 he had done any investigation into the investments?
13   A.   No, I don't.
14   Q.   Did you ever meet in person with Mr. Lex
15 regarding your investments?
16   A.   These notes?
17   Q.   Yes.
18   A.   No, I did not.
19   Q.   Did you ever speak to him over the telephone
20 regarding these notes?
21   A.   No, I did not.
22   Q.   Did you and your husband discuss the investments
23 in these two notes prior to making the investment?
24   A.   Yes.

**Page 16**

1    Q.   Why did you decide to make the investments in
2  these two notes?
3    A.   I believe my husband thought it was a good, safe
4  investment and that he wanted to do some things for our
5  children.  He thought he would be able to do that.
6    Q.   Did he specifically state what made him feel they
7  were safe investments?
8    A.   No, he did not.
9    Q.   Do you know whether Mr. Lex was informed of your
10 risk tolerance at the time of making the investments in
11 the notes?
12   A.   No, I do not.
13        MR. MATHEWS:  Objection.
14   Q.   Do you recall what your risk tolerance was at
15 this time of making the investments?
16        MR. MATHEWS:  Objection.
17   A.   No.
18   Q.   Do you know whether Mr. Lex received any fees or
19 commissions in connection with your investments in the
20 notes?
21   A.   No.
22   Q.   Did you ever ask whether Mr. Lex received any
23 fees or commissions?
24   A.   No.

**Page 17**

1    Q.   Did your husband ever describe these particular
2  investments to you prior to making the investments?
3    A.   No.
4    Q.   Did you know anything about the risks of the
5  investment prior to making the investments in the two
6  notes?
7    A.   No.
8    Q.   Do you know whether your husband discussed the
9  risk of losing a portion or all of your investments in
10 the notes?
11   A.   No.
12   Q.   Do you know if he discussed with Mr. Lex that you
13 might not get the interest rate that was promised?
14   A.   No.
15   Q.   Did you understand that there was an inherent
16 risk in your investments?
17   A.   No.
18   Q.   What did you understand about your investments?
19   A.   I actually thought they were safe and that I
20 really didn't worry about it.  I thought they would be
21 okay.
22   Q.   That was based on what your husband had told you
23 or some other --
24   A.   Sorry.  Excuse me.

# **Exhibit 26**

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF NEW YORK
 2         CIVIL ACTION NO. 3:14-cv-01303-TJM-DEP

 3

 4  NEAL A. CUPERSMITH, et al.,

 5       Plaintiffs,

 6       vs.

 7  PIAKER & LYONS, P.C.,
    RONALD L.SIMONS and
 8  TIMOTHY N. PAVENTI,

 9       Defendants.

10

11

12              Oral deposition of DAVID THOMAS

13  SHANNON, taken at the offices of Kang, Haggerty &

14  Fetbroyt, LLC, 123 South Broad Street, Suite 1670,

15  Philadelphia, Pennsylvania, on Thursday, November

16  19, 2015, commencing at 1:40 p.m., before Suzanne

17  Walinsky, a Court Reporter and Notary Public,

18  pursuant to notice.

19

20

21

22

23

24
```

**Page 18**

1    Q.    And do you recall what that return
2 was?
3    A.    Between 7 and a half and 9 and a half
4 percent.
5    Q.    Did Mr. Lex mention whether he was
6 collecting fees or commissions based on the
7 investment?
8    A.    Not that I recall.
9    Q.    Did you have any independent knowledge
10 regarding any fees or commissions he was going to
11 receive?
12    A.    No, I didn't.
13    Q.    Did Mr. Lex or anyone describe for you
14 what the nature of this investment was?
15    A.    He did.
16    Q.    He did.  Okay.
17          And what did he tell you about it?
18    A.    That it was about alarm systems.
19    Q.    Did he tell you anything else about
20 the investment?
21    A.    Not that I recall.
22    Q.    Did he ever mention any risks involved
23 in the investment?
24    A.    All I recall is that it would not be

**Page 19**

1 risk free; that every investment has a risk.
2    Q.    Was there ever a discussion that you
3 might not get the interest rate that was promised?
4    A.    Not that I recall.
5    Q.    You said you don't recall whether you
6 discussed with Mr. Lex the amount of risk you were
7 willing to take in an investment?
8    A.    I don't recall a particular discussion
9 on that, no.
10    Q.    Okay.  But you understood that there
11 was an inherent risk in the investment?
12    A.    I understand that there's a risk in
13 any investment.
14    Q.    Okay.  And do you recall whether the
15 document, Exhibit 1, for example, did that
16 document mention any risks involved in the
17 investment?
18    A.    I don't recall.
19    Q.    Do you recall whether you read Exhibit
20 1?
21    A.    No, I don't recall.
22    Q.    Is that your signature on the
23 document?
24    A.    Yes, it is.

**Page 20**

1    Q.    Would you have signed it if you hadn't
2 read the document?
3    A.    Again, I don't remember if this is the
4 first one or -- I would have paid more attention
5 to the first one.
6    Q.    All right.  Well, I guess now's a good
7 time to mark Exhibit 2.
8          MS. PIETRASZEWSKI:  It's the other
9 subscription agreement, David, but it's the
10 $25,000 one and it's L 19579, the first page.
11          MR. DEAN:  Okay.  I got it.
12          (Deposition Exhibit Shannon-2 was
13 marked for identification.)
14          MR. DEAN:  All right.  It's marked.
15 I'm handing it to Mr. Shannon.
16          MS. PIETRASZEWSKI:  Okay.  Great.
17 BY MS. PIETRASZEWSKI:
18    Q.    Mr. Shannon, I'd just like you to take
19 a look at that one as well and see if you
20 recognize that document.
21    A.    Well, I recognize it the same as I do
22 the other one.
23    Q.    And do you see your signature on this
24 document?

**Page 21**

1    A.    Yes, I do.
2    Q.    And it looks like they're dated the
3 same date.  Do you recall if you made two
4 investments at the same time?
5    A.    I don't recall, no.
6    Q.    Is it possible that that was the case?
7    A.    Yes, it is.
8    Q.    And is that your handwriting where it
9 has 3/25/05 written on it?
10    A.    I believe so.
11    Q.    And I guess just let's also mark
12 Exhibit 3.  It's the subscription agreement for
13 the trust.
14          (Deposition Exhibit Shannon-3 was
15 marked for identification.)
16          MR. DEAN:  Just as a point of
17 clarification, it looks like if you look at the --
18 there's a signature page that's part of the
19 subscription agreement, it's not the investor
20 questionnaire.
21          In Exhibit 1, it's on the page
22 ending in 562.  And in Exhibit 2, it's the one
23 ending in 586.  There appears to be dates on that
24 that --

**Page 26**

```
1  agreeing to the terms that are written above your
2  signature?
3       A.   No, I would not disagree with that.
4       Q.   Did Mr. Lex describe any research that
5  he had done with respect to any of these
6  investments?
7       A.   I don't recall.
8       Q.   And I believe you said you did not do
9  any of your own independent investigation for any
10 of these investments?
11      A.   No, I did not.
12      Q.   Are you familiar with the term
13 "liquidity"?
14      A.   Yes.
15      Q.   And what is your understanding of that
16 term?
17      A.   Liquidity is just the ease of
18 transference of the investments or other fixed
19 tools into more readily liquid cash.
20      Q.   And did you discuss with Mr. Lex the
21 liquidity of any of these three investments?
22      A.   I don't recall such a discussion, no.
23      Q.   Okay.  And was liquidity of the
24 investments important to you?
```

**Page 27**

```
1       A.   No.
2       Q.   Were you ever told whether the
3  investments were liquid?
4       A.   I don't recall that, no.
5       Q.   Did you have any expectation that you
6  would be able to take your money out at any time
7  prior to the maturity dates?
8       A.   No.
9       Q.   What was your understanding as far as
10 the ability to retrieve money earlier than the end
11 of the term?
12      A.   I didn't have any understanding as to
13 the ability to get it out prior to the end term.
14      Q.   Okay.  Do you recall whether you were
15 ever provided with a document that's called
16 Private Placement Memorandum?
17      A.   I don't recall that, no.
18      Q.   Were you provided with any written
19 materials regarding your investments?
20      A.   I don't recall that.
21      Q.   Do you recall being provided with any
22 documentation that described the investment and
23 that would have included the phrase, the term "the
24 offering"?
```

**Page 28**

```
1       A.   I do not recall that.
2       Q.   Did you receive any binders that
3  included various documents regarding your
4  investments?
5       A.   Do not recall that, no.
6       Q.   Going back to Exhibits 1, 2 and 3, do
7  you recall whether you met with Mr. Lex regarding
8  those documents?
9       A.   I don't recall specifically meeting
10 with him on these specific documents.
11      Q.   Do you recall meeting with him
12 regarding any documents?
13      A.   No, not specifically.
14      Q.   Do you recall receiving anything that
15 indicated that due diligence performed by McGinn
16 Smith was not to be considered independent?
17      A.   I do not recall.
18      Q.   And do you recall receiving any
19 documents that outlined the various risk factors
20 involved in the investments?
21      A.   I do not recall.
22      Q.   Do you recall whether when you signed
23 the documents, Exhibits 1, 2 and 3, was anyone
24 present?
```

**Page 29**

```
1       A.   I don't recall that, no.
2       Q.   I just want to clarify:  You don't
3  recall or you don't recall someone being there?
4       A.   I don't recall --
5       Q.   You're not sure either way or you
6  don't --
7       A.   I don't -- I don't remember the
8  specific moment when I signed the documents, and I
9  don't -- so I don't know if anyone was there or
10 not.
11      Q.   Okay.  I know you said that you would
12 have spent probably less time reviewing the
13 documents that you received after the initial
14 investment.
15           Do you recall how much time you spent
16 reviewing documents with your first investment?
17      A.   No, I don't.
18      Q.   Would you say you spent less than an
19 hour reviewing the documents?
20      A.   I don't really recall how much time I
21 spent.
22      Q.   You can't even estimate?
23      A.   Well, I can estimate that it might
24 have been an hour or less, but I don't know.
```

# **Exhibit 27**

1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF NEW YORK
2                 CIVIL ACTION NO. 3:14-CV-01303

3

4  NEAL A. CUPERSMITH, ET AL.,

5        Plaintiffs,

6        v.

7  PIAKER & LYONS, P.C., RONALD L.
   SIMONS AND TIMOTHY N. PAVENTI,
8
         Defendants.
9

10

11

12                   Oral deposition of MONSIGNOR ROBERT J.

13  WARGO, taken at the law offices of Kang, Haggerty &

14  Fetbroyt, 123 South Broad Street, Suite 1670,

15  Philadelphia, Pennsylvania, on Monday, November 2,

16  2015, commencing at 1:41 p.m., before Suzanne

17  Walinsky, a Court Reporter and Notary Public,

18  pursuant to notice.

19

20

21

22

23

24

**Page 42**

1  ago, it was more of perusal of it?
2      A.      That's correct.
3      Q.      Now, 8(a)(iii).  Do you see that?
4      A.      Mm-hmm.
5      Q.      Do you see where it states "I have had
6  the opportunity to ask questions of and receive
7  answers from the Trust Fund concerning the Trust
8  Fund and the offering of Certificates and to obtain
9  any additional information necessary to verify the
10  accuracy of the information furnished"?
11      A.      I did not.
12      Q.      But that's accurate the way I read it?
13      A.      The way you read it is correct.
14      Q.      Now, you did not have the opportunity
15  or you did not ask questions --
16      A.      I did not ask the questions.
17      Q.      Did George Lex ever advise you that
18  you had the opportunity to do that?
19      A.      I don't recall.
20      Q.      If he would have advised you, would
21  you have exercised your right to do so?
22      A.      I believe I would have trusted him in
23  the -- in what we were writing, what we were doing.
24      Q.      At the time you made that investment,

**Page 43**

1  did you know who the trustee of the trust fund was?
2      A.      No.
3      Q.      Did he explain to you that McGinn
4  Smith was going to be the trustee?
5      A.      That, I don't recall.
6      Q.      At the time that you made the
7  investments, did you understand what McGinn Smith
8  was?
9      A.      No.
10      Q.      Did you understand that McGinn Smith
11  was somehow affiliated with these transactions?
12      A.      No.
13      Q.      Did you know what that company even
14  was at the time?
15      A.      No.
16      Q.      Okay.
17      A.      I didn't even know where they were
18  located.
19      Q.      Okay.  Next I want to turn to
20  8(a)(iv).  Do you see that one?
21      A.      Mm-hmm.
22      Q.      Do you see where it states "I have
23  relied only on the foregoing information and
24  documents in determining to make the subscription,

**Page 44**

1  and the decision to acquire Certificates of the
2  Trust Fund has been made based on my own evaluation
3  of the merits and the risks of the Trust Fund"?
4              Did you read that?
5      A.      Yes.
6      Q.      And you understood that when you
7  signed this document?
8      A.      Yes.
9      Q.      And you agreed to that by signing the
10  document?
11      A.      I did.
12      Q.      I think we touched upon this, but when
13  it states "Based upon my own evaluation of the
14  merits and the risks," how did you arrive that
15  evaluation?
16      A.      Based upon my own experience.  That's
17  all.
18      Q.      Okay.  And then your trust of George
19  Lex?
20      A.      And trust in George Lex.
21      Q.      And then at Section 8(b) and this is
22  the last one in this document.
23              Do you see where 8(b) is?
24      A.      Yes.  "I recognize the investment and

**Page 45**

1  the Certificates involves substantial risk factors,
2  including those set forth under "Risks" in the
3  memorandum."
4      Q.      And we went over those risks just a
5  few moments ago, correct?
6      A.      Correct.
7      Q.      And when you signed this document, you
8  understood that there were risks set forth in the
9  Private Placement Memorandum?
10      A.      Yes, I did.
11      Q.      But as we discussed, you didn't really
12  read them very closely, correct?
13      A.      That's correct.
14      Q.      Either way though, you did understand
15  there were risks?
16      A.      Sure.  Yes.
17      Q.      When George Lex dropped these
18  documents off in person, did he give you the
19  opportunity to read through everything first before
20  signing?
21      A.      I believe he did.  Did I do it?  No.
22  I sat and talked with him and signed them.
23      Q.      How long was that discussion?
24      A.      About a half hour.

TIMOTHY PAVENTI, CPA

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
- - -

NEAL A. CUPERSMITH,   :  Civil Action No.
ET AL.,            :  3:14-cv-01303-TJM-DEP
      Plaintiffs  :
      vs.         :
               :
PIAKER & LYONS, P.C.,  :
ET AL.,            :
      Defendants :

- - -
Thursday, December 17, 2015
- - -

Oral deposition of TIMOTHY PAVENTI, CPA, taken pursuant to notice, held at the DoubleTree by Hilton Hotel, 225 Water Street, Binghamton, New York 13901, commencing at approximately 9:02 a.m., on the above date, before MARIA NOELLE DAMIANI, Registered Merit Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, Certified Shorthand Reporter (PA; DC; NY; NJ, License No. 30XI00224100; DE, License No. RPR-117) and a Notary Public in the Commonwealth of Pennsylvania.

- - -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19102
www.Elitelsllc.com ~ (215) 563-3703

## Page 2

2  A P P E A R A N C E S :
3
      KANG HAGGERTY FETBROYT, LLC
4     BY: EDWARD T. KANG, ESQUIRE
      BY: DAVID DEAN, ESQUIRE
5     123 S. Broad, Suite 1670
      Philadelphia, Pennsylvania 19109
6     Telephone: (215) 525-5850
      E-mail: Ekang@LawKHF.com;
7     Ddean@LawKHF.com
      --Representing the Plaintiffs
8
9
      JAECKLE FLEISCHMANN & MUGEL, LLP
10    BY: CHARLES C. SWANEKAMP, ESQUIRE
      Avant Building, Suite 900
11    200 Delaware Avenue
      Buffalo, New York 14202-2107
12    Telephone: (716) 856-0600
      E-mail: Cswanekamp@jaeckle.com
13    --Representing the Defendants

## Page 3

C O N T E N T S

- - -

Testimony of:     TIMOTHY PAVENTI
            Page Number
By Mr. Kang . . . . . . . . . . 6
      E X H I B I T S
      - - -
"P" DEPOSITION EXHIBIT NO.    PAGE MARKED
15  Memorandum, Decision and          79
    Order SEC vs. McGinn,
    Smith & Co., Inc., et al.
16  Expert Report by               96
    Stephen J. Scherf,
    CPA, CFF, CFE,
    September 17, 2015


Exhibits Marked in Previous Deposition of
Ronald Simons and Referenced in Timothy
Paventi Deposition
---------------------------------------
1  Amended Notice of
    Deposition of Corporate
    Designee(s) of Piaker & Lyons, P.C.

2  AICPA Code of Professional
    Conduct and Bylaws As of
    June 1, 2008

3  Statements and Standards for
    Tax Services, August 2000, 1-8
4  Confidential Private Placement
    Memorandum FAIN

## Page 4

Exhibits Marked in Previous Deposition of
Ronald Simons and Referenced in Timothy
Paventi Deposition
---------------------------------------
5  Letter, October 13, 2008
6  Plea Agreement
7  AU Section 314,
    Accounting Memo

8  AU Section 316,
    Accounting Memo
9  Court Transcript
10 FEIN Transactions by Account
    12/31/06

11 Journal Entries

12 FEIN Transactions by Account
    As of December 31, 2007
13 FEIN General Ledger As of
    December 31, 2007

14 Audit Planning Checklist

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

TIMOTHY PAVENTI, CPA

Page 25

1    yes, the -- I would agree that the
2    Code of Professional Conduct does
3    apply to other things, but I would
4    say that the skepticism is more of
5    an audit standard than -- than
6    anything else.
7    BY MR. KANG:
8        Q.    I understand, you're saying
9    that it's more relevant to an audit?
10       A.    Yes.
11       Q.    Right.  "Article III"
12   "Integrity," which we read, which I read
13   earlier, it said "to maintain and broaden
14   public confidence, members should perform
15   all professional responsibilities with the
16   highest sense of integrity."
17            Do you remember that section?
18       A.    Yes.
19       Q.    And it says, "all professional
20   responsibilities," right?
21       A.    Yes.
22       Q.    And that all professional
23   responsibilities include any professional
24   services that you provide as a CPA, right?

Page 26

1        A.    Yes.
2             MR. SWANEKAMP:  Form.
3    BY MR. KANG:
4        Q.    And including tax services;
5    yes?
6        A.    Yes.
7        Q.    Including financial statement
8    preparation services?
9        A.    Yes.
10       Q.    Including cost accounting
11   services?
12       A.    Yes.
13       Q.    And of course audit services?
14       A.    Yes.
15       Q.    And let's go to Page 4441.
16       A.    (Witness complies with
17   request.)
18            MR. SWANEKAMP:  I'm sorry,
19   Edward, what was that, 44?
20            MR. KANG:  4441.
21            MR. SWANEKAMP:  Thank you.
22   BY MR. KANG:
23       Q.    This is Section 102 that says,
24   "Integrity and Objectivity"?

Page 27

1        A.    Yes.
2        Q.    Rule 102?
3        A.    Uh-huh.
4        Q.    It says, "In the performance
5    of any professional services, a member shall
6    maintain objectivity and integrity, shall be
7    free of conflicts of interest, and shall not
8    knowingly misrepresent facts or subordinate
9    his or her judgment to others."
10            Did I read that correctly?
11       A.    Yes, you did.
12       Q.    Are you familiar with Section
13   102 or Rule 102 that I just read?
14       A.    Yes.
15       Q.    That rule relates to part of
16   exercising professional skepticism?
17            MR. SWANEKAMP:  Form.
18            THE WITNESS:  Yes.
19   BY MR. KANG:
20       Q.    Right.  So professional
21   skepticism is part of the requirements of
22   integrity and objectivity; isn't that right?
23            MR. SWANEKAMP:  Form.
24            THE WITNESS:  Yes.

Page 28

1    BY MR. KANG:
2        Q.    And based on the language of
3    Rule 102, that professional skepticism
4    applies to any professional services, right?
5             MR. SWANEKAMP:  Form.
6             THE WITNESS:  Yes.
7    BY MR. KANG:
8        Q.    In other words, if a client
9    walks in the door to McGinn, Smith -- I'm
10   sorry, not McGinn, Smith, strike that -- I
11   meant Piaker & Lyons.
12       A.    Okay.
13       Q.    If a client walks into Piaker
14   & Lyons and talks to you and asks you to
15   prepare and file tax returns and gives you a
16   tax return that he prepared, and by looking
17   at it you know that the numbers don't make
18   sense, isn't it your job then to ask him
19   where he got the numbers from?
20            MR. SWANEKAMP:  Form.
21            THE WITNESS:  Yes.
22   BY MR. KANG:
23       Q.    Isn't it your job then to see
24   backup documents supporting those numbers?

Page 33

1    AICPA. Are you familiar with this document?
2         A.   Yes.
3         Q.   And are you familiar with
4    these Statements on Standards for Tax
5    Services?
6         A.   Yes.
7         Q.   Go to Page 21.
8         A.   (Witness complies with
9    request.)
10        Q.   Paragraph 2, the statement in
11   paragraph 2, it says, "In preparing or
12   signing a return, a member in good faith
13   rely without verification on information
14   furnished by the taxpayer or by third
15   parties.  However, a member should not
16   ignore the implications of information
17   furnished and should make reasonable
18   inquiries if the information furnished
19   appears to be incorrect, incomplete, or
20   inconsistent either on its face or on the
21   basis of other facts known to a member.
22   Further, a member should refer to the
23   taxpayer's returns for one or more prior
24   years whenever feasible."

Page 34

1         Did I read that correctly?
2         A.   Yes.
3         Q.   This relates to the example
4    that I talked about a few minutes ago; yes?
5         A.   Yes.
6              MR. SWANEKAMP:  Form.
7    BY MR. KANG:
8         Q.   The example I gave you, a
9    client comes in with prepared tax returns
10   and if the numbers don't make sense, you
11   ask, right?
12             MR. SWANEKAMP:  Form.
13             THE WITNESS:  Yes.  Correct.
14   BY MR. KANG:
15        Q.   Statement Number 4, "When
16   preparing a tax return, a member should
17   consider information actually known to that
18   member from the tax return of another
19   taxpayer if the information is relevant to
20   that tax return and its consideration is
21   necessary to properly prepare that tax
22   return.  In using such information, a member
23   should consider any limitations imposed by
24   any law or rule related to confidentiality."

Page 35

1         Did I read that correctly?
2         A.   Yes.
3         Q.   You are familiar with the
4    provisions that I just read?
5         A.   Yes.
6         Q.   And under that provision, that
7    it's okay, and, in fact, you should as a CPA
8    consider information of even a different
9    taxpayer if that information is necessary
10   for you to prepare a tax return of a
11   taxpayer?
12             MR. SWANEKAMP:  Form.
13             THE WITNESS:  Yes.
14   BY MR. KANG:
15        Q.   In other words, if when you're
16   preparing a tax return for client A, you may
17   and, in fact, you should consider
18   information from the tax return of client B
19   if that information is necessary for you to
20   prepare the tax return of client A
21   accurately so long as you don't violate any
22   duties of confidentiality?
23             MR. SWANEKAMP:  Form.
24             THE WITNESS:  Yes.

Page 36

1    BY MR. KANG:
2         Q.   So, Mr. Paventi, what kind of
3    services did you provide for McGinn, Smith
4    or McGinn, Smith related entities and
5    persons?
6         A.   We did an audit of Maginn
7    Smith & Co. and we prepared tax returns for
8    various related limited liability companies,
9    partnerships, C corporations, trusts,
10   individuals.  I think that about all covers
11   most of it.
12        Q.   So you did audit services and
13   tax services?
14        A.   Yes.
15        Q.   Did you prepare any financial
16   statements?
17        A.   For McGinn, Smith & Co., yes.
18        Q.   So you did financial statement
19   preparation --
20        A.   Correct.
21        Q.   -- for McGinn, Smith?
22        A.   Correct.
23        Q.   Any other entities or persons?
24        A.   We started to do a financial

TIMOTHY PAVENTI, CPA

Page 41

1            MR. SWANEKAMP: Form.
2    BY MR. KANG:
3        Q.    Mr. Paventi, do you agree with
4    that decision of the Court?
5            MR. SWANEKAMP: Form.
6            THE WITNESS: Uhm, I don't
7        really know enough about the case to
8        -- to really form a true opinion.
9    BY MR. KANG:
10       Q.    Then rather than talking about
11   what the Court concluded, do you agree that
12   McGinn, Smith and those other individuals
13   and entities named as a defendant in this
14   civil action we just talked about were
15   engaged in a Ponzi scheme?
16           MR. SWANEKAMP: Form.
17           THE WITNESS: Again, I don't
18       know that I know enough about the
19       details of -- of what ultimately
20       happened to -- to say one way or the
21       other.
22   BY MR. KANG:
23       Q.    So your answer is you don't
24   know the answer?

Page 42

1        A.    I don't know.
2        Q.    You know what a Ponzi scheme
3    is, right?
4            MR. SWANEKAMP: Form.
5            THE WITNESS: Yes.
6    BY MR. KANG:
7        Q.    As a part of carrying out your
8    duties as an auditor, it is your job to do a
9    risk assessment of various kinds of fraud,
10   right?
11       A.    Yes.
12       Q.    And fraud that exists or
13   potentially exists in financial statements,
14   right?
15       A.    Yes.
16       Q.    And one type of fraud is a
17   Ponzi scheme, right?
18           MR. SWANEKAMP: Form.
19           THE WITNESS: Yes.
20   BY MR. KANG:
21       Q.    Kiting could be another fraud,
22   right?
23       A.    Yes.
24       Q.    I mean there are a number of

Page 43

1    different types of fraud?
2        A.    Correct.
3        Q.    And a Ponzi scheme is a
4    well-known type of fraud, isn't it?
5            MR. SWANEKAMP: Form.
6            THE WITNESS: Yes, I would say
7        so.
8    BY MR. KANG:
9        Q.    And since you have been
10   working as an auditor for 30 years out of
11   which 20 years is as a CPA, you are quite
12   familiar with a Ponzi scheme?
13           MR. SWANEKAMP: Form.
14           THE WITNESS: I would say I'm
15       not. I have not experienced a Ponzi
16       scheme before.
17   BY MR. KANG:
18       Q.    Even if you have not
19   experienced it personally, you know that it
20   may exist and it's one type of fraud that
21   you try to detect when you're providing
22   audit services?
23           MR. SWANEKAMP: Form.
24           THE WITNESS: Audit is not

Page 44

1        designed to detect fraud. It says
2        that right in the first or second
3        paragraph of the audit report that
4        is issued.
5    BY MR. KANG:
6        Q.    Isn't the audit expressing
7    your opinion as the auditor for the accurate
8    representation of the financial statements?
9        A.    That is correct.
10           MR. SWANEKAMP: Form.
11   BY MR. KANG:
12       Q.    Right. And if during your
13   audit services you discover a Ponzi scheme
14   existed by the client, you do not issue an
15   unqualified opinion, right?
16           MR. SWANEKAMP: Form.
17           THE WITNESS: That's correct.
18   BY MR. KANG:
19       Q.    And that's because the
20   financial representations made in the
21   financial statements are not accurate?
22           MR. SWANEKAMP: Form.
23           THE WITNESS: That would be
24       correct.

11 (Pages 41 to 44)

TIMOTHY PAVENTI, CPA

Page 125

```
 1      talking about?  Are you talking
 2   about hypothetically in the -- for
 3   clarity of this transcript, are you
 4   talking about an audit
 5   hypothetically, meaning conducted,
 6   or in regard to the tax return work
 7   that was actually done?
 8           MR. KANG:  You can put this
 9   here.  Let's go to --
10           MR. SWANEKAMP:  I take it
11   you're not going to clarify my
12   inquiry as to what my question is?
13           MR. KANG:  Let's go to P-11.
14           Your objection is noted.
15   BY MR. KANG:
16      Q.   Have you seen that document
17   before?
18           MR. SWANEKAMP:  Whoa, whoa,
19   whoa.  What exhibit is this?
20           MR. KANG:  P-11.
21   BY MR. KANG:
22      Q.   Mr. Paventi, have you seen
23   that document before?
24      A.   Yes.
```

Page 126

```
 1      Q.   What is it?
 2      A.   It is a workpaper for FEIN
 3   that owes money to FIIN.
 4      Q.   F-E-I-N, do you call that FEIN
 5   or FEIN?
 6      A.   Either/or.  I don't think it
 7   really matters.
 8      Q.   I don't think it matters
 9   either, it just makes it easier for us to
10   refer to them during today's deposition.
11      A.   Yeah.
12      Q.   According to this document,
13   FEIN, or F-E-I-N, owes money to FIIN, right?
14      A.   That's correct.
15      Q.   And there's a payment of
16   $30,000 being made --
17      A.   Yes.
18      Q.   -- between the two entities?
19      A.   Yes.
20      Q.   It says "payment to cover
21   interest"?
22      A.   Yes.
23      Q.   That's your handwriting?
24      A.   That is my handwriting.
```

Page 127

```
 1      Q.   Where did you get that
 2   information from?
 3      A.   I don't recall.
 4      Q.   I mean unlike the other one,
 5   Exhibit P-10 that we saw --
 6      A.   Yes.
 7      Q.   -- P-11 is your document,
 8   right?
 9      A.   That is correct.
10      Q.   And --
11      A.   Well, P-10 is my document with
12   -- I did the original and then Ron added the
13   note.
14      Q.   I see.  So going back to P-10
15   briefly, who prepared this ledger?
16      A.   McGinn, Smith would have
17   provided that.
18      Q.   All right.  So you didn't
19   prepare it, right?
20      A.   No, but I -- the writing on
21   top, the "PBC" and the "T", that's my
22   handwriting.  And then the --
23      Q.   On P-10?
24      A.   Yes.  And the little note on
```

Page 128

```
 1   the bottom of "1260," that's my handwriting
 2   as well in the bottom right-hand corner.
 3      Q.   "1260 RTC loan"?
 4      A.   Right.
 5      Q.   Back to P-11, that notation
 6   next to the date of July 10, '07 it looks
 7   like, right?
 8      A.   10, '08.
 9      Q.   '08 or '07?
10      A.   Up in the --
11           Oh, I'm sorry.  In the body of
12   the workpaper?
13      Q.   Yes.
14      A.   It looks like July 16 of '07,
15   yes.
16      Q.   It says "payment to cover
17   interest," "PMT" actually "to cover
18   interest."
19           And PMT means payment?
20      A.   Yes.
21      Q.   So the $30,000 payment was
22   being made by whom?
23      A.   It was made by -- I'm trying
24   to think.  Without having the trial balance
```

TIMOTHY PAVENTI, CPA

Page 129

1  to look back at, I don't know if this being
2  negative means FIIN owes the money to FEIN
3  or -- I don't know if FEIN made the payment
4  for FIIN, or if FIIN made the payment for
5  FEIN.
6      Q.    Whether it's from FEIN or
7  FIIN, one of these two funds was making a
8  $30,000 payment to the other one, right?
9      A.    Yes.
10     Q.    To cover interest it says.
11           What interest were you talking
12  about?
13     A.    I don't recall.
14     Q.    So looking at this paper
15  alone, you don't know what that interest
16  means?
17     A.    No.
18     Q.    Let's go to P-12.
19     A.    Yes.
20     Q.    And you recognize this
21  document, right?
22     A.    Yes.
23     Q.    The handwritten notation on
24  the top and on the bottom, that's yours,

Page 130

1  right?
2      A.    That's all me.
3      Q.    So all of the handwriting on
4  this document is yours, right?
5      A.    Except for the initials in the
6  bottom "RLS," that means Ron reviewed it and
7  signed off.
8      Q.    Where is it?  Oh, the one that
9  looks like a P or something?
10     A.    Yeah.
11     Q.    Why would he put this mark on
12  this paper?
13     A.    That's his sign-off.
14     Q.    No, no.  Sign off for what
15  purpose?
16     A.    That he reviewed the
17  workpaper.
18     Q.    So Mr. Simons, he has to sign
19  off on all of the workpapers, right?
20     A.    Yes.
21     Q.    Does he do that on each page?
22     A.    Yes.
23     Q.    That means he reviewed each
24  page?

Page 131

1      A.    If his signature is on it and
2  his initials are on it, then yes.
3      Q.    I want to make sure we are
4  talking about the right one.  Point me to
5  which one you're referring to.
6      A.    (Pointing.)
7      Q.    I am going to put a circle
8  around it.  Okay?
9      A.    Okay.
10     Q.    So that we know what I am
11  talking about.  And I will make sure I
12  circle the right thing.  Okay?
13     A.    Uh-huh.
14           MR. SWANEKAMP:  Could you put
15           your initials there so that we know
16           that you had made that circle and
17           that wasn't on the original
18           workpapers?
19           MR. KANG:  Sure.  And I put a
20           date on it too, 12/17/15.
21  BY MR. KANG:
22     Q.    All right.  What I did, I put
23  circle, my initials ETK, and put the date
24  next to it, just so you will confirm what I

Page 132

1  did.
2      A.    Yes.
3      Q.    And I did it just so we know
4  what Mr. Simons's initial or signature looks
5  like.
6      A.    Yes, those are his initials.
7      Q.    All right.  According to this
8  paper TAIN, T-A-I-N, was making a payment to
9  FEIN, F-E-I-N, for $450,000, right?
10           MR. SWANEKAMP:  Form.
11           THE WITNESS:  That's what it
12           looks like, yes.
13  BY MR. KANG:
14     Q.    And based on what it says on
15  the memo section, that payment was made to
16  cover 7.5 percent redemptions, meaning to
17  redeem investors of FEIN, or F-E-I-N?
18           MR. SWANEKAMP:  Form.
19           THE WITNESS:  That -- that
20           says "funding to cover redemptions,"
21           yes.
22  BY MR. KANG:
23     Q.    And when did you first see
24  this document?

TIMOTHY PAVENTI, CPA

Page 133

1    A.   Uhm, when I prepared the
2  workpaper.
3    Q.   And --
4    A.   There would have been a sheet
5  behind this that would have my initials and
6  the date prepared up in the upper right-hand
7  corner in our file, or there should have
8  been anyways.
9    Q.   It probably was sometime in
10  2008, right?
11    A.   Probably.
12    Q.   Mr. Paventi, when you saw this
13  document showing that TAIN made a payment to
14  FEIN to cover -- to pay for to redeem FEIN's
15  investors, did that concern you?
16        MR. SWANEKAMP:  Form.
17        THE WITNESS:  No, I would say
18      the chances are I didn't even read
19      that.  My main objective on this
20      workpaper is to make sure that the
21      balance agrees to the trial balance
22      because I'm preparing a tax return.
23  BY MR. KANG:
24    Q.   So you just look at the

Page 134

1  numbers?
2    A.   Correct.
3    Q.   Not what the money was for?
4    A.   Correct.
5    Q.   You can put that back.
6    A.   (Witness complies with
7  request.)
8        MR. KANG:  All right, let's
9      take a break.
10        - - -
11        (Whereupon, there was a recess
12      held at this time, 11:21 a.m. to
13      11:31 a.m.)
14        - - -
15        MR. KANG:  Okay, we are back
16      on the record.
17  BY MR. KANG:
18    Q.   The Four Funds, they went
19  through a restructuring process in 2008,
20  right?
21        MR. SWANEKAMP:  Form.
22        THE WITNESS:  Uhm, I don't
23      recall.
24  BY MR. KANG:

Page 135

1    Q.   P-5, we marked this yesterday,
2  this document.  Do you recognize this
3  document?
4    A.   No, I do not.
5    Q.   You can put that back then.
6    A.   Okay.
7    Q.   You are familiar with the
8  trial balances for the Four Funds, right?
9    A.   Yes.
10    Q.   What's the difference between
11  McGinn, Smith Holdings, LLC and McGinn,
12  Smith Capital Holdings Corp?
13    A.   I think they are two different
14  entities.
15    Q.   But you're familiar with both
16  of them?
17    A.   Yes.
18    Q.   Who owns McGinn, Smith
19  Holdings, LLC?
20        MR. SWANEKAMP:  Form.  Asked
21      and answered.
22        THE WITNESS:  Yeah, I don't
23      recall.  I would have to see the
24      file.

Page 136

1        MR. KANG:  Okay.
2  BY MR. KANG:
3    Q.   Are you familiar with the
4  company called Pine Street Capital Partners?
5    A.   I'm aware of the name, yes.
6    Q.   Who owns that company?
7    A.   I don't recall.
8    Q.   It's one of the McGinn, Smith
9  related entities, right?
10    A.   It sounds like it, although
11  I'm not sure if that's one that we did any
12  work on.  I don't remember, to be honest
13  with you.
14    Q.   And what kind of work did you
15  do for a company called TDM Verifier Trust?
16    A.   For the trust, we most likely
17  just did a tax return.
18    Q.   And the same thing with TDM
19  Cable Funding, LLC?
20    A.   A tax return, yes.
21    Q.   When you were providing audit
22  services for McGinn, Smith, what steps did
23  you take to make sure reasonably that the
24  financial statements provided to you by

# **Exhibit 29**

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through June 23, 2016.

Selected Entity Name: PIAKER & LYONS, P.C.
Selected Entity Status Information

|  |  |
|---:|:---|
| **Current Entity Name:** | PIAKER & LYONS, P.C. |
| **DOS ID #:** | 666826 |
| **Initial DOS Filing Date:** | DECEMBER 01, 1980 |
| **County:** | BROOME |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC PROFESSIONAL CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

PIAKER & LYONS, P.C.
PO BOX 1330
92 HAWLEY STREET
BINGHAMTON, NEW YORK, 13902-1330

Chief Executive Officer

RONALD L SIMONS
92 HAWLEY ST
PO BOX 1330
BINGHAMTON, NEW YORK, 13902-1330

Principal Executive Office

PIAKER & LYONS, P.C.
92 HAWLEY ST
PO BOX 1330
BINGHAMTON, NEW YORK, 13902-1330

Registered Agent

NONE

This office does not record information regarding the
names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include the
name(s) and address(es) of the initial officers, directors,
and shareholders in the initial certificate of
incorporation, however this information is not recorded
and only available by viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|-------------|---------------|-------------------|
| 200         | No Par Value  |                   |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date   | Name Type | Entity Name        |
|---------------|-----------|--------------------|
| DEC 01, 1980  | Actual    | PIAKER & LYONS, P.C. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York
State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

# **Exhibit 30**

Administrative  Proceedings                    January 28, 2014

Page 367

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

------------------------------------------

In the Matter of:

DONALD ANTHONY, JR., FRANK H. CHIAPPONE,
RICHARD D. FELDMANN, WILLIAM P. GAMELLO,
ANDREW G. GUZZETTI, WILLIAM F. LEX,
THOMAS E. LIVINGSTON, BRIAN T. MAYER,
PHILIP S. RABINOVICH and RYAN C. ROGERS,

File No. 3-15514
------------------------------------------

                         26 Federal Plaza
                         Courtroom 208
                         New York, New York

                         Tuesday,
                         January 28, 2014


BEFORE:    HONORABLE BRENDA P. MURRAY

     The above-entitled matter came on for

continued hearing at 9:02 a.m.

Administrative   Proceedings                    January 28, 2014

Page 431

1            K. Palen - Cross
2 objection.  The question was is it possible
3 that.  Right?
4            THE WITNESS:  Can I review the whole
5 document?
6     Q.  Sure.
7            JUDGE MURRAY:  Let's go off the
8 record.
9            (Discussion held off the record.)
10           JUDGE MURRAY:  Back on the record.
11 You said you understood the question, so do you
12 want to answer the question?
13           THE WITNESS:  Yes.
14           I was just -- I just wanted to point
15 out that the pages that follow this correspond
16 to the outline, and so you can actually read
17 exactly what Mr. Smith meant when he said
18 "communications to brokers."  And it is at page
19 10.  It starts at page 10.
20           And I read it quickly, and it talks
21 about a lot of different things.  It talks about
22 the fact that they are short on cash and they
23 need to restructure.  So, I think communicating
24 to brokers is actually described within this
25 document.

Page 432

1            K. Palen - Cross
2     Q.  And what do you believe it means?
3     A.  I think that they are talking about
4 that they need to tell the clients and the
5 brokers that they need to restructure the
6 current -- the -- I think they are talking about
7 just the Four Funds here.
8            MR. CAVALIER:  All right.  I will move
9 on, your Honor.
10           JUDGE MURRAY:  Fine.
11     Q.  I would like to now switch gears and
12 move on to the second topic of your declaration,
13 which is that the Four Funds invested in
14 affiliates.  I am just going to give a little
15 summary of what I think you are saying and tell
16 me if I am correct.  I believe what you are
17 saying in this section of the declaration, which
18 is paragraphs 51 through 57, is that McGinn
19 Smith didn't disclose in PPM's that they are
20 going to invest in affiliates, that they made
21 bad investment choices, threw good money after
22 bad by putting money into affiliates that were
23 already failing and that by December of 2007
24 more than 50 percent of all investments of Four
25 Funds money were made in McGinn Smith

Page 433

1            K. Palen - Cross
2 affiliates.
3            Would that be a fair summary of that
4 portion of your declaration?  Feel free to look
5 at 51 through 57.
6            MS. MARLIER:  Objection.  Misstates
7 the declaration.
8            JUDGE MURRAY:  No, I will overrule the
9 objection.
10     A.  Can we maybe talk about each piece
11 separately?
12     Q.  I am going to talk about some things
13 that apply to all of them and we are going to
14 get to your balance sheets now.  But my
15 question, is that a fair summary of what this
16 section is about?
17     A.  I am sorry.  I would have to hear it
18 again.
19     Q.  That McGinn Smith didn't disclose in
20 the PPM's that they going to transact with
21 affiliates, that they made bad investment
22 choices, they continued to put money into
23 affiliates even after the affiliates were
24 failing and that more than 50 percent of all the
25 investments by December 2007 were with McGinn

Page 434

1            K. Palen - Cross
2 Smith affiliates.
3            I think you say that in paragraph 51
4 through 57.
5     A.  Yes.  I say other things in paragraphs
6 51 to 57 --
7     Q.  I am not saying that is all you said.
8     A.  Okay.
9     Q.  I will go forward.
10           Now, we talked about one way --
11 earlier we talked about one way that the
12 registered reps could have learned of the
13 fraudulent transactions is by bank records and
14 you pointed out, did you not, that another way
15 is looking at the Four Funds balance sheets.
16 Correct?
17     A.  Correct.
18     Q.  Were balance sheets prepared for the
19 Four Funds?
20     A.  Yes.
21     Q.  Were they prepared by the accountants,
22 the internal accountants, if you know?
23     A.  I think they were -- there were
24 balance sheets that were prepared by the
25 internal accountants and then the Piaker & Lyons

17  (Pages 431 to 434)

Administrative   Proceedings                    January 28, 2014

| Page 435 | Page 437 |
|---|---|

Page 435

1            K. Palen - Cross
2    folks kind of formalized them.
3        Q.   Piaker & Lyons was the outside
4    certified public accountant servicing McGinn
5    Smith and the entities.  Correct?
6        A.   Yes.
7        Q.   Do you know if those balance sheets
8    were audited?
9        A.   They weren't audited.
10       Q.   Were they reviewed?
11       A.   They weren't reviewed.
12       Q.   When I say "reviewed" I am talking
13   about the technical accounting meaning of
14   reviewed financial statements.  Correct?
15       A.   That is what I understood.
16       Q.   Just wanted to make sure.
17            JUDGE MURRAY:  Sorry.  Did you say
18   they were not audited?
19            THE WITNESS:  Correct.
20       Q.   They were not audited, which is the
21   highest level of examination; and they were not
22   reviewed, which is the second highest level.
23   Do you know if they were compiled by
24   the accountants?
25       A.   That is my understanding.

Page 436

1            K. Palen - Cross
2        Q.   By the outside accountants?
3        A.   Yes.
4        Q.   And the balance sheets of the Four
5    Funds showed the investments of the Four Funds.
6    Correct?
7        A.   Correct.
8        Q.   So if a registered rep wanted to know
9    what was invested in the Four Funds they could
10   have looked at the balance sheets.  Correct?
11       A.   The ones that we are talking about,
12   the Piaker --
13       Q.   The Four Funds balance sheets?
14       A.   Yes.
15       Q.   Are you aware, by the way, as an
16   aside, that some of the registered reps did ask
17   Mr. Smith to provide information as to the
18   investments and that he refused to do so?
19       A.   I am not aware of that.
20       Q.   For my next question I am going to ask
21   you to assume for the purposes of this question
22   that the registered reps asked for access to
23   balance sheets and were given it.
24            My question to you is, what good would
25   it have done?  Do you understand the question?

Page 437

1            K. Palen - Cross
2        A.   I understand the question.  What good
3    would it have done?  They would have understood
4    what the Four Funds were investing in.
5        Q.   All right.  Let's talk about that.
6    Now, didn't you testify yesterday that when you
7    looked at the Four Funds balance sheets there
8    were two types of transactions, there were
9    purchase transactions of alarm contracts and
10   receivables and RMR, and there were loans.
11   Correct.
12            I think you said the alarm contracts
13   were booked at cost, at what they paid for the
14   alarm contracts.  Correct?
15       A.   Correct.
16       Q.   In your declaration you make the point
17   very well that McGinn Smith paid more for the
18   alarm contracts than the companies they bought
19   from paid for them.  Correct?
20       A.   And I made the point that they paid
21   what they needed to redeem those SPT investors.
22       Q.   We'll get to that.  But my question
23   is, did you not point out in your declaration
24   that the Four Funds essentially overpaid for the
25   purchase of alarm contracts; they paid more than

Page 438

1            K. Palen - Cross
2    they were bought for originally from the
3    affiliated entity that they bought it from.
4    Correct?
5        A.   Correct.
6        Q.   And the amount that they paid was the
7    amount necessary to redeem the investors.
8    Correct?
9        A.   Correct.
10       Q.   Which has no connection whatever to
11   the true value of those contracts.  Correct?
12       A.   Correct.
13       Q.   And didn't you also testify yesterday
14   that McGinn Smith never wrote down the value of
15   these contracts?
16       A.   No.
17       Q.   You -- didn't you testify -- I am
18   sorry -- until late, until 2007 they never wrote
19   down the value of these contracts?
20       A.   Correct.  But they were amortized on
21   the books.
22       Q.   They were amortized but they never
23   took a discount for lack of collectability,
24   uncollectability or anything like that?
25       A.   Correct.

18  (Pages  435  to  438)

Administrative   Proceedings                    January 28, 2014

Page 439

1           K. Palen - Cross
2      Q.  And they continued to carry these
3  purchase contracts at the value they put less
4  amortization.  Correct?
5      A.  Correct.
6      Q.  And these values, we will agree, were
7  overstated, overpriced.  Correct?
8      A.  Correct.
9      Q.  So if the brokers went to look at the
10 balance sheets, they were not going to see the
11 true condition of those alarm contracts, were
12 they?  They were not going to see that they were
13 worthless, they were going to see the numbers
14 that McGinn Smith put on the books?
15     A.  Well, if I can, I can explain what I
16 think they might have seen if they saw it.
17         MR. CAVALIER:  I want her to answer my
18 question.
19     Q.  Wouldn't they have seen inflated
20 numbers?
21     A.  They would have seen a number which
22 represents a number that is very close to the
23 amount of the total offering for the SPT trusts.
24 And if they sold the SPT trust, they would have
25 seen the SPT PPM that said how much was being

Page 440

1           K. Palen - Cross
2  invested in those alarm contracts.
3      Q.  Well, they would have to look at more
4  than the balance sheets then.  They would have
5  to go look at a whole bunch of records.
6  Correct?
7         Let me ask you this.
8         JUDGE MURRAY:  Wait a second.  Did you
9  answer that?
10         THE WITNESS:  They would have to have
11 the SPT, PPM and the balance sheet.
12     Q.  Let me ask you about the loans.  The
13 loans were booked at the amount of the loan.
14 Correct?
15     A.  Yes.
16     Q.  So when that transaction took place an
17 asset was booked on the balance sheet of the
18 lending Four Funds company.  Correct?
19     A.  Correct.
20     Q.  And a liability was booked on the
21 balance sheet whatever company got the loan?
22     A.  Correct.
23     Q.  And I think you said that they carried
24 these loans at full value through the course,
25 correct, until 2007 or thereabouts?

Page 441

1           K. Palen - Cross
2      A.  I wouldn't say full value, no.
3      Q.  Did they book interest to these loans
4  on the various balance sheets?
5      A.  Sometimes.
6      Q.  And did they book interest in spite of
7  the fact that interest hadn't been paid for
8  months and sometimes years?
9      A.  Yes.
10     Q.  That doesn't comport with generally
11 accepted accounting principles, does it?
12     A.  I don't think the financial statements
13 were created -- I don't think they were prepared
14 under GAAP.
15     Q.  Is it proper to book interest on your
16 balance sheet when, in fact, interest hasn't
17 been paid for months or years?
18     A.  I mean, it depends on the
19 circumstance.  But if you are not expecting
20 interest to be paid then it is not appropriate.
21     Q.  All right.  In many cases -- withdraw
22 that.
23         If you are not expecting interest to
24 be paid it is not appropriate.  If interest
25 hasn't been paid and is overdue it is not

Page 442

1           K. Palen - Cross
2  appropriate.  Correct?
3      A.  Correct.
4      Q.  If the McGinn Smith brokers went to
5  look at balance sheets, they were going to see
6  values for loans, including accruals for
7  interest that weren't accurate.  Correct?
8      A.  They would see balances of various
9  amounts that were due to affiliates.
10     Q.  And those amounts would be more than
11 they were likely to recover?
12     A.  Yes.
13     Q.  Didn't you testify to that?  I mean
14 that is the fraud you testified to, isn't it?
15     A.  That's correct.  And they were
16 investments in affiliates.
17     Q.  And the accountants internally who
18 booked these things and the outside accountants,
19 Piaker, they would know this was improper to
20 book that way.  Correct?
21     A.  Correct.
22     Q.  So would it be a logical conclusion
23 that someone told them to book it this way even
24 though it wasn't the appropriate way to book it?
25         MS. MARLIER:  Objection, your Honor.

19 (Pages 439 to 442)

Page 443

K. Palen - Cross

1
2   This is getting into very speculative territory.
3   It is just someone who would tell McGinn Smith's
4   accountants something whether proper or not.
5   Almost two layers of speculation.
6         MR. CAVALIER:  What I am saying, your
7   Honor, she has admitted it is not proper to book
8   it this way.  She admitted the outside
9   accountants looked at it.  She admitted that
10  they shouldn't do it this way.  I am asking is
11  it a logical conclusion that someone directed
12  them to do it this way?
13        A.  It's possible.
14        Q.  And that someone would be Mr. Smith or
15  Mr. McGinn.  Correct?
16        A.  It could have been.
17        Q.  If you know?
18        A.  I don't know.
19        Q.  Could it have been Mr. Shea?
20        A.  I don't know.
21        Q.  It wasn't any of the brokers, was it?
22        A.  I don't know.
23        Q.  Does it appear that the accounting for
24  the loans and such was intended to hide the true
25  financial status of the Four Funds?

Page 444

K. Palen - Cross

1
2         A.  I don't know.
3         Q.  Well, regardless of what was intended,
4   did, in fact, the bookings of the alarm
5   contracts and the way they were booked and the
6   bookings of the loan and the interest, did it
7   hide the true financial condition of the Four
8   Funds?
9         A.  It would have looked like it was worth
10  more than they were worth; yes.
11        Q.  Is that hiding the true financial
12  condition of the Four Funds if you say you are
13  worth more than you are worth?
14        A.  I don't know if it was lazy
15  bookkeeping or if it was hiding.  I don't know.
16        Q.  Well, the registered representatives,
17  who are not certified public accountants and who
18  are not certified fraud examiners, if they
19  looked at those Four Funds balance sheets, they
20  wouldn't know how to look for the fraud, would
21  they?  They are not you.
22        A.  They would see that there were
23  investments in affiliates and that is what I
24  said in my declaration.
25        Q.  But investments in affiliates is not

Page 445

K. Palen - Cross

1
2   the problem.  You are saying they were investing
3   in affiliates and those investments were going
4   bad and they continued to invest in affiliates.
5   Correct?
6         A.  That is not what I said.
7         Q.  In any event, had they looked at the
8   balance sheets, would you agree with me that it
9   would not disclose the true financial condition
10  of the Four Funds?
11        A.  That's correct.
12        Q.  And if that is correct, wouldn't the
13  alleged failure to comply with the alleged duty
14  to investigate become an academic matter because
15  if they looked at it they wouldn't have been
16  tipped off because they wouldn't have seen the
17  true financial condition?
18        A.  You are completely ignoring the income
19  statement.
20        Q.  We'll get to the income statement.
21        A.  But you are just looking at one
22  balance sheet and saying if they looked at this
23  one piece of paper would they have known?  They
24  would have seen investments in affiliates.
25  That's my answer.

Page 446

K. Palen - Cross

1
2         Q.  Well, didn't you testify that had they
3   looked at the balance sheets they would have
4   discovered the fraud?  Wasn't that the substance
5   of your testimony, yesterday?
6         A.  I don't think so.  I don't think I
7   concluded anything about that.
8         Q.  Let's move on to, starting at
9   paragraph 58, is a list of other unauthorized
10  uses.  Would you turn to paragraph 58 of your
11  declaration, please?  I am going to read that.
12  It is short so I will read it.  It says, "The
13  Four Funds used money from each other and the
14  trusts--"  By "trusts" I assume you are talking
15  about the later Triple Play and alarm deals.
16  Correct?
17        A.  Correct.
18        Q.  "--in order to pay investor
19  redemptions and interest, for example, as
20  described above as paragraph 39, FEIN's January
21  and February 2005 interest payments and a
22  $2 million investor redemption were paid in part
23  using nearly 2 million of TAIN investor funds.
24  According to bank and accounting records, in
25  February 2007 TAIN loaned FEIN $450,000 to make

20  (Pages 443 to 446)

Administrative   Proceedings                    January 28, 2014

Page 447

1           K. Palen - Cross
2  an investor redemption to pay interest due to
3  investors.  In another example, FEIN investors
4  were paid interest using a total of $184,500 of
5  funds raised in the Fortress trust."
6           Correct?
7      A.  Correct.
8      Q.  Again, these transfers --
9           JUDGE MURRAY:  Sorry.  You left out
10 "for this trust offering."
11          MR. CAVALIER:  I left off the word
12 offering?  All right.
13          Would now be a good time for a break?
14          JUDGE MURRAY:  Off the record.
15          (Discussion held off the record.)
16          JUDGE MURRAY:  We'll take five
17 minutes.
18          (Recess.)
19          JUDGE MURRAY:  Back on the record.
20 BY MR. CAVALIER:
21     Q.  Before we go to paragraph 58, I want
22 to go back to a question I asked much earlier.
23 That was a question about whether in your
24 experience you had ever seen a fraudster
25 voluntarily give documents that proved the fraud

Page 448

1           K. Palen - Cross
2  to a subordinate employee.  Do you remember
3  that?
4      A.  Yes.
5      Q.  I am going to re-ask the question in a
6  different way.
7           Did you ever see a fraudster
8  voluntarily give documents that proved a fraud
9  to a subordinate employee who was not involved
10 in the fraud?
11     A.  No.
12     Q.  Okay.
13          So can we now conclude that it would
14 not be likely that Mr. McGinn or Mr. Smith would
15 have given access to those bank records which
16 proved the fraud?
17     A.  I don't know.
18          MS. MARLIER:  Same objection, your
19 Honor.
20          JUDGE MURRAY:  To the respondents?
21          MR. CAVALIER:  To the respondents.
22 And the basis for the question is, she just
23 said, and she has been in the business many
24 years, she's never seen it.  So I think it is a
25 fair question at this point in time.

Page 449

1           K. Palen - Cross
2           JUDGE MURRAY:  I will overrule the
3  objection.  If you understand the question, you
4  may answer.
5           THE WITNESS:  I lost the question.
6      Q.  The question was, given the fact that
7  McGinn and Smith were perpetrating the fraud had
8  somebody asked them for access to these bank
9  records that would have proven the fraud, very
10 unlikely they would have given them.  Correct?
11     A.  If someone who didn't know the fraud
12 asked for documents that proved the fraud, yes,
13 I agree with you.  It isn't likely that someone
14 would give those documents to the person who
15 doesn't know about the fraud.
16     Q.  Thank you.  And my question was
17 limited to bank records so I am going to ask the
18 same question again but basically expand it to
19 include is it likely that Mr. McGinn or
20 Mr. Smith, as the fraudsters would have given
21 any document that proved the fraud to a
22 registered representative who asked for that
23 document?
24     A.  I can't answer you with respect to the
25 respondents.  I don't know what they knew so I

Page 450

1           K. Palen - Cross
2  can't answer you.  I agree with you with the
3  concept that if someone is trying to hide
4  something they wouldn't give it to someone who
5  doesn't know something.  I agree with you with
6  that.
7      Q.  Would you agree with me that McGinn
8  and Smith were doing a pretty good job of hiding
9  something for about 10 to 20 years?
10     A.  I agree, if -- I don't know -- I
11 didn't say that they were hiding something.  I
12 don't know for sure whether they were hiding it
13 or if it was bad bookkeeping.
14     Q.  Well, if it was bad bookkeeping,
15 wouldn't FINRA have caught it?  They were in
16 there every year.
17     A.  I don't know.
18     Q.  You objected to or you said you
19 couldn't answer the question because of the
20 reference to -- because you didn't know what the
21 registered reps knew.  Right?
22     A.  Correct.
23     Q.  Assuming they didn't know of the
24 fraud, do you think it's likely -- withdraw
25 that.

                   21 (Pages 447 to 450)

Administrative  Proceedings                    January 28, 2014

Page 451

K. Palen - Cross

1
2        Assuming for purposes of this question
3   that they didn't know of the fraud, do you think
4   it is likely that McGinn and Smith would have
5   given access to documents that revealed the
6   fraud to someone who was not involved in the
7   fraud?
8        A.   That is -- I can't even follow that
9   question.  Assuming they knew of the fraud --
10       Q.   No.  Assuming they didn't know of the
11  fraud.  Assuming they were people who didn't
12  know of the fraud --
13       A.   I think I already answered that.
14       Q.   Fine.  Let's move on to paragraph 58.
15  We have covered it, but basically, again, these
16  are transfers of money and again the best
17  evidence of this would be bank records.
18  Correct?
19       MS. MARLIER:  Objection, your Honor.
20  Ms. Palen can't testify to the best evidence
21  rule, which is a legal conclusion.
22       MR. CAVALIER:  I am not talking about
23  the best evidence rule.  I am just talking about
24  the best way to discover the fraud would be to
25  look at those bank records.

Page 452

K. Palen - Cross

1
2        Q.   Correct?
3        A.   Actually for the Four Funds I reviewed
4   less of the bank records than I did of just
5   looking at the balance sheets and the income
6   statements and understanding other documents.
7        Q.   I won't go over access to bank records
8   again because we have covered that.
9        Were any of these intercompany
10  transactions that the Four Funds entered into,
11  were they booked as loans, some of them?
12       A.   Yes.
13       Q.   Do you know if there were any loan
14  documents for the loans -- withdrawn that.
15       Do you know if there were any
16  promissory notes or loan documents evidencing
17  these loans?
18       A.   Yes.
19       Q.   There were?
20       A.   Sometimes.
21       Q.   And in other cases not?
22       A.   Correct.
23       Q.   So in a case where there wasn't a loan
24  document, if someone wanted to look at a loan
25  document, it wasn't there to look at.  Right?

Page 453

K. Palen - Cross

1
2        A.   And I think that would be a big red
3   flag, too.
4        MR. CAVALIER:  Can I ask for an
5   instruction that the witness answer the
6   question, your Honor, and only the question?
7        JUDGE MURRAY:  Well, you sat here for
8   her testimony and she tells you what she thinks.
9        Q.   Now, these transactions involved the
10  unauthorized uses of funds; correct?  By
11  "unauthorized" I mean not described in the
12  PPM's.
13       A.   These transactions?
14       Q.   We are talking now about paragraph 58
15  and so forth, the unauthorized uses of Four
16  Funds money.
17       A.   Can you, please, ask me the question
18  again?
19       Q.   Let me ask a new question.  These were
20  booked, these intercompany transfers were booked
21  as loans, correct, in some cases?
22       JUDGE MURRAY:  She has said -- I
23  thought you said some were and some weren't.
24       THE WITNESS:  Correct.
25       Q.   Well, the ones in paragraph 58,

Page 454

K. Palen - Cross

1
2   though, those weren't purchases of alarm
3   contracts, were they?
4        A.   Actually, the $2 million transaction
5   related to alarm contracts.
6        Q.   In which case it would have been
7   booked on the balance sheet at a price higher
8   than the fair market value.  Correct?
9        A.   I actually haven't formed a conclusion
10  with respect to the fair market value.  My
11  testimony was that they purchased the contracts
12  for a price that was higher than what was
13  initially paid.
14       Q.   And the purpose of that testimony
15  would have been to show that they purchased it
16  for more than fair market value; correct?  What
17  else would be the purpose of that testimony?
18       A.   Because in the PPM it specifically
19  states that one fund will not buy an investment
20  from another affiliate for a price higher than
21  what they purchased it for.
22       Q.   You are correct.  But in any event, if
23  someone looked at the balance sheets of the
24  paragraph 58 transactions they are going to see
25  the numbers that were on there and not the

22  (Pages 451 to 454)

Administrative   Proceedings                    January 28, 2014

Page 455

1              K. Palen - Cross
2   actual fair value.  Correct?
3        A.  Correct.
4        Q.  All right.
5        A.  They would see transactions with
6   affiliates.
7        Q.  Transactions with affiliates.
8   Correct.
9        A.  Correct.
10        Q.  And by looking at that balance sheet
11   alone they wouldn't be able to tell whether or
12   not any of those transactions involved fraud,
13   would they?
14        A.  My declaration doesn't talk about that
15   specifically.  What they would see is, they
16   would see that those funds were used for
17   purposes that weren't consistent with what was
18   disclosed to investors in the PPM's.
19        Q.  If they looked at them and they had
20   the PPM's handy, correct, and they were going to
21   read the PPM's?
22        A.  Yes.
23        Q.  Let's move on to the paragraphs 59 to
24   62 of your declaration, which is the Four Funds
25   ran a cash deficit.  Correct?

Page 456

1              K. Palen - Cross
2        A.  Yes.
3        Q.  I am going to read from paragraph 60,
4   I believe, and 61, a portion of 61, and just ask
5   if I have read it correctly.
6        "According to the information in the
7   Four Funds tax returns, by December 31, 2007 the
8   Four Funds had generated a cumulative cash basis
9   loss amounting to approximately 6.4 million, see
10   Exhibit 15.  Based on these reported results,
11   the Funds had not generated enough cash flow to
12   pay investor interest and fees they had been
13   paying."
14        And for paragraph 61 I will read the
15   first sentence.  "According to financial
16   statements and a fee analysis prepared by Bryant
17   Cooper in late 2009, the Four Funds paid
18   approximately 7.7 million in underwriting,
19   management and administrative fees to MS & Co.
20   during the period 2003 through 2009."
21        Did I get that right?
22        A.  Correct.
23        Q.  You said your source documents for
24   determining the cash deficit were the tax
25   returns.  Correct?

Page 457

1              K. Palen - Cross
2        A.  It was actually the same as the
3   balance sheets.  The balance sheets and the
4   income statements were what fed into the tax
5   returns.
6        Q.  All right.  But in your document you
7   say that the Four Funds -- according to the
8   information from the Four Funds tax returns, so
9   on?
10        A.  Yes.
11        Q.  Was that a source document you used to
12   make the statement?
13        A.  Yes.
14        Q.  Now, did McGinn and Smith prepare
15   income statements or profit and losses, P and
16   L's what you want to call them?
17        A.  Yes.
18        Q.  They did.  Did they prepare statements
19   of cash flows?
20        A.  I didn't see them.
21        Q.  Were the P and L's prepared on a cash
22   basis or accrual basis?
23        A.  I believe they were both.  I don't
24   remember, sitting here.
25        Q.  The tax returns were prepared on a

Page 458

1              K. Palen - Cross
2   cash basis; correct?
3        A.  The ones I am referencing are a cash
4   basis.  I don't remember what the actual
5   original document was.
6        Q.  So you know they prepared cash basis
7   tax returns.  Correct?
8        A.  Correct.
9        Q.  And you know they prepared cash basis
10   income statements.  Correct?
11        A.  Correct.
12        Q.  And those are the documents you relied
13   on?
14        A.  Yes.
15        Q.  But no statement of cash flows?
16        A.  Right.
17        Q.  Wouldn't a statement of cash flows be
18   the best document to look at if you wanted to
19   determine if there was a cash deficit?
20        A.  Or you could figure it out from the
21   profit and loss statement.
22        Q.  But the cash flow statement does it
23   all for you; right?  It starts with net income
24   and then it makes adjustments to deal with how
25   much actual cash came in, regardless of whether

23  (Pages 455 to 458)

Administrative  Proceedings                     January 28, 2014

Page 459

1               K. Palen - Cross
2    it was booked as income, and how much went out,
3    regardless of whether it was booked as an
4    expense?
5        A.  But their P and L's had only one or
6    two non-cash items.
7        Q.  But a statement of cash flows, you
8    agree, would be the best way to determine
9    whether or not there was a cash deficit --
10       A.  You would expect a company like McGinn
11   Smith & Company to have cash flow statements,
12   yes.
13       Q.  So if these brokers went to look for
14   the cash flow statements because they wanted to
15   see how the Four Funds were doing, they wouldn't
16   find one, would they?
17       A.  No, and it would be a big red flag.
18       Q.  Do you know if these guys would even
19   have the ability as salesmen, without an
20   accounting degree, to read a cash flow statement
21   and understand what it meant?
22       A.  A broker?  I have no idea.
23       Q.  A broker.
24       A.  I imagine.  I would think so but I
25   have no idea.

Page 460

1               K. Palen - Cross
2        Q.  Now, the tax returns were prepared on
3    a cash basis.  Correct?
4        A.  Yes.
5        Q.  And they would have -- nobody wants to
6    overstate their income so the tax returns would
7    have shown the cash flow deficit that you talk
8    about.  Correct?
9        A.  Correct.
10       Q.  Do you have any evidence that
11   Mr. Chiappone was ever given access to McGinn
12   Smith & Co. tax returns?
13       A.  No.
14       Q.  Do you have any evidence any
15   registered representative was given access to
16   the McGinn Smith tax returns?
17       A.  I have seen no evidence of them asking
18   or getting.
19       Q.  Do you know of any reason why a sales
20   rep would want to look at a tax return?
21       A.  To understand how the investments that
22   they are putting their customers' money in are
23   doing.
24       Q.  These are not the tax returns of the
25   companies being invested in.  This is the tax

Page 461

1               K. Palen - Cross
2    return of the company doing the investing.
3    Correct?
4        A.  Correct.  It's the funds.
5        Q.  And its books, we already agreed, were
6    being manipulated.  Correct?
7        A.  But if they asked -- I -- we just sat
8    here and we went through that there are certain
9    things on these documents that would have been a
10   red flag.
11       Q.  Didn't we agree that the financial
12   statements were being manipulated by McGinn and
13   Smith?
14       A.  We did, yes.
15       Q.  And didn't you just testify two
16   minutes ago that the tax returns were prepared
17   upon the information that was on the income
18   statement?
19       A.  Yes.
20       Q.  All right.
21       A.  I would think if they were
22   manipulating --
23       Q.  Wait a second.  There is no question
24   before you, ma'am.
25           And at the time some of these balance

Page 462

1               K. Palen - Cross
2    sheets and income statements were being prepared
3    the investments were already made.  Correct?
4        A.  I don't know.  Whatever is on the
5    actual balance sheet would have been made.
6        Q.  Well, let's say they saw a bad
7    investment.  At this point, by the time it is on
8    the balance sheet there is nothing you can do
9    about it?
10       A.  You cannot sell more.
11       Q.  In paragraph 62 you indicate that the
12   Four Funds redeemed some preferred investors.
13   Correct?
14       A.  Correct.
15       Q.  You said there was 2.7 million that
16   you -- withdrawn.
17           Do you know if that 2.7 million all
18   went to Tim -- withdraw that.
19           Do you know if the entire 2.7 million
20   went to David Smith's customers?
21       A.  I think that may be correct but I
22   don't know for sure.  I can't remember for sure.
23       Q.  Are you aware of whether any of that
24   money went to a customer of Mr. Chiappone?
25       A.  I don't know.

24  (Pages 459 to 462)

Administrative   Proceedings                    January 28, 2014

Page 463

K. Palen - Cross

1
2    Q.  Do you know if Mr. Chiappone played
3   any role whatsoever in determining who got
4   redeemed and who didn't get redeemed?
5    A.  I don't know.
6    Q.  Do you have any evidence that he
7   played any role in determining who got redeemed
8   or -- didn't get redeemed?
9    A.  Do I have evidence?
10   Q.  Yes.
11   A.  No.
12   Q.  You have no evidence that
13  Mr. Chiappone was involved?
14   A.  No.
15   Q.  In paragraph 66 of your declaration
16  you begin to talk about -- actually you start at
17  paragraph 63, about the trust offerings.  In
18  paragraph 66 the heading is "Proceeds from trust
19  offerings were misused."  Correct?
20   A.  That is the heading, yes.
21   Q.  Would it be a fair summary of the
22  following paragraphs that the trusts used money
23  now that went to Tim McGinn, David Smith and
24  Matthew Rogers to pay McGinn Smith operating
25  expenses and affiliates?  Correct?

Page 464

K. Palen - Cross

1
2    A.  You asked me is that a correct
3   summary?
4    Q.  Yes.
5    A.  Of paragraph 66?
6    Q.  Yes.  Let me read paragraph 66 for
7   you?
8    A.  I can read it, thank you.
9    Q.  Go ahead.
10    (Pause.)
11   A.  Okay.  I have read it.
12   Q.  Would that be a fair summary?
13   A.  Yes.  And there was also use of funds
14  for investment interest for other offerings.
15   Q.  All right.  You also say in this part
16  of your declaration, do you not, that the money
17  that was invested by the trusts was less than
18  the PPM's provided that would be invested in
19  income-producing assets?
20   A.  Correct.
21   Q.  At paragraph 70 I believe you are
22  saying that, in substance -- if you turn to
23  paragraph 70 -- that these trusts paid fees in
24  excess of the -- to McGinn Smith organizations
25  in excess of the amounts disclosed in the PPM's.

Page 465

K. Palen - Cross

1
2   Correct?
3    A.  Correct.
4    Q.  In paragraph 72 you talk about fees
5   that were paid that were later reclassified on
6   the books as loans.  Correct?
7    A.  To McGinn Smith.
8    Q.  To -- no.  Loans to McGinn and Smith?
9    A.  Personally, yes.
10   Q.  Personally.
11    These are the transactions where there
12  were no loan documents created until much after
13  the fact.  Correct?
14   A.  The personal loans --
15   Q.  The documents of the personal loans.
16   A.  Correct.
17   Q.  They didn't document these things as
18  loans at the time the money was paid out?
19   A.  Correct.
20   Q.  It happened much later, didn't it?
21   A.  Yes.  April 2009.
22   Q.  2009, and it happened as a result of
23  FINRA coming in and conducting an investigation
24  and telling them they had to have documents for
25  the loans.  Correct?

Page 466

K. Palen - Cross

1
2    A.  I don't know.  Something like that.
3    Q.  You understood that they didn't just
4   decide to do this in April of 2009; they were
5   told to do it?
6    A.  I don't know if they were told to do
7   it or if they did it in anticipation, but
8   something along those lines.
9    Q.  It had to do with an agency audit.
10  Correct?
11   A.  Correct.
12   Q.  So if -- when these loan transactions
13  were taking place, if the registered
14  representatives, any of them, had wanted to take
15  a look at these loan documents, they didn't
16  exist?
17   A.  Correct.
18   Q.  Until 2009.
19   A.  Correct.
20   Q.  And by 2009 most of the damage had
21  been done, hadn't it?
22   A.  Well, but these transactions were
23  happening since 2006.
24   Q.  Right.  But if they wanted to find out
25  something about the fees that were paid to

                    25  (Pages 463 to 466)

Administrative   Proceedings                      January 28, 2014

Page 467

1              K. Palen - Cross
2    Mr. McGinn and Mr. Smith and Mr. Matthew
3    Rogers -- not to be confused with Mr. Rogers the
4    broker -- there would be no documents for them
5    to look at?
6         A.   And again, it would be another big red
7    flag in 2006.
8         Q.   Now, in paragraph 73 and 74 you
9    delineate some guilty pleas with respect to tax
10   fraud, correct, that was committed?
11        A.   Correct.
12        Q.   Mr. Simmons or "Simons", the CPA, pled
13   guilty to tax fraud?
14        A.   Correct.
15        Q.   Mr. Rogers pled guilty to tax fraud?
16        A.   Correct.
17        Q.   Was the tax fraud, if you know,
18   related to these commissions that were later
19   deemed to be loans or recharacterized as loans?
20        A.   I don't refer to them as commissions,
21   but they had to do with the payments that were
22   paid to McGinn, Smith and Rogers.
23        Q.   That was my mistake.  I should have
24   said payments.  Sorry.
25             But the pleas took place in 2011.

Page 468

1              K. Palen - Cross
2    Right?
3         A.   Yes.
4         Q.   So they are not a red flag to anybody,
5    right, because the brokers are all gone by 2010;
6    right?
7         A.   Okay.
8         Q.   And this all happened after McGinn
9    Smith was shut down?
10        A.   Correct.
11        Q.   We previously discussed the pre-2003
12   alarm trusts.  Now I want to talk about the ones
13   that came later, the ones dealt with your
14   declaration, all right?  Did you come across in
15   your investigation any document that indicated
16   Mr. Chiappone participated in any of the
17   transactions that are covered in paragraph 66 to
18   the end of your declaration, basically the
19   trusts?
20        A.   No.
21        Q.   Did you come across any document that
22   indicated he benefited from any of these
23   transactions?
24        A.   Yes.
25        Q.   Did you come across any documents that

Page 469

1              K. Palen - Cross
2    indicated he knew of the transactions?
3         A.   Yes.
4         Q.   Did you come across any document that
5    any other registered representative participated
6    in any of these transactions?
7         A.   I don't understand what you mean,
8    "participated."
9         Q.   Was involved in the making of the
10   transaction, authored the transaction, caused
11   the transaction to come about?
12        A.   They sold it.
13        Q.   No.  I am talking about -- we are
14   talking now about the misuse of funds in the
15   later group of alarm trusts.  The Triple Play
16   trusts and the alarm trusts.
17        A.   Okay.
18        Q.   The stuff that is dealt with in the
19   last part of your declaration.
20        A.   I understand.
21        Q.   And the question was -- and you
22   answered no -- did you come across any evidence
23   that Mr. Chiappone participated in any of these
24   transactions in the later part of your
25   declaration.  And you answered no?

Page 470

1              K. Palen - Cross
2         A.   In the structuring of the deals?
3         Q.   Yes, in the -- I am not talking about
4    the selling of the alarm trusts.  I am talking
5    about the misuse of the funds in the alarm
6    trusts?
7         A.   You are saying participated in the
8    transaction, so it is not clear.
9         Q.   I am sorry.  Well, when I say
10   "participate in the transactions," I am talking
11   about participation in fraudulent transactions
12   that you outline in your declaration.
13        A.   These are the trusts that are
14   summarized in my summary of sales and the
15   commissions paid, so from that perspective there
16   was participation.
17        Q.   Didn't you say in your declaration
18   that there were a number of frauds committed
19   with respect to the trusts, not just the Four
20   Funds?
21        A.   Correct.
22        Q.   And that is my question.  When I say
23   "participated in transactions," I am talking
24   about the fraudulent transactions.
25        A.   Meaning did Mr. Chiappone pay

26  (Pages 467 to 470)