**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NEAL A. CUPERSMITH,** *et al.*

                                        **Plaintiffs,**

        **v.**                                                    **3:14-cv-01303-TJM-DEP**

**PIAKER & LYONS P.C.,** *et al.*

                                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                                **DECISION & ORDER**

**I.      INTRODUCTION**

        This action was commenced by sixty-six individuals and two estates alleging that the Defendants, the

Piaker & Lyons accounting firm and two partners in the firm, Ronald L. Simons and Timothy N. Paventi,

participated in and helped conceal a Ponzi scheme in which Plaintiffs unwittingly invested.  Plaintiffs asserted

claims against Defendants under several theories, with the only remaining claims being those asserting that

Defendants aided and abetted the perpetration of the Ponzi scheme.

        Defendants move to dismiss all remaining claims on the grounds that they are barred by the applicable

statutes of limitations, and/or that Plaintiffs cannot establish the requisite elements of these claims.  See dkt. #

127 (motion), dkt. # 129 (Def. MOL).  Plaintiffs oppose the motion, dkt. # 137, and Defendants filed a reply.  Dkt.

# 138.  For the reasons that follow, the motion is granted in part and denied in part.

## II.    BACKGROUND[1]

### a.    The Ponzi Scheme

The Ponzi Scheme allegedly involved Timothy McGinn and David Smith and a number of firms, including McGinn, Smith & Co., Inc., McGinn Smith Advisors, LLC, and McGinn Smith Capital Holdings Corp. (collectively, "McGinn Smith").   Plaintiffs allege McGinn Smith raised more than $119,000,000 from investors, making "numerous false and misleading misrepresentations and omissions of material fact" about potential returns on investments.  They purportedly justified these claimed returns by paying off old investors with funds from new investors.

On April 20, 2010, the Securities and Exchange Commission ("SEC") commenced an emergency enforcement action in this Court against various McGinn Smith entities and Timothy M. McGinn and David L. Smith, alleging that McGinn Smith perpetrated a fraudulent scheme in violation of multiple federal securities laws and regulations. *See Securities and Exchange Commission v. Mcginn, Smith & Co., et al.*, 1:10cv457 (N.D.N.Y.).  McGinn Smith's assets were frozen and the Court appointed a receiver for the McGinn Smith entities.  The violations alleged in the case included the sale of unregistered securities, acting as unregistered broker-dealers, and fraud in the offer and sale of securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  The receiver was made permanent over McGinn Smith on July 22, 2010.

On January 26, 2012, Timothy McGinn and David Smith were indicted on criminal charges relating to the same scheme, including conspiracy, mail fraud, wire fraud, and securities fraud.  On February 6, 2013, a court convicted Timothy McGinn on 27 of 29 counts.  He was sentenced to 15 years in prison.  On the same

---

[1] The Court provides only a general background of this case (taken from the allegations in the Amended Complaint) simply to give an overview of the matter and to put the parties' arguments in proper context. More specific and material factual content is addressed in the Discussion section of this Decision and Order.

date, a court convicted David Smith on 15 of 29 counts.  He was sentenced to ten years in prison.  On

November 8, 2011, Defendant Ronald L. Simons pleaded guilty to one count of delivering and disclosing a false

federal income tax return relating to McGinn Smith.

### b.    Details of the Scheme

The Amended Complaint describes the McGinn Smith Ponzi scheme in detail.  According to that

pleading, the scheme involved four funds established between September 2003 and October 2005.  These

funds (referred to in the Amended Complaint as the "Four Funds"), were First Independent Income Notes LLC

("FIIN"), First Equity Income Notes LLC ("FEIN"), First Albany Income Notes LLC ("FAIN"), and Third Albany

Income Notes LLC ("TAIN").  They were all unregistered investment companies.

The Four Funds were wholly owned subsidiaries of McGinn Smith Advisors, which served as managing

member for each of them.  The Advisors also served as investment advisor for the Four Funds.  Another

subsidiary, McGinn Smith & Co., acted as the placement agent for debt offering by the Four Funds, and raised

approximately $90 million.  McGinn Smith Capital served as trustee and servicing agent for each of the funds.

The Four Funds had between 150 and 300 investors, and McGinn Smith purportedly urged Plaintiffs to

purchase notes on each of the funds, promising different levels of return depending on the investment.  Each

fund had three levels of investment, and promised returns ranged from 5% to 10.25%.

McGinn Smith also made another series of smaller-scale offerings, through a number of trusts.  These

trusts issued one or more tranches of notes and promoted interest rates ranging from 7.75% to 13%.

Each of the Four Funds allegedly invested more than 40% of its assets in securities.  McGinn Smith did

not register any of the Funds as investment companies, though it was required to do so.  McGinn Smith

disclosed the offering terms in Confidential Private Placement Memoranda ("PPMs").  These memoranda

indicated that the Funds "were formed to identify and acquire various public and private investments, such as

3

debt securities, equity securities, collateralized stock, and other such investments that would add value to the portfolios."

Plaintiffs assert that the Funds did not disclose, however, that funds would be loaned, transferred or invested between the funds. Despite this, the Funds increasingly made unauthorized loans and transfers to and investments in affiliated McGinn Smith entities. By September 2009, about one-half of all the assets in the Four Funds had been loaned to or invested in affiliated, often cash poor, McGinn Smith entities. Indeed, it is alleged that only about $3.6 million of the $106 million raised by the Four Funds were actually invested in liquid, publically traded companies. At the same time, the funds loaned more than $8 million to one of the McGinn Smith principals. The money was purportedly used to pay his salary and for investment in one of his companies, and was never repaid.

Plaintiffs allege that the Four Funds never had assets sufficient to pay their investors. As of September 30, 2009, they had revenues of $12.9 million and had spent $37 million. At some point before that date the Chief Financial Officer analyzed the Funds and determined that the book value was $69 million and notes payable exceeded $86 million. The "net realizable" income of the Four Funds combined was $37 million, almost $49 million less than the amount owed investors.

Plaintiffs maintain that McGinn Smith concealed these facts about the Funds' financial status from investors, continuing to raise money from them. They also assert that McGinn Smith encouraged investors to roll over their notes when they became due. Plaintiffs contend that McGinn Smith did this so it could avoid having to repay investors, and instead could use the rolled-over capital to pay interest on the notes. In October 2008, McGinn Smith proposed a restructuring plan to investors that continued to mislead Plaintiffs. McGinn Smith blamed the poor financial condition of the Funds on the stress in financial markets, thus concealing the financial mismanagement in which McGinn Smith was engaged. McGinn Smith also failed to disclose to

4

investors that the Four Funds' asset value was 50%, less than owed investors. Plaintiffs contend that McGinn Smith falsely suggested that note holders had a reasonable prospect of receiving their principal investment through the restructuring. The restructuring plan also extended the length of the notes and reduced the interest to be received. Despite the financial straights under which the Funds operated, McGinn Smith continued to sell notes to new investors and roll over old notes.

Plaintiffs assert that the financial fraud also included a series of trusts (the "Trusts"). McGinn Smith represented that the Trusts were created for specific purposes, such as purchasing alarm contracts, cable services contracts, and/or luxury cruises. A number of Trusts bearing various names were established, and they were often designated as "Junior" or "Senior." McGinn Smith claimed that returns on the Trusts would annually amount to between 7.75% and 13%, and that principal would be re-paid at maturity, which was five years. McGinn Smith charged what Plaintiffs allege were "largely undisclosed and concealed fees" which made the claimed rates of return "virtually impossible" to achieve. While the Trusts' claimed purpose was to invest in promissory notes, Plaintiffs allege their real purpose was to structure a series of transactions, using various McGinn Smith entities as conduits, to siphon and misappropriate investors' funds. The Trusts purportedly served as vehicles for paying "exorbitant and undisclosed fees to McGinn Smith" and "earned interest" to investors, to make loans to the McGinn Smith principals and affiliates, and to cover payroll. Investors' funds in the Trusts were commingled, diverted and misappropriated, "in direct contradiction to the represented investment purpose, and to the detriment of the investors."

c.      **Specifics of Defendants' Alleged Roles**

Plaintiffs allege that from 1992 until at least 2008, Defendants served as outside auditors and accountants for McGinn Smith. Plaintiffs contend that they knew that an independent public accounting firm audited McGinn Smith's financial statements. Plaintiffs also contend that Defendant Piaker & Lyons did this

auditing, and worked closely with McGinn and Smith regarding all of the McGinn Smith entities. Defendants prepared the tax returns for McGinn Smith and each of the Funds and Trusts. Defendants purportedly reviewed documents related to the relationships among the McGinn Smith entities, the Funds, and the Trusts, talked with representatives of each of these entities in order to understand the McGinn Smith businesses, and review the books and records of McGinn Smith to verify the accuracy of journal entries, to confirm transactions, and to obtain evidence to support the audit opinions rendered from at least 1992 to 2008.

Plaintiffs allege that even though there was mounting evidence of improper related party transactions which were not accurately recorded and documented, each of the Defendants' audit reports represented that the financial statements presented fairly, in all material respects, the financial position of the entity, the results of its operations, and cash flows from the year then ended in conformity with generally accepted accounting principals ("GAAP") and that the Defendants had performed the audits in accordance with generally accepted accounting standards ("GAAS").

Plaintiffs allege that the Defendant accounting firm, under the supervision and control of Defendants Simons and Paventi, deliberately failed to follow the rudimentary auditing standards that would have revealed material misstatements and fraud in the financial statements of McGinn Smith. Plaintiffs also allege that the Defendants deliberately concealed the irregularities and the fraud. Instead, Plaintiffs allege, the Defendants were motivated by the large fees paid by McGinn Smith and chose to ignore the problems with the Funds and Trusts, as well as the other McGinn Smith entities.

Plaintiffs further allege that if the Defendants had followed proper accounting practices they would have seen that "[b]y 2009, approximately half of all the assets in the Four Funds had been conveyed to McGinn Smith by means of unauthorized loans and transfers." Thus, plaintiffs allege that proper accounting methods would have allowed them to detect these improper loans and transfers, preventing the fraudulent operations. In the

same way, they assert that proper accounting would have recognized the fraudulent structure of the trusts and the improper uses to which the funds in the Trusts were put.

Plaintiffs therefore allege that "Defendants concealed the fraud and hid the Scheme by, among other things, (a) characterizing transactions falsely, (b) covering up payments of investor money to McGinn Smith principals, and (c) failing to issue any qualified opinion." By failing to issue a qualified opinion on the materiality of the McGinn Smith's financial representations, Defendants failed to issue a warning that would have " triggered a red flag to others who relied on such warnings, including Plaintiffs." According to Plaintiffs, the Defendants failed to take their opportunity to alert the public about the Ponzi scheme, but instead " chose to conceal the fraudulent Scheme."

Plaintiffs claim that Defendants' actions helped conceal the scheme and left Plaintiffs clueless about the fraud. Plaintiffs point to a "qualified opinion" issued by Defendants in 2009 listing McGinn Smith only as a "going concern" as evidence of Defendants' knowledge of the ongoing scheme, and conduct by Defendants that allow the scheme to continue undetected.[2]

Plaintiffs point to specific activity that they allege demonstrates Defendants' involvement in the fraud. Pointing to the movement of money "in a circuitous manner to cover up the Scheme," and to cover expenses,

---

[2]Plaintiffs cite to a number of failures by the Defendants to meet proper accounting standards, such as:

(i) failing to maintain professional skepticism and an independent stance (see, AU § 150.02, GAAS General Standard No. 2); (ii) failing to perform analytical procedures in connection with planning the audit to identify unusual transactions and events (AU Section 329); (iii) failing to identify and assess the risks of material misstatement (GAAS Auditing Standing No. 12); (iv) failing to recognize during the course of the audits numerous misrepresentations and misstatements about related party transactions of McGinn Smith suggestive of fraud (AU § 316.05, Consideration of Fraud in a Financial Statement Audit); (v) failing to exercise due professional care in the performance of the audits and the preparation of the audit reports (GAAS General Standard No. 3); and (vi) failing to obtain obtaining the level of evidence necessary under the circumstances to support the opinions rendered in connection with the audits (GAAS Auditing Standard No. 15).

Plaintiffs allege that "[t]he Defendants took these directions from McGinn Smith and implemented them, thereby substantially assisting the fraudsters to perpetuate the Scheme and conceal the Scheme from investors."  As an (undated) example, Plaintiffs allege that "Defendant Paventi discovered and questioned about $170,000 showing due from FIIN to McGinn Smith and was advised that McGinn Smith does 'not account for this' on its operating books.  A similar 'payable of about $113,000 was shown for FAIN."  Defendants made no additional inquiry into these irregularities, though they knew that the transactions were unlawful or at least irregular.  Instead, Defendants allegedly concealed those transactions "and perpetrated the fraud."  Defendants also allegedly made false accounting entries for McGinn Smith and the Funds and Trusts.  Those entries concealed preferred investor payments, payroll diversions, and improper payments to the McGinn Smith principals.  Defendants also allegedly "mischaracterized income payments to McGinn Smith principals as loans," though they knew the true purpose of the payments, and knew of improper payments from one Fund to another.  Such "cooked" accounting records and backdated notes and other documents were submitted to FINRA as part of the SEC action.  Defendants also knew of misuse of investor funds by the principals for luxury purposes.

Defendant Simons pleaded guilty in 2011 to filing a false federal income tax return related to the scheme.  He admitted that had prepared financial statements for McGinn Smith and Smith, a principal in the firm from 1992 through 2008.  Simons caused Smith's 2006 U.S. individual income tax return to be filed in October 2007.  The return failed to report $407,000 in fees paid to Smith from a McGinn Smith affiliate.  At the time he prepared the return, Simons allegedly knew that Smith had characterized the fees as income before 2007, but had the McGinn Smith controller booked some of those fees as origination fees.  In October 2007, Smith claimed that some of the fees were a loan to avoid having to claim them as income.  Despite knowing their true source, Simons "reclassified some of the fees from origination fees to loans by making an adjusting journal entry."  Simons purportedly knew the return was not accurate.  Plaintiffs contend that Simons pleaded guilty to

filing a false tax return because he knew it was a lesser offense than securities fraud and "it allowed him to continue to conceal the Defendants' involvement in substantial assistance in the Scheme from the investors."

Plaintiffs also allege that Defendants "knowingly prepared materially false and misleading financial statements regarding McGinn Smith, the Four Funds, and the Trusts," and knew that Plaintiffs would rely on those statements. Defendants had received information on their investments with McGinn Smith as part of their auditing work. They purportedly knew that the investors–including the Plaintiffs–"were the intended recipients and were expected to rely upon the financial statements regarding McGinn Smith, the Four Funds, and/or the Trusts." They would rely on the auditing statements, and relied on Defendants to report any irregularities. Still, Defendants allegedly did not question the absence of documentation for transactions; failed to question fraudulent bookkeeping entries; did not remain independent; mischaracterized loans as fees; failed to obtain documentation for transactions; did not question commingling of assets in the Trusts; failed to obtain confirmations and other documents about transactions by the Trust; ignored the deteriorating financial position of McGinn Smith; filed false returns; concealed improper commissions, loans and expenditures; and failed to report "anomalies" to authorities. Plaintiffs allege that by failing to issue at least a "qualified" if not "adverse" opinion, Defendants' actions sent signals to investors that their money was safe. Plaintiffs also allege that Defendants failed to exercise proper professional care and control in their audits, failed to structure their auditing practice to catch the obvious fraudulent activity, and failed to render accurate accounting reports.

Plaintiffs contend that they had no opportunity to discover the Defendants involvement in the Scheme, because of the Defendants' concealment, until the SEC prosecuted the individual McGinn Smith brokers, and an SEC staff accountant, Keri Palen, disclosed during her testimony in January 2014 that the Defendants knew about the scheme. Only through the testimony of Keri Palen, Plaintiffs insist, did they discover, and "had their first reasonable opportunity to discover, the Defendants' malfeasance and involvement in the Scheme. At no

time have Plaintiffs had access to the accounting work papers of Defendants upon which the SEC accountant's incriminating testimony was based."

> **d.    Plaintiffs' Lawsuit**

Plaintiffs filed a Complaint in this matter on September 11, 2014 in the U.S. District Court for the District of New Jersey.  The case was transferred to this Court.  After Defendants filed a motion to dismiss, Plaintiffs filed an Amended Complaint.  The Amended Complaint raises Four Counts: Count I–Aiding and Abetting Breach of Fiduciary Duty/Trust; Count II–Aiding and Abetting Fraud; Count III–Fraud; Count IV–Gross Negligence.

Defendants then filed a motion to dismiss the Amended Complaint.  On April 24, 2015, the Court issued a decision from the bench dismissing Plaintiffs' claims for aiding & abetting a breach of fiduciary duty (Count I), and gross negligence (Count IV).  See Dkt. # 52 (Order); dkt. # 71 (Transcript of 04/24/15 Proceeding).  The basis for the dismissal was that the claims were brought beyond the applicable statutes of limitations.  Dkt. # 71, pp. 22-35.  In making his decision, the Court found that Plaintiffs could have, with the exercise of reasonable diligence, discovered their injuries shortly after the SEC commenced its action against McGinn Smith in April, 2010.  Id.  pp. 33-34.

On November 16, 2016, Plaintiffs filed a Notice of Voluntary Dismissal voluntarily dismissing Count III of the Amended Complaint (Fraud). Dkt. # 82.  Thus, the only remaining claims fall under Count II, aiding and abetting fraud.  Defendants now seek summary judgment on all claims under Count II.

## III.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011).

## IV.    DISCUSSION

### a.    Statutes of Limitations

Defendants argue that the majority of plaintiffs' claims are barred by the applicable statutes of limitation. Plaintiffs oppose this aspect of the motion.

#### 1.    New York's Statutes of Limitations - CPLR 213(8) & CPLR 202

New York CPLR 213(8), addressed to actions based upon fraud,  provides that:

> the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it.

N.Y. CPLR 213(8).

However, where "a nonresident sues on a cause of action accruing outside New York, CPLR 202 [(the "borrowing statute")] requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (N.Y. 1999); N.Y. CPLR 202.[3]  There is no dispute that Plaintiffs reside in Pennsylvania, Delaware, Florida, and New Jersey, and that none are New York residents. (Defendants' Local Rule 7.1(a)(3) Statement of Material Facts ("Def. SMF") ¶¶ 4-8).  Defendants contend that a claim sounding in fraud, like Plaintiffs' aiding and abetting

---

[3]N.Y. CPLR 202 provides:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

*Id.*

fraud claims, is considered to accrue where the Plaintiffs' suffered their injuries, "which is generally the place where plaintiffs resided and sustained the economic impact of their loss." *Dutton v. Glass*, 2005 WL 146503, at *2 (S.D.N.Y. 2005) (citing *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002)). Thus, Defendants argue that "with the possible exception of three claims asserted by New Jersey resident-plaintiffs totaling $50,000, all of Plaintiffs' claims are untimely under either the limitations period of Plaintiffs' respective states of residence or CPLR 213(8)." Def. MOL p. 6.

In opposition, Plaintiffs argue that New York's "borrowing statute" does not apply because it requires a showing that the Plaintiffs could have brought their claims in their home states, yet "nothing in the record suggests that Plaintiffs could have brought the action in any jurisdiction other than New York." Pl. MOL. p. 3. Plaintiffs contend that in similar circumstances, New York courts "have refused to apply NY CPLR § 202 and have instead looked only to New York's statute of limitations to determine the timeliness of a plaintiff's claims." *Id.* (citing *Stafford v. Int'l Harvester Co.*, 668 F.2d 142, 152 (2d Cir. 1981) and *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763 (S.D.N.Y. 1993)).

In *Stafford*, the Second Circuit held a foreign statute of limitations could not be applied under CPLR 202 because the defendant was not amenable to suit in that foreign jurisdiction. 668 F.2d at 152. The *Cuccolo* court acknowledged that it was bound by *Stafford* and applied the same rule. 826 F. Supp. at 768. However, neither *Stafford* nor *Cuccolo* remain good law. The New York Court of Appeals expressly rejected the *Stafford* holding in *Insurance Co. of North America v. ABB Power Generation*, 91 N.Y.2d 180 (1997).[4] The Second Circuit has

---

[4]In *Insurance Co.*, the Court of Appeals, after being presented with a certified question from the Second Circuit because the breadth of the New York borrowing statute had yet to be resolved by New York courts (91 N.Y.2d. at 182; *Insurance Co. v. ABB Power Generation*, 112 F.3d 70, 73 (2d Cir. 1997)), determined that "*Stafford* misconstrue[d] CPLR 202," and that "the purposes underlying the borrowing statute do not require that amenability to suit be demonstrated before an action can be said to accrue in a particular jurisdiction." 91 N.Y.2d. at 185-86. The Court of Appeals therefore rejected the *Stafford* court's reasoning and concluded that New York's borrowing statute "requires that a court, when presented with a

(continued...)

since acknowledged that the rule articulated in *Stafford* "has now been firmly rejected by the Court of Appeals." *Bianco v. Erkins*, 243 F.3d 599, 608 n.7 (2d Cir. 2001) (citing *Insurance Co.*, 91N.Y.2d at 186); see *Tilton v. Nynex*, 2000 U.S. App. LEXIS 16258, at *2-3 (2d Cir. July 11, 2000). Thus, New York's borrowing statute applies in this case.

"New York's 'borrowing statute' provides that claims arising in another state are governed by that state's statute of limitations if it is shorter than New York's." *Atlantica Holdings. Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2016 U.S. App. LEXIS 1782, at *23 (2d Cir. Feb. 3, 2016) (citing CPLR 202)). Defendants are correct that a tort claim sounding in fraud accrues where the plaintiff suffers his or her injury, which is generally the state in which the plaintiff resides. *See Atlantica Holdings, Inc.*, 2016 U.S. App. LEXIS 1782, at *23-24; *see also Dutton v. Glass*, 2005 U.S. Dist. LEXIS 868, at *8-9 (S.D.N.Y. Jan. 19, 2005) ("Even if the fraud occurred in New York, where the action is purely economic, it is governed by the law where plaintiffs suffered their injury which generally is the place where plaintiffs resided and sustained the economic impact of their loss."); *Lorely Fin. (Jersey) No. 28, Ltd. v. Merrill Lynch. Pierce, Fenner & Smith Inc.*, 117 A.D.3d 463, 465 (1st Dep't 2014) (same).

### 2. The Discovery Rule

In applying New York's borrowing statute, the Court must decide the date on which the limitations period began. Under New York CPLR 213(8), "the time within which an action based upon fraud must be commenced is 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff ... discovered the fraud, or could with reasonable diligence have discovered it.'" *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 153-54 (2d Cir. 2012)(quoting CPLR 213(8)). The limitations periods of Plaintiffs' respective

---

[4](...continued)
cause of action accruing outside New York, should apply the limitation period of the foreign jurisdiction if it bars the claim." *Id.* at 187.

states of residence all employ slightly varying versions of the "discovery rule."  *Gleason v. Borough of Moosic*, 609 Pa. 353, 362 (Pa. 2011) (Pennsylvania discovery rule); *Van Lake v. Sorin CRM USA. Inc.*, No. 12C-04-036, 2013 Del. Super. LEXIS 57, at *26 (Del. Super. Ct. Feb. 15, 2013) (Delaware discovery rule);  *Donald Kipnis v. Bayerische Hypo-Und Vereinsbank, A.G.*, 784 F.3d 771, 781 (11th Cir. 2015) (Florida's statutory "delayed discovery" rule); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.* , 181 F.3d 410, 425 (3d Cir. 1999) (New Jersey discovery rule).  Under each state's variation of the discovery rule (explained more fully below), the date on which Plaintiffs were placed on "inquiry notice" of the underlying fraud also placed Plaintiffs on inquiry notice of aiding and abetting claims premised on that fraud.  *See Adams v. Deutsche Bank AG*, 2012 U.S. Dist. LEXIS 143332, at *12-13 (S.D.N.Y. Sept. 24, 2012) (finding aiding and abetting fraud claims untimely because "Plaintiffs were on notice of a potential fraud claim ... at least as early as 2003, when the Senate Report was released."); *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 570-72 (S.D.N.Y. 2010)(plaintiffs were placed on inquiry notice of their aiding and abetting claims by a Senate Report, newspaper articles, and other lawsuits, all of which detailed the underlying fraud); *Aozora Bank LTD v. Barclays Bank PLC*, 2015 N.Y. Misc. LEXIS 2301, at *14-18 (Sup. Ct. N.Y. Co. June 24, 2015)(finding that newspaper articles, a governmental report, and other lawsuits against the defendant relating to the underlying fraudulent activity placed the plaintiff on inquiry notice of its aiding and abetting fraud claims); *Ciccarelli v. Gichner Svs. Grp.*, 862 F. Supp. 1293, 1301 (M.D. Pa. 1994) (finding "as a matter of law" that a single letter "describing potential pricing irregularities" "presented adequate 'storm warnings' ... that there might well be fraud," and dismissing fraud-based claims as untimely); *Borah v. Monumental Life Ins. Co.*, 2007 U.S. Dist. LEXIS 24756, at *13-19, 22 (E.D. Pa. Apr. 2, 2007) (finding that IRS notice regarding validity of tax product and counsel letter warning of potential IRS litigation constituted "storm warnings"); *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 513 (D. De. 2003) ("Media reports and press articles may constitute 'storm warnings' sufficient to

put Plaintiffs on inquiry notice."); *Lesti v. Wells Fargo Bank. N.A.*, 960 F. Supp. 2d 1311, 1322 (M.D. Fla. 2013) (finding that a single warning published by the Austrian Financial Market Authority regarding the underlying fraudster and "his business practices" placed the plaintiffs on inquiry notice of their aiding and abetting fraud claims); *Cetel v. Kirwan Fin. Grp. Inc*., 460 F.3d 494, 507, 512-13 (3d Cir. 2006) (noting that the inquiry notice standard "saddles the investor with responsibilities like reading prospectuses, reports, and other information related to the investments, and additionally, assumes knowledge of publicly available news articles and analyst's reports," and concluding that plaintiffs were placed on inquiry notice with respect to aiding and abetting fraud claim by a publicly-disseminated IRS notice "and its attendant consequences, combined with the audits and deficiency notices") (internal quotation marks and citation omitted).

The Court previously determined that Plaintiffs were placed on inquiry notice of Defendants' purported involvement in the McGinn Smith Ponzi scheme when the SEC commenced an enforcement action against McGinn Smith in April 2010. Dkt. No. 71 at 33-34. In this regard, the Court concluded that once the SEC commenced its action in April 2010, Plaintiffs "had ample opportunity to discover their injuries," and "[r]easonable diligence would have allowed such a discovery." *Id.* The Court rejected as "not credible" Plaintiffs' contention that they could not have discovered Defendants' alleged involvement in the Ponzi scheme until January 2014 when Keri Palen, an SEC staff accountant, testified in a separate action. *Id.* at 34. The Court determined, instead, that the SEC "allegations against McGinn Smith clearly implicated all of their financial dealings, including the filings of their auditors, long before Palen's testimony." *Id.*

Because Plaintiffs have not presented cogent and compelling reasons to reject this determination, it remains binding law of the case. *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)(Under the "law of the case" doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise.")

(internal quotation marks and citation omitted). Thus, when applying a discovery rule under New York New York CPLR 213(8) or a similar statute of limitations from another jurisdiction, the Court adheres to his ruling that Plaintiffs were placed on discovery notice of the underlying fraud, and Defendants' purported involvement therein, in April 2010. Accordingly, the Court finds that Plaintiffs were placed on discovery notice of the bases of their aiding and abetting fraud claims in April 2010.

### 3. Pennsylvania's Statute of Limitations

The claims of forty-nine (49) of the remaining sixty-two (62) Plaintiffs are governed by the applicable Pennsylvania statute of limitations (the "Pennsylvania Plaintiffs"). (Def. SMF ¶ ¶ 5, 29, 30, 43, 89.)[5] Pennsylvania has a two-year statute of limitations for aiding and abetting fraud claims. 42 Pa. Const. Stat.§ 5524(7); *see Germinaro v. Fid. Nat'l Title Ins. Co.*, 107 F. Supp. 3d 439, 453-54 (W.D. Pa. 2015) ("With regard to Plaintiffs' claims for ... aiding and abetting fraud ... Pennsylvania imposes a two-year statute of limitations period .... "); *Travelers Cas. & Sur. Co. of Am. v. Morris*, 2010 U.S. Dist. LEXIS 29913, at *6 n.3 (E.D. Pa. March 29, 2010) (same). Because Pennsylvania provides a limitations period for aiding and abetting fraud claims that is shorter than CPLR 213(8), that shorter period governs the Pennsylvania Plaintiffs' claims. *See Atlantica Holdings, Inc.*, 2016 U.S. App. LEXIS 1782 at *23-24.

Pennsylvania employs a "narrow" discovery rule, which "places a greater burden upon Pennsylvania plaintiffs vis-a-vis the discovery rule than most other jurisdictions." *Gleason v. Borough of Moosic*, 609 Pa. 353, 362 (Pa. 2011) (quoting *Wilson v. El-Daief*, 600 Pa. 161, 179 (Pa. 2009)). Under this narrow discovery rule, the

---

[5]Plaintiffs Deanna M. Ayers, Alice J. Forsyth, and Susan J. Forsyth are identified in the Amended Complaint as Florida residents. (Def. SMF ¶ 7.) However, these Plaintiffs were Pennsylvania residents during the relevant time period, including at the time they suffered their investment losses, and their claims are therefore governed by Pennsylvania's statute of limitations. (Def. SMF ¶¶ 43-89); *see Dutton v. Glass*, 2005 U.S. Dist. LEXIS 868, at *8-9 (noting that fraud claims are governed by law of state in which plaintiffs suffered economic injury). In any event, as established below, even if the Florida four-year limitations period is found to govern the claims of Plaintiff Ayers and the Forsyth Plaintiffs, those claims are nevertheless time-barred.

two-year limitations period begins to run when the plaintiff has "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury ... or precise cause." *Id.* (internal quotation marks and citation omitted). In the fraud context, a plaintiff "need only be put on inquiry notice by 'storm warnings' of possible fraud." *Beauty Time Inc. v. Vu Skin Sys., Inc.*, 118 F.3d 140, 148 (3d Cir. 1997) (quoting *Ciccarelli v. Giebner Sys. Grp.*, 862 F. Supp. 1293, 1301 (M.D. Pa. 1994)).

Here, as previously determined, Plaintiffs were placed on inquiry notice of their aiding and abetting a fraud claim in April 2010 when the SEC commenced this action against McGinn Smith. Thus, Pennsylvania's two-year limitations period began to run in April 2010 and expired well before Plaintiffs commenced the instant action in September 2014. Accordingly, all claims by Pennsylvania-resident Plaintiffs are dismissed. *See, e.g., Carns v. Yingling*, 406 Pa. Super. 279, 285 (Sup. Ct. Pa. 1991) ("[W]here the undisputed facts lead unerringly to the conclusion that the length of time it took a plaintiff to discover the injury or its cause was unreasonable as a matter of law, summary judgment is proper.")(internal quotation marks and citation omitted).

### 4. Delaware's Statute of Limitations

One plaintiff - Kathleen A. Connell - resides in Delaware. (Def. SMF ¶ 6.) Aiding and abetting fraud claims in Delaware are governed by a three-year statute of limitations. 10 Del. C. § 8106; *see In re Winstar Communs., Inc.*, 435 B.R. 33, 35, 43-46 (D. Del. Br. 2010) *aff'd* 2013 U.S. Dist. LEXIS 162878 (D. Del. Nov. 15, 2013); *Van Lake v. Sorin CRM USA, Inc*., 2013 Del. Super. LEXIS 57, at *21 (Del. Super. Ct. Feb. 15, 2013) ("Pursuant to 10 Del. C. § 8106, ... fraud [claims] must be brought within three years after the claim has accrued."). Fraud-based claims in Delaware accrue "at the time the tort is committed," *Boerger v. Heiman*, 965 A.2d 671, 674 (Del. 2009), but they may be tolled by the discovery rule "where there is evidence of concealment or fraud, or where the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful

act and the injury complained of." *Van Lake*, 2013 Del. Super. LEXIS 57, at *26 (internal quotation marks

omitted). Under Delaware's discovery rule, "the statute of limitations begins to run upon the discovery of facts

constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary

intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." *Boerger*, 965

A.2d at 674 (Del. 2009) (internal quotation marks and citation omitted) (emphasis in original). In other words,

"the limitations period beings to run when the plaintiff is ... on inquiry notice." *In re Dean Witter Partnership Litig.*,

No. 14816, 1998 Del. Ch. LEXIS 133, at *23 (Del. Ct. Chane. July 17, 1998); *see Estate of Buonamici v. Morici*,

No. 08C-10-231, 2010 Del. Super. LEXIS 223, at *10 (Del. Super. Ct. June 1, 2010).

As Defendants argue, "[a]bsent application of the discovery rule, Ms. Connell's aiding and abetting fraud

claim, which was filed over six years after her most recent investment in a McGinn Smith product (on December

17, 2007) (SMF ¶ 25), is facially untimely." Def. MOL p. 15 (citing *Maddox v. Isaacs*, No. K13C-02-026, 2013

Del. Super LEXIS 196, at * 5 n. 9 (Del. Super Ct. May 7, 2013) ("A cause of action for fraud accrues at the time

the fraud is perpetrated.")).

As Defendants also argue, the discovery rule does not salvage Ms. O'Connell's claim. *Id.* Like all

Plaintiffs, Ms. Connell was on inquiry notice of her claim in April 2010. *See In re DaimlerChrysler AG Sec. Litig.*,

269 F. Supp. 2d at 513 (noting that "[m]edia reports and press articles" are sufficient to place a plaintiff on

inquiry notice where there is a "reasonable nexus between the allegations made in the article and the nature of

the action subsequently brought") (internal quotation marks and citation omitted). Thus, Delaware's three-year

limitations period began to run over four years before Plaintiffs commenced this action. Ms. Connell's claim is

untimely as a matter of law and is dismissed. *See, e.g., Commonwealth Land Title Ins. Co. v. Funk*, No.

N14C-04-I 99, 2014 Del. Super. LEXIS 702, at *22-23 (Del. Super. Ct. Dec. 22, 2014) (noting that the limitations

period begins to run, once the plaintiff is on inquiry notice); *Estate of Buonamici*, 2010 Del. Super. LEXIS 223, at

18

*25 (granting summary judgment where "undisputed record conclusively show[ed]" plaintiffs were on inquiry notice outside the limitations period).

### 5. Florida's Statute of Limitations

Five (5) of the remaining Plaintiffs are governed by the applicable Florida statute of limitations (the "Florida Plaintiffs").[6] (Def. SMF ¶¶ 7, 26-27.)  Under Florida law, aiding and abetting fraud claims are governed by a four-year statute of limitations. *Donald Kipnis v. Bayerische Hypo-Und Vereinsbank, A.G.*, 784 F.3d 771, 780- 81 (11th Cir. 2015)(citing Fla. Stat.§ 95.11(3)(j)); *Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1322 (M.D. Fla. 2013).  Pursuant to Florida's "statutory exception for delayed discovery," aiding and abetting fraud claims accrue when the plaintiff "either knows or should know that the last element of the cause of action occurred."  *Lesti*, 960 F. Supp. 2d at 1320 (citing Fla. Stat. § 95.031 and Davis v. Monahan, 832 So. 2d 708, 709 (Fla. 2002)); *see Becnel v. Deutsche Bank, AG*, 507 Fed. App'x 71, 73 (2d Cir. 2013) ("The [Florida] statute of limitations for fraud-based claims begins when the facts giving rise to it were discovered or should have been discovered with the exercise of due diligence.").  Because Plaintiffs were on inquiry notice in April 2010, the Florida Plaintiffs were required to file their claims by April 2014.  Their failure to do so mandates dismissal of those claims. *See Brooks Tropicals. Inc. v. Acosta*, 959 So. 2d 288, 296 (Fla. Dist. Ct. App. 2007) ("[T]he question of whether this plaintiff should have discovered the basis for a cause of action for fraud was one of law to be determined by the court").

### 6. New Jersey's Statute of Limitations

In New Jersey, claims of aiding and abetting fraud are subject to a six-year statute of limitations, which

---

[6] Defendants represent that Plaintiffs provideda list of investments made by Plaintiffs after September 11, 2008. (Def. SMF ¶ 31.)  Included on that list was a January 30, 2009 investment in the amount of $40,000 made by "Kenneth Dale," who is the deceased husband of Plaintiff Mary Dale. (Pl. Resp. to Def. SMF ¶ 28.) Because neither Kenneth Dale nor an estate on his behalf is a plaintiff in this action, this $40,000 investment is not at issue here.

may be tolled by the discovery rule. N.J. Stat. Ann. 2A: 14- l; *see Blystra v. Fiber Tech Grp .. Inc.*, 407 F. Supp. 2d 636, 644-45 (D. N.J. 2005); *see also Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) (citing N.J. Stat. Ann. 2A: 14-1 and *Lopez v. Sawyer*, 62 N.J. 267, 300 (N.J. 1973)). Because New Jersey affords a limitations period for aiding and abetting fraud claims that is equal to, or more generous than, CPLR 213(8), the seven (7) New Jersey Plaintiffs (Def. SMF ¶ 8) must satisfy New York's statute of limitations. Global Fin. Corp., 93 N.Y.2d at 528.

### 7. New York's Statute of Limitations

"Under New York law, the time within which an action based upon fraud must be commenced is 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff ... discovered the fraud, or could with reasonable diligence have discovered it.'" *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 153-54 (2d Cir. 2012) (quoting CPLR 213(8)); *see Landow v. Wachovia Secs., LLC*, 996 F. Supp. 2d 106, 126 (E.D.N.Y. 2013) (applying CPLR 213(8) to claim for aiding and abetting fraud). Because the Court has already determined that Plaintiffs could have, with reasonable diligence, discovered the bases of their aiding and abetting fraud claims in April 2010, and because they did not commence their action until April 2014, the discovery rule of CPLR 213(8) affords them no relief. Thus, to determine whether the New Jersey Plaintiffs' claims are timely under CPLR 213(8)'s six-year time limit, the Court must determine when their claims accrued.

In New York, an investment-based fraud claim accrues "on the date of the purchase of the securities." *Commerzbank AG London Branch v. UBS AG*, 6, 2015 N.Y. Misc. LEXIS 2175, at *4-5 (Sup. Ct. N.Y. Co. June 17, 2015); *see Koch*, 699 F.3d at 154 (finding fraud claim accrued when purchase in question was executed - *i.e.* "the alleged fraud was completed"); *Varga v. McGraw Hill Fin. Inc.*, No. 652410/2013, 2015 N.Y. Misc. LEXIS 2848, at *29 (Sup. Ct. N. Y. Co. July 31, 2015) ("[T]he claim accrues on the date the plaintiff 'completed the act that the alleged fraudulent statements had induced.'" (quoting *Prichard v. 164 Ludlow Corp.*, 49 A.D.3d

408, 408-09 (1st Dep't 2008)).  Under this rule, each New Jersey Plaintiff's aiding and abetting fraud claim(s) accrued on the date(s) that the Plaintiff purchased a McGinn Smith investment product.  *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459-61 (S.D.N.Y. 2009)(holding that aiding and abetting fraud claims accrued on the transaction date); *Corporate Trade,Inc. v. Golf Channel*, No. 12 Civ. 8811, 2013 U.S. Dist. LEXIS 136781, at *13 (S.D.N.Y. Sept. 24, 2013) (holding that "aiding and abetting" claims "began to run on the accrual date of plaintiff's" underlying tort claims); *Aozora Bank, LTD v. Barclays Bank PLC*, 2015 N.Y. Misc. LEXIS 2301, at *8 (Sup. Ct. N.Y. Co. June 24, 2015) (same); *Gordon Grp. Invs., LLC v. Kugler*, 2012 N.Y. Misc. LEXIS 6341, at *33 (Sup. Ct. N.Y. Co. July 18, 2012) (same) *aff'd in part* 115 A.D.3d 433 (1st Dep't 2014).

The only purchases made by New Jersey Plaintiffs after September 11, 2008, and thus within 6 years of the date Plaintiffs filed the Complaint on September 11, 2014, were four separate investments belonging to Plaintiffs Peter and Teresa Zakroff and Ilene Nemeth, totaling $50,000.  Defs. MOL p 19; Def. SMF ¶ ¶ 23-24; Swanekamp Reply Decl. Ex. A.  Thus, Defendants maintain that all other claims asserted by the New Jersey Plaintiffs are premised on investments made before September 11, 2008, and are therefore time-barred by CPLR 213(8).  Plaintiffs argue, however, that "all of Plaintiffs' claims, even those related to Plaintiffs' investments in the Four Funds and Trusts made as far back as 2004, are timely, as the underlying fraud perpetrated by McGinn Smith constituted a continuing violation for statute of limitations purposes."  Pl. MOL, p. 4 (citing *Neufeld v. Neufeld*, 910 F.Supp. 977, 982 (S.D.N.Y. 1996) ("Despite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuous wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act.").[7]

---

[7] Plaintiffs assert this argument in relation to all Plaintiffs claims, not just the New Jersey plaintiffs. However, for the reasons discussed above, all other plaintiffs claims are barred by their respective state statues of limitations. Thus, the Court will apply this argument only to the New Jersey plaintiffs' claims.

Plaintiffs seemingly assert that they are entitled to the benefit of what has been referred to as the " pure continuing violation doctrine." *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *135 (S.D.N.Y. Oct. 20, 2015), *on reargument in part sub nom. In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016).[8] "The pure continuing violation doctrine applies when a plaintiff's injury is the product of a sequence of small harms" when, taken together, amount to a single wrong. *Id.* at *137. In this regard, where violations occurring outside the limitation period are so closely related to other, non-time barred violations, as to be viewed as part of a single continuing wrong, a plaintiff may recover for all violations, including those which on their face fall outside of the limitations period. *Id.* ("For example, in the Title VII context, a hostile work environment claim 'occurs over a series of days or perhaps years and ... a single act of harassment may not be actionable on its own.'")(*quoting Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). However, the continuing fraud doctrine does not apply where, as here, a plaintiff's injury "accrues at the moment of the discrete act." *Id.* ("By contrast, a Title VII claim based on a discrete act (for example, termination or refusal to extend a raise) accrues at the moment of the discrete act, regardless of subsequent discrimination or retaliation.")(citation omitted). Consistent with this principle, New York courts have repeatedly refused to apply the continuing violation doctrine to common law fraud-based claims which, like Plaintiffs' claims, accrue at the time of purchase. *Varga v. McGraw Hill Fin. Inc.*, 2015 N.Y. Misc. LEXIS 2848, *20-*25 (Sup. Ct. N. Y. Co. July

---

[8]The Southern District wrote:

The label "continuing violation doctrine" can be used to refer to two separate doctrines. *See generally White v. Mercury Marine, Div. of Brunswick, Inc.*, 129 F.3d 1428, 1430 (11th Cir.1997). One doctrine (the "pure" continuing violation doctrine, or simply the continuing violation doctrine) holds that a cause of action does not accrue until a defendant ceases a continuous course of wrongful conduct. When this doctrine applies, the plaintiff may sue for the entire course of conduct, including wrongful acts that would otherwise be untimely. The other doctrine (the "modified" continuing violation doctrine or "theory of continuous accrual") holds that a plaintiff may recover for a harm committed within the limitations period, even though the plaintiff cannot recover for similar harms committed outside the limitations period.

31, 2015)(Refusing to apply the continuing violation doctrine in case in which investor plaintiffs alleged that the rating agency defendants knowingly issued inaccurate ratings for mortgage-backed securities, holding that although defendants "engaged in a series of continuing misrepresentations and omissions" into the limitations period, "[a] straightforward application of [CPLR 213(8)] is appropriate in the instant case."); *see also Pike v. New York Life Ins. Co.*, 72 A.D.3d 1043, 1046-48 (2d Dep't 2010) (refusing to apply the doctrine to fraudulent misrepresentation and inducement claims stemming from the purchase of insurance policies, holding that "any wrong accrued at the time of purchase of the policies, not at the time of payment of each premium"); *Golding v. Nationscredit Fin. Servs. Corp.*, 2012 N.Y. Misc. LEXIS 2888, at *6-7 (Sup. Ct. Queens Co. Apr. 17, 2012) (same in mortgage fraud context); *People v. Trump Entrepreneur Initiative, LLC*, 2014 N.Y. Misc. LEXIS 464, at *11-12 (Sup. Ct. N.Y. Co. Jan. 30, 2014) (same with respect to GBL § 349-based fraud claims). Like in *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, "[t]he pure continuing violation doctrine does not apply to the facts of [this case] because plaintiffs suffered discrete, actionable harms each time they" invested in the McGinn Smith Ponzi scheme. *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, 2015 WL 6243526, at *137.

Further, because Plaintiffs' aiding and abetting fraud claims are based upon conduct occurring before the statute of limitations period, neither the continuous accrual doctrine, nor *S.E.C. v. Kelly*, 663 F. Supp. 2d 276 (S.D.N.Y. 2009)(the case principally relied upon by Plaintiffs), alters the conclusion that Plaintiffs' pre-October 14, 2008 claims are not salvaged by discrete purchases occurring within that the limitations period. *See In re LIBOR-Based Fin. Instruments Antitrust Litigation*, 2015 WL 6243526, at *137 ("Notwithstanding [the continuous accrual doctrine], the fact that a plaintiff suffered injury within the limitations period does not salvage a claim that a defendant committed a misrepresentation or omission about the nature of LIBOR before the limitations period. In this case, the wrongful act occurred at the moment of the misrepresentation or omission, and only the injurious effects continued into the limitations period."); *Kelly*, 663 F. Supp. 2d at 288 ("Although

23

the continuing violation doctrine can bootstrap otherwise time-barred claims into the limitations period, it applies only to continual unlawful acts, not continual ill effects from a single violation.")(interior quotation marks and citation omitted).

Accordingly, the Court finds that all claims asserted by New Jersey Plaintiffs premised upon investments made before September 11, 2008 are time-barred by CPLR 213(8). This means that only four separate investments belonging to New Jersey Plaintiffs Peter and Teresa Zakroff and Ilene Nemeth made after September 11, 2008 were timely filed. The Court will proceed to determine whether Plaintiffs have asserted legally viable aiding and abetting fraud claims related to these investments.

**b.      Legal Viability of Plaintiffs' Aiding and Abetting Fraud Claims**

Plaintiffs' remaining claims all fall under a single cause of action. Specifically, Plaintiffs contend that Defendants aided and abetted the Ponzi scheme perpetrated by McGinn Smith and its related entities. Defendants move for summary judgment on these claims, contending that Plaintiffs cannot satisfy the elements of an aided and abetted fraud cause of action. Plaintiffs oppose this aspect of the motion, contending that genuine issues of material fact exist as to whether, based upon the record now before the Court, they can satisfy these elements.

To establish a claim for aiding and abetting fraud, a plaintiff must show "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 464 (S.D.N.Y. 2009) (quoting *Gabriel Capital, L.P. v. NatWest Fin.*, Inc., 94 F. Supp.2d 491, 511 (S.D.N.Y. 2000)).

**1.      The Existence of an Underlying Fraud**

The underlying fraud connected to Plaintiffs' aiding and abetting fraud claims is the Ponzi scheme orchestrated by McGinn Smith. Based on the evidence presented, including the report of Plaintiffs' expert

witness, Stephen J. Scherf, the record contains sufficient evidence for a jury to find that Plaintiffs have established the existence of an underlying fraud.

In this regard, the record reflects that McGinn Smith and its principals have been the subject of multiple findings and judgments in this district based upon the perpetration of a Ponzi scheme related to the Four Funds and Trusts, which involved the investment offerings purchased by the Plaintiffs in this action. (Pl. SMF ¶¶ 1, 2). Specifically, Judge Sharpe granted summary judgment in favor of the SEC and against McGinn Smith, *et al.* relating to the McGinn Smith Ponzi scheme in *Securities and Exchange Commission v. McGinn Smith & Co., Inc., et al.*, No. 1:10-cv-457-GLS-CFH (N.D.N.Y.) (Doc. Nos. 807 and 816). Similarly, on February 1, 2013, a jury convicted McGinn Smith's principals, Timothy M. McGinn and David L. Smith, of various securities, mail, and wire fraud and tax charges. *See United States of America v. McGinn and Smith*, No. 1:12-cr-00028-DNH (N.D.N.Y.) (Doc. No. 135). These cases provide sufficient evidence that McGinn Smith and its principals engaged in fraudulent conduct. *See S.E.C. v. McGinn, Smith & Co., Inc*., 2015 WL 667848, at *10 (N.D.N.Y. Feb. 17, 2015) (concluding that "[b]ecause all of the elements of collateral estoppel have been met, the SEC is entitled to summary judgment on its first four causes of action, which, as discussed above, all require that the SEC establish essentially the same elements that were already proven in the MS Criminal Case by virtue of McGinn and Smith's convictions of wire fraud, mail fraud, and securities fraud.").

Moreover, a jury could reasonably conclude that McGinn Smith fraudulently set forth the terms of the investments in the Four Funds and Trusts in PPMs and subscription agreements for each of the investments. (*See, e.g.*, Pl. Resp. to Def. SMF, ¶ 47 and Kang Decl. Ex. 13,[9] at internal Exs. 1 and 2). For example, the PPM for FIIN contained a number of representations that turned out to be false. *Id.* In this regard, the PPM claimed,

---

[9]Exhibit 13 to the Kang Declaration is portions of Plaintiff Deanna Ayers' deposition testimony, and exhibits to documents referenced during that deposition.

among other things, that the Fund was "[f]ormed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and other investments that may add value to our portfolio." (Kang Decl. Ex. 13, at internal Ex. 1). Further, the PPMs represented that "[The Fund] may acquire investments from our managing member or an affiliate of our managing partner that has purchased the Investments. If the Investment is purchased from our managing partner or any affiliate, we will not pay above the price paid by our managing partner or such affiliate for the Investment, other than to reimburse our managing partner or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship. In other words, if we purchase an Investment from our managing member or any of its affiliates, we will pay the same price for the Investment that we would have paid if we had purchased the Investment directly. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., is acting as underwriter or placement agent and for which McGinn, Smith & Co. will receive a commissions." (*Id.*). However, Plaintiffs have presented evidence through Mr. Scherf's Report (drafted after review of the McGinn Smith records and Defendants' work papers) that McGinn Smith's representations concerning the investments were false. (Kang Decl. Ex. 14,[10] at 3, 16-20). In this regard, Plaintiffs have presented sufficient evidence from which a reasonable fact finder could conclude that the PPMs and subscription agreements falsely represented that Plaintiffs' investments would be for a prescribed time period, that Plaintiffs would be able to redeem their investments at the maturity date, that Plaintiffs would be paid quarterly interest at a set rate, and that the various Funds and Trusts each offered several different interest rates, corresponding to various "senior" and "junior" tranches of notes within each Fund or Trust. For example, the FIIN offering contained three tranches of notes,

---

[10]Exhibit 14 to the Kang Declaration is Mr. Scherf's Report.

which offered varying interest rates corresponding to the priority in which investors would be repaid in the event of liquidation. (*See, e.g.*, Kang Decl. Ex. 13, at internal Ex. 1).

Still further, Plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that McGinn Smith made fundamental misrepresentations in connection with the investment offerings. As detailed in the Scherf Report, the promised payments of quarterly interest, to the extent they were actually paid, were frequently paid not from the investment returns of the individual Funds and Trusts, but through improper loans and transfers between the various Funds and Trusts, as well as from funds from new investors. (Kang Decl. Ex. 14, at 25-26). Further, the evidence indicates that after the fall of 2008, all interest payments from the Funds ceased, and Plaintiffs were no longer able to redeem their investments, contrary to the representations made at the time of their investments. (Kang Decl. Ex. 13, at internal Ex. 5) (Pl. Resp. To Def. SMF ¶¶ 41, 48, 59, 67, 75, 93, 100, 108, 118, 126, 131, 160). In addition, the evidence is sufficient to establish the promised priority allocated to "senior" notes offered through the various Funds and Trusts was also a fiction.

While Defendants point to testimony from several Plaintiffs that they either did not read the PPMs related to their investments, read those items in a cursory manner, or relied on the advice of Bill Lex, the broker for McGinn Smith who sold the investments to the vast majority of the Plaintiffs here, and therefore did not rely on their underlying fraud in their investment decisions (Def. MOL p. 23), Plaintiffs have presented sufficient evidence indicating that they relied on the representations of McGinn Smith—whether through the printed offering materials or their conversations with Mr. Lex—that their investments in the Four Funds and Trusts were legitimate investments that would pay them a determined rate of quarterly interest and would be redeemable at the investment's maturity. (*See, e.g.*, Pl. Resp. to Def. SMF ¶¶ 62, 85, 135).

Further, for purposes of this motion Plaintiffs' reliance is satisfied by evidence indicating that McGinn Smith omitted to disclose numerous material facts in the PPMs. In this context, Plaintiffs have demonstrated

27

that McGinn Smith omitted to disclose that the underlying loans were in default or that McGinn Smith was engaging in a pattern and practice of moving investments received by one Trust or Fund to another in order to make payments of principal and interest due to investors in those other entities. Additionally, Plaintiffs demonstrate that the PPMs and subscription agreements omitted any mention of the fact that the Funds would make loans to or transfers or investments in affiliated entities. (*Id.*; Kang Decl. Ex. 14, at 3).

Because proof of material omissions is sufficient to create a presumption of reliance, *see, e.g., Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 638-39 (S.D.N.Y. 2012) ("'[I]n the case of omissions, reliance on the omitted information may be presumed where such information is material.'") (*quoting Black v. Finatra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005)), Plaintiffs have presented sufficient facts for a jury to reasonably conclude that Plaintiffs relied on the McGinn Smith fraud in making their investment decisions. While Defendants can challenge the presumption of reliance at trial, *see Black v. Finantra Cap., Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) (reliance presumptions are "rebuttable"), Plaintiffs have adequately demonstrated sufficient evidence indicating the existence of the underlying fraud upon which they relied in making their investment decisions.

### 2.     Defendants Had Actual Knowledge of the McGinn Smith Fraud

In addition to showing the existence of an underlying fraud, a plaintiff must show "knowledge of the fraud on the part of the aider and abettor." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009) (quoting *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 511 (S.D.N.Y. 2000)). Defendants contend that mere constructive knowledge – "the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud" – is insufficient to show knowledge. *See Maxzzaro De Abreu v. Bank of Am. Corp*., 812 F.Supp.2d 316, 322 (S.D.N.Y. 2011). In demonstrating actual knowledge, however, a plaintiff may establish knowledge through circumstantial evidence.

*See JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 253 (S.D.N.Y. 2005);[11] *see also King County, Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 453-54 (S.D.N.Y. 2013) (same).

As detailed in the Scherf Report, Defendants' working papers related to their preparation of audits for McGinn Smith, and their preparation of tax returns for the Four Funds and Trusts, contain ample evidence, including notations in Simons' and Paventi's handwriting, that support an inference of actual knowledge of the McGinn Smith fraud. Moreover, Plaintiffs have presented evidence indicating that Defendants Simons and Paventi, as CPAs, were well aware of the nature of a Ponzi scheme, such as the one orchestrated by McGinn Smith, and its characteristics. Mr. Simons, for example, admitted at his deposition that his understanding of a Ponzi scheme is, in part, "the use of monies that may be raised and not used for their intended purpose but to be used to facilitate payments to other earlier investors." (Kang Decl. Ex. 12, at 45:1-6). Mr. Paventi similarly expressed his understanding of a Ponzi scheme. (Kang Decl. Ex. 28, at 41-44).

Further, the evidence is sufficient to establish a conclusion that Defendants maintained and reviewed, as part of the working papers from their auditing and tax engagements, a number of documents that demonstrated McGinn Smith's Ponzi scheme. The PPMs from the Four Funds and Trusts, for example, were a part of Defendants' working papers. As Mr. Scherf details in his report, the trial balances of the Four Funds, which were provided to Piaker & Lyons by McGinn Smith, and used for the preparation of the tax returns for the Four Funds, demonstrate that the investments of Four Funds consisted largely of investments in affiliated companies, in clear contravention of the PPMs. (Kang Decl. Ex. 14, at 19-20 and Table 4). A jury could reasonably conclude that Defendants were aware of the various information contained in these documents, as

---

[11]In *JP Morgan*, a syndicate of commercial banks alleged that individual officers of a telecommunications company to whom the banks had issued a series of loans, had aided and abetted the company's fraud on the banks. The court found that, while there was no definitive admission or direct evidence establishing the officers' knowledge of the fraud, the officers' access to communications containing evidence of the fraud was sufficient to infer actual knowledge. *J.P. Morgan*, 406 F. Supp.2d at 254-56.

they testified that they were professionally obligated to maintain professional skepticism and conduct necessary inquiries as part of auditing and tax preparation. (Kang Decl. Ex. 28, at 25-28).

As Mr. Scherf further details in his report, given the professional standards governing the audit and tax work performed by Defendants, which Defendants insist they followed, "basic knowledge of the components of assets, specifically related party transactions, would have made the Defendants familiar with the composition of these investments," and, thus, of the improper nature of those investments. (Kang Decl. Ex. 14, at 20).

In addition, the evidence indicates that the trial balances that Defendants maintained and reviewed as part of their tax preparation demonstrate that the Four Funds were profitable in just four of the fifteen quarterly periods reflected in the work papers between 2004 and 2007. (*Id.* at 23 and Table 5). Yet Defendants were aware that the Four Funds continued to make interest payments to investors, despite those interest payments supposedly being derived from the profitability of the Funds. (*Id.* at 23-25). This evidence is sufficient to support a conclusion that Defendants knew or should have known that interest payments were being made from funds received from new investors, not from the profits of the Funds.

Further, the working papers contain a number of notations in Simons' and Paventi's own handwriting, detailing payments from one Fund or Trust to another to cover interest payments, or to cover redemptions to investors. For example, FEIN's 2006 tax working papers included a handwritten note which stated, "Per Dave Rees [McGinn Smith's controller] – represents funding of RTC Trust monthly cash flow shortages. To be repaid with Trust receipts – after Trust debt is paid off - OR – will be purchased by another entity. Not accruing any interest income on above loans as of 12/31." (Kang Decl. Ex. 12, at internal Ex. 10; Kang Decl. Ex. 14, at 25). In Mr. Scherf's opinion, this handwritten notation demonstrates actual knowledge of the fraud, and is a classic example of a Ponzi scheme. (Kang Decl. Ex. 14, at 25). Another FEIN working paper identifies, in Defendants' handwriting, a $30,000 payment between FEIN and FIIN as being a "PMT to Cover Interest." (Kang Decl. Ex.

12, at internal Ex. 12; Kang Decl. Ex. 14, at 26).  Additional working papers show transfers or other loans

between various of the Four Funds and Trusts to cover redemptions of investors. (Kang Decl. Ex. 12, at internal

Ex. 13; Kang Decl. Ex. 14, at 26).  This evidence, together with the analysis and conclusions of the Scherf

Report,[12] provides ample evidence from which a jury could conclude that Defendants had actual knowledge of

McGinn Smith's fraud.

### 3.    Defendants Provided Substantial Assistance to McGinn Smith's Fraud

In addition to presenting sufficient evidence to show the existence of the underlying fraud, and

Defendant's actual knowledge of the fraud, Plaintiffs must also present sufficient evidence for a reasonable jury

to conclude that Defendants provided "substantial assistance … in the achievement of the fraud." *Kottler*, 607

F.Supp.2d at 447.  Under New York law, "substantial assistance" exists "where a defendant affirmatively assists,

helps conceal, or by virtue of failing to act when required to do so, enables the fraud to proceed." *Cromer Fin.*

*Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); *see also McDaniel v. Bear Stearns & Co., Inc.*, 196 F.

Supp. 2d 343, 352 (S.D.N.Y. 2002); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,*

*LLC*, 652 F.Supp.2d 495, 511 (S.D.N.Y.2009) (denying bank's motion for summary judgment on aiding and

abetting hedge fund manager's alleged breach of fiduciary duty because bank recorded information showing

"'too good to be true'" gains by the funds; prepared accounting statements reflecting these gains that were, in

turn, used by auditors and administrators; and made other statements concealing the fraud).

Defendants contend that Plaintiffs' claims rely solely on Defendants' failure to notify Plaintiffs of the

---

[12]The report, *inter alia*,  analyzes the facts supporting Defendants' knowledge of the fraud, for example, that (1) the Defendants knew or should have known that the investments by McGinn Smith to support the Four Funds and Trusts were in violation of the PPMs; (2) the various investment vehicles made a number of related-party loans and other transactions that violated the terms of the PPMs; the Four Funds and Trusts paid excessive fees to McGinn Smith; and the Four Funds and Trusts generated insufficient income to make required principal and interest payments. (Kang Decl. Ex. 14, at 16 – 20). The report further details the consistent losses of the Four Funds and Trusts as a glaring red flag of an underlying fraud of which Defendants were aware, based on their work preparing annual tax returns for those entities. (*Id.* at 23 – 24).

ongoing fraud, and stress that none of the Plaintiffs had an existing professional relationship with Piaker &

Lyons, and did not receive or rely on any of Piaker & Lyons' work product in making their investments in the

Four Funds and Trusts. (Def. MOL pp. 32-34) (Pl. Resp. to Def, SMF, ¶¶ 51, 56, 61, 69-70, 77-78, 83, 88,

95-96, 103-104, 109-110, 114, 120, 127, 134, 139, 144, 152, 161, 162-163).  Plaintiffs concede that they never

received or relied on any of Defendants' work product in making their investments in the Four Funds and Trusts,

(Pl. Resp. tp Def. SMF ¶¶ 162, 163), but assert that their allegations of substantial assistance consist of

Defendants' actions in acting professionally irresponsible manners such to allow the fraud scheme to continue

undetected, rather than failing to notify Plaintiffs of the Defendants' actions.  In this regard, and in reliance on

Mr. Scherf's report, Plaintiffs contend that  Defendants, in connection with their knowledge of the fraud, issued

clean audit reports for McGinn Smith, despite the fact that the financial state of the Funds and Trusts

themselves made infeasible the fees and payments claimed and received by McGinn Smith related to those

entities (Kang Decl. Ex. 14, at 14-15, 24-25); prepared and filed tax returns for the Four Funds and Trusts

based on information they knew to be reflective of the operation of a Ponzi scheme ( *Id.* at 23-26); and proposed

and made adjusting journal entries that were designed to conceal a Ponzi scheme, despite the presence of

transactions indicating the existence of a Ponzi scheme ( *Id*. at 20-21).  Plaintiffs assert:

> Defendants' actions, in concealing the fraud and failing to intervene, allowed McGinn Smith's
> scheme to continue unabated. These affirmative actions by Defendants, when viewed together
> with the improper transfers, payments of interest, and payment of redemptions discussed
> above, are sufficient for a reasonable jury to conclude that Defendants substantially assisted in
> the perpetration of McGinn Smith's Ponzi scheme, which caused Plaintiffs' loss of their
> investments.

Pl. MOL p. 23 (citing Kang Decl. Ex. 14, at 26-28).

A reasonable jury could conclude Defendants' actions amounted to affirmative assistance that helped

conceal the true nature of the Ponzi scheme and thereby allowed it to continue.  Accordingly, the Court finds

that Plaintiffs have submitted sufficient evidence to allow the aiding and abetting fraud claims based on four separate investments belonging to New Jersey Plaintiffs Peter and Teresa Zakroff and Ilene Nemeth made after September 11, 2008, to proceed.

## V. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment [dkt. # 127] is **GRANTED in part and DENIED in part**.

The motion is denied as to the aiding and abetting fraud claims based on four separate investments made after September 11, 2008 belonging to Plaintiffs Peter and Teresa Zakroff and Ilene Nemeth, and the motion is granted in all other respects, thereby dismissing all other aiding and abetting fraud claims.

**IT IS SO ORDERED.**

Date: September 27, 2016

Thomas J. McAvoy
Senior, U.S. District Judge